# Exhibit D

```
 1        IN THE UNITED STATES DISTRICT COURT
        FOR THE NORTHERN DISTRICT OF OHIO
 2                EASTERN DIVISION
                 - - - - -
 3
    VITA-MIX CORPORATION,  )
 4                         )
            Plaintiff,  ) Case No.
 5                      )  1:06-CV-02622-PAG
        -v-             ) Judge Patricia A.
 6                      )  Gaughan
    BACK TO BASICS       )
 7  PRODUCTS, INC., ET AL.,)
                        ) (Subject to
 8          Defendants.  ) Protective Order.)
 9              - - - - -
    VIDEOTAPED DEPOSITION OF MAJID RASHIDI,
10              Ph.D., P.E.
            Friday, January 25, 2008
11              - - - - -
12  Videotaped deposition of MAJID RASHIDI,
13  Ph.D., P.E., called by the Plaintiff for
14  examination under the Federal Rules of Civil
15  Procedure, taken before me, Carla A. Virgili,
16  Registered Professional Reporter, Certified
17  Realtime Reporter, Notary Public in and for
18  the State of Ohio, at the offices of McDonald
19  Hopkins Co., LPA, 600 Superior Avenue, East,
20  Suite 2100, Cleveland, Ohio 44114, commencing
21  at 9:00 a.m., the day and date above set
22  forth.
23              - - - - -
            CORSILLO & GRANDILLO
24            COURT REPORTERS
           700 City Club Building
25          Cleveland, Ohio  44114
```

1              MR. AYCOCK:  Objection.

2       Lacks foundation.

3  A     As I said, my very first tests that I

4  asked to do and I did it myself in Calfee was

5  to just observe the behavior of the Vita-Mix

6  blender when I put pure water in it.  So I

7  was kind of on the big picture just to see

8  how the fluid is turned around because when

9  you have a pitcher which is a square cross-

10  section versus a pitcher that is round in

11  cross-section, many other things can happen.

12      Some of the shortcomings of the '021

13  patent is this:  They only talk about two

14  very simplistic matters and they are silent

15  about many other important issues.  So I was

16  just trying to demonstrate that if you change

17  the RPM, the channel changes; if you have a

18  round pitcher versus square pitcher in cross-

19  section, things are different.  So I was on a

20  very preliminary domain or stage.

21      So I did not make any thick smoothie or

22  anything up to March 14th so it was just pure

23  water to demonstrate that the air channel --

24  one of the most important factors is the RPM

25  of the blade.  I was just demonstrating --

1   because I concentrated -- with all due

2   respect, Mr. Robert Aycock is not a physicist

3   or engineer so I was demonstrating to him

4   that when you read these patents, don't get

5   tangled with the legal language.  Just look

6   at the RPM.  Look at -- if you increase the

7   RPM, the channel grows; if you have very low

8   RPM, the channel's just a little dip and it

9   never gets to the blade.  So RPM is one of

10  the most important factors in the definition

11  of the size of the channel and blah, blah.

12  So I was kind of at this very preliminary

13  stage.

14  Q    So therefore, if there is a blender or

15  a mixer of any kind in the small appliance

16  area, in the kitchen blender area, it doesn't

17  have sufficient RPM, is it your opinion that

18  such a mixer or blender has no bearing with

19  respect to the Vita-Mix '021 patent?

20               MR. AYCOCK:  Objection.

21         Form, lacks foundation.

22  A    All I'm saying is RPM is a parameter in

23  defining the air channel, that's all I'm

24  saying, one of the parameters which defines

25  the air channel.  Low RPM, very small or very

1   shallow channel; higher RPM, more agitation,

2   more pumping action.  So this is a very

3   trivial type of matter to me and I was trying

4   to explain these things to Mr. Robert Aycock

5   and if Mr. Clint Duke was there, to him as

6   well.

7   Q    Up to the point of the meetings through

8   March 14th, 2007, did you ever operate, up to

9   that point, a Back To Basics blender or

10  smoothie maker?

11  A    I don't recollect.  That's also

12  something that I don't recall whether I have

13  done it or not.

14  Q    You were able to conclude

15  noninfringement even though you never tested

16  a Back To Basics smoothie maker or blender up

17  to that point?

18  A    As I said, I was not kind of -- see, I

19  didn't start working toward noninfringement.

20  One thing that I told Mr. Robert Aycock was

21  that I have to look at the device of Vita-Mix

22  and my very first attempt was to see if the

23  device of Vita-Mix works as it promises or as

24  the teaching of the patent goes and then I

25  started with that and then I started working

1    say that certain things that were

2    communicated between the inventor of Vita-Mix

3    and the patent examiner was kind of not

4    discussed very clearly.  That's why the

5    patent examiner allowed them a very narrow

6    band of, kind of, claim and after that claim

7    was allowed as a method claim, it is my

8    understanding that Vita-Mix is trying to, on

9    their own, expand the scope of the claim.

10   Q    Do you agree with me that the Back to

11   Basics Defendants must prove invalidity by

12   even a higher standard if the Patent and

13   Trademark Office considered the prior art

14   that you're considering during the

15   prosecution of the Vita-Mix '021 patent?

16                   MR. AYCOCK:  Objection.

17            Calls for a legal conclusion.

18   A    As I said, one of the patents that I'm

19   using as a prior art that the patent examiner

20   has seen is that of Jacobsen and the reason

21   Vita-Mix basically withdrew 15 claims of

22   their patent from 16 and kind of summarized

23   as to one was the way they argued about the

24   prior art, Jacobsen, and the fact that, well,

25   there is a stir stick and so forth and so

Page 94

1    on.  What they did not disclose, Vita-Mix,

2    was the fact that the problem existed but

3    nobody knew about it.

4         For example, the way they got around

5    the Jacobsen's patent was -- in other words,

6    the patent examiner did not have access to

7    the Wayne patent and Vita-Mix, in my opinion,

8    incorrectly claimed that they were the first

9    one who understood the problem.  And how

10   could Jacobsen, who doesn't even talk about

11   the existence of a problem, offer a

12   solution?  So this is a very huge

13   assumption.

14        So this is one of those things that, in

15   my opinion, has fallen between the cracks.

16   I'm not criticizing the patent examiner but

17   if the patent examiner had access to Wayne,

18   they might have had a different situation.

19   So here we have a kind of gray zone area that

20   all of us are trying to resolve.

21   Q    So is it accurate, then, that Jacobsen

22   does not disclose air pockets or preventing

23   air pockets?

24   A    It does not talk about air pockets and

25   that's exactly what the Vita-Mix has used to

1    allow -- to get allowance for this claim

2    because they say they are the only and first

3    ones who talk about air pocket and

4    deleterious problems of an air pocket, and

5    how could Jacobsen, who doesn't know about

6    this, would offer solution?  But the

7    presumption, in my opinion, is if somebody

8    has a patent, they have access or knowledge

9    of the prior art.  So if they don't

10   specifically talk about it, then

11   unfortunately the patent examiner kind of

12   didn't include that because he didn't have

13   access to the Wayne patent.

14   Q     Is it accurate, then, that Harris also

15   does not disclose a method of preventing

16   formation of an air pocket?

17                     MR. AYCOCK:  Objection.

18          Lacks foundation.

19   A     As I said, let's go back to the level

20   of ordinary skill in the art.  When these

21   different patents put an object or a device

22   within the -- within the pitcher of a

23   blender, supposedly it does the exact same

24   thing that the plunger of Vita-Mix does.

25   Now, whether they talk about it or not, to

1    to say that a patent is invalid using that

2    particular patent and I'm trying to go

3    through the gray zone that how this has

4    developed.  If it was as clear as what we

5    said, none of us would be here today.

6    Q     That wasn't my question and I think I'm

7    figuring out the problem here.  You keep

8    going on with these answers that have nothing

9    to do with my question.

10         This is my question:  Does Harris

11   disclose a method of preventing the formation

12   of an air pocket, yes or no?

13   A     Not explicitly --

14   Q     No, it doesn't.

15   A     -- but to a person of prior art, it

16   does.  I mean, a person of ordinary skill in

17   prior -- in the field, it does.

18   Q     How does Harris disclose or teach or

19   whatever, to a person of ordinary skill in

20   the art, preventing a formation of an air

21   pocket?

22   A     I have to look at the -- I have to look

23   at the patent figures and I'll tell you

24   because I don't memorize anything.

25   Q     Is it in your opinion?  Isn't that

1    your --

2    A      Yeah.

3    Q      Is that your opinion?

4    A      Yeah.

5    Q      Explain to me your opinion, what that

6    basis is.

7    A      I have to look at the figure of the

8    patent.  I have to look at the figures that

9    are disclosed in that patent and I'll explain

10   it to you.

11   Q      You do agree with me, though, that

12   Harris does not disclose a method of

13   preventing the formation of an air pocket?

14   A      The only patent which directly does

15   that is Wayne.

16   Q      Okay.

17          So Jacobsen also does not disclose a

18   method for preventing the formation of an air

19   pocket around rotating blades, correct?

20   A      They don't explicitly talk about air

21   pocket, that's true, yeah.  It's in the

22   patent.

23   Q      The Vita-Mix 3600 and 4000 blenders, do

24   you recall those?

25   A      Yeah.

1    and if my memory helps me, they say you can

2    turn the machine on and just leave and it

3    does the job.  You don't have to come back to

4    it and stir occasionally and so forth and so

5    on.  So any stirring, in my opinion, before

6    or after is not covered and the reason I just

7    wrote it like that is because it's a court

8    definition.  I don't want to --

9    Q    So it is your opinion that a method of

10   stirring before an air pocket has begun to

11   form is not covered under claim one of the

12   Vita-Mix '021 patent?

13   A    It's not covered.  The Vita-Mix patent

14   does not talk about any stirring in the

15   claim.

16   Q    Take a look at the next row on page ten

17   of the left-hand column under "Elements of

18   Claim 1 of the '021 Patent"; do you see that?

19   A    That's right.

20   Q    It states, "the air pocket being

21   created from an air channel of a cross-

22   sectional size defined by a member associated

23   with the blades"; do you see that?

24   A    That's right.

25   Q    What is your understanding of that

1   term?

2   A      First of all, if I want to get

3   technical, I do not consider this statement

4   accurate and correct.  Physically this is not

5   correct.

6   Q      What is your understanding of this

7   term, sir?

8   A      This understanding says that there

9   exists a member associated with the blade

10  that defines the cross-sectional size of the

11  air channel.  That's my understanding.  And

12  then further, when that is the case, there is

13  a statement that it is basically mutually

14  exclusive from the above, the top statement.

15  It says, "Comprising the step of supplying a

16  fluid in the pitcher."

17  Q      I don't understand what you mean by

18  that.  What do you mean by that, sir?

19  A      The second sentence has nothing do to

20  do with the first sentence.  It says, "The

21  air pocket being created from an air channel

22  of a cross-sectional size defined by a member

23  associated with the blades," comma, so that's

24  the kind of technical assertion which is not

25  necessarily correct, and then all of the

1   member associated with the blades?

2   A     The sentence doesn't say --

3                  MR. AYCOCK:  Could I have

4           that question back?

5                  (Record read.)

6   A     My personal opinion is definitely yes,

7   there are many other parameters, and this

8   patent has been totally silent about them.

9   Q     One of the parameters that creates the

10  air channel is the member associated with the

11  blades; is that accurate?

12  A     Repeat the question.

13                 (Record read.)

14  A     See, you're throwing the member

15  associated -- take that "member associated"

16  out; is that what you mean?

17  Q     No.

18        I'm asking you if the member associated

19  with the blades is one of the factors or

20  parameters that defines an air channel.

21  A     Yes, definitely.  Oh, yes.

22  Q     Your opinion or understanding is that

23  other parameters or factors affect the air

24  channel as well; is that right?

25  A     And they are more important, that's

1    right.

2    Q     But one of the factors is a member

3    associated with the blades; is that

4    accurate?  Did you hear my question?

5    A     No, not really.

6    Q     That's okay.  I'll ask it again.

7          One of the factors that --

8    A     One of the factors is this but it is

9    the least important factor.

10   Q     Let me ask my question fully just so

11   it's on the record.

12   A     Yeah.  Yeah.

13   Q     One of the factors that affects or

14   defines -- let me strike that.

15         One of the factors that -- let me

16   strike that again.

17         A member associated with the blades

18   defines an air channel; is that accurate?

19   A     As one of the least important factors.

20   Q     But it is one of the factors?

21   A     It's one of the least important ones,

22   yeah.

23   Q     Is it your opinion or understanding,

24   then, that claim one of the '021 patent, the

25   air channel that's being defined is only

```
 1            (Plaintiff's Exhibit 106 was

 2             marked for identification.)

 3                - - - - -

 4    Q     I'm going to hand to you what's been

 5    marked as Plaintiff's Exhibit 106.

 6    A     Sure.

 7    Q     At the top it states 2,757,909 and

 8    that's US patent number 2,757,909.  The

 9    inventor's name is JC Wayne.  Do you see that

10    document in front of you, sir?

11    A     That's right.

12    Q     Have you ever seen this document

13    before?

14    A     Yes.

15    Q     What is it?

16    A     This is the patent application and

17    patent allowed for a food processing blender

18    or mixer that had certain attributes.

19    Q     What's your understanding of -- what's

20    your understanding of what Wayne teaches?

21    A     What Wayne teaches, first of all, it

22    identifies the problem that Vita-Mix asserts

23    that they were the first one to understand

24    about this deleterious air pocket.  Wayne

25    talks about sizable bubbles which may get
```

1    involved with the blender and make the blade

2    inefficient so he tries to resolve that by

3    putting a device above and adjacent to the

4    rotating blades and basically solve the

5    problem.  And on top of that, he has some

6    additional feature and the additional

7    feature, which I call like icing on the cake,

8    is he provides a groove in that device which

9    is above and adjacent to the blade to augment

10   the pumping of the material toward the

11   blade.  That's my understanding of this

12   patent in a nutshell.

13   Q    Does Wayne require that auger or

14   component in order for the Wayne blender to

15   work, do you know?

16   A    Say that again.

17   Q    Sure.

18        Does Wayne require that auger component

19   in order for the blender device set forth in

20   Wayne to actually work?

21   A    To work effectively or in general?

22   Q    To effectively work.

23   A    Actually, he's kind of disclosing that

24   and he claims that it is going to enhance the

25   performance.

1    Q     -- air pocket or air channel is defined

2    by a member associated with the blades?

3    A     I'm talking about existence of air

4    channel to begin with.  I'm saying that an

5    ordinary person skilled in the art knows that

6    a rotating blade of a blender first creates

7    an air channel and then that air channel

8    grows in depth and reaches the blade and

9    depending upon the content of the pitcher, it

10   may or may not translate or have a transition

11   to an air pocket.

12   Q     Your understanding of what a person of

13   ordinary skill in the art would understand in

14   terms of the formation of an air channel

15   defined at least in part by a member

16   associated with the blades is based here in

17   2008 today, right?

18   A     Yeah, as kind of one of the parameters

19   and as I said, the least important parameter.

20   Q     Okay.

21         And now I want you to go back, though,

22   in time to 1956.

23   A     Okay.

24   Q     Here's Wayne -- the Wayne patent in

25   front of you.  Show me where Wayne discloses

1   that an air channel is defined by a member

2   associated with the blades.  Can you show me

3   that in that patent?

4   A     As I'm saying, even in 1957, people

5   were observant.  There is no changing

6   observation of people.  He has actually

7   observed air pockets or air bubbles of enough

8   dimensions that causes the blade to be

9   ineffective and he puts a device right at the

10  point of the source of problem which is an

11  air channel.  So if he specifically has not

12  talked about an air channel, it is implicitly

13  readable, in my opinion, from this patent

14  that he is actually solving the exact same

15  problem and he, in some points in his patent,

16  he explicitly talks about that.  So --

17  Q     Other than --

18  A     I'm sorry.  Let me finish.

19  Q     Sure.

20  A     So if we are going to look at one-to-

21  one statement of the observation and

22  solution, we may not find that, but to a

23  person of ordinary skill in the art, that is,

24  in my opinion, what is extracted out of this

25  patent.

1       In other words, if I see this patent or

2   if somebody who has the ordinary skill in the

3   art sees this patent, knows that the air

4   pocket is generated from the center of the

5   blender so if we have a device there to

6   somehow assist, either by pumping the fluid

7   just like this and having an auger shape to

8   it or to have something in there to occupy.

9       Now, these things said, I reserve the

10   right to say that they are not effective when

11   I come to enablement because these are all

12   perceived, kind of, simplistic view of a

13   solution to this problem.  So when I say

14   these things in my deposition and when I come

15   later on during the deposition and say

16   basically none of the systems work as

17   intended, I reserve the right for that.

18   Q     Are you --

19   A     But I'm just comparing concept to

20   concept.

21   Q     Sure.

22       Just based on that statement, is Wayne

23   enabling, do you believe, in your opinion?

24   A     Probably not.  I don't know.  I'd have

25   to test it.  But here I was just testing -- I

1   mean, comparing document to document, not

2   performance to performance.

3   Q     Okay.

4         So based on the Wayne patent and what

5   it discloses, you don't believe today as

6   we're sitting here, and especially compared

7   to the Vita-Mix '021 patent, that the Wayne

8   patent itself is even enabling; is that

9   accurate?

10  A     That's an accurate -- Wayne may not

11  work either.  In other words, in my opinion,

12  Vita-Mix doesn't work and Wayne may not work

13  either.

14  Q     Okay.

15  A     Here, I'm just kind of comparing

16  statement to statement --

17  Q     Sure.

18  A     -- teaching to teaching, not going to

19  lab and testing.

20  Q     So your opinion, then, is that neither

21  the Vita-Mix '021 patent nor the Wayne patent

22  are enabling to a person of ordinary skill in

23  the art?

24  A     Definitely.  On the Vita-Mix I have

25  tested, on the Wayne I have to test, but

1   you're absolutely right.  I give 90 percent

2   that even this doesn't work (indicating).

3   Q     You said that you tested the Vita-Mix.

4   What do you mean by that in terms of

5   enablement?

6   A     Enablement, I tested -- I created two

7   types of extreme fluids.  One is very thin

8   like pure water and I have added a couple of

9   drops of food coloring just for visualization

10  so it doesn't change the viscosity or

11  anything and then I have ran the Vita-Mix

12  device from low RPM and I have done a series

13  of tests.  One was totally without the

14  plunger and as you increase the RPM you see

15  the formation of an air channel which dips

16  down and as you increase the RPM, that air

17  channel keeps traveling toward the blade and

18  if you keep the RPM low enough, the air

19  channel is there but the water is

20  transparent.  You can see through.  It's

21  translucent.  If you increase the RPM beyond

22  a certain level, the channel reaches the

23  blade and you have air reaching the blade and

24  that blade breaks up that air channel and

25  makes the water murky so it is no longer

1   see-through and then when you lower the RPM,

2   the same thing happens.  That's experiment

3   number one.

4        Then if I am a -- kind of observant, I

5   could have an ordinary skill in the art or I

6   could be a scientist or ordinary people.  I

7   say, okay, now that this channel is

8   generated, if I put a solid piece in there, I

9   occupy the space so I am going to get rid of

10  that channel, so therefore, I designed this

11  and I go and get a patent for it.

12       But when I do the same test with a

13  plunger in, in vertical position untouched

14  and I start increasing the RPM, the same

15  channel starts -- starts to form again

16  despite the existence of the plunger and it

17  travels down on the sides of the plunger and

18  every now and then, as a result of fluid

19  mechanics action in there, kind of bubbles of

20  air is thrown toward the blade.  And if I

21  increase that, at some point the channel

22  forms as an annular space around the plunger

23  or device and it gets to the blade.  In other

24  words, existence of this plunger is not able

25  to prevent formation of a channel to begin

1   with which eventually translates to an air

2   pocket.

3   Q      Now -- go ahead.

4   A      So this was for one class of fluids

5   which was kind of Newtonian fluid and low

6   viscosity, relatively low viscosity fluid and

7   so forth.

8          Then if you go to the extreme case

9   which makes your fluid a little bit more

10  viscus like a pancake batter, and usually

11  when you mix flour and water the fluid

12  becomes usually non-Newtonian -- and if you

13  want an accurate definition of that I can

14  tell you later -- but under the same

15  condition now you don't observe anything

16  because the content is not translucent.  But

17  when you turn on the machine, somehow air

18  gets around this infamous plunger, gets to

19  the blade and stays there.  And depending

20  upon many other variables, either you totally

21  make the blender inefficient or partially

22  efficient and then when you turn the system

23  off, one or two big bubbles of air comes up

24  and that is the air that was supposed not to

25  be there because of the plunger.

1    Q      Going back to the second row in Wayne

2    where you say that Wayne discloses, "Air

3    bubbles or air pockets are created in the

4    Wayne blender from an air channel of a cross-

5    sectional size defined by a member associated

6    with the blades," what you're saying there is

7    that that is implicit in Wayne but it does

8    not actually explicitly disclose it; is that

9    accurate?

10   A      That is my understanding.  That's

11   accurate.  And here, if I may add, again, I'm

12   just trying to compare apple to apple because

13   personally as a scientist, I don't believe

14   that this particular member associated with

15   the blades is defining that.  It's one of

16   the -- I'm just trying to compare a statement

17   that is implicitly in there.  So for a person

18   of ordinary skill in the art, they could see

19   that.

20   Q      Can you show me where in the Wayne

21   patent Mr. Wayne implicitly knew that an air

22   channel is defined at least in part by a

23   member associated with the blades?

24   A      By positioning his auger right adjacent

25   and above the blade.  In other words, he got

1    the same idea of, okay, then there's going to

2    be a space there, an air channel, so let me

3    just put that, and I may mention

4    approximating the member, as you can see, so

5    the size of that auger may touch the fluid

6    content or blend content and pump it back

7    in.

8           Remember, people who are designing

9    these, they are running a blender without

10   anything to begin with so they get some idea

11   about what is the habit of the fluid inside

12   the blender.  So if the channel is a certain

13   size, they're going to say, well, I'm going

14   to put something in there to occupy that

15   void.  What they don't consider is fluid

16   has -- fluids have other habits.  They go

17   around things just like the way it goes

18   around the plunger of Vita-Mix.

19   Q     Can you show me where Wayne discloses a

20   cross-sectional size or teaches, for that

21   matter, explicitly teaches a cross-sectional

22   size for a plunger or a device that can be

23   inserted into a blender?

24   A     Actually this auger, item number A3 in

25   his first figure.

1    Q      Okay.

2    A      That is the, basically, teaching of

3    having a device above and adjacent to the

4    blades.

5    Q      Can you show me where you disclosed

6    that in your chart on the right-hand side on

7    page ten, where you disclosed that --

8    A      On the third row on the right-hand

9    side.  "Wayne includes a device that can be

10   inserted into a blender which has a cross-

11   sectional size approximating the cross-

12   sectional size of a member associated with

13   the blades."

14   Q      So your opinion is that the agitator

15   component or that agitator in the Wayne

16   patent shown in figure 1 is the device that

17   can be inserted into a blender?

18   A      Exactly.  That's what I call the

19   device.  You call it the agitator but I call

20   it the device.

21   Q      That's not what I call it; that's what

22   Wayne calls it.

23   A      I know, but based on the definition of

24   the court I would say, okay, this is a device

25   that is above and adjacent to the blades

1    because "blade" has a definition.  Those two

2    up and down cutting figures, that's the

3    blade.  It has a hub, and I'm going to

4    momentarily accept the definition of that as

5    the member associated with the blade and very

6    clearly he has item A3 as the device which

7    has substantially approximately the same

8    cross-sectional size as the member below.  So

9    I see all of these things in this figure

10   because for me as an engineer, sometimes

11   drawings are even more important than

12   descriptive words.

13   Q     Other than in figure 1, can you

14   identify for me, by column and line number in

15   the Wayne patent, where it discloses a

16   plunger or a device that can be inserted into

17   a blender having a particular cross-sectional

18   size?

19   A     I am referring only to figure 1 on that

20   particular column for a person of ordinary

21   skill in the art.

22   Q     So it's your opinion that the only

23   place where Wayne discloses a plunger having

24   a particular --

25   A     Not plunger.

1   Q     A plunger or a device.

2   A     Device.

3   Q     Having a particular -- let me start

4   over again.  Let's --

5                   MR. AYCOCK:  Just one -- let

6           him state his question and if you

7           have a problem with his question,

8           answer it in the answer.

9                   THE WITNESS:  Sorry.

10                  MR. AYCOCK:  One at a time

11          for Carla's sake.

12                  MR. CUPAR:  Thank you,

13          Mr. Aycock.

14  Q     Can you identify for me, by column and

15  line number, where Wayne discloses a plunger

16  or a device that requires a particular cross-

17  sectional size?

18  A     In the very image of the patent he

19  doesn't explicitly refer to that; in the

20  figure he does.

21  Q     So you are only inferring from the

22  figure that Wayne is disclosing or teaching a

23  member having a particular cross-sectional

24  size?

25  A     Absolutely.

1    Q     Moving on, then, for the member

2    associated with the blades, where does Wayne

3    disclose a particular cross-sectional size of

4    a member associated with the blades?

5    A     Again, in the first figure I can see

6    the member associated with the blades

7    according to the Vita-Mix assertion and right

8    on top of that, I see the auger or device

9    member A3 in the same figure and they have

10   approximately the same cross-sectional size.

11   Q     So is it your opinion that the cross-

12   sectional size of a member associated with

13   the blades is disclosed in figure 1 of the

14   Wayne patent; is that accurate?

15   A     Absolutely.

16   Q     Can you identify for me where else in

17   the specification, by column or line number,

18   where Wayne discloses a member associated

19   with the blades having a particular cross-

20   sectional size?

21   A     Not in the verbiage but in the figure.

22   Q     So your only basis for your opinion is

23   figure 1 of the Wayne patent; is that

24   accurate?

25   A     Exactly, and that's what I think --

Page 158

1    this figure is enough for a person with

2    ordinary skill in the art to draw these

3    conclusions.

4    Q      Can you identify for me where Wayne

5    discloses that the cross-sectional size of a

6    plunger or device that can be inserted into a

7    blender approximates the cross-sectional size

8    of a member associated with the blades?

9    A      In the figure again, and as I said,

10   people who are doing these kind of inventions

11   and practices, they run the blenders without

12   any device, they observe the column or air

13   channel generated and they try to do

14   something about it and that is exactly the

15   cross-sectional -- I mean, by kind of naked

16   eyes you can see that the diameter of the

17   auger is approximating the diameter of the

18   hub of the blade.

19   Q      That's just based on your opinion based

20   on the visual of figure 1; is that accurate?

21   A      Absolutely.  Because to me, this figure

22   is somewhat to scale in kind of two or more

23   directions.  In other words, it is not shrunk

24   down or it's not widened so this is the

25   typical proper proportions of a blender.

1    Q      Do you know if patent drawings are

2    drawn to scale, sir?

3    A      Not necessarily, but from this I can

4    extract that.

5    Q      So you know that patents are not

6    normally -- normally have figures that are

7    not drawn to scale; is that accurate?

8    A      That is accurate.

9    Q      Yet you are of the opinion that this

10   Wayne patent figure 1 is drawn to scale; is

11   that right?

12   A      That is drawn to scale, in my opinion,

13   because of being familiar with blenders, yes.

14   Q      Why can you deduce that this figure is

15   drawn to scale when you know that patent

16   figures are normally not drawn to scale?

17   A      Because of common sense.

18   Q      Anything else?

19   A      No.  Common sense.

20   Q      So other than your common sense you do

21   not know if the Wayne blender shown in figure

22   1 is drawn to scale, correct?

23   A      Because the word "approximate" has been

24   used.  If there is any deviation from this

25   figure, it falls into the definition of

1    approximate, so therefore, for me, the

2    teaching is there.

3    Q     Can you identify for me the cross --

4    what's the size of the -- well, let me back

5    up.

6          So it is your opinion that the Wayne

7    patent on figure 1 is drawn to scale,

8    correct?

9    A     To some extent, I mean, covering the

10   word "approximation," yes, I can deduce sizes

11   from this drawing, yes.

12   Q     You said "to some extent."  Is the

13   Wayne patent drawing in figure 1 drawn to

14   scale or not?

15   A     If you're talking about exact with

16   engineering tolerance as plus or minus

17   one-thousandths of an inch, I don't make a

18   comment on that, but to fall into the

19   definition of approximating sizes, definitely

20   they are in scale.

21   Q     Other than in figure 1, can you tell me

22   where in Wayne that Mr. Wayne discloses that

23   the cross-sectional size of the device that

24   can be inserted into a pitcher must

25   approximate the cross-sectional size of a

1   member associated with the blades?

2   A      On figure 3, the next page, with the

3   cross-sectional device which is referred to

4   as A3 and the hub of the blade, which I

5   considered, according to the Vita-Mix, as the

6   member associated with the blade and they are

7   approximating to me.

8   Q      Is it your opinion that figure 3 is

9   also drawn to scale?

10  A      It looks like it because it has all the

11  dimensions in a certain scale and proportions

12  that if I include the variations of

13  approximation technology, it is drawn to

14  scale but if you're asking me whether the

15  tolerance of plus or minus one-thousandth of

16  an inch has been observed, there's no need

17  for that because here we are just teaching

18  something in general concept.

19  Q      Other than the figures 1 and 3, can you

20  identify for me where else you believe

21  Mr. Wayne disclosed that the cross-sectional

22  size of the device inserted into the pitcher

23  must be -- must approximate the cross-

24  sectional size of a member associated with

25  the blades?

1    A      These are the figures.

2    Q      So nothing else in the Wayne patent

3    discloses that the cross-sectional size of

4    the device inserted into the pitcher

5    approximates the cross-sectional size of a

6    member associated with the blades?

7    A      Your statement is true and these two

8    figures are enough for an ordinary skilled in

9    the art to make deductions.

10    Q      Have you ever measured the agitator

11    component identified in figure 3, the cross-

12    sectional size?  Let me repeat my question.

13          Have you ever measured the cross-

14    sectional size of the agitator component in

15    figure 3?

16    A      I can't even tell you right now by

17    eyeballing.  It's about -- anything between

18    three-quarters of an inch and one inch as

19    shown in this figure.

20    Q      But prior to your eyeballing it today,

21    have you ever measured figure 3 of the Wayne

22    patent?

23    A      I had the same opinion when I

24    previously looked at that.  That's how I came

25    to my conclusion.

1    A      No.

2    Q      -- of the Wayne patent?

3    A      No, you don't need to.

4    Q      So it's your opinion that you don't

5    need to measure the cross-sectional size in

6    the Wayne patent to determine what its cross-

7    sectional size is; is that right?

8    A      The reason the word "approximation" has

9    been used, it eliminates the requirement for

10   exact measurements with any tolerances.  It

11   is approximating with naked eyes.  Vita-Mix

12   asserts that their plunger approximates the

13   hub of the blade assembly so I use the same

14   criteria and exactly put it here.

15   Q      Can you identify for me, by using that

16   pink highlighter again, the -- what the

17   central hub of the blades is on the Wayne

18   patent?

19   A      Okay.  I'm going to draw two vertical

20   lines and then put two arrows next to it.

21   The lower arrow.

22   Q      Can I see that?  Can you show for the

23   video?

24   A      Yeah.  And if I do the same thing to

25   Vita-Mix, I have exact deviation or even

1    causes an air channel.

2    Q     Does Wayne disclose anywhere that the

3    agitator or helical component has to

4    approximate the cross-sectional size of a

5    member associated with the blades?

6    A     Not at all.  Not at all.

7    Q     So it does not have to; is that right?

8    A     It does not have to because as a person

9    with ordinary skill in the art, I can extract

10   that.

11   Q     So is it your opinion that the agitator

12   or auger component 43 -- cross-sectional size

13   of that auger component does not have to

14   approximate the cross-sectional size of a

15   member associated with the blades in the

16   Wayne patent; is that right?

17   A     Please repeat the question.

18   Q     Sure.

19         Is it your opinion that the cross-

20   sectional size of the auger component in

21   Wayne does not have to approximate the cross-

22   sectional size of a member associated with

23   the blades for the blender device in Wayne to

24   work?

25   A     It has to approximate because if it is

1   too narrow it falls in the cavity of the air

2   channel and it doesn't do anything.  It has

3   to touch the fluid so it has to basically be

4   large enough to contact the fluid and then

5   pump the fluid downward.

6   Q     Other than your prior opinion regarding

7   figures 1 and 3, can you show me where in

8   Wayne that is disclosed or taught?

9   A     As I said, as a person with ordinary

10  skill in the art, I can draw all of these

11  conclusions.  In other words, if I see a

12  blender without any device or plunger having

13  an air channel, when I see that, I say, well,

14  why not.  We should put something in there.

15  Q     So in other words, your opinion is that

16  Wayne does not disclose an auger component

17  having a cross-sectional size that

18  approximates the cross-sectional size of a

19  member but that you can imply or infer that

20  from Wayne; is that accurate?

21  A     That is very accurate and I kind of --

22  if you'll allow me to elaborate on that, if I

23  turn a kind of blend and look at the top view

24  of the contents in the blender and I see that

25  I have a hole or a channel which is about one

1    inch in diameter, it is very kind of

2    unrealistic to design an auger which is only

3    a quarter of an inch and expect to do

4    anything.  So you are going to be large

5    enough in the diameter.  That contacts the

6    fluid.  And what is the diameter of that is

7    dictated by many parameters, among them this

8    hub section, and then you want to approximate

9    these two.  So, I mean, this is so common

10   sense in design and engineering that there is

11   no need to look for any explicit statement in

12   the patent because in 1957, the author of

13   this patent was not the author of the Vita-

14   Mix patent for the choice of force.

15        I would like to make one more

16   statement.  The reason the wording of the

17   Vita-Mix patent is as-is is because of the

18   problems that they had during prosecution so

19   they reworded until it is being allowed.  So

20   I'm not expecting to look at word by word

21   kind of one-to-one correspondence and

22   correlation between the two and say he said,

23   explicitly, approximating and they said,

24   explicitly, approximating.

25   Q    So your opinion is that the Wayne

1   patent is not a one-to-one correlation with

2   claim one of the Vita-Mix '021 patent; is

3   that accurate?

4   A     No.  From a design point of view it's a

5   one-to-one correspondence; from various point

6   of view, it doesn't need to be.

7   Q      From the what point of view?

8   A      Performance and configuration.  It's

9   one-to-one correspondence but from verbiage

10  of the explanation of the figure, it doesn't

11  need to be because two authors have two

12  different styles and tastes of writing.

13          And by the way, this is the

14  preferred -- as a person who is studying a

15  patent, I realize that this is a preferred

16  embodiment.  Very easily as a designer, as a

17  person with ordinary skill in the art, I can

18  invert this device and put it on the lid of

19  the device very easily.  In other words, the

20  transition from having it on the rotor, I can

21  have the mirror image inverted on the lid and

22  the difference would be now it doesn't rotate

23  anymore, it's going to be stationary, but it

24  fills the gap or it fills the air channel and

25  because it has some grooves, it may, I don't

1    is identified as 24 millimeters is about 218

2    percent larger than the cross-sectional size

3    of the auger component; is that accurate?

4    A     That's accurate, yes.

5    Q     Based on your measurement in Wayne, the

6    cross-sectional size of the central hub is

7    about 190 percent larger than the cross-

8    sectional size of the auger component; is

9    that accurate?

10    A     119 or 90?

11    Q     90.  190 percent larger.

12    A     It's almost twice as much, yeah.

13    Q     So it's your opinion here today that

14    the cross-sectional size of the bearing

15    housing which is about 218 percent larger

16    than the cross-sectional size of the auger

17    component approximates one another?

18    A     If I consider the same criteria of

19    Vita-Mix, yes, because if I did the same

20    measurement on the hub and diameter of the

21    plunger at its larger portions, I'll have

22    almost the same type of numbers, and again,

23    the word is "approximate" and it's pretty,

24    kind of, wide open.

25          And then one more thing added to that,

1    as I said, when we are looking at inventions

2    and generating a new device, if somebody in

3    the ordinary skill in the art looks at the

4    cross-section of the channel generated and he

5    or she wants to put a device there to prevent

6    that, I'm sure nobody would say, "Let's put

7    something which is lesser than the cross-

8    sectional size of the channel."  So

9    regardless of what these numbers are, they

10   would have a device which basically fills the

11   space and that's exactly what Vita-Mix people

12   have tried to do.

13   Q     Is it your opinion that the accused

14   Back To Basics blenders -- that the cross-

15   sectional size of the stir stick in the Back

16   To Basics blenders approximates the cross-

17   sectional size of the member associated with

18   the blades in the Back To Basics blenders?

19   A     That's right, yes.

20   Q     Going back to the Wayne component, it

21   is your opinion that even though Wayne does

22   not explicitly disclose that the cross-

23   sectional size of a device inserted into the

24   pitcher, such as an auger component,

25   approximates the cross-sectional size of a

1    member associated with the blades, that your

2    measurement of the bearing housing being 218

3    percent larger than the cross-sectional size

4    of the auger component nevertheless

5    approximates; is that accurate?

6    A      That's --

7                   MR. AYCOCK:  Can I have that

8            question read back, please?

9                   (Record read.)

10                   MR. AYCOCK:  Objection.

11           Vague.

12   A      My answer to that is we are in the

13   realm of nonquantitative numbers and all of

14   the sudden we are hearing millimeters and

15   percentages because in the patent's teaching,

16   there is no quantitative in the claim

17   language, therefore, no one is there to

18   define what approximates means.  But based on

19   the common sense, nobody will sit down and

20   design member 43 of Wayne smaller than a

21   typical observed air channel, so this is

22   basically contrary to common sense.  So

23   whatever physics happens inside the blender,

24   whoever, which is Wayne, has designed member

25   number 43 or device number 43, it has to be

1  large enough to occupy that space.  So our

2  measurements on this figure is not going to

3  kind of bring anything contrary to what I am

4  learning from this patent.

5      In other words, again, if we go to

6  extreme of the case, if I'm blending

7  something for which a channel is generated

8  one and-a-half inch in diameter, I'm not

9  going to sit here and design something which

10  is 11 millimeters.  I'm going to design

11  something or put that device that is at least

12  one and-a-half inch and if you convert it to

13  millimeters, whatever it is, 25 plus 12,

14  30-some millimeters.

15      So what I'm trying to say is when you

16  study the figures of the Wayne disclosure, it

17  gives you or it leads you to invention of a

18  device that is going to occupy the void, the

19  channel.  So as I said, and I repeat myself

20  again, nobody will sit down and design an

21  auger of 43 as big as this marker in diameter

22  when the channel is two inches in diameter.

23  That is contrary to common sense, contrary to

24  the actions and attitude of an ordinary --

25  person with ordinary skill in the art.

1        So therefore, getting to numeric of 11

2    versus 21 millimeters, 11 versus 24

3    millimeters and these percentages is not the

4    issue and even Vita-Mix patent has not gone

5    to quantitative measurements in their claim.

6    So we are here and just comparing, for the

7    sake of anticipation, device with device in

8    writing, so I'm saying that this basically

9    leads me to go in that direction.  And as a

10   matter of fact, I am taking one step

11   further.  This very number 43 can be inverted

12   and put it on the lid.  That's for a person

13   with ordinary skill in the art, that is the

14   first thing which comes to my mind.

15   Q    Based on your opinion in your testimony

16   that you just provided, is it accurate, then,

17   in the Wayne patent that a person of ordinary

18   skill in the art, based on the teachings in

19   Wayne, can increase the size of the bearing

20   housing without increasing the size of the

21   auger or agitator component and still end up

22   with the invention set forth in Wayne?

23   A    Actually, as I said before, a person

24   with a skill in ordinary art is going to

25   proportionally size them.  In other words,

1    first of all, this auger 43, in my opinion,

2    is one of the last parts that goes to this

3    blender.  So if they have a given hub, a

4    given flat portion for the blade and a given

5    content for the blender, they run it and they

6    observe the size of the channel, the cross-

7    section of the channel, then they say,

8    "Ah-ha.  Let's have something which fills the

9    gap."  So that is something that's kind of so

10   intuitive for a person with skill in

11   ordinary -- with ordinary skill in the art

12   that to me, it is not an issue.

13        So if they increase the size of the

14   bearing housing proportionally and if that is

15   truly defining the -- allegedly defining the

16   size of the cross-section which I still have

17   some reservation for that, then they have to

18   decrease the size of 43 proportionally to

19   fill up the gap.

20        Remember, what motivates for people to

21   go after invention?  Performance.  So if you

22   observe air channel of one and-a-half inch in

23   diameter or 36 millimeter in diameter, you

24   won't sit down and just design 43 of 11

25   millimeter.  You make it 40 -- I mean, 38

1   millimeters.  So you have a tolerance of 2

2   millimeters, 1 millimeter to each side to

3   occupy the place.  But as I said, the fluid

4   has its own behavior which is kind of a

5   little bit beyond all of these performances

6   that everybody claims.

7   Q     Your opinion is that this auger

8   component 43 is the plunger or the device

9   inserted into the blender; is that accurate?

10   A     That is accurate.  This is a device

11   which is adjacent and above the blade.

12   Q     How is it adjacent to and above the

13   blades if it's contacting or touching the

14   blades?

15   A     Again, I go back to the definition of

16   the court and this adjacent, above, just

17   means that.  It doesn't mean it shouldn't

18   touch or it should touch.  If it was an

19   issue, I was expecting to see that.  And

20   again, when you see my tables in this

21   anticipation, I am just comparing word by

22   word because there is an allegation of

23   infringement and I'm trying to respond to

24   that through prior art.  So personally, I'm

25   not going to accept any other extra

1   definition of adjacent and above.  Adjacent

2   and above means exactly that.

3   Q     Take a look at page ten, Plaintiff's

4   Exhibit 105 which is your invalidity expert

5   report, sir.

6   A     That's right.

7   Q     There's a chart there on page ten; do

8   you see that chart?

9   A     That's right.

10  Q     On the left column, the third row down,

11  there's a statement, "Positioning"; do you

12  see that?

13  A     Uh-huh.

14  Q     It states, "Positioning" -- it's

15  claim -- it's a term out of claim one of the

16  '021 patent; do you see that?

17  A     Uh-huh.

18  Q     It states, "Positioning a device that

19  can be inserted into a blender having a

20  cross-sectional size approximating the cross-

21  sectional size of the member adjacent to and

22  above the rotating blades"; do you see that?

23  A     Uh-huh.

24  Q     Can you explain to me how in Wayne a

25  person of ordinary skill in the art or anyone

1    quantitative from the very beginning, you

2    have to define your scale and then you

3    have -- on top of that, you have to define

4    your tolerances.

5    Q    You would agree with me, too, that the

6    auger component which is attached to this

7    entire blade assembly in figure 3 of the

8    Wayne patent cannot be adjacent to and above

9    the blades that you identified as 28 and 29;

10   is that accurate?

11   A    As I said, I believe that this is

12   adjacent and above, so that, I think, should

13   answer your question.  The auger of 43 of

14   Wayne is adjacent and above.  It is not

15   outside of the blender, it is not on top of

16   the lid, it is very close to the blade

17   adjacent and above.

18   Q    I want you to now take -- do you see

19   the blade that you marked as 28?

20   A    Uh-huh.

21   Q    Is the top tip of the blade 28 that you

22   marked higher -- is it above the auger

23   component, the bottom portion of the auger

24   component?

25   A    Again, we have a range here so

1    I'm trying to say is what motivates the

2    designer to design this is the size and

3    dimensions of the air channel, so the name of

4    the game is to fill that air channel.  So

5    nobody would come and design an auger which

6    is only two inches high when the air channel

7    starts on the very top.  And depending upon

8    the level of filling in the pitcher -- so if

9    somebody wants to fill the pitcher all the

10    way to the top, the auger must extend all the

11    way to the top to be effective.

12    Q    You would agree with me that the auger

13    component 43, at least a part of it, is lower

14    than the rotating blade 28, correct?

15    A    A part of it is lower than a part of

16    the blade but the overall center of it must

17    be above the blade to be effective even for

18    Wayne.

19    Q    So Wayne does not teach that the entire

20    auger component has to be above the blades;

21    is that accurate?

22    A    Actually, my understanding from Wayne

23    is it must be above the blade; otherwise, it

24    wouldn't work.  In other words, if we take

25    your example and take it to an extreme and

1   bend this blade upward toward the tip of

2   the -- to the free level of the content in

3   the pitcher, then this auger would be

4   ineffective.  It would be part of the hub

5   assembly, basically.  So therefore, the auger

6   must extend far above the blade to be

7   effective.

8   Q     But the auger does extend below the

9   blade, too, in the Wayne patent; is that

10  accurate?

11  A     Below part of the blade but definitely

12  all of it above the left side which is

13  slanting down and part of it is below the

14  blade on the right and most of it is above

15  it.  So if we go to the definition of

16  centroid, it has to be, and that is just

17  working with terminology.

18        In order to make Wayne work as he

19  alleges, it has to be way above the blade to

20  work because, remember, what are we doing in

21  a blender?  We are pumping.  These two blades

22  are pumping the fluid in different directions

23  that has an overall component upward and then

24  it comes back down through the center.  So

25  you have to go up there and capture that

1    fluid.

2    Q     So you would agree with me that Wayne

3    does not disclose or teach that the entire

4    auger component has to be adjacent to and

5    above the top tip portion of the rotating

6    blade 28, right?

7    A     As I said to you previously, Wayne does

8    not explicitly talk about adjacent and above,

9    it does not talk about cross-sections.  Wayne

10   teaches to have a device which basically

11   fills up the void generated and it has an

12   additional function of an auger which helps

13   to pump the fluid downwards.  So if the sides

14   of this auger are not touching the fluid,

15   Wayne doesn't have an invention.  So nobody

16   will sit down and make a blender according to

17   Wayne and have the blender so narrow and so

18   small in height, then it justifies the

19   purpose.  So any person with ordinary skill

20   in the art would make the item number 43

21   large enough lengthwise and cross-section-

22   wise to be effective because, again, we are

23   talking about a person with ordinary skill

24   here.

25   Q     Take a look at your -- well, what's

1    your opinion regarding whether Wayne is

2    maintained -- the auger component Wayne is

3    maintained free from contact with the

4    pitcher?

5    A     Again, common sense.  It is not

6    contacting because when I read Vita-Mix's

7    patent, not contacting the pitcher means that

8    they are based on the prosecution histories

9    and even the statement of the patent it is

10   supposed to extend in the middle so they are

11   not -- they are saying that they are not

12   using that as a stir stick, they are using it

13   as a device that magically prevents air

14   pocket formation.  So by not touching means

15   staying in the center on a vertical axis

16   pointing toward the blade and the same thing

17   is happening here, in my opinion.

18   Q     Is it your opinion, then, that claim

19   one of the '021 Vita-Mix patent is limited to

20   the device inserted in the pitcher has to be

21   in the center of the pitcher?

22   A     Actually, the booklet that Vita-Mix

23   provides teaches against that.  It says use

24   it as a tamping device, stir it.  If

25   something happens, take it out.  So basically

1   disperse, dislodge or break up an air

2   pocket," I mean, we have to kind of honor

3   what the court says also on the very top.  So

4   anytime you deviate from the center you are

5   basically going against what the court has

6   claimed -- defined this to be.

7   Q    That's your opinion, right,

8   Dr. Rashidi?

9   A    That is my opinion based on reading

10  what the court says.

11  Q    Can you explain to me how the Wayne

12  device is maintained free of contact with the

13  pitcher?

14  A    It is so obvious that -- I mean, it's

15  like by inspection.  You don't even need to

16  explain.  It's sitting there and it's not

17  contacting the walls of the pitcher.

18  Q    Can you show me where in your report

19  you disclose that the Wayne patent discloses

20  that the device is maintained free of contact

21  with the pitcher?

22  A    Actually, I'm assuming that this has

23  been provided as part of my report.  I'm

24  referring to it, you have access to it and

25  you can see it for yourself so if I don't say

1    it explicitly in the right-hand column, it

2    doesn't mean it doesn't exist.  I mean,

3    certain things which are too obvious I don't

4    feel compelled to write it.  This is too

5    obvious, that when you have something on top

6    and above the blade as is in Wayne, it's not

7    going to touch unless it breaks.

8    Q     But you didn't include, in any portion

9    of your report, any explicit disclosure

10   regarding Wayne; is that accurate?

11   A     I am referring to the Wayne patent in

12   this table of comparison.

13   Q     Right.  I'm asking you the specific

14   citations of the disclosures.

15   A     No.

16   Q     You didn't provide that, correct?

17   A     And I didn't feel any necessity to do

18   that because it's so obvious.

19   Q     And that was because it's so obvious?

20   A     It's so obvious.

21   Q     Your understanding, as part of your

22   anticipation analysis, is that you do not

23   need to specifically disclose each and every

24   element out of claim one in the '021 patent

25   to Wayne; is that accurate?

1   A      Would you repeat the question again?

2                   (Record read.)

3                   MR. AYCOCK:  Objection.

4          Mischaracterizes the prior testimony,

5          vague and ambiguous.

6   A      To answer that, who is going to

7   anticipate?  A person with ordinary skill in

8   the art.  So I am basically providing this

9   report and I'm demonstrating that a person

10  with ordinary skill in the art would

11  anticipate all of the things that '021 patent

12  is claiming or asserting so I don't need to

13  have a kind of statement-by-statement

14  correlation.  I'm saying that for a person

15  with ordinary skill in the art looking at the

16  Wayne patent, they can anticipate that there

17  has to be a device or a solid piece in the

18  cavity of the air channel.

19  Q      So you do not believe -- it's your

20  opinion that you do not have to disclose each

21  and every specific element or you do not have

22  to identify each and every specific element

23  out of the Wayne patent to anticipate -- to

24  come up with a determination of anticipation

25  of claim one of the Vita-Mix '021 patent?

1          MR. AYCOCK:  Objection.

2          Mischaracterizes prior testimony.

3    A    I think I have done that.  I have done

4    element by element and actually my page ten

5    is self-explanatory.  I'm saying that you

6    have some element on the left column and the

7    right element, sometimes explicit, sometimes

8    implicit, is in Wayne.  In other words, when

9    they talk about the formation of an air

10   pocket, explicitly Wayne talks about air

11   pocket, deleterious air pocket, a large

12   enough bubble that causes problem.  And then

13   on top of that, his drawings implicitly or

14   very vividly shows a person with ordinary

15   skill what to do.

16   Q    Can you identify for me which of the

17   elements out of claim one of the Vita-Mix

18   '021 patent is shown implicitly based on

19   your -- implicitly based on your opinion in

20   the Wayne patent?

21   A    These matter of cross-sections.  The

22   ratios of the cross-sections.  So Wayne never

23   goes explicitly to talk about approximating

24   size of something with something else but

25   it's there, it's implicitly there, and

Page 205

1    anybody with ordinary skill in the art would

2    come up with the right conclusion in a very

3    easy fashion.

4         Again, I think I'm saying something

5    here and somehow we are passing by it.  If

6    you see an air channel and you're an attorney

7    and you may not be a designer but if you see

8    an air channel inside a blender and I ask you

9    what size of a device do you do for Wayne

10   design, I'm sure you say, "At least as big as

11   the air channel," even though you may not be

12   a person of ordinary skill in the art of

13   blender design.  So with the same token, the

14   person with ordinary skill in the art would

15   definitely come up with the right cross-

16   section.  So if he doesn't talk about it

17   explicitly with that language because people

18   are not responsible for the language that one

19   patent attorney uses, they may express it in

20   different ways.

21   Q    Just to be clear, then, you would agree

22   with me, then, while a person of -- you

23   believe a person with ordinary skill in the

24   art would find that obvious, Wayne does not

25   require that the cross-sectional size of the

1    don't want to get into that.

2    Q     One of your tests here was using 32

3    ounces of clear corn syrup; do you see that?

4    A     Yes.

5    Q     Is that some sort of normal recipe that

6    people --

7    A     No.

8    Q     -- use?

9    A     I had a purpose for that.  I was trying

10   to demonstrate that the size of the air

11   channel is very much dictated by the liquid

12   consistency.  Because the member associated

13   blade is the same size, the RPM is almost the

14   same, it's a little bit less because of the

15   viscosity, but I'm trying to say that

16   everything else constant in this machine, the

17   very fact that you change your liquid, your

18   air channel totally kind of changes in

19   configuration.

20        So I'm kind of indirectly disputing

21   '021 claim, that the air channel which is

22   defined by these two members.  Because if

23   that -- if those things are the determining

24   factor and defining factors, the air channel

25   should stay the same size, so that is what

1    I'm trying to do with the corn syrup.  So I'm

2    not trying to invite anybody to drink corn

3    syrup; I'm just trying to have an

4    experimental approach to say that viscosity,

5    density and other things are more important

6    than a member associated with the blade.

7    Q     So in other words, these 32-ounce corn

8    syrup analyses are not exactly pertinent to

9    whether or not the Back To Basics blenders

10   infringe claim one of the '021 patent; is

11   that accurate?

12                  MR. AYCOCK:  Objection.

13        Lacks foundation.

14   A     It does.  Actually, it does, because

15   I'm saying that there actually exists no

16   member which singularly defined that air

17   channel.  So I'm saying that your air channel

18   is totally different, for the same machine,

19   for the same cross-sectional areas on the

20   bearing housing and on the hub of the blade

21   and all of the sudden you get an air channel

22   which is very thin in diameter, very small in

23   diameter.  So what happened here?

24        So all I'm saying is because, again,

25   for me as a researcher, I would say one

1          marked for identification.)

2                 - - - - -

3    Q    I'm going to hand you to you what's

4    been marked Plaintiff's Exhibit 110.  It's US

5    patent number 4,561,782 to Jacobsen et al.

6    Have you seen this patent before?

7    A    Yes, sir.

8    Q    Can you identify for me where Jacobsen

9    discloses or teaches a cross-sectional size

10   for a plunger or a device to be inserted into

11   the pitcher?

12   A    Actually if you look at this larger

13   figure on figure 3, right at the bottom

14   portion you see --

15   Q    Are you referring to figure 2?

16   A    Figure 3, actually.

17   Q    Figure 3's that cap.

18   A    I'm sorry.  Figure 3.  Okay.  Figure 2

19   then.  I'm referring to figure 2.  If you

20   look at the item 21 with two twisting arrows

21   which matches exactly what Dr. Swanger

22   interpreted the word "turning," if you look

23   at the diameter of item 20, number 20, and if

24   you look at the hub portion of the blade that

25   is the member associated with the blade and

Page 393

1   even by naked eyes they are very close to

2   each other so they are approximating each

3   other.  And you can, again, become technical

4   on measuring the millimeters and coming up

5   with the ratios and percentage but this is

6   approximating the member associated with the

7   blade.  And actually, it does not even teach

8   to rotate in terms of describing a cone.  It

9   teaches exactly the same way that Dr. Swanger

10   alleges that teaching of the Back To Basics

11   encourages the customers to do it, so --

12   Q    What basis do you have to state that

13   the cross-sectional size of Jacobsen should

14   be measured from the elongated portion 20 as

15   opposed to that rubber spatula 23?

16   A    Because that is the location that the

17   air channel forms.  In other words, the air

18   channel starts from the top and for a long

19   distance the air channel is not even aware of

20   this rubber piece and it comes down and then,

21   according to Vita-Mix allegation, the cross-

22   sectional size of that air channel is defined

23   by the hub portion of this blade.  And that

24   hub portion is substantially or approximately

25   equal to the diameter of item number 20

1   because the air channel comes from the top so

2   it has to travel the axial direction of this

3   member number 20.  So it basically --

4   Q     What's more adjacent to the rotating

5   blades, the cylindrical portion 20 or the

6   rubber foot 23?

7   A     Again, this is beside the point because

8   if you look at the cross-section of this, if

9   you look at the end view, if you turn your

10  view 90 degrees, you see the rubber piece 23

11  as a point or as a little dot but you see the

12  same diameter 20.  So if you change your --

13  so this is only on a very single line or

14  plane but the stir stick or whatever of

15  number 20 is elongated just like a plunger,

16  so therefore, that's the reason I'm using

17  that.

18  Q     Do you know what my last question was?

19  A     Yeah.  Which one is closer to the

20  blade.  I'm saying that even if this is

21  closer to the blade or more closer, it's

22  irrelevant.

23  Q     You would agree with me that the rubber

24  foot at the distal end, 23, is closer and

25  more adjacent to and above the rotating

1          MR. AYCOCK:   Objection.

2          Asked and answered.

3   A     The answer is no.  Yeah.

4   Q     Is there any way that the Wayne -- take

5   a look at figure 3.

6   A     I'm looking at it.

7   Q     Do you agree that the auger component

8   43 acts as a nut to connect the blade

9   assembly to that screw component 30?

10  A     That is what is depicted here, yes.

11  Q     So in other words, without the auger

12  component 43, the blades would not stay on

13  that blade assembly during operation; is that

14  accurate?

15  A     That's accurate unless you use a

16  regular nut, yes, so what Wayne has done, he

17  has extended the nut vertically up and

18  expanded it as an auger.

19  Q     What does -- do you know what Wayne

20  teaches with respect to the helical portion

21  of the auger component?  What's the purpose

22  of that?

23  A     Basically he's trying to create a

24  positive pumping flow downward toward the

25  blade and therefore, that's why I am

1   asserting that these diameters are going to

2   match the '021 patent in terms of cross-

3   section because unless the auger diameter is

4   large enough to contact a given air channel,

5   it's not going to work and I'm sure the

6   inventor of a device has thought of that

7   already.  So according to Wayne, the damage

8   of the air channel was about this and the air

9   channel is defined by the defining member so

10  A equal to B, B equal to C, therefore, A's

11  equal to B.

12  Q    You would agree that in operation, the

13  cutting blades of the helical member rotate

14  at the same angular velocity as disclosed in

15  Wayne?

16  A    Absolutely.  Absolutely.

17  Q    It's the shape of the helix plus the

18  angular velocity of the auger component in

19  Wayne that Wayne believes prevents the

20  formation of air pockets?

21                  MR. AYCOCK:  Objection.

22          Vague, ambiguous.

23  Q    You can answer.

24  A    I mean, you have this rigidly attached

25  to the rotating shaft.  It is very obvious

1 If I am a person of ordinary skill in the art

2 of blender design, I keep going back to the

3 need.  I look at a blender without any device

4 in it and I see that an air channel is

5 generated and then something dawns on me that

6 if I have something in there, I occupy the

7 space, and then I look at the Wayne patent

8 and it says somebody has put something in

9 there already, and actually, I don't want to

10 even to have the rotational portion of it so

11 all I do is to have the mirror image of it

12 and hang it from the top.  So that's how an

13 ordinary skill would come up with that.

14     - - - - -

15   (Plaintiff's Exhibit 112 was

16    marked for identification.)

17     - - - - -

18 Q Dr. Rashidi, I'm going to hand to you

19 what's been marked as Plaintiff's Exhibit

20 112.  It's the Harris patent, patent number

21 3,346,029.

22 A Uh-huh.

23 Q Take a look at figure 1.  Is it your

24 opinion that the spatula 10, the bottom of it

25 approximates the member associated with the

Page 408

1    blades?

2    A      Actually it's larger than the hub

3    portion of the blade so --

4    Q      So it does not approximate?

5    A      It does not approximate, but if the

6    allegation of '021 patent is correct, this is

7    supposed to work even better than Vita-Mix.

8    Q      How would this work better if this --

9    see the large spatula portion 15 there, sir?

10   A      Yeah.  I was going to explain that.

11   Q      Go ahead.  Explain that.

12   A      Because the name of the game is to

13   occupy space and actually this is what Vita-

14   Mix has done, to make the plunger much larger

15   in diameter compared to the wooden stick so

16   that it occupies a space.  So if '021 -- if

17   Vita-Mix is alleging the little disk at the

18   bottom of the Back To Basics as approximating

19   the size, if you make that size bigger it's

20   even better.  Here --

21   Q      Can you draw by arrows --

22   A      I'll use this one.

23   Q      Yeah.

24          Can you draw by arrows a flow diagram

25   of how the fluids or liquids would flow in

Page 410

1    of getting an ice cube you can get a cup of

2    slush from your refrigerator and when you put

3    it in there, when you tilt it, you can go on

4    the left side of the conical upside-down

5    shape and it can get there and if you just

6    wiggle it, you can transfer the ice slush

7    from top to bottom.

8    Q     Wouldn't you agree with me that this

9    spatula having this peripheral edge 15 would

10   actually prohibit some mixing during

11   operation?

12   A     I really cannot.  This is one of those

13   things that we have to test.  This can be one

14   of the best designs.  I don't know.  I don't

15   know.  I cannot answer that.

16   Q     Do you know what I'm asking by that

17   question, though?

18   A     I absolutely understand but what I'm

19   saying is I am using a simple logic of

20   inventors of Vita-Mix '021 patent.  They say

21   we need something to occupy the space and

22   this is the largest occupation you can find.

23   Even bigger.  In other words, if you go and

24   interview the Vita-Mix patents, the larger

25   you make the plunger, the better the,

Page 411

1    supposedly, solution is going to be.  There

2    is no harm in increasing the diameter of the

3    plunger.  The reason they don't increase it

4    to the absolute limit is because they still

5    need some room for material to be there.

6         So if the logic of '021 patent is

7    correct, the best thing is to have a plunger

8    which is three inches in diameter but there

9    is no room for material anymore so they have

10   found a happy medium of an optimum --

11   supposedly, somehow they attach it to the

12   associated to the blade member and so forth.

13   Therefore, based on that argument, I'm saying

14   that yes, here, you have something which

15   works very well.

16   Q    Is it your opinion that a person of

17   ordinary skill in the art would have to

18   change the design in Wayne to practice the

19   method set forth in claim one of the '021

20   patent?

21   A    To change the design?  What do you mean

22   by that?

23   Q    Does a person of ordinary skill in the

24   art have to change the design in Wayne to

25   practice the method set forth in claim one of