# EXHIBIT A

Page 1

```
        IN THE UNITED STATES DISTRICT COURT
        FOR THE NORTHERN DISTRICT OF OHIO
                  EASTERN DIVISION
                   - - - - -

VITA-MIX CORPORATION,      )
                           )
              Plaintiff,   ) Case No.
                           )  1:06-CV-02622-PAG
        -v-                ) Judge Patricia A.
                           ) Gaughan
BACK TO BASICS             )
PRODUCTS, INC., ET AL.,)
                           ) (Subject to
              Defendants.  ) Protective Order.)

                   - - - - -
     VIDEOTAPED DEPOSITION OF MAJID RASHIDI,
                  Ph.D., P.E.
              Friday, January 25, 2008
                   - - - - -
```

Videotaped deposition of MAJID RASHIDI,

Ph.D., P.E., called by the Plaintiff for

examination under the Federal Rules of Civil

Procedure, taken before me, Carla A. Virgili,

Registered Professional Reporter, Certified

Realtime Reporter, Notary Public in and for

the State of Ohio, at the offices of McDonald

Hopkins Co., LPA, 600 Superior Avenue, East,

Suite 2100, Cleveland, Ohio 44114, commencing

at 9:00 a.m., the day and date above set

forth.

```
                   - - - - -
            CORSILLO & GRANDILLO
               COURT REPORTERS
             700 City Club Building
             Cleveland, Ohio  44114
```

Page 2

1  APPEARANCES:

2       On Behalf of the Plaintiff:

3           David Cupar, Esquire
            Risto Pribisich, Esquire
4           McDonald Hopkins Co., LPA
            600 Superior Avenue, East
5           Suite 2100
            Cleveland, Ohio 44114
6
7       On Behalf of the Defendants:

8           Robert E. Aycock, Esquire
            Workman Nydegger
9           1000 Eagle Gate Tower
            60 East South Temple
10          Salt Lake City, Utah 84111

11      Also Present:

12          Ken Arnold, Video Reporter
            Lee A. Swanger, Ph.D., P.E.
13
14                 - - - - -
15
16
17
18
19
20
21
22
23
24
25

Page 3

1                  INDEX

2

3  EXAMINATION:                  PAGE:

4

5  BY MR. CUPAR:                    4

6

7              - - - - -

8

9  EXHIBITS:                     PAGE:

10 Plaintiff's Exhibit 100         26

11 Plaintiff's Exhibit 101         26

12 Plaintiff's Exhibit 102         26

13 Plaintiff's Exhibit 103         27

14 Plaintiff's Exhibit 104         29

15 Plaintiff's Exhibit 105         65

16 Plaintiff's Exhibit 106        136

17 Plaintiff's Exhibit 107        208

18 Plaintiff's Exhibit 108        233

19 Plaintiff's Exhibit 109        299

20 Plaintiff's Exhibit 110        391

21 Plaintiff's Exhibit 111        396

22 Plaintiff's Exhibit 112        407

23

24

25              - - - - -

Page 4

1          MAJID RASHIDI, Ph.D., P.E.

2  called by the Plaintiff for examination under

3  the Federal Rules of Civil Procedure, after

4  having been first duly sworn, as hereinafter

5  certified, was examined and testified as

6  follows:

7                 - - - - -

8                EXAMINATION

9                - - - - -

10 BY MR. CUPAR:

11 Q     Good morning, sir.

12 A     Good morning.

13 Q     Could you state your full name for the

14 record, please.

15 A     My name is -- first name Majid,

16 Rashidi.  M-a-j-i-d R-a-s-h-i-d-i.

17 Q     Have you ever been deposed before, sir?

18 A     Yes.

19 Q     How many times?

20 A     I don't know exact numbers but more

21 than three, four times.

22 Q     More than?

23 A     Three or four times.

24 Q     Three or four times.

25        Have you ever been deposed as an expert

1 before?

2 A    Yes.

3 Q    How many times?

4 A    That's the same number.

5 Q    So you've never been deposed as a fact

6 witness before, correct?

7 A    No.

8 Q    Have you ever been deposed as an expert

9 in a patent case before?

10 A    No.

11 Q    This is your first time?

12 A    This is my first time.

13 Q    What did you do to prepare for this

14 deposition today?

15 A    I was familiar with the -- I got

16 familiar with the case and I did some study

17 of the patents and some laws of physics and

18 some experimentation.

19 Q    I don't mean what -- I didn't ask what

20 you did to prepare for your opinion; I'm

21 asking what you did to prepare for this

22 deposition specifically today.

23 A    I don't understand the question.

24 Q    Sure.

25      Did you do anything to prepare for this

1 deposition today, sir?

2 A    Did I do anything today for today's

3 deposition or before?

4 Q    Correct.  For today.

5 A    Did I do anything today for this

6 deposition?

7 Q    No, no.  I'm sorry.  That's not what I

8 mean.

9      What I'm asking you is did you do

10 anything to prepare for your deposition that

11 we're taking here today?

12 A    I have written two reports; is that

13 what you mean?

14 Q    Did you meet with any lawyers in

15 preparation for your deposition today?

16 A    No.

17 Q    Did you meet with lawyers yesterday?

18 A    That's right.

19 Q    Okay.

20      Did you meet in regards to preparing

21 for this deposition today?

22 A    No.

23 Q    What did you meet with lawyers about?

24 A    To give them some videotapes that I

25 made the day before.

1 Q    You made videotapes the day before

2 yesterday?

3 A    That's right.

4 Q    That means on January 23, 2008?

5 A    That's right.

6 Q    So on January 23rd, 2008 you made

7 videotapes?

8 A    That's right.

9 Q    Why did you make videotapes on January

10 23rd, 2008?

11 A    Because I was going to experiment on

12 the performance of two blenders.

13 Q    Did you know that your reports were due

14 by January 7, 2008 for this matter, sir?

15 A    But I always wrote in my report that

16 this is an ongoing investigation so I reserve

17 the right to continue testing and studying

18 and coming up with opinions.

19 Q    Is it accurate, then, and do you agree

20 with me that your reports as of January 7,

21 2008 are incomplete based on the fact that

22 you did additional testing on January 23rd,

23 2008?

24 A    It's not a matter of incomplete.  I'm

25 adding material to it.

1 Q    Before we go any further, just to be

2 clear, in depositions, we'll talk one at a

3 time, so I'll ask a question --

4 A    Sure.

5 Q    -- and then just let me finish my

6 question and then you can answer; do you

7 understand that, sir?

8 A    Yes, sir.

9 Q    And then I'll allow you to answer, of

10 course, as well, and the idea behind that is

11 so two people aren't talking at the same time

12 on the record; do you understand that, sir?

13 A    Yes, sir.

14 Q    So again, explain to me why you

15 conducted additional testing on January 23rd,

16 2008 when all reports for this case were due

17 and all opinions for this case with respect

18 to those reports were due by January 7, 2008.

19 A    Are you done with your question?

20      As I said in my report, I have written

21 that I reserve the right to continue testing

22 and studying and researching on this problem.

23 Q    Are your opinions as of January 7, 2008

24 incomplete based on the fact that you did

25 additional testing on January 23rd, 2008?

Page 9

1 A    No.  What I have done, I just basically
2 verified my opinion with videotape.
3 Q    Did you supplement your report on
4 January 23rd, 2008 based on the additional
5 testing you conducted on January 23rd, 2008?
6 A    Not yet.  I don't have anything in
7 writing to supplement.
8 Q    So as we sit here today for your
9 deposition, you did additional testing after
10 reports were due but you did not supplement
11 your opinions or your reports regarding such
12 testing; is that accurate?
13 A    I reserve the right to supplement, yes.
14 Q    That's not my question, sir.
15    My question is that even though you did
16 additional testing after the January 7, 2008
17 deadline and such testing -- but you did not
18 do any supplemental or prepare any
19 supplemental report regarding such testimony;
20 is that accurate?
21 A    That's accurate, sure, but I would like
22 to make another statement here.  Is it
23 possible?
24 Q    No.  I'm just going to ask questions
25 and you just answer those questions.

Page 10

1         MR. AYCOCK:  Was your answer
2    complete?
3         THE WITNESS:  No.  I would
4    love to continue to complete my
5    answer.
6 Q    Okay.
7    If you have a complete answer, please
8 do so.
9 A    These matters are technical matters so
10 I believe we are here for fact finding and I
11 don't want that kind of technicality of what
12 report is due when to influence the matter
13 which has been in litigation for a number of
14 years and the effect of it would be for many,
15 many more years from now, so therefore, I
16 reserve the right to continue testing, to
17 continue coming up with facts and adding it
18 to the material.
19 Q    When were you first retained for this
20 case?
21 A    Actually, about -- I don't know an
22 exact date but it was almost a year ago.
23 Q    So despite being retained almost a year
24 ago in this case, you believe that you still
25 have not had time to conduct all the testing

Page 11

1 you need to make the opinions that you have
2 rendered in this case?
3 A    As I said, I did not run the test to
4 come up with a new opinion, I ran the test to
5 verify my opinion, and I can -- I mean, I
6 reserve the right to do it at any time that
7 basically the case is ongoing and the case
8 allows.
9 Q    So therefore, your testing that you
10 conducted on January 23rd, 2008 was
11 unnecessary because you said it verified your
12 previous opinions; is that accurate?
13 A    It was unnecessary for me but for you
14 maybe it was necessary so you observe what is
15 the facts of the case.
16 Q    However, you did not conduct any
17 videotaping prior to January 7, 2008
18 regarding your testing or analysis; is that
19 correct?
20 A    That's correct.
21 Q    You said you were deposed three or four
22 times previously; is that right?
23 A    That's right.  I don't know the exact
24 numbers because I don't do these kind of
25 depositions on a regular basis.

Page 12

1 Q    What kind of cases were those previous
2 depositions in regards to?
3 A    One case was an investigation on a
4 failure analysis and one was another failure
5 analysis on an Archimedes pump.  There was
6 one case on a failure of -- a machine was
7 dropped and somebody was injured so these are
8 all related to machineries and stuff like
9 that.
10 Q    Product liability cases?
11 A    I don't know the exact case but it was
12 product liability but one of them was the
13 buyer of a product sued the company who sold
14 them the machine because it kept breaking and
15 the company was using kind of a Band-Aid
16 solution to rectify the problem and I got
17 involved and I proved that there was design
18 flaw in the machine.  Same thing for the
19 other Archimedes pump.
20 Q    Would you agree with me that those
21 cases involved products liability or personal
22 injury, then, sir?
23 A    Oh, absolutely.
24 Q    But you have never testified in a
25 deposition regarding patent matters before;

Page 13

1 is that right?

2 A    No.

3 Q    So therefore, you have never testified

4 at trial regarding patent matters?

5 A    No.

6 Q    You've never testified as an expert in

7 trial regarding patent matters?

8 A    No.

9 Q    You've never been admitted by a court

10 regarding expert testimony in any patent

11 matters; is that accurate?

12 A    That's accurate.

13 Q    You said you met with some lawyers

14 yesterday.  Who did you meet with?

15 A    Mr. Robert Aycock and I forgot the

16 name -- last name of Mr. David -- what's his

17 name?  David -- I know his first name; I

18 don't know his last name.

19 Q    Is his name David Wright?

20 A    I think so, yeah.

21 Q    Have you ever met him before?

22 A    Once before when I was getting

23 introduced to the case.

24 Q    When was that?

25 A    Several months ago.  I don't know exact

Page 14

1 dates.

2 Q    Robert Aycock and David Wright are Back

3 To Basics's lawyers, right?

4 A    That's right.

5 Q    So you met with Back To Basics's

6 lawyers yesterday?

7 A    That's right.

8 Q    Did you talk about this deposition

9 today during your meeting with Robert Aycock

10 and David Wright, the Back To Basics lawyers?

11 A    I asked where the location of the place

12 is and Mr. Aycock says, "Come and pick me up

13 from the hotel.  I'll take you there."  That

14 was it.

15 Q    Anything else?

16 A    Nothing technical.  Nothing.

17 Q    Did the Back To Basics lawyers have any

18 discussions in front of you regarding this

19 case even if they were not directed at you?

20 A    No.

21 Q    Did the Back to Basics lawyers ask you

22 to prepare that video that you prepared on

23 January 23rd, 2008?

24 A    As a matter of fact, contrary.  I was

25 telling Mr. Aycock that I think I need to

Page 15

1 prepare a video for this and so that was my

2 opinion from many months ago.

3 Q    So in other words, many months ago you

4 told the Back To Basics lawyers that you

5 should prepare a video; is that right?

6 A    That's right.

7 Q    But no video was actually prepared

8 until January 23rd, 2008; is that correct?

9 A    That was my decision and that's

10 correct.

11 Q    That was your decision because you did

12 not believe a video was previously necessary;

13 is that right?

14 A    Yeah, that's true.  Because to me the

15 case was so obvious that there was no need

16 for any visual aid.

17 Q    Do you know who Thomas Daniels is?

18 A    No.

19 Q    Have you ever met a person named Thomas

20 Daniels before?

21 A    No.

22 Q    Have you ever met anybody from Back To

23 Basics before?

24 A    No.

25 Q    Other than the Back To Basics lawyers

Page 16

1 that you already mentioned, namely Robert

2 Aycock and David Wright, what other Back To

3 Basics lawyers have you talked with in

4 regards to this litigation?

5 A    Mr. Clint Duke.

6 Q    Other than the Back To Basics lawyers

7 Robert Aycock, David Wright or Clint Duke,

8 any other Back To Basics lawyers that you

9 have spoken with in regards to this

10 litigation?

11 A    None.

12 Q    Have you ever testified as an expert in

13 trial?

14 A    Yes.

15 Q    How many times have you testified as an

16 expert in trial?

17 A    Inside the court, once.  Typically when

18 I am hired as an expert usually I present the

19 cases in a clear fashion that usually they

20 are settled except once that they went to

21 court, and even in the court the case was

22 interrupted as a result of my testimony and

23 the parties came to an agreement.

24 Q    Again, you've never testified with

25 respect to any patent lawsuit; is that

1 accurate?

2 A    No, no.  That's accurate.

3 Q    Other than the opinions you've rendered

4 in this lawsuit have you rendered any

5 opinions regarding patents before?

6 A    I personally have patents myself so I'm

7 in very close interaction with patent

8 attorneys for writing of the claims and

9 detailed descriptions -- and other issues.  I

10 have about, I think -- when I say "about"

11 because some of them are pending -- eight

12 patents myself.

13 Q    To be clear, I'm not asking about

14 whether or not you're a patent owner or have

15 been an inventor; I'm asking, have you ever

16 rendered any opinions regarding patents

17 before?

18 A    No, no.

19 Q    So this case is the first time you've

20 ever rendered any opinions regarding patents?

21 A    That's right.

22 Q    So prior to this case you've never

23 rendered an opinion regarding patent

24 infringement; is that right?

25 A    That's right.

1 Q    Prior to this case you've never

2 rendered an opinion regarding invalidity or

3 validity; is that right?

4 A    I'm familiar with the terms and

5 conditions but I have never rendered opinions

6 about invalidity or infringement, that's

7 right.

8 Q    You've never rendered an opinion

9 regarding inequitable conduct in patent

10 matters, have you, sir?

11 A    No.

12 Q    You've never rendered an opinion

13 regarding patentability or unpatentability in

14 patent matters before, have you, sir?

15 A    I have rendered opinions with my

16 interactions with my lawyer for my own

17 inventions.

18 Q    And that's it, right?

19 A    That's right.

20 Q    So you've never been retained by any

21 party or lawyers previously to determine

22 whether or not there's infringement,

23 correct?

24 A    That's correct.

25 Q    This is the first time you've ever

1 taken on that exercise --

2 A    Exactly.

3 Q    -- is that accurate?

4     Let's do that again just so we have the

5 record straight, sir.

6     This is the first time -- let me strike

7 that.

8     This is the first time you've ever

9 taken on the exercise of determining patent

10 infringement; is that accurate?

11 A    That's accurate and I think I have

12 answered that at least five times now but the

13 answer is always no.

14 Q    Who retained you in this litigation?

15 A    The first time it was about several, I

16 mean, months ago or a year ago I got a call

17 from Calfee and they told me that we have two

18 gentlemen, Mr. Robert Aycock and Mr. Clint

19 Duke, that would like to see if I can help

20 them with a patent infringement case.  That

21 was the very first contact.

22 Q    You said Calfee.  Who is Calfee?

23 A    Calfee is a law firm in Cleveland.  I

24 think it's the next building in.

25 Q    Is that the first time you've ever

1 dealt with Calfee before, the Calfee firm?

2 A    Calfee's basically the firm that is

3 helping me for my patents and because they

4 knew that I'm working with patents and I'm

5 familiar with the -- some of the laws and the

6 relations to patents I believe they just

7 called me and asked me to.

8 Q    So you've retained the Calfee, Halter,

9 Griswold law firm for your own patents?

10 A    At Cleveland State University, that's

11 true.

12 Q    In return, Calfee, Halter, Griswold

13 contacted you to be a potential expert after

14 you've already retained Calfee for patent

15 matters; is that accurate?

16 A    Not in return because it was not a tit

17 for tat type of deal.  It was just a matter

18 of kind of knowing me.

19 Q    Do you have an attorney-client

20 relationship with Calfee, Halter, Griswold?

21 A    As I said, I'm an employee of Cleveland

22 State University so Calfee actually

23 represents Cleveland State University, not me

24 personally.

25 Q    But you're an inventor on those patent

Page 21

1 applications that Calfee, Halter, Griswold

2 prepared; is that right?

3 A    That's right.

4 Q    You have had direct interaction with

5 lawyers at Calfee, Halter, Griswold regarding

6 your patent applications, right?

7 A    That's right.

8 Q    Those are attorney-client privileged

9 communications, aren't they?

10 A    For my patents, yes.

11 Q    The Calfee, Halter, Griswold firm has

12 filed at least three patent applications on

13 which you're named as an inventor; is that

14 accurate?

15 A    That's right.  That's accurate.

16 Q    The Calfee, Halter, Griswold firm is

17 one of the law firms representing the

18 Defendants, Back To Basics, in this case; is

19 that accurate?

20 A    That, I'm not aware of because my

21 assumption is that the firm in Utah is

22 representing Back To Basics.  I'm not aware

23 of Calfee doing anything.

24 Q    You said the Calfee, Halter, Griswold

25 firm initially contacted you in regards to

Page 22

1 this litigation; is that right?

2 A    One of the patent attorneys but not the

3 one that was helping me.

4 Q    Which patent attorney contacted you at

5 Calfee, Halter, Griswold?

6 A    Two individuals in Calfee which are

7 working on my patents, Ms. Jennifer Hilton

8 and Andrew Miller or Mueller, and the person

9 who contacted me was Jennifer Wick and I have

10 never worked with Jennifer Wick on my

11 patents.  I think now that this is something

12 to talk -- I have to mention that I have

13 never worked with Jennifer Wick on my patents

14 so there's no attorney-client relationship

15 with myself and the person who first called

16 me.

17 Q    Jennifer Hilton, Andrew Mueller and

18 Jennifer Wick are all at the Calfee firm; is

19 that right?

20 A    That's right.

21 Q    Jennifer Wick received your name from

22 either Jennifer Hilton or Andrew Mueller; is

23 that right?

24 A    That's wrong because prior to my patent

25 actions with Calfee, I got a call from

Page 23

1 another lady from Calfee.  Her name was

2 Paige -- Paige -- I forgot her last name.

3 And Paige and Jennifer Wick were working

4 together and they were trying to hire me on a

5 patent infringement for a pumpkin cutter

6 system, so therefore, they had access to my

7 name prior to my relationship getting started

8 with Calfee for my patents --

9 Q    So this is the --

10 A    -- so --

11 Q    I'm sorry.  Go ahead.

12 A    So Jennifer Wick, to the best of my

13 knowledge, did not get my name from the

14 patent attorneys that are helping me at

15 Calfee.  They found my name on the Internet

16 on the website of CSU and since they realized

17 I have several patents under my name they

18 contacted me about an infringement for a

19 pumpkin cutter.  And that case basically, for

20 some reason, was dropped out and I had

21 some -- several initial meetings but it

22 didn't go anywhere and it didn't get to the

23 point that they needed to hire me.

24 Q    So this was the second time that the

25 Calfee, Halter firm contacted you regarding

Page 24

1 potential patent matters; is that right?

2 A    That's right, but on the first one I

3 never did anything because I think the case

4 was dismissed or settled or something.  I

5 don't know what happened to that case.

6 Q    Is your relationship regarding those

7 patent applications with the Calfee firm

8 still ongoing?

9 A    That's right.

10 Q    What steps have you taken to avoid any

11 conflicts of interest between you and the

12 Calfee firm in this case?

13 A    In this case I see absolutely zero

14 relationship because I'm dealing with

15 different attorneys and I didn't know up to

16 this point today that Calfee's also

17 representing Back To Basics.  I don't know

18 even -- I'm hearing it from you for the first

19 time.  Based on my interactions and my

20 assumptions it is the firm in Utah who is

21 representing Back To Basics.  As far as I'm

22 concerned there is no relationship between

23 Calfee and if you say there is then that's

24 news to me today.

25 Q    What steps have you taken to avoid any

Page 25

1 conflicts between you and Cleveland State
2 based on your relationships with the Calfee
3 firm?
4 A    Between myself and Cleveland State?
5 Q    Correct.
6 A    For this case?
7 Q    Yes.
8 A    Is there any conflict?
9 Q    No, I didn't ask that.
10     What steps have you taken to avoid any
11 potential conflicts between you and Cleveland
12 State based on your relationship with the
13 Calfee firm?
14 A    Anytime I take cases like this as a
15 consultant we have to inform our
16 administrators and I have explicitly asked
17 for permission to work on this from the Dean
18 of the College of Engineering.  So I hope
19 that answers that.
20 Q    Have you ever worked in the blender
21 industry, sir?
22 A    No.
23 Q    Have you ever designed blenders before?
24 A    No, not specific blenders.  I'm in the
25 machine design area so I fully understand

Page 26

1 blenders and the principles of operation.
2 Q    But you've never worked in the blender
3 industry or designed blenders?
4 A    No, no.
5 Q    You've never been retained by a blender
6 company to do any consulting or design work;
7 is that accurate?
8 A    That's accurate.
9         MR. CUPAR:  Let's go off the
10      record for a second.
11     (Discussion held off the record.)
12         - - - - -
13     (Plaintiff's Exhibits 100 through 102
14      were marked for identification.)
15         - - - - -
16 Q    Dr. Rashidi, I'm going to hand you
17 what's been marked as Plaintiff's Exhibit 100
18 which is US patent application publication
19 number 2006/0273597 entitled "Wind Harnessing
20 System" and I just have one question for
21 you.  Is this one of the patent applications
22 that the Calfee, Halter law firm is preparing
23 on your behalf as an inventor?
24 A    That's right.
25 Q    I'm going to now hand to you what's

Page 27

1 been marked as Plaintiff's Exhibit 101 which
2 is PCT application number WO 2006/133122 and
3 again, I'm going to ask you, is this another
4 patent application that the Calfee, Halter
5 law firm is preparing on your behalf?
6 A    That is true.
7     (Discussion held off the record.)
8         - - - - -
9     (Plaintiff's Exhibit 103 was
10      marked for identification.)
11         - - - - -
12 Q    Dr. Rashidi, I'm going to hand to you
13 what has been marked as Plaintiff's Exhibit
14 102 which is US provisional patent
15 application 060305 and it also is identified
16 as application number 60/687622.  Is this
17 another patent application that the Calfee
18 law firm has prepared on your behalf, sir?
19 A    I believe so.  That's right.
20 Q    I'm going to now hand to you what's
21 been marked as Plaintiff's Exhibit 103 which
22 is your curriculum vitae or resume,
23 sometimes, as most people call it.  Have you
24 seen this document before?
25 A    That is my resume.  That's right.

Page 28

1 Q    Take a look at -- could you explain --
2 before you testified that you've never worked
3 in the blender industry or designed blenders;
4 is that accurate?
5 A    That's accurate.
6 Q    Take a look at page two of your resume
7 here.
8 A    Uh-huh.
9 Q    You'll see the word "Patents" here; do
10 you see that?
11 A    That's right.
12 Q    Then you'll see a list of eight things
13 below that term "Patents"; do you see that?
14 A    You're asking me?
15 A    Yes.
16 A    Yeah.  Because you're facing someone
17 else.  I thought you were asking someone
18 else.  Yes, I see that.
19 Q    However, not all of those developments
20 identified under "Patents" are in fact issued
21 patents; is that accurate?
22 A    Yeah.  Some of them are applications.
23 That's why there's no patent number.
24 Anything that doesn't have a patent number is
25 pending.

Page 29

1  Q    So while this identifies eight patents,
2  there's actually only three patents that have
3  been issued in your name; is that accurate?
4  A    That's accurate.  So I mean, it's
5  pretty obvious when I don't have a patent
6  number and I have patent application, that's
7  what I -- I'm depicting here.  I didn't claim
8  that these are patents in print.  Three of
9  them are in print; the rest of them are
10 pending.
11 Q    Take a look at the third description,
12 "Wind Harnessing System."  It states, "Law
13 firm: Calfee"; do you see that?
14 A    That's right.
15 Q    That's accurate, right?
16 A    That's accurate.  I think we discussed
17 that before.
18               - - - - -
19       (Plaintiff's Exhibit 104 was
20       marked for identification.)
21               - - - - -
22 Q    You've been handed what's been marked
23 as Plaintiff's Exhibit 104.  It states at the
24 top, "Invoice --"
25 A    That's right.

Page 30

1  Q    "-- Ending period: 12/17/2007"; do you
2  see that?
3  A    That's right.
4  Q    Do you know what this invoice is
5  referring to?
6  A    I prepared that invoice for my services
7  that I have rendered to this case.
8  Q    At the top it says, "To: Robert
9  E. Aycock, Attorney at Law"; do you see that?
10 A    That's right.
11 Q    Below that, it states, "Baker and
12 Hostetler"; do you see that?
13 A    Oh.  That's because I did cut and paste
14 so that's an error.
15 Q    Have you ever done any patent work for
16 Baker and Hostetler?
17 A    No.  I have rendered expert opinion and
18 because I cut and paste from one invoice to
19 them, this is a typo and I have to take it
20 out.  So this is not an accurate line on top
21 there.  You have to strike that.
22 Q    You testified before that you did not
23 know that the Calfee firm was involved in
24 this litigation; do you recall that?
25 A    That's right.

Page 31

1  Q    I want you to take a look now at this
2  invoice.  Below, you see the term, "Itemized
3  services and costs rendered for the period
4  ending December 17, 2007."
5  A    Uh-huh.
6  Q    Then below that, you state, "First
7  meeting at Calfee"; do you see that?
8  A    That's right.
9  Q    Does that refresh your recollection
10 that the Calfee firm was involved in this
11 litigation?
12 A    No.  As I said, I was -- I told you the
13 first call I got for this case was from
14 Calfee so I didn't try to hide that.  I said
15 Calfee -- Jennifer Wick of Calfee called me
16 and my impression was that this is a firm in
17 Utah, they need to have a home base in Ohio
18 to come and take a case, and I told you my
19 first meeting was at Calfee.  I said that.
20 So you don't need to show me this again.  If
21 you go back to my deposition several
22 statements ago I said that my first contact
23 was from Jennifer Wick.
24 Q    Where it states, "First meeting at
25 Calfee" there, when did that occur?

Page 32

1  A    That is the one that's about a year ago
2  and if you see, there was no charge so I was
3  contacted by Jennifer Wick and I said for the
4  first meeting I don't charge because I want
5  to understand what the case is and I --
6  Q    Other than Jennifer Wick who else did
7  you meet in that first meeting at Calfee?
8  A    It was Mr. Robert Aycock and Duke Clint
9  and my understanding when I came out of that
10 meeting was this is a case that the firm in
11 Utah is handling and the entire case is in
12 the hands of the Utah firm.
13 Q    What did they tell you at the first
14 meeting at Calfee in regards to this
15 litigation?
16 A    Basically what they told me that they
17 said there is a patent infringement case and
18 then they handed me the patent which we now
19 call it patent '021 of Vita-Mix and I studied
20 it for about 10, 15 minutes.  And then I
21 looked at the single claim because that's
22 pretty straightforward language in that claim
23 and then I very clearly told Mr. Aycock that,
24 "If you are representing the holder of this
25 patent, I'm not going to take this case."

Page 33

1 That was my exact sentence and I have two
2 other witnesses for that.  It was Jennifer
3 Wick and Duke Clint.  I said, "If you are
4 going to hire me to represent Vita-Mix and
5 this patent, I'm not going to take the case
6 because this patent basically is full of
7 flaws."  And I studied it, just that single
8 claim, because the language was very --
9 pretty unusual and pretty unrealistic.  And
10 then, as a matter of fact, Mr. Aycock didn't
11 tell me anything right at that moment.  I
12 didn't know who they are representing,
13 whether it's the plaintiff or defendant.
14       And then we went through some more
15 discussion, they asked me to read the patent
16 and look at the nature of the patent and they
17 asked me, "Are you comfortable with the
18 physics which happens in this type of
19 blenders," and so forth.
20       And then again, I studied it again and
21 I looked at it and I said, "Yeah, this is a
22 pretty straightforward problem."
23       And they asked me whether I have ever
24 testified in a patent infringement and I said
25 no and then they said, "Well, how do you

Page 34

1 think you can help us?"
2       And I said, "Well, let me look at this
3 some more time and then I'll let you know."
4 Q    This all occurred in the first meeting
5 at Calfee?
6 A    Exactly.
7 Q    So you were able to determine the
8 technology set forth in the Vita-Mix '021
9 patent based on reviewing that patent for 10
10 to 15 minutes; is that accurate?
11 A    Absolutely.  Absolutely.  And I have
12 done that some other cases for design flaws
13 and I have a very simple example for that.
14 If somebody comes to me and says they
15 designed a stool with two legs, I say that is
16 a design flaw.  I would like to see a stool
17 or chair with at least three legs.  So this
18 is so obviously out of whack because I'm
19 familiar with design of machinery.  I said,
20 "Well, I cannot answer you whether I can help
21 you.  I need a couple more days.  Is there
22 anything else you can provide me?"
23       And they said, "Well, we will send you
24 some material but you have to let us know
25 whether you are interested or not.  So I

Page 35

1 didn't make the decision to take the case
2 then but I vividly remember what I told
3 Mr. Aycock.
4       And on that first meeting, I didn't
5 know whether Mr. Aycock was representing
6 Vita-Mix or Back To Basics but I said, "If
7 you are doing the Back To Basics -- if you
8 are representing the holder of this patent,
9 I'm sorry, I cannot take the case in this
10 case."
11 Q    Based on that 10 to 15 minutes of your
12 review, you understood the technology set
13 forth in the Vita-Mix '021 patent; is that
14 accurate?
15 A    The technology of a blender is so
16 trivial to some extent in terms of stirring
17 the fluid that you don't need to basically do
18 any heavy-duty analysis and if you try to do
19 heavy-duty analysis, you cannot get accurate
20 answers because the phenomenon which takes
21 place in this blender in terms of fluid
22 mechanics is so complex that mathematical
23 modeling cannot render an accurate solution.
24 So you have to rely on basically some of the
25 very basics of the principle.

Page 36

1       And when I saw the claim, and at that
2 time I knew the difference between design
3 claim and method claim, I realized that
4 certain trivial things were being claimed in
5 this patent on the single claim and I said --
6 well, I mean, I can give you an example.  One
7 part of the claim language is adding fluid to
8 the pitcher.  I mean, I don't know how an
9 attorney may look at it but for me as a
10 designer, as an engineer, if I can use
11 improper language, I would say, big deal.
12 Adding fluid to a pitcher, is it a claim?  I
13 mean, who doesn't add fluid in a pitcher?
14 Q    So in other words, it's not that the
15 technology set forth in the claim one of the
16 Vita-Mix '021 patent is difficult to
17 understand or ascertain, it's the other way
18 around, it's that it's trivial; is that
19 accurate?
20 A    It's very trivial based on other
21 people's work and -- I mean, I have a blender
22 at home and I realize that it was talking
23 about -- I mean, everybody who's sitting at
24 this table maybe except you are familiar with
25 the patent language of claim number one.  So

1 to me, it is what has been claimed is
2 extremely trivial.
3 Q    Dr. Rashidi, just to be clear, my
4 questions here so far are based on your first
5 meeting at Calfee.  Are your answers based on
6 this first meeting at Calfee as well?
7 A    That's right.  I'm saying that -- I
8 told Mr. Aycock that, "If you are
9 representing this patent, I'm not going to
10 take the case," and that was my agreement,
11 that when I am hired as an expert, I don't
12 charge for the first meeting because I want
13 to feel comfortable working on a case and
14 that's why any case that I have been
15 involved, the final rendition of either
16 opinion by the court or by the parties was in
17 line with what I have rendered the opinion
18 for the case.
19 Q    Take a look at the next three meetings
20 here, March 2nd, March 13th and March 14th at
21 Calfee on the invoice that's identified as
22 Plaintiff's Exhibit 104; do you see those?
23 A    That's right.
24 Q    Who did you meet with in those meetings
25 at Calfee?

1 A    I believe -- I don't know exactly.
2 Probably with Mr. Aycock and -- or both of
3 them, Mr. Aycock and Clint Duke, or it could
4 have been with Jennifer Wick to give me some
5 material on the case.  Because after I
6 studied the case I was comfortable to render
7 opinion on that, so I don't recollect whether
8 it was just with Mrs. Jennifer Wick to get
9 the prosecution history or it was with
10 Mr. Aycock and Mr. Duke or both of them.
11 Q    After your first meeting at Calfee,
12 what materials -- or during that first
13 meeting at Calfee, what materials did the
14 Calfee lawyers or the Workman Nydegger
15 lawyers provide to you?
16 A    That was the patent itself.  From the
17 best of my recollection, that was the case.
18 Q    Anything else?
19 A    If they showed me the prosecution
20 history at that time, I don't recollect, but
21 it could have been on the first meeting but I
22 didn't study it on the first meeting or it
23 could have been in the subsequent meetings.
24 I don't recollect.  It was almost a year ago.
25 Q    Take a look specifically at the March

1 2nd, 2007 meeting at Calfee; do you see that
2 one?
3 A    Yeah.
4 Q    It states one and-a-half hours; do you
5 see that?
6 A    Yes.
7 Q    What's that meeting in regards to?
8 A    To the case.  To the -- kind of what is
9 happening inside the blender and I was
10 basically lecturing.  I was not getting
11 information; I was saying that when you turn
12 a key on a blender, these are the types of
13 physical phenomenon happening in the blender.
14 Q    Based on this lecturing, you were
15 basing your lecturing solely on the Vita-Mix
16 '021 patent and no other documents; is that
17 accurate?
18 A    I don't recollect.  By that time I
19 might have seen the prosecution history, I
20 might have not, I don't remember.  I don't
21 recollect.
22 Q    How long between the first meeting at
23 Calfee and the meeting of March 2nd, 2007 at
24 Calfee?
25 A    It was not a very short time but I

1 don't know the exact time.  I don't know the
2 exact duration.
3 Q    A month?
4 A    I really don't know because believe me,
5 sir, I have many other things to do in life.
6 So kind of rendering expert opinions is not
7 my only work so I just -- I don't remember.
8 Q    The next meeting is the meeting of
9 March 13, 2007 at Calfee; do you see that?
10 A    That's right.
11 Q    It was for 3.5 hours; do you see that?
12 A    Uh-huh.
13 Q    What was that meeting in regards to?
14 A    In some of the meetings after I -- at
15 some point I realized that Mr. Robert Aycock
16 is not representing Back To Basics -- I mean,
17 Vita-Mix, so when I said that I'm going to
18 take the case then I had, I think, some
19 preliminary observation of one or two of
20 these blenders.  So I think one of them was I
21 asked them to put some water in the blender
22 and I said, "Let me show you what is
23 happening and what is my opinion on how these
24 things work."  So some of them might have
25 been those type of very preliminary

1 experimentations on the table.

2 Q    At the Calfee firm?

3 A    At the Calfee firm, that's right.

4 Q    But you weren't making smoothies at

5 that point in time?

6 A    No, no, no.

7 Q    Nor were you making any ingredients or

8 recipes that were thicker; is that right?

9 A    No, no.  It was just pure water.

10 Q    So up to this point, you were able to

11 make conclusions regarding the Vita-Mix '021

12 patent despite the fact that you have not --

13 you did not perform any operations with

14 respect to thicker mixtures such as

15 smoothies?

16 A    That is true, yeah.

17 Q    So you're able to render an opinion of

18 noninfringement before doing such

19 experimentation or testing; is that accurate?

20 A    Your question is basically a little bit

21 vague.  What I'm trying to say is people who

22 are familiar with fluids and the definition

23 of fluids and fluid behavior know that when

24 you turn a blender on and you see a kind of

25 channel or tunnel or some people call it a

1 vortex that generated, an inventor naively

2 may say, okay, if I can fill up that space

3 with an object, with an object, with a

4 device, I'm home free, and because I'm

5 familiar with the laws of mechanics and laws

6 of physics, I know that adding a device there

7 is not going to rectify the matter.  So that

8 is how I base my, actually, acceptance of the

9 case because when you put that in the

10 pitcher, all you do is you generate another

11 boundary condition, another stationary

12 boundary condition.

13 Q    And you were able to make that

14 conclusion without having tested or having

15 made a single smoothie or any other viscus

16 recipe in a blender; is that accurate?

17 A    That's accurate, and that's why we call

18 it hypothesis, and then I started working on

19 my hypothesis to prove it, yeah.

20 Q    And you did not test, during that time

21 frame of March 2007, the blenders in

22 accordance with the Vita-Mix patent; is that

23 accurate?

24 A    Repeat the question again, please.

25         (Record read.)

1         MR. AYCOCK:  Objection.

2         Lacks foundation.

3 A    As I said, my very first tests that I

4 asked to do and I did it myself in Calfee was

5 to just observe the behavior of the Vita-Mix

6 blender when I put pure water in it.  So I

7 was kind of on the big picture just to see

8 how the fluid is turned around because when

9 you have a pitcher which is a square cross-

10 section versus a pitcher that is round in

11 cross-section, many other things can happen.

12     Some of the shortcomings of the '021

13 patent is this:  They only talk about two

14 very simplistic matters and they are silent

15 about many other important issues.  So I was

16 just trying to demonstrate that if you change

17 the RPM, the channel changes; if you have a

18 round pitcher versus square pitcher in cross-

19 section, things are different.  So I was on a

20 very preliminary domain or stage.

21     So I did not make any thick smoothie or

22 anything up to March 14th so it was just pure

23 water to demonstrate that the air channel --

24 one of the most important factors is the RPM

25 of the blade.  I was just demonstrating --

1 because I concentrated -- with all due

2 respect, Mr. Robert Aycock is not a physicist

3 or engineer so I was demonstrating to him

4 that when you read these patents, don't get

5 tangled with the legal language.  Just look

6 at the RPM.  Look at -- if you increase the

7 RPM, the channel grows; if you have very low

8 RPM, the channel's just a little dip and it

9 never gets to the blade.  So RPM is one of

10 the most important factors in the definition

11 of the size of the channel and blah, blah.

12 So I was kind of at this very preliminary

13 stage.

14 Q    So therefore, if there is a blender or

15 a mixer of any kind in the small appliance

16 area, in the kitchen blender area, it doesn't

17 have sufficient RPM, is it your opinion that

18 such a mixer or blender has no bearing with

19 respect to the Vita-Mix '021 patent?

20         MR. AYCOCK:  Objection.

21     Form, lacks foundation.

22 A    All I'm saying is RPM is a parameter in

23 defining the air channel, that's all I'm

24 saying, one of the parameters which defines

25 the air channel.  Low RPM, very small or very

1 shallow channel; higher RPM, more agitation,
2 more pumping action.  So this is a very
3 trivial type of matter to me and I was trying
4 to explain these things to Mr. Robert Aycock
5 and if Mr. Clint Duke was there, to him as
6 well.
7 Q     Up to the point of the meetings through
8 March 14th, 2007, did you ever operate, up to
9 that point, a Back To Basics blender or
10 smoothie maker?
11 A     I don't recollect.  That's also
12 something that I don't recall whether I have
13 done it or not.
14 Q     You were able to conclude
15 noninfringement even though you never tested
16 a Back To Basics smoothie maker or blender up
17 to that point?
18 A     As I said, I was not kind of -- see, I
19 didn't start working toward noninfringement.
20 One thing that I told Mr. Robert Aycock was
21 that I have to look at the device of Vita-Mix
22 and my very first attempt was to see if the
23 device of Vita-Mix works as it promises or as
24 the teaching of the patent goes and then I
25 started with that and then I started working

1 with the noninfringment issue.
2 Q     What did you find in regards to the RPM
3 in a Vita-Mix blender?  Is it relatively high
4 or relatively low?
5 A     Actually, there are two settings.  One
6 is high and then if you push the button on
7 the left to the lower setting, you have the
8 option of increasing it from virtually not
9 zero but very low RPM all the way to one of
10 the medium or higher settings.  So it has,
11 basically, a range.
12            MR. AYCOCK:  Could I get that
13        answer back, please?
14            (Record read.)
15 Q     Did you mean Vita-Mix or Back To
16 Basics?
17 A     Vita-Mix.
18        Is it Back To Basics or Vita-Mix?
19 Q     I don't know.
20        What did you test?
21 A     The setting is for Vita-Mix, the black
22 one, not Back To Basics.  Back To Basics
23 doesn't have the option of variable.
24 Variable is only -- if I said it, I should
25 stand corrected.  This is only for black

1 benders of Vita-Mix which gives you two
2 options, a constant high or a variable low
3 from almost virtually zero, not exactly zero,
4 all the way to a higher setting.
5 Q     And is it your opinion, then --
6 A     Excuse me.  I would like to make
7 another comment.  I would appreciate if we
8 all cooperate here and don't set each other
9 up so if I inadvertently make a mistake and I
10 ask for corrections, I would like to be given
11 that permission and that allowance.  So if I
12 said Back To Basics for all these things, I
13 withdraw it.  I'm saying that this is for
14 Vita-Mix.
15 Q     I don't think there's any
16 misunderstanding.
17     You stated through March 14, 2007 that
18 the only blender you tested with respect to
19 the Vita-Mix '021 patent are Vita-Mix
20 blenders; is that accurate?
21 A  Vita-Mix, yeah.
22 Q  Correct.
23 A  Not Back To Basics.
24 Q  That's how I understood your testimony
25 at this point.

1 A     Yeah.  So yeah.
2 Q     Just to be clear, if you believe that
3 you need to clarify something, please let me
4 know.
5 A     Sure.  Thanks.  I appreciate that.
6 Because the last thing we want in complicated
7 cases is misunderstandings and -- kind of
8 like that Baker and Hostetler.
9 Q     Exactly.
10 A     Because I had the format of the
11 invoice.  I just cut and pasted and I forgot
12 to delete it.
13 Q     I'll also say this, too:  If you do not
14 understand any of my questions, please let me
15 know.
16 A     I will do that by all means.
17 Q     Finally, on the flip side, if you do
18 answer my questions, I'm presuming you do
19 understand them.
20 A     That is definitely the main assumption
21 and hopefully that's the case.
22 Q     Moving on now to tests in Utah, in your
23 invoice it says 12 hours.  When did those
24 tests occur?
25 A     This was during the summer.  I don't

Page 49

1 know the exact date. It could have been in
2 July or -- I don't remember. I'd have to go
3 back and look at my flight itinerary.
4 Basically, I told Mr. Robert Aycock
5 that I needed to do some tests on these so I
6 would like to have access to blenders.
7 And then he said that, "We have many of
8 these blenders. For me to send them to you
9 in Cleveland, it would be a pain in the neck
10 because there are like 10, 12 or whatever
11 number of them. Is it possible for you to
12 come to Utah and conduct your tests?"
13 And I said, "By all means, I'll do
14 that. Let me find my schedule in my work."
15 And then we made an arrangement so I flew to
16 Utah and then I conducted these tests.
17 Q Take a look at the next entry, "Study
18 prosecution and prior art documents: 28
19 hours"; do you see that?
20 A Uh-huh.
21 Q Is that the first time you studied the
22 prosecution history of the '021 patent?
23 A That's right, yeah.
24 Q Okay.
25 So up to the point of meeting numerous

Page 50

1 times at Calfee and testing in Utah, you
2 never reviewed or analyzed the prosecution
3 history of the '021 patent, correct?
4 A Actually, no. Actually, I started
5 reading the prosecution history well before
6 going to Utah but in terms of invoicing, that
7 was the time that I could lump it here. So
8 this lumping of the prosecution history and
9 the prior art does not necessarily mean
10 that -- I mean, there's no date here. In
11 other words, you can take half of this
12 prosecution history and prior art and put it
13 before the Utah trip. This is just a
14 formatting invoicing.
15 Q Do you have a calendar that can support
16 that statement, sir?
17 A No. I don't write things on a
18 calendar, no.
19 Q So you don't know whether or not --
20 A No, I do know.
21 Q -- the 28 hours was -- which part --
22 A This --
23 Q Hold on. I'm not done with my
24 question, sir.
25 A Okay.

Page 51

1 Q You do not know what part of the "Study
2 prosecution history and prior art documents"
3 that totals 28 hours was prior to testing in
4 Utah, do you, sir?
5 MR. AYCOCK: Objection.
6 Mischaracterizes prior testimony.
7 A What I'm saying is I basically lumped
8 all of my studying of the prosecution history
9 and prior art in one. It doesn't mean that
10 it occurred in one date. That's all I'm
11 saying.
12 Q I understand that.
13 I'm just asking you, how many hours did
14 you study the prosecution history and prior
15 art documents prior to your testing in Utah;
16 can you tell me that?
17 A Probably -- it was mostly on the
18 prosecution history so probably by the time I
19 went to Utah I had studied the prosecution
20 history.
21 Q But this invoice doesn't show it that
22 way; is that accurate?
23 A No. This is -- I'm not a professional
24 invoice writer. I'm not a company to have
25 itemized -- no. This is just my style of

Page 52

1 writing things and you can see there is
2 "Baker and Hostetler" up there so there's a
3 lot of objections to this invoice as-is.
4 Q If you don't write things down in a
5 calendar, how do you know that you spent 28
6 hours studying the prosecution history and
7 prior art documents?
8 A I basically memorize it. Every three
9 hours, two hours there, just like that.
10 Q When did you prepare this invoice?
11 A This invoice was basically about -- it
12 was in '08. It was -- there's a date
13 somewhere, isn't there?
14 Q It says at the top, "Ending
15 Period: 12/17/2007."
16 A Yeah. So it was after that.
17 Q So you prepared this invoice after
18 December 17th, 2007?
19 A Definitely, yeah.
20 Q You were able, in December of 2007 or
21 at some point after December 17, 2007, to
22 calculate that you studied the prosecution
23 history and prior art documents for 28 hours
24 even though --
25 A That's right.

Page 53

1 Q    I'm not done yet.

2      -- even though you did not write down

3 any of your time in any calendar?

4 A    I just write it on pieces of papers and

5 napkins and like that.  I don't use a

6 calendar.

7 Q    So you did write it down somewhere?

8 A    Oh, yeah.  Oh, yeah.

9 Q    What did you do with those pieces of

10 paper and napkins?

11 A    Throw it out.

12 Q    When did you throw it out?

13 A    When I prepared this invoice.

14 Q    When did you prepare this invoice?

15 A    As I said, it's after 12/17 of '07.

16 Q    When?  Was it after Christmas?  After

17 December 25, 2007?

18 A    I think it was in '08.  I sent it to

19 Mr. Aycock and it was basically two nights

20 before I sent it to him.

21 Q    Did you throw out those napkins and

22 papers in 2008 as well?

23 A    That's right.

24 Q    Did you know that the parties were

25 supposed to produce to each other all

Page 54

1 documents pertaining to notes and files in

2 this case at the end of December, in the last

3 week of December 2007?

4 A    I didn't know that my time, two hours,

5 three hours, pertained to kind of proving

6 that kind of validity of the case.

7 Q    It sure does.  It shows how much time

8 you spent in this case.  Did you know that,

9 sir?

10 A   Yeah.  That's here.  That's why I'm

11 disclosing it here.

12 Q    You say that documents existed as of

13 the last week of 2007 regarding how much time

14 you spent studying; is that right?

15 A    That's right, yeah.  Just a bunch of

16 numbers.

17 Q    You didn't provide any of those notes

18 or documents to your lawyers --

19 A    You didn't understand --

20 Q    Hold on.  Let me ask the question and

21 you can answer it.

22      You did not provide those notes or

23 napkins or notations to your lawyers?

24 A    There was no -- there was a bunch of

25 numbers.  I did not provide them to my

Page 55

1 lawyers because it was 3, 2, 5, 2.5, 1.5, so

2 if I provide that to my lawyer, it could be

3 the number of minutes that I was listening to

4 music.  So what those bunch of numbers which

5 doesn't mean anything, which doesn't have any

6 note would do anything for my attorney or to

7 you.  Just numbers with no units.

8 Q    Did you take any notes at all in

9 preparing for, analyzing or ultimately

10 opining in this case?

11 A    Basically what I did when I went to

12 Utah, I had my laptop on and I basically

13 started noting the mixtures that I was

14 blending and I used the same file to prepare

15 my test case so I didn't take any handwritten

16 note or anything.

17 Q    But you did take notes on your

18 computer; is that accurate?

19 A    Yeah, and then they're reflected on my

20 basically second report, all those tests that

21 you see.

22 Q    Did you provide those notes to your

23 lawyers to produce in this litigation?

24 A    I sent them the report so they must

25 have access to it.

Page 56

1 Q    I'm not asking about your report; I'm

2 asking about your initial notes regarding

3 your testing.

4 A    I didn't, no.  I just promised I'd get

5 them the report and I did.

6 Q    Do those notes still exist on your

7 laptop?

8 A    I changed those notes to the report.

9 In other words, I went there and then I added

10 the statement on top and bottom of them so it

11 became the report.

12 Q    But you did have notes before you

13 drafted a report, right?

14 A    I had a file which had these tests and

15 then I added my statements on top of the file

16 and some concluding, whatever signature page,

17 so that's how I do it.

18 Q    So you prepared a report, your report

19 regarding your opinions based off of your

20 notes; is that accurate?

21 A    Let me explain to you what I did.

22 Q    Answer my question before you --

23 A    I don't understand your question.

24 Q    Let me ask it again, then.

25      Did you prepare notes on your laptop

1 computer before you prepared a draft of your

2 report?

3 A    I just wrote what I was doing in my

4 computer. Test number one, banana, ice, this

5 and that and that and I had that, then I got

6 the same file and I turned it into my second

7 report.

8 Q    Does that first file, though, still

9 exist?

10 A    No, because I just added, I modified

11 it, I edited it.

12        MR. CUPAR:  At this point I

13    definitely want all notes and

14    handwritten notes, computer notes,

15    laptop notes that Dr. Rashidi

16    took and I --

17        MR. AYCOCK:  I think you're

18    misunderstanding --

19        MR. CUPAR:  Hold on. I'm not

20    done yet. One at a time.

21        I want all of those and I

22    reserve the right to take a second

23    deposition here and I'm not

24    misunderstanding anything. He took

25    notes and I want to see those if they

1        exist and if they don't exist

2    anymore, I want something in writing

3    from the parties -- from Defendants

4    here stating that.

5        MR. AYCOCK:  David, I think

6    what you've done is misunderstood

7    what Dr. Rashidi has testified to.

8        MR. CUPAR:  I --

9        MR. AYCOCK:  Let me finish.

10    I gave you the courtesy.

11        I believe what he just

12    testified to was if he took his

13    notes, and those notes are reflected

14    in his report in the tests in the

15    back of that report.

16        MR. CUPAR:  What I want is

17    the notes to verify that in fact his

18    notes are reflected in his report and

19    they're not different. That's what I

20    want --

21        MR. AYCOCK:  That's what he

22    just testified to.

23        MR. CUPAR:  -- and that's

24    what I'm asking for.

25        MR. AYCOCK:  Then ask

1    Dr. Rashidi.

2        MR. CUPAR:  I did, and what I

3    want is to make sure that if those

4    exist --

5 Q    Do those exist, Dr. Rashidi?

6 A    I'm saying something very simple and

7 you're electing to ignore my statement. Let

8 me explain again.

9    I'm trying to write a report and I need

10 to put some testing in my report so I go to

11 my computer to a Word document and I open a

12 file. I call it, let's say, for example,

13 "Tests" or whatever. The name of the file

14 can change. Then I start inputting some

15 statements, correct, and that becomes a file

16 and I save it.

17    Then three months, four months, a year

18 later I go back to the same file. I open up

19 the same file and basically move whatever I

20 had to a second page and on the first page I

21 start writing my report and then I go back to

22 the test section and if there is any

23 grammatical error or any formatting, I change

24 it and I resave it. So that is what I have

25 and that is what I have included as my second

1 report. So which part of this is kind of

2 ambiguous --

3 Q    There's nothing ambiguous --

4 A    -- and what I can provide to you -- let

5 me finish, please. What I can provide to

6 you, again, is the same second report that I

7 have already submitted to Mr. Robert Aycock.

8 Q    What I want, though, and what I'm

9 asking about are the notes that you took

10 prior to the first preparation of a report.

11 Do those exist?

12 A    Not in the same format. They have

13 changed. They have changed with the second

14 report. Is this clear? Okay.

15 Q    So none of the notes that you took

16 during your testing exist; is that accurate?

17 A    No, this is not accurate because the

18 notes that I have taken is reflected in my

19 second report and you keep ignoring that

20 because you're trying to demonstrate, based

21 on my understanding, that there were some

22 mysterious notes and they mysteriously

23 disappeared. That is absolutely inaccurate

24 on your part because --

25 Q    How --

**Page 61**

1 A    I'm not finished yet.

2 Q    Go ahead.

3 A    See, unfortunately, I have been in the
4 position -- we are coming from two different
5 worlds. I'm coming from the world of physics
6 and fact finding and you are coming from the
7 world of lawyership and for you, two and two
8 could be anything plus, from zero to four to
9 eight. So I'm here for a fact-finding
10 mission and you're trying to kind of put me
11 in some sort of stumbling block, whether it
12 is the "Baker and Hostetler" there, whether
13 there is a kind of privilege, kind of
14 confidentiality between me and CSU, and
15 actually, the best way of kind of expressing
16 my opinion is the language of the claim one
17 of '021. See, playing with words is not
18 going to help us to find the facts. We are
19 here, the expert of the our group is here for
20 fact finding.

21 Q    Dr. Rashidi, are you answering my
22 question?

23 A    I'm not done. I'm not done.

24 Q    Go ahead, but I'm going to -- go ahead.

25 A    Please ask me as much question -- I

**Page 62**

1 have as much time for you as you want for a
2 second deposition, for a third deposition.
3 All I'm saying is you are trying to kind of
4 play with language and depict that there were
5 certain notes that intentionally or
6 unintentionally were destroyed or hidden.
7 That is not the case. I appreciate if you
8 would stay on a fact-finding mission rather
9 than painting me into a corner with use of
10 language and things like that.

11 Q    Let's do that. Let's go into your
12 world of engineering and science, sir.

13 A    Sure.

14 Q    You're a professor at Cleveland State,
15 aren't you?

16 A    That's right.

17 Q    You have students at Cleveland State
18 University who are mechanical engineering
19 students?

20 A    That's right. That's right.

21 Q    You tell your students who are
22 mechanical engineering students at Cleveland
23 State University to keep lab notebooks during
24 their testing; is that accurate?

25 A    I don't teach lab courses.

**Page 63**

1 Q    But isn't that accurate, during lab
2 courses and testing, that students might --
3 design or engineering students at Cleveland
4 State are taught to maintain or keep lab
5 notebooks?

6        MR. AYCOCK:  Objection.

7        Lacks foundation.

8 A    See --

9 Q    Answer the question, sir.

10 A    I don't teach lab courses so I am never
11 getting to the point of asking people to take
12 lab notes.

13 Q    So you don't know if it's good
14 protocol, as a mechanical engineer, to
15 maintain a lab notebook for testing?

16 A    I'm not here to testify about the
17 mechanical engineering students and how they
18 are treated. That's beside the point of this
19 case.

20 Q    What about you as a professional
21 engineer or mechanical engineer? Is it good
22 practice to maintain lab notebooks for
23 testing?

24 A    I do that on my computer, yes.

25 Q    You're saying that those lab notebooks

**Page 64**

1 or your testing notes no longer exist other
2 than what's set forth in your report; is that
3 accurate?

4 A    Your question is not accurate. See, my
5 lab notes, my test notes evolve to a report
6 so I did not destroy them, I did not hide
7 them. The same exact statements had the same
8 results with minor modification of format and
9 take this word and put another word, put in
10 article t-h-e because it was missing during
11 the taking of the experiment. Those notes
12 have evolved to a report without destroying
13 that. Which part of that is difficult?

14        It seems you are very happy to just get
15 this point and somehow show that some notes
16 were destroyed. That is not the case so you
17 are inaccurate in terms of posing this
18 question.

19 Q    How do you know, if the notes no longer
20 exist, that all of the notes that you
21 originally took are set forth in your report?

22        MR. AYCOCK:  Objection.

23        Mischaracterizes the prior testimony,

24        inaccurate statement.

25 A    It seems, either it's just me or you,

Page 65

1 we have some difficulty for communication.
2 I'll give you a step-by-step example. Let's
3 say I want to have one test. I want to fill
4 up my cup of coffee with coffee. I go there
5 and I push the button and I fill it up and I
6 come over here and then I go to my laptop and
7 I say I took the cup to the coffee machine, I
8 filled it up halfway and I add sugar and I
9 stir it up and that's it.
10      Now, later on, I come and make that to
11 a report so I come and add that when I was
12 coming there I went and I picked up
13 Mr. Robert Aycock and blah, blah so it
14 becomes a report. And then the same
15 statement that I typed, it's still there, and
16 you are trying to depict that that statement
17 isn't there anymore. I just added material
18 to make it like a report for saving time. So
19 I'm not going to take notes and then later on
20 go and retype the same experiment again.
21 Does that -- I mean, maybe somebody else
22 should help me here. Is this clear or is it
23 ambiguous?
24           - - - - -
25      (Plaintiff's Exhibit 105 was

Page 66

1      marked for identification.)
2           - - - - -
3 Q    I'm going to hand to you what's been
4 marked as Plaintiff's Exhibit 105. It states
5 on the front, "Expert Report of Majid
6 Rashidi, Ph.D., P.E."; do you see that?
7 A    That's right.
8 Q    Is this your report, sir?
9 A    That's right.
10 Q    Take a look at page 30 of this report.
11 You'll see a signature at the bottom. Is
12 that your signature, sir?
13 A    That's my signature, yes.
14 Q    It's dated December 17th, 2007; do you
15 see that?
16 A    That's right.
17 Q    Did you write this report, sir?
18 A    That's right.
19 Q    Did you write every word in this
20 report?
21 A    I basically wrote all of the technical
22 aspects of this report, yes.
23 Q    What didn't you write?
24 A    The report.
25 Q    What did you not write in this report?

Page 67

1 A    Basically everything is written by
2 myself and I asked Mr. Robert Aycock to
3 correct my grammar if there is any mistakes
4 because even now when I write something I
5 typically miss articles t-h-e, I may miss
6 genders and so forth. So I asked him to
7 basically look at the English and grammar of
8 it and help me with that.
9 Q    Is it your testimony, then, that you
10 prepared the first draft of this report?
11 A    This is my report, basically.
12 Q    Did you hand a draft of your report to
13 your lawyers for review?
14 A    As I said, I sent the same report and
15 when I got it back, the grammar was kind
16 of -- anything that I had mistakes, it was
17 corrected, the grammar, English grammar.
18 Q    Take a look at page two to the report
19 behind the cover page. There's a
20 paragraph -- it's the Roman numeral two.
21 A    Okay.
22 Q    Did you prepare that paragraph?
23 A    No.
24 Q    Did the lawyers, the Back To Basics
25 lawyers prepare that paragraph?

Page 68

1 A    That's right.
2 Q    Does this report identify all of your
3 opinions regarding invalidity, sir?
4 A    This report basically, as I said, I
5 reserve the right to amend this, to add to
6 it. So when you say all of it, I would say I
7 may find something tomorrow to add to this
8 report. So this report conveys my opinion up
9 to this point.
10 Q    That's what I'm asking.
11 A    You said all of it.
12 Q    Right.
13 A    To this point in time. Because you
14 ignore to put the words "at this point in
15 time." Up to this point in time, it
16 basically conveys my opinion.
17 Q    Okay.
18      There's nothing missing in regards --
19 there's no other opinions that you have up to
20 this point regarding invalidity; is that
21 accurate?
22 A    As I said, I consider this case ongoing
23 and I may add material to it so this is --
24 this is my opinion up to this point.
25 Q    Does your report here identify a

Page 69

1 complete statement of all your opinions
2 you're expressing to this point?
3 A     At the time that I prepared this
4 report, that was my opinion and I reserve the
5 right to amend it, to add to it, but the
6 basics of it will stay the same.  I'm not
7 going to change my opinion.
8 Q     Today is January 25, 2008.  Are your
9 opinions today the same as the opinions you
10 set forth in Plaintiff's Exhibit 105, your
11 invalidity report?
12 A     Absolutely.  That's right.
13 Q     You have no additional opinions; is
14 that right?
15 A     I have -- I mean, as I said, based on
16 further study, I may supplement this and I
17 may find more fact-finding reasons to convey
18 to you and to convince other people that I'm
19 right.
20 Q     So are you saying, based off that
21 statement, that your report of December 17,
22 2005 that's labeled Plaintiff's Exhibit 105
23 does not identify your full basis for
24 invalidity?
25 A     No.  The report is complete.  I can add

Page 70

1 material to it for further clarification.
2 Q     Are you planning on adding further
3 material for clarification?
4 A     If need be, I will.
5 Q     I've asked you about three or four
6 times and you keep qualifying your answer
7 that you're going to amend, that you're going
8 to supplement.
9       I'm just asking, right now, do you have
10 any plans of supplementing or amending your
11 report here of December 17, 2007 that's
12 labeled as Plaintiff's Exhibit 105?
13 A     Are you done?  Can I answer that now?
14 Q     Yes.
15 A     As far as I am concerned, my opinion
16 has been said in my first report.  Any
17 further documents that I provide, whether
18 it's testing or statement, will be for
19 further clarification of it.  It's not going
20 to change my opinion.  It's going to clarify
21 for people who are not in the field to
22 understand it.
23 Q     Does your report identify all the bases
24 for your opinions?
25 A     True, yeah.

Page 71

1 Q     Your report identifies all your
2 opinions at this point in time?
3 A     Yeah.  Yeah.
4 Q     Your report identifies all the reasons
5 for your opinions; is that accurate?
6 A     All the reasons.  There might be some
7 other reasons that I may need to add for
8 further clarification but to this point for
9 some -- basically I wrote this report for an
10 expert which is the expert of Vita-Mix, for
11 the expert to read and understand what it is
12 but if I need to further clarify this for a
13 nontechnical person, I reserve the right to
14 do that.
15 Q     Does your report identify all the
16 reasons for your opinions at this point in
17 time?
18 A     Does my report -- would you elaborate
19 on that question?
20 Q     Sure.
21       What part do you not understand and
22 I'll help you?
23       MR. AYCOCK:  Why don't we
24       have the question read back?
25 Q     I can ask it again.

Page 72

1       Does your report identify all the
2 reasons for your opinions at this point in
3 time?
4 A     All the reasons -- it basically
5 reflects the majority of reasons, yeah.
6 Q     What reasons are not reflected in this
7 report regarding your opinion?
8 A     See, I'm an educator.  If I want to
9 explain a technical subject, I would like --
10 depending upon the audience, I use different
11 language and different techniques so as I
12 said, this report was written for an expert.
13 If I need to explain the same thing to a kind
14 of layman person with no education, then I
15 would bring some other reasoning.  So that's
16 why when you use the word "reason," "all the
17 reason," for me, that reason has a meaning.
18 So for reasoning, to a layman, I would use a
19 probably different language or different
20 technique.
21 Q     Are there any reasons that are not in
22 your report that you require to render an
23 opinion here?
24 A     For an expert, everything is here.
25 Q     Does your report identify all data or

Page 73

1 information that you considered in forming
2 your opinions in the report identified as
3 Plaintiff's Exhibit 105?
4 A     You mean the December 17th --
5 Q     Correct.
6 A     As I said, part of the material that I
7 produced reflects my second report so a
8 combination of the two, yeah.  Yes.
9 Q     Are you saying, then, that your
10 invalidity report of December 17, 2007 is not
11 complete with respect to your opinions
12 regarding validity?
13 A     It is complete.  It is complete and
14 basically, I have based my opinion based on
15 the information that I had and I had included
16 in this report.
17 Q     So your second rebuttal report of
18 January 7, 2008 does not include any bases,
19 facts or data supporting --
20 A     It does.
21 Q     Hold on.  Let me ask it -- let me
22 finish my question, sir.
23      What I'm asking is the data and
24 information that's set forth in your January
25 7 -- excuse me -- in your December 17, 2007

Page 74

1 report is the complete data or information
2 necessary for you to provide an opinion of
3 invalidity; is that accurate?
4 A     Oh, definitely, yeah.
5 Q     Are you saying that you provided an
6 opinion regarding invalidity -- any opinion
7 regarding invalidity in your January 7, 2008
8 report?
9              MR. AYCOCK:  Objection.
10      Vague.
11 A     Would you elaborate on the question
12 again?
13 Q     Sure.
14      Do you understand when I say "January
15 7, 2008 report," which one I'm referring to?
16 A     Yeah.  The second report.
17 Q     Right.
18 A     For me, just say first or second --
19 yeah.  Second report, yeah.
20 Q     The second report.  I'll call it the
21 rebuttal report.
22 A     Yeah.  That's --
23 Q     Okay.  The rebuttal report.
24      Does your rebuttal report have any
25 opinions, data or information that you are

Page 75

1 relying upon for your invalidity opinion?
2 A     That's right.
3 Q     You do?
4 A     Yeah.
5 Q     Why did you not include that data or
6 information that's set forth in your rebuttal
7 report in your first invalidity report of
8 December 17, 2007?
9 A     Because I didn't think that was
10 necessary for an expert.
11 Q     Can you elaborate on that answer?  I'm
12 not sure what you mean by that.
13 A     See, if you look at my first report,
14 close to the end, I have certain very kind of
15 straightforward statements on page 27
16 starting with letter X.  Do you see that,
17 page 27, letter X, "Enablement"?
18 Q     Yes.
19 A     If you read that, if somebody's an
20 expert, these things are so straightforward
21 and obvious that it will be very clearly
22 understood that what I'm trying to convey in
23 this report as far as enablement is
24 concerned.  And when you look at the tables
25 that I have provided in the previous pages in

Page 76

1 the matter of infringement based on
2 anticipation or lack of the infringement
3 based on anticipation and some other issues,
4 I consider that pretty straightforward.  So I
5 didn't need to present any tests and I
6 reserve the tests -- if there is any question
7 further, then I can basically share my
8 testing results.
9 Q     So you agree with me, then, that you
10 did not identify any testing in your
11 enablement analysis in your expert report of
12 December 17, 2007; is that accurate?
13 A     I based my opinion based on those tests
14 because if you look at those tests it was
15 done prior to this report.
16 Q     Take a look at your enablement section
17 starting on page 27 and identify for me the
18 testing or data that you relied upon for that
19 opinion in your report.
20 A     As a matter of fact, the entire section
21 is written based on my tests on page 27.  I'm
22 talking about Newtonian, non-Newtonian, RPM,
23 viscosity, density, and these are the type of
24 material that I tested and I observed and
25 believe it or not, even before testing, I had

Page 77

1  a hunch that my -- I mean, anytime you do a
2  test, you have a kind of anticipation for the
3  result of the test.  So all the tests that I
4  did, it basically verified my anticipation so
5  all the statements that you are seeing here
6  is based on the tests that I did.
7  Q      Identify the testing that you conducted
8  in your enablement analysis in your report.
9  Show me where it says that you performed
10 testing.
11 A      I don't say it here.
12 Q      Okay.
13 A      Yeah.
14 Q      So in other words, you do not state --
15 even though you said your opinion here of
16 December 17, 2007 is your full opinion and it
17 sets forth all your bases, you did not
18 include any experimentation supporting your
19 enablement analysis; is that accurate?
20 A      That's accurate, yeah.
21 Q      How many drafts of this report were
22 there?
23 A      Basically I wrote the report and I sent
24 it to Mr. Robert Aycock for getting
25 assistance for kind of fixing the grammar and

Page 78

1  English and that's how -- and that's how,
2  basically, this report came to writing.
3  Q      How long did it take you to write the
4  first draft of this report?
5  A      Actually I started, believe it or not,
6  way back right after I started -- I mean, I
7  finished the tests but I had it in my
8  computer and I let it go and then I came back
9  to it in the month of December.
10 Q      For the prior art that you identify in
11 your report, identify for me which ones that
12 you've -- did you find any of those prior art
13 references on your own or were all of those
14 provided to you by the Back To Basics
15 lawyers?
16 A      Actually, I asked for them.  I asked
17 for any patent which relates to blenders and
18 basically that was the requirement and they
19 sent me, basically, a long list and I looked
20 at them and basically identified four of them
21 for my report that are tabulated.
22 Q      So all the patents that you identify or
23 rely upon in your opinion were provided to
24 you by the Back To Basics lawyers; is that
25 accurate?

Page 79

1  A      Based on my request, yes.  Based on my
2  request.
3  Q      And you did not provide any prior art
4  search on your own; is that accurate?
5  A      That's accurate.
6  Q      Why didn't you perform any prior art
7  search on your own?
8  A      Just a matter of time.  I didn't want
9  to spend the time.  Anybody -- high school
10 students can go and do a patent search.
11 Q      So in other words, it's a pretty simple
12 act to do a patent search; is that right?
13 A      I have done it myself.  It just takes
14 time.
15 Q      You've done a patent search prior to
16 rendering or analyzing this -- let me strike
17 that.
18        You've done patent searches prior to
19 your involvement in this litigation; is that
20 right?
21 A      Patent search for this case or other
22 cases?
23 Q      Other cases.
24 A      Yeah, I have done patent searches.  I
25 usually go to The Cleveland Library.  On the

Page 80

1  fourth floor, you'll see there are
2  microfiches -- first of all, you can search
3  them on Internet, Google, and then if you
4  want to see the document, if you have a good
5  paid account on the computer, you can see it
6  right there.  If you don't, you go to the
7  fourth floor of The Cleveland Library and
8  then you pull the patent up on the microfiche
9  and I have done that.  And I know it's kind
10 of elaborate, time consuming.  Basically I
11 consider it, excuse my language, a
12 no-brainer, so I said, "Please give me all
13 the patents which pertains to blenders."
14 Q      While you know how to do patent
15 searches and have done them in the past, you
16 did not do one in this litigation; is that
17 right?
18 A      That's correct, because I know how long
19 does it take and it's kind of not the best
20 use of my time.  I don't want to charge $175
21 per hour and then go and do patent searches.
22 Q      You did not retain anybody on your own
23 to do a patent search for less money; is that
24 right?
25 A      No.

Page 81

1 Q    Instead you asked the Back To Basics
2 lawyers to do the patent searching for you;
3 is that right?
4 A    Basically the statement was, "Please
5 find any patent that pertains to blenders and
6 submit it to me."
7 Q    Take a look at page two of your
8 report --
9 A    Okay.
10 Q    -- under the section called
11 "Information and Documents Reviewed"; do you
12 see that?
13 A    Uh-huh.
14 Q    The third paragraph, it starts with,
15 "In connection"; do you see that?
16 A    Yeah.
17 Q    The second sentence states, "The
18 following patents, included in alphabetical
19 order as Exhibits 3 through 68, are referred
20 to herein"; do you see that?
21 A    That's right.
22 Q    Are those your words?
23 A    Yeah.
24 Q    Then below that, it states, "US
25 Patents"; do you see that?

Page 82

1 A    That's right.
2 Q    And identifies 3 through 68, various US
3 patents; do you see that?
4 A    That's right.  69, actually.
5 Q    Then it goes on to say, for example, in
6 number -- entry number three on page two, "US
7 Patent Number Design 269,471 to Auerbach,
8 included as Exhibit 3 (hereinafter referred
9 to as Auerbach)"; do you see that?
10 A    Uh-huh.
11 Q    Why did you write, "Hereinafter
12 referred to as Auerbach" there?
13 A    As a matter of fact, I noticed that
14 this was another thing that I don't know why
15 it was not mentioned because I'm not
16 referring in my report to most of these
17 patents so this is just like that "Baker and
18 Hostetler."  I was -- I write these things in
19 a kind of generic format and I cut and paste.
20 Q    In other words, it was a typographical
21 error; is that right?
22 A    Yes.  In other words, I'm not depending
23 on every 69 of these patents of this report,
24 only on some of them, but because I'm
25 generically cutting and pasting, that

Page 83

1 "hereinafter referred to" stuck with all of
2 them.
3 Q    Is it accurate, then, that your report,
4 in your opinion, regarding invalidity is only
5 based on the patents or prior art references
6 that you specifically identify in your
7 analysis; is that right?
8 A    That is just one aspect of it.  Not
9 only -- it's not relying only on those four,
10 it's relying on the observations of the two
11 machines and common sense as well.
12 Q    But the other patents here under 3
13 through 68, if they're not referred later in
14 your report --
15 A    No.
16 Q    -- they are not part of your invalidity
17 opinion; is that right?
18 A    Exact --
19 Q    I'm sorry?  What's your answer, sir?
20 A    There might be some that I can extract
21 more from it.  For me at that point those
22 four that I mentioned are the most relevant
23 ones but I reserve the right to go back to
24 those patents and if I can extract something
25 to strengthen my case, I reserve the right to

Page 84

1 do that.
2 Q    But you've already reviewed these
3 patents, correct?
4 A    Yeah.
5 Q    You haven't found, to this date,
6 anything else that you can extract out of
7 those patents to support your opinion; is
8 that right?
9 A    It might have slipped my mind so as I
10 said, I reserve the right to go back to them
11 and extract something.
12 Q    But up to this point you have not
13 extracted, from those remaining patents,
14 anything to support your opinion; is that
15 right?
16 A    That's true.  That is true.
17 Q    For your invalidity report here that's
18 dated December 17, 2007 and it's marked as
19 Plaintiff's Exhibit 105, did you review any
20 deposition transcripts in the preparation of
21 your invalidity report?
22 A    No.
23 Q    Did you review any of the deposition
24 transcripts of the inventors of the Vita-Mix
25 '021 patent in preparation of this report?

Page 85

1 A    No depositions, no.

2 Q    Did you review any Back To Basics

3 internal testing documents?

4 A    No.

5 Q    Did you review any Back To Basics

6 internal engineering documents?

7 A    No.

8 Q    Have you done so at any point in time?

9 A    I have not seen any documentation from

10 Back To Basics.  I have seen Back To Basics's

11 product and I have tested Back To Basics's

12 product.

13 Q    So as we sit here today, you have not

14 reviewed any deposition transcript or any

15 Back To Basics internal document; is that

16 right?

17 A    Not at all.  Correct.

18 Q    Take a look at page eight.  There's a

19 heading that states "Level of Ordinary Skill

20 in the Art and Field of the Invention"; do

21 you see that?

22 A    That's right.

23 Q    What's your understanding of the level

24 of ordinary skill in the art and field of the

25 invention in this litigation?

Page 86

1 A    In this particular case for blenders,

2 the level of ordinary skill would be somebody

3 who has a college degree in, let's say,

4 mechanical engineering specifically which

5 deals with fluid mechanics and dynamics and

6 so forth and understanding momentum, forces,

7 pressures, and that could be kind of replaced

8 by somebody who is working in the blender

9 industry for a couple of years or maybe

10 more.  So somebody who is kind of involved

11 with blenders.

12    I did, at a theoretical level, because

13 when you go to universities and look

14 at undergrad students, they don't necessarily

15 work on blenders but if you show them a

16 blender, they understand the principle of

17 operation because they have fundamental

18 courses in fluid mechanics and dynamics and

19 so forth.  So that's what I mean by ordinary

20 skill in the field.

21 Q    Based on your definition, do you

22 believe that Dr. Lee Swanger is a person of

23 ordinary skill in the art, in the blender

24 design art and in this field of invention?

25 A    I don't know the level of his

Page 87

1 innovative or creativity, but technically,

2 sure, yes.

3 Q    So you agree with me, then, that

4 Dr. Swanger is a person of ordinary skill in

5 the art in this field; is that right?

6 A    That's right.

7 Q    Take a look at page nine.  You'll see a

8 heading that states "Anticipation" on page

9 nine of your report.

10 A    That's right.

11 Q    This "Anticipation" section starts on

12 page 9 and ends --

13 A    On page 12.

14 Q    -- on page 14.

15 A    Page 14.

16 Q    So pages 9 through 14 of your report

17 identifies your opinion regarding

18 anticipation; is that correct?

19 A    That's correct.

20 Q    Is that your full opinion regarding

21 anticipation, sir?

22 A    This is my opinion regarding

23 anticipation up to this point, yes.

24 Q    It's your complete opinion regarding

25 anticipation up to this point; is that

Page 88

1 correct?

2 A    It is complete as of today.

3 Q    All the bases for your opinion

4 regarding anticipation as of today is set

5 forth in this report on pages 9 through 14;

6 is that accurate?

7 A    That's right, on the second column of

8 this table.  And I would like to have a

9 little statement here.

10 Q    Is it in response to a question of

11 mine?

12 A    Yeah.

13 Q    Which question?

14 A    The anticipation.  My idea about

15 anticipation are reflected in these pages.

16 Q    The first sentence under "Anticipation"

17 states, "I understand that to invalidate a

18 patent claim by anticipation, each and every

19 element of the claimed invention must be

20 disclosed in a single prior art reference as

21 viewed by a person of ordinary skill in the

22 art"; do you see that?

23 A    That's right.

24 Q    Is that accurate?

25 A    That's accurate, sure.

Page 89

1 Q    How do you know that that's how you
2 determine anticipation?
3 A    Basically, I've done studies on
4 infringement and kind of invalidity of
5 patents so I have -- I have done my studying
6 also.
7 Q    Did the Back To Basics lawyers explain
8 to you that that's the law of anticipation as
9 well?
10 A    I asked for that and then that was
11 provided now.
12 Q    What else was provided to you regarding
13 the law of anticipation by the Back To Basics
14 lawyers?
15 A    Basically when I get this type of
16 initial information I go and do some research
17 myself.  So I have done some Google searches
18 and looked at other cases and see how
19 anticipation is defined and exercised and so
20 forth.
21 Q    Is the methodology -- is that -- this
22 first sentence in the anticipation sentence
23 on page nine that I just read, is that the
24 full methodology for determining anticipation
25 in a patent dispute?

Page 90

1 A    This is what I have relied on.  This
2 part of it, I have used.  If there are other
3 nitty-gritty details, I don't need it to use
4 here.  I'm just going based on the
5 fundamental definition.
6 Q    So your methodology for determining
7 anticipation is based on this first sentence
8 which states that, "I understand that to
9 invalidate a patent claim by anticipation,
10 each and every element of the claim invention
11 must be disclosed --"
12 A    That's right.
13 Q    "-- in a single prior art reference as
14 viewed by a person of ordinary skill in the
15 art," correct?
16 A    That's correct.
17 Q    Is this the first anticipation analysis
18 you've ever provided for any litigation?
19 A    That's correct.
20 Q    Who provided this methodology regarding
21 the determination of anticipation?
22 A    As I said, I asked Mr. Robert Aycock if
23 I want to investigate on how I can anticipate
24 or how you can basically show that a patent
25 has been disclosed or taught by previous

Page 91

1 prior art, lead me to the place that I can
2 find out the language and that's what I did.
3 Q    Your report does not identify that the
4 Vita-Mix '021 patent is presumed valid; is
5 that accurate?
6 A    Please repeat the question.
7 Q    Sure.  Your -- let me strike it,
8 actually.  Let me ask it a different way.
9     Do you agree with me that the Vita-Mix
10 '021 patent is presumed valid?
11 A    When they issue the patent it's
12 presumed valid, yeah.
13 Q    You agree with me that the Defendants
14 here, the Back To Basics Defendants, have the
15 burden of proving invalidity by clear and
16 convincing evidentiary standard?
17 A    That is basically the reasonable
18 assumption.
19 Q    Is that your understanding?
20 A    That's my understanding.
21 Q    Do you agree with me the Defendants
22 must prove invalidity by even a higher
23 standard if the United States Patent and
24 Trademark Office considered a prior art
25 that's being used in an anticipation analysis

Page 92

1 during the prosecution of the Vita-Mix '021
2 patent?
3         MR. AYCOCK:  Objection.
4         Vague, ambiguous, calls for a legal
5         conclusion.
6 A    That question was so long that I missed
7 it.
8 Q    Sure.  That's okay.
9 A    It was a pretty long question.
10 Q    Sure.
11 A    By the way, sir, you talk pretty fast.
12 Q    I'll slow down for you.  Not a problem.
13         MR. AYCOCK:  For help and
14         ease of clarification, if --
15         MR. CUPAR:  Sure.
16 Q    Do you agree with me that the Back to
17 Basics Defendants must prove invalidity by
18 even a higher standard if the United States
19 Patent and Trademark Office considered a
20 prior art reference that you are considering
21 in your anticipation analysis?
22         MR. AYCOCK:  Same objection.
23 A    But the thing is if you go back to the
24 prosecution history and the way that single
25 claim of '021 was basically allowed, I would

Page 93

1 say that certain things that were
2 communicated between the inventor of Vita-Mix
3 and the patent examiner was kind of not
4 discussed very clearly.  That's why the
5 patent examiner allowed them a very narrow
6 band of, kind of, claim and after that claim
7 was allowed as a method claim, it is my
8 understanding that Vita-Mix is trying to, on
9 their own, expand the scope of the claim.
10 Q    Do you agree with me that the Back to
11 Basics Defendants must prove invalidity by
12 even a higher standard if the Patent and
13 Trademark Office considered the prior art
14 that you're considering during the
15 prosecution of the Vita-Mix '021 patent?
16      MR. AYCOCK:  Objection.
17      Calls for a legal conclusion.
18 A    As I said, one of the patents that I'm
19 using as a prior art that the patent examiner
20 has seen is that of Jacobsen and the reason
21 Vita-Mix basically withdrew 15 claims of
22 their patent from 16 and kind of summarized
23 as to one was the way they argued about the
24 prior art, Jacobsen, and the fact that, well,
25 there is a stir stick and so forth and so

Page 94

1 on.  What they did not disclose, Vita-Mix,
2 was the fact that the problem existed but
3 nobody knew about it.
4      For example, the way they got around
5 the Jacobsen's patent was -- in other words,
6 the patent examiner did not have access to
7 the Wayne patent and Vita-Mix, in my opinion,
8 incorrectly claimed that they were the first
9 one who understood the problem.  And how
10 could Jacobsen, who doesn't even talk about
11 the existence of a problem, offer a
12 solution?  So this is a very huge
13 assumption.
14      So this is one of those things that, in
15 my opinion, has fallen between the cracks.
16 I'm not criticizing the patent examiner but
17 if the patent examiner had access to Wayne,
18 they might have had a different situation.
19 So here we have a kind of gray zone area that
20 all of us are trying to resolve.
21 Q    So is it accurate, then, that Jacobsen
22 does not disclose air pockets or preventing
23 air pockets?
24 A    It does not talk about air pockets and
25 that's exactly what the Vita-Mix has used to

Page 95

1 allow -- to get allowance for this claim
2 because they say they are the only and first
3 ones who talk about air pocket and
4 deleterious problems of an air pocket, and
5 how could Jacobsen, who doesn't know about
6 this, would offer solution?  But the
7 presumption, in my opinion, is if somebody
8 has a patent, they have access or knowledge
9 of the prior art.  So if they don't
10 specifically talk about it, then
11 unfortunately the patent examiner kind of
12 didn't include that because he didn't have
13 access to the Wayne patent.
14 Q    Is it accurate, then, that Harris also
15 does not disclose a method of preventing
16 formation of an air pocket?
17      MR. AYCOCK:  Objection.
18      Lacks foundation.
19 A    As I said, let's go back to the level
20 of ordinary skill in the art.  When these
21 different patents put an object or a device
22 within the -- with the pitcher of a
23 blender, supposedly it does the exact same
24 thing that the plunger of Vita-Mix does.
25 Now, whether they talk about it or not, to

Page 96

1 me, it's not an issue because to a person of
2 ordinary skill, if they, as I said, naively
3 see a channel and you have, let's say, a
4 receptacle for having ice in it, it does the
5 job.  So I'm saying all of these things in
6 relationship to the person of ordinary skill
7 in the art.  So even in they don't explicitly
8 talk about it, it doesn't mean that it's not
9 there.  That's my opinion.  For example --
10 Q    Let me ask the next question here.
11      MR. AYCOCK:  Wait, wait.
12      Was your answer complete on
13      that question?
14 A    My complete answer is that anytime you
15 have a patent, one of the kind of interesting
16 statements at the end is that this is the
17 preferred embodiment.  Other embodiments that
18 I haven't shown here or it's not even
19 discussed here is claimed kind of implicitly
20 because a person of ordinary skill in the art
21 can deduct from that.
22 Q    Dr. Rashidi, what was my last question?
23 A    Your last question was whether this --
24 because prior art was available to the
25 examiner, you have a higher burden of proof

Page 97

1 to say that a patent is invalid using that
2 particular patent and I'm trying to go
3 through the gray zone that how this has
4 developed.  If it was as clear as what we
5 said, none of us would be here today.
6 Q    That wasn't my question and I think I'm
7 figuring out the problem here.  You keep
8 going on with these answers that have nothing
9 to do with my question.
10     This is my question:  Does Harris
11 disclose a method of preventing the formation
12 of an air pocket, yes or no?
13 A    Not explicitly --
14 Q    No, it doesn't.
15 A    -- but to a person of prior art, it
16 does.  I mean, a person of ordinary skill in
17 prior -- in the field, it does.
18 Q    How does Harris disclose or teach or
19 whatever, to a person of ordinary skill in
20 the art, preventing a formation of an air
21 pocket?
22 A    I have to look at the -- I have to look
23 at the patent figures and I'll tell you
24 because I don't memorize anything.
25 Q    Is it in your opinion?  Isn't that

Page 98

1 your --
2 A    Yeah.
3 Q    Is that your opinion?
4 A    Yeah.
5 Q    Explain to me your opinion, what that
6 basis is.
7 A    I have to look at the figure of the
8 patent.  I have to look at the figures that
9 are disclosed in that patent and I'll explain
10 it to you.
11 Q    You do agree with me, though, that
12 Harris does not disclose a method of
13 preventing the formation of an air pocket?
14 A    The only patent which directly does
15 that is Wayne.
16 Q    Okay.
17     So Jacobsen also does not disclose a
18 method for preventing the formation of an air
19 pocket around rotating blades, correct?
20 A    They don't explicitly talk about air
21 pocket, that's true, yeah.  It's in the
22 patent.
23 Q    The Vita-Mix 3600 and 4000 blenders, do
24 you recall those?
25 A    Yeah.

Page 99

1 Q    Do those disclose a method of
2 preventing the formation of an air pocket
3 around rotating blades?
4 A    No.
5 Q    Take a look on page ten, sir.  There's
6 a heading that states "Summary of
7 Anticipation By Wayne"; do you see that?
8 A    Page ten?  That's right.
9 Q    You identify this as a summary but you
10 previously testified here that this report
11 fully discloses your entire opinion regarding
12 anticipation; is that accurate?
13 A    I really don't understand your
14 question.
15 Q    Sure.
16 A    I'm using the word "summary" here as my
17 choice and I -- actually, the reason I call
18 it "summary" is because I'm tabulating
19 something.  So in engineering when we
20 tabulate something, we call it a summary, but
21 if you have a different meaning for "summary"
22 in the legal system, I'm not using it in that
23 regard.
24 Q    That's what I'm asking.
25     Does this summary of anticipation by

Page 100

1 Wayne starting on page ten and ending on page
2 ten include your full opinion regarding why
3 you believe Wayne anticipates claim one of
4 the '021 patent?
5 A    Yeah.  That's a tabulated summary of
6 the claim, yeah.
7 Q    So it's a complete -- so this section
8 here provides your full and complete opinion
9 regarding the anticipation by -- what you
10 believe is the anticipation by Wayne of --
11 A    That's right.
12 Q    -- claim one of the '021 patent; is
13 that correct?
14 A    That's correct.  So here, by summary, I
15 mean a table just like what we refer to in
16 engineering.
17 Q    Can you identify for me where you
18 identify your interpretation of claim one of
19 the '021 patent, be it in this section or any
20 other part of your opinion --
21     MR. AYCOCK:  Objection.
22     Calls for --
23 Q    -- regarding invalidity?
24     MR. AYCOCK:  Objection.
25     Calls for a legal conclusion.

Page 101

1 A    Would you please repeat the question?

2         (Record read.)

3 A    Okay.  I got it.

4      If you look at the claim one of '021
5 patent, there are several statements in that
6 single claim and what I'm doing here is I am
7 tabulating a two-column table and in the left
8 column, I put the claim of the patent plus
9 whatever the court has determined what the
10 claim means and on the right side, I'm
11 extracting what the Wayne teaching is and I'm
12 basically, in a very self-explanatory
13 fashion, I put it row by row next to each
14 other.

15      So in my opinion, what I have put, for
16 example, on page ten on Wayne, is I'm saying
17 that on the very first point of the method
18 for preventing the formation of an air
19 pocket, Wayne basically has that in his
20 detailed descriptions and he has put a device
21 on top -- above and on top of the blade and
22 according to the court definition it's a
23 device and so forth.  So this is how I'm
24 doing it in this table and other tables.

25 Q    Dr. Rashidi, what was my last

Page 102

1 question?

2 A    What was your opinion on -- "What is
3 your interpretation of this anticipation,"
4 and I'm telling you that my interpretation is
5 what I have written on the right column.

6 Q    On the right column, though, is your
7 statement regarding where you believe Wayne
8 discloses the claim elements of claim one of
9 the '021 patent, right?

10 A    That's right.

11 Q    I'm not asking about that.

12      What I'm asking for is where's your
13 interpretation or understanding of the claim
14 terms in claim one of the '021 patent in your
15 opinion as set forth in your report?

16         MR. AYCOCK:  Objection.

17         Calls for a legal conclusion as the
18         court has already construed the
19         claim.

20 A    As I said, I was relying on the
21 definition of the claims by the court.  So
22 for example, they say when it comes to
23 stirring or when it comes to like above and
24 on top of the blade, it means just that.  I'm
25 relying on those kind of definition of the

Page 103

1 claim.

2 Q    Other than what the court has
3 identified in its claim construction order,
4 you have no -- do you agree with me that you
5 have no opinion regarding your interpretation
6 or understanding of these claim terms?

7 A    I am solely relying on what the court
8 has defined as the claim.

9 Q    You have not provided any opinion,
10 understanding or interpretation of any of
11 these claim terms in your invalidity report
12 or in your opinion; is that right?

13 A    As I said, I'm basically relying -- I'm
14 taking what court has defined as the meaning
15 of the statement of the claim and I'm
16 basically using that as a criteria to come up
17 with these opinions.

18 Q    Dr. Rashidi, what was my last question?

19         MR. AYCOCK:  Objection.

20         Argumentative.

21 A    I am using the definition of the
22 court's claim line by line and I'm saying
23 that if we stick to the court's definition of
24 the claim, whether it's stirring or
25 prevention and so forth, I'm using that as a

Page 104

1 criteria to basically declare Wayne as
2 something which is anticipating '021 patent.

3 Q    Dr. Rashidi, you didn't even answer my
4 question.  My question was, before that, what
5 was my last question.  What was it?  Do you
6 recall what I asked you?

7 A    No.  Believe it or not, no.

8 Q    Okay.  Okay.  I want you to listen to
9 my question and answer my question, sir,
10 okay?

11 A    Okay.

12 Q    Do you have any opinion, interpretation
13 or understanding, other than the claim
14 court's order, construction order, regarding
15 the meaning of the terms of claim one of the
16 '021 patent?  Are they set forth anywhere in
17 your report?

18         MR. AYCOCK:  Objection.

19         Compound.

20 A    You mean personally?

21 Q    Yes.

22 A    As a common sense, yes, I do have an
23 opinion.

24 Q    Where is it set forth in your report?

25 A    As I said, my personal opinion, in my

Page 105

1 opinion, doesn't matter. I'm going to go
2 with what the court has defined.
3 Q    Because your personal opinion does not
4 matter you did not identify it in your
5 report; is that accurate?
6 A    My personal opinion matters with me but
7 I would like to go with the law.
8 Q    So you believe your opinion is
9 consistent with the court's claim
10 construction?
11 A    That is definitely a yes answer.
12 Q    You do not have any additional
13 opinions, interpretations or understandings
14 regarding the meaning of these claim terms
15 that you set forth in your report; is that
16 accurate?
17 A    As I stated, I have answered your
18 question several times. I am relying only on
19 the court's definition.
20 Q    Could you identify for me your
21 understanding or interpretation of what the
22 term "an air pocket around rotating blades"
23 means?
24 A    Just as it means. You have an air
25 pocket around the rotating blade. I don't

Page 106

1 think there's anything ambiguous in that.
2 Q    What kind of air pocket is that?
3 A    It's an air pocket. It's a ball of air
4 around the rotating blade.
5 Q    What's your understanding in the
6 blender art -- do you have any understanding
7 what an air pocket is in the blender art?
8 A    Yes, I do.
9 Q    What is it?
10 A    Basically what happens is when you have
11 a certain consistency of the material in the
12 blender as a result of the movement of the
13 liquid and air around, part of the air comes
14 down to the center and it gathers around --
15 and in certain consistencies, if there is a
16 kind of specific mixture of solid particles
17 to the liquid, there is going to be an
18 entrapment of a pocket of air around the
19 blade. That's an air pocket.
20 Q    What does that entrapment of air around
21 the blade do to the performance of the
22 blender?
23 A    Basically it makes it kind of not so
24 effective.
25 Q    Is that your understanding of the air

Page 107

1 pockets --
2 A    Yeah.
3 Q    -- in claim one of the Vita-Mix '021
4 patent?
5 A    Absolutely, yeah.
6 Q    So it's the air pocket that affects the
7 performance of the blender?
8 A    Absolutely. Absolutely.
9 Q    So in other words, if there are other
10 air pockets in the blender that aren't
11 affecting the performance of the blender,
12 those are irrelevant; is that correct?
13 A    That's correct, yeah.
14 Q    So when it states here in claim one of
15 the '021 patent, "an air pocket around
16 rotating blades," it's the air pocket that
17 affects -- it's the air pocket around the
18 rotating blades that actually affects the
19 performance of the blender, correct?
20 A    That's correct, and I call it a
21 deleterious air pocket in my language or
22 whatever.
23 Q    Take a look at page ten of your report.
24 A    Okay.
25 Q    In the left-hand column in the first

Page 108

1 row, it states -- it's under "Elements of
2 claim 1 of the '021 Patent"; do you see that?
3 A    That's right.
4 Q    It goes on to state, "but not including
5 a method of stirring to disperse, dislodge or
6 break up an air pocket after it has begun to
7 form"; do you see that?
8 A    Exactly.
9 Q    What is your understanding of that
10 statement?
11 A    Basically it says that if this claim is
12 saying that if there is any stirring, that's
13 not part of this claim, if there is any
14 dislodging or breaking of the air pocket,
15 that's not the claim. And if I want to
16 elaborate on that, my understanding is Vita-
17 Mix is saying that we don't stir, we don't do
18 anything, we just let it stay there and it
19 does the job. That's my understanding.
20 Q    So your opinion is that any stirring at
21 all is not covered under claim one of the
22 Vita-Mix '021 patent?
23 A    That is my understanding, yes.
24 Q    So your interpretation of claim one of
25 the '021 patent is that any method of

Page 109

1 stirring at all is not covered under claim
2 one of the Vita-Mix '021 patent; is that
3 right?
4 A    And I have -- yes, that's right, and I
5 have based that based on the court's
6 definition.
7 Q    The court definition goes on to state
8 that, "the method of stirring to disperse,
9 dislodge or break up an air pocket after it
10 has begun to form"; do you see that?
11 A    That's right, yeah.
12 Q    So if any method -- what about if
13 there's a method of stirring that occurs
14 before an air pocket has begun to form?  Is
15 that method of stirring covered under claim
16 one of the Vita-Mix '021 patent?
17 A    Based on the study of the prosecution
18 history, no, because what the Vita-Mix
19 proclaims and asserts is that this plunger,
20 supposedly, with this magical cross-sectional
21 size, fills the void space that otherwise
22 would have been generated which they call an
23 air channel, so therefore, they have
24 basically zero stirring requirement.  They
25 say in some -- I think, if I'm not mistaken

Page 110

1 and if my memory helps me, they say you can
2 turn the machine on and just leave and it
3 does the job.  You don't have to come back to
4 it and stir occasionally and so forth and so
5 on.  So any stirring, in my opinion, before
6 or after is not covered and the reason I just
7 wrote it like that is because it's a court
8 definition.  I don't want to --
9 Q    So it is your opinion that a method of
10 stirring before an air pocket has begun to
11 form is not covered under claim one of the
12 Vita-Mix '021 patent?
13 A    It's not covered.  The Vita-Mix patent
14 does not talk about any stirring in the
15 claim.
16 Q    Take a look at the next row on page ten
17 of the left-hand column under "Elements of
18 Claim 1 of the '021 Patent'; do you see that?
19 A    That's right.
20 Q    It states, "the air pocket being
21 created from an air channel of a cross-
22 sectional size defined by a member associated
23 with the blades"; do you see that?
24 A    That's right.
25 Q    What is your understanding of that

Page 111

1 term?
2 A    First of all, if I want to get
3 technical, I do not consider this statement
4 accurate and correct.  Physically this is not
5 correct.
6 Q    What is your understanding of this
7 term, sir?
8 A    This understanding says that there
9 exists a member associated with the blade
10 that defines the cross-sectional size of the
11 air channel.  That's my understanding.  And
12 then further, when that is the case, there is
13 a statement that it is basically mutually
14 exclusive from the above, the top statement.
15 It says, "Comprising the step of supplying a
16 fluid in the pitcher."
17 Q    I don't understand what you mean by
18 that.  What do you mean by that, sir?
19 A    The second sentence has nothing do to
20 do with the first sentence.  It says, "The
21 air pocket being created from an air channel
22 of a cross-sectional size defined by a member
23 associated with the blades," comma, so that's
24 the kind of technical assertion which is not
25 necessarily correct, and then all of the

Page 112

1 sudden it goes to a different sentence,
2 "comprising the steps of supplying a fluid
3 into the pitcher."
4 Q    You said there was a different sentence
5 there.  Can you show me where the period is
6 in that sentence?
7 A    No, no.  Comma.  I take my words back.
8 Comma.
9 Q    Okay.
10 A    Different sentence.  Comma, but it's
11 just a different sentence.
12 Q    Do you understand, in the English
13 language, that sentences are separated by
14 commas, Dr. Rashidi?
15 A    You have supporting statements so
16 commas separate supporting statements or
17 different statements in the same sentence and
18 I'm not here to argue English language, so
19 what I'm saying is comprising a -- kind of
20 applying fluid is kind of not directly
21 related to cross-sectional size and members
22 and dynamics and physics that happens with
23 that.  That's something different.  That's
24 all I'm trying to say.  I'm not criticizing
25 the statement.

Page 113

1 Q    Are you -- I'm just trying to figure

2 out what your opinion is.

3 A    My opinion is what I just said.

4 Q    Let me just ask -- and maybe I'm going

5 to have to ask again just so I understand

6 it.

7       What is your opinion regarding the

8 claim term, "The air pocket being created

9 from an air channel of a cross-sectional size

10 defined by a member associated with the

11 blades"?

12 A    That's what Vita-Mix is saying.  That

13 there exists an air channel, the size of

14 which is defined by the cross-sectional size

15 of a member associated with the blade.  I

16 mean, this is pretty straightforward.

17 Q    Is it your understanding that this term

18 here means that the air channel is defined

19 only by a member associated with the blades?

20 A    "The air pocket being created from an

21 air channel of a cross-sectional size defined

22 by the member associated with the blade."  So

23 when they say there is -- there exists a

24 member associated with the blade that defines

25 the size of this air channel.  What else --

Page 114

1 Q    Sure.

2       I'm asking, is your understanding that

3 the member associated with the blades is the

4 only feature that defines the air channel?

5 A    In my opinion, no, it is not, but as

6 far as this language of this particular

7 sentence is, I, as a reader, would say that

8 they're saying that this member defines the

9 air channel size.  It's simple language.

10 Q    So your opinion or understanding of

11 this claim term is that an air channel of a

12 cross-sectional size is defined only by a

13 member associated with the blades; is that

14 accurate?

15 A    The word "only" isn't there so I'm

16 not --

17 Q    That's what I'm asking.  Is that --

18 A    The word "only" isn't there so I don't

19 draw that conclusion.  I mean, I leave that

20 up to a linguist to kind of interpret that.

21 Q    So based on your interpretation or

22 understanding of this term in claim one,

23 other things other than a member associated

24 with the blades can create that air channel

25 of a cross-sectional size in addition to a

Page 115

1 member associated with the blades?

2 A    The sentence doesn't say --

3           MR. AYCOCK: Could I have

4       that question back?

5           (Record read.)

6 A    My personal opinion is definitely yes,

7 there are many other parameters, and this

8 patent has been totally silent about them.

9 Q    One of the parameters that creates the

10 air channel is the member associated with the

11 blades; is that accurate?

12 A    Repeat the question.

13           (Record read.)

14 A    See, you're throwing the member

15 associated -- take that "member associated"

16 out; is that what you mean?

17 Q    No.

18       I'm asking you if the member associated

19 with the blades is one of the factors or

20 parameters that defines an air channel.

21 A    Yes, definitely.  Oh, yes.

22 Q    Your opinion or understanding is that

23 other parameters or factors affect the air

24 channel as well; is that right?

25 A    And they are more important, that's

Page 116

1 right.

2 Q    But one of the factors is a member

3 associated with the blades; is that

4 accurate?  Did you hear my question?

5 A    No, not really.

6 Q    That's okay.  I'll ask it again.

7       One of the factors that --

8 A    One of the factors is this but it is

9 the least important factor.

10 Q    Let me ask my question fully just so

11 it's on the record.

12 A    Yeah.  Yeah.

13 Q    One of the factors that affects or

14 defines -- let me strike that.

15       One of the factors that -- let me

16 strike that again.

17       A member associated with the blades

18 defines an air channel; is that accurate?

19 A    As one of the least important factors.

20 Q    But it is one of the factors?

21 A    It's one of the least important ones,

22 yeah.

23 Q    Is it your opinion or understanding,

24 then, that claim one of the '021 patent, the

25 air channel that's being defined is only

Page 117

1 limited to a member associated with the
2 blades?  Is that how you understand claim one
3 of the '021 patent?
4 A     Because they are designing a plunger
5 and attributing the cross-sectional size of
6 it to that member associated with the blade,
7 that is where I have problem with this
8 patent.
9 Q     I'm asking you that.
10      Is that your understanding, that an
11 air -- that claim one of the '021 patent is
12 limited so that the air channel of a cross-
13 sectional size is defined only by a member
14 associated with the blades?
15 A     As I said, the language of the patent
16 doesn't use the word "only," but they
17 designed the plunger only based on that,
18 based on everything else that they have said
19 in the patent and patent prosecution.
20 Q     But claim one is not limited to that;
21 is that accurate?
22 A     Limited to what?
23 Q     Limited to an air channel being defined
24 only by a member associated with the blades.
25 A     The way I read it, it is.

Page 118

1 Q     Oh, so you're saying that an air
2 channel of a cross-sectional size is defined
3 only by a member associated with the blades?
4 A     I am not saying that.  See, you are
5 trying to play with the language.  I'm
6 totally against that.  I'm saying that Vita-
7 Mix inventors had no idea about fluid
8 mechanics.  That's what I'm trying to say.
9 Q     Based on that statement that Vita-
10 Mix -- you believe Vita-Mix inventors had no
11 idea about fluid mechanics, you did not read
12 any of the Vita-Mix inventor deposition
13 transcripts in formulating your opinion; is
14 that accurate?
15 A     Not because of that.  They are mutually
16 conclusive.  I didn't not read it because I
17 think they are not proficient in fluid
18 mechanics.  No, that was not the reason.
19 Q     But you didn't read the Vita-Mix
20 inventor deposition transcripts --
21 A     No.
22 Q     -- to determine whether or not they
23 know anything about fluid dynamics, correct?
24 A     At least in the invention of this
25 device they have made a mistake.

Page 119

1 Q     You would agree with me that you don't
2 have any personal knowledge regarding --
3 A     No.
4 Q     -- the amount of knowledge that the
5 Vita-Mix inventors have regarding fluid
6 mechanics?
7 A     So I stand corrected, but whatever
8 knowledge they have, they have not depicted
9 in this device.
10 Q     Do you know what college degrees that
11 the Vita-Mix engineers or inventors have in
12 this Vita-Mix '021 patent?
13 A     No, no, I don't.
14 Q     Do you believe that the Vita-Mix
15 engineers and inventors here have more
16 knowledge regarding the blender design art
17 than you do?
18 A     I may dispute that but as I said on the
19 previous comment that I made, I stand
20 corrected.  They may be extremely
21 knowledgeable in fluid mechanics but in this
22 particular device, they have made major
23 mistakes.  So you can be a scientist and
24 still send a spaceship up there and it
25 explodes.  If it explodes and destroys, that

Page 120

1 doesn't mean that the people who invented it
2 or made it are knowledgeless, so I take my
3 "knowledgeless" back.  They have made a
4 mistake.  The device does not reflect the
5 knowledge.
6          MR. AYCOCK:  Dave, we've been
7          going for about two hours.
8          MR. CUPAR:  Let's take a
9          break here.
10          (Recess had.)
11 Q     Dr. Rashidi, going back to page ten of
12 your December 17, 2007 report that's marked
13 as Plaintiff's Exhibit 105.
14 A     That's right.
15 Q     Take a look again at the second row on
16 the left-hand column under "Elements of Claim
17 1 of the '021 Patent"; do you see that?
18 A     That's right.
19 Q     That row there has a statement,
20 "comprising the steps of supplying a fluid
21 into the pitcher"; do you see that?
22 A     Uh-huh.
23 Q     What's your understanding or
24 interpretation of that term?
25 A     That during this usage of the device at

Page 121

1 some point you have to apply fluid into the
2 pitcher.
3 Q    What's your understanding of the
4 meaning of the word "fluid"?
5 A    That is actually one of my objections
6 because what is happening inside the blender
7 in terms of content is far beyond a simple
8 definition of fluid because by definition,
9 for me as an engineer, fluid has a definition
10 and when we have the mixture -- the slurry
11 mix of material in there, just the fluid by
12 itself does not do the justice on the
13 material which is in there.  So if I was
14 writing this patent as an attorney, I would
15 say, "Supplying material to this pitcher."
16 Q    As opposed to fluid?
17 A    Wait a minute.  Now, this is -- okay.
18 Assuming that there is solid content in
19 there.  So fluid in this case means fluid,
20 yeah.  Fluid is --
21 Q    You said you have a definition for
22 fluid.  What is that definition?
23 A    Fluid is something -- a state of matter
24 that cannot take shear stress.  It has
25 infinite distortion under shear stress.

Page 122

1 Q    So food ingredients would be consistent
2 with that definition, correct?
3 A    Food ingredients will be or will not
4 be?  I didn't hear you.
5 Q    Yeah.
6    Food ingredients or foodstuffs, if you
7 will, are consistent with your definition of
8 fluids; is that accurate?
9 A    No.  Meat is not a fluid.
10 Q    Well, is your definition of fluid there
11 consistent with one of a person of ordinary
12 skill in the art, in the blender arts?
13 A    Repeat the question again.
14    (Record read.)
15 A    An ordinary skill in the art may not
16 have the exact definition that I have in
17 terms of not being able to endure shear
18 stress and it has infinite distortion.
19 Q    What would the definition of fluid be
20 in accordance with a person with ordinary
21 skill in the art, in the blender design art?
22 A    Anything that flows like water, honey,
23 syrup, orange juice, things like that.
24 Q    Food, in other words?
25 A    Water is not food to me.

Page 123

1 Q    Why not?
2 A    Food is something that has other
3 contents than H2O like meat, biscuit, bread,
4 spaghetti.  I have a hard time to define
5 water as food.  I mean, maybe if you go to
6 the language dictionary, water all of the
7 sudden is defined as food.  I'm not aware of
8 it.
9 Q    Is it your opinion that water is not
10 fluid?
11 A    Water is fluid.
12 Q    So water falls within the term "fluid"
13 under claim one?
14 A    Yeah.  Yeah.
15 Q    Does food fall within the term "fluid"
16 of claim one of the '021 patent?
17 A    No, not to me, no.
18 Q    Not to you?
19    But I'm just asking, as a person of
20 ordinary skill in the art, would a person of
21 ordinary skill in the art understand the term
22 fluid to mean food in accordance of claim one
23 of the '021 patent which deals with
24 blenders?
25 A    I doubt that a person of ordinary skill

Page 124

1 would consider bread as fluid.
2 Q    Who have you spoken with -- which
3 persons of ordinary skill in the art, in the
4 blender art, have you spoken with to
5 determine that certain foods are not in fact
6 fluids?
7    MR. AYCOCK:  Objection.
8    Lacks foundation.
9 A    This is common sense.
10 Q    So can you identify for me any facts or
11 bases to support your claim that foods such
12 as bread are not considered fluids in
13 accordance with claim one of the Vita-Mix
14 '021 patent?
15    MR. AYCOCK:  Objection.
16    Lacks foundation.
17 A    As I said, if I take 100 people and I
18 ask them whether beef jerky's fluid, I'm sure
19 that 99 percent are in the right state of
20 mind to say beef jerky's not fluid.
21 Q    Are those 100 people you're asking just
22 people off the street?
23 A    Yeah, or anybody with higher degrees.
24 Q    Is that how a claim -- is that how
25 claim one of the '021 patent is supposed to

Page 125

1 be interpreted, as a person off the street?
2 A    No.  It should be an ordinary skill in
3 the art.
4 Q    That's what I'm asking about, not
5 people off the street or the 100 people
6 you're referring to.
7 A    Okay.  So --
8 Q    I'm asking, a person of ordinary skill
9 of the art, in the field of blender design,
10 blender engineer, in other words, would they
11 understand, when you're speaking about a
12 claim such as -- well, let me back up.
13    What kind of apparatus is being claimed
14 here in the method?
15 A    Food processing blender.
16 Q    Okay.
17    What kind of a person of ordinary skill
18 in the art are we talking about here with
19 respect to claim one of the '021 patent?
20 A    The same definition that I gave you.
21 Somebody with either a four-year college
22 degree or equivalent experience in industry
23 related to food processing devices and so
24 forth.
25 Q    Okay.

Page 126

1    And based on your understanding is it
2 your -- based on your understanding of a
3 person of ordinary skill in the art and based
4 on your understanding of claim one of the
5 Vita-Mix '021 patent, is it your opinion that
6 certain foods do not fall under the
7 classification of fluid?
8 A    Definitely, and I gave you the
9 examples.
10 Q    What examples are those to support your
11 opinion or understanding?
12 A    Meat, bread, crackers, these are not
13 fluid.
14 Q    Have you ever read a Vita-Mix recipe
15 book?
16 A    Yes.
17 Q    Do you recall ever seeing bread being
18 used in any of the recipes in a Vita-Mix
19 blender?
20 A    I don't recall.
21 Q    What about crumbs or bread crackers?
22 A    When you get bread crackers -- bread
23 crackers and crumbs, technically they are
24 classified as Bingham fluids or Bingham
25 solids that they deviate from the ordinary

Page 127

1 definition of fluid.
2 Q    So you said that crackers are a form of
3 Bingham fluid; is that accurate?
4 A    Yeah, or Bingham solids, actually,
5 sometimes they call it.  Anything which is
6 granular they have some sort of initial
7 resistance against shear flow and then after
8 a certain threshold of shear, they start
9 flowing.  So those are called, depending upon
10 the authors, either Bingham fluids or Bingham
11 solids.
12 Q    So it is accurate, then, that breads or
13 crackers are in fact fluids; is that
14 accurate?
15    MR. AYCOCK:  Objection.
16    Mischaracterizes prior statement.
17 A    Not fluid as the matter of having zero
18 shear resistance.  No, they are not fluid in
19 that definition.
20 Q    Do you know if, in the blender design
21 arts, that Vita-Mix or any other companies
22 teach the use of bread or crackers to be
23 mixed in a blender?
24 A    I'm not aware of it.
25 Q    Do you know if Back To Basics has ever

Page 128

1 tested bread or bread crumbs in its blenders?
2 A    I have not checked on that.  I am just
3 trying to define the word "fluid" here.
4 Q    What facts do you have to support your
5 definition of fluid?  What I mean by facts is
6 data or documents, things like that.
7 A    Textbook.
8 Q    Which textbook are you relying on for
9 your definition of fluid in the blender art?
10 A    Any textbook in elementary fluid
11 mechanics defines fluid so I'm expecting that
12 a person of ordinary skill in the art, which
13 is a college person with the first elementary
14 course in fluid mechanics, understands the
15 definition of fluid versus solid.  So it's
16 not just one source; it is many, many
17 textbooks and elementary courses in fluid
18 mechanics very clearly defines the three
19 states of matter, fluid, solid and gas.
20 Q    Is it your opinion, then, that this
21 claim one of the Vita-Mix '021 patent, when
22 it states "fluid," includes non-food fluids?
23 A    There are two issues here.  One is what
24 is in the pitcher and what you add to it.
25 There is no statement in this claim that

Page 129

1 there are other solids or material in there
2 so that's why I considered it kind of not
3 very accurate in teaching.
4 Q    What was my last question?
5 A    You said, "Do you consider this fluid
6 is added into this pitcher?"
7 Q    No.
8        My question was, do you consider
9 non-foods as fluids that can be added into
10 the blender of claim one of the Vita-Mix '021
11 patent?
12 A    When you say "non-food," do you mean
13 like gasoline or --
14 Q    Exactly.
15 A    So repeat the question again because --
16 okay.
17 Q    Sure.
18        Do you understand my question now?
19 A    Repeat the question now that I included
20 gasoline in your --
21 Q    Do you understand that claim one of the
22 Vita-Mix '021 patent, when it refers to
23 fluid, means non-foods such as gasoline to be
24 inserted into a blender?
25 A    No, I hope not.  No.

Page 130

1 Q    So it's foods we're talking about here;
2 do you understand that?
3 A    For me as a person of ordinary skill,
4 food and water are two separate things for
5 me.  I'm using myself as the criteria here or
6 as a source.  For me, when you say, "I want
7 to have food and I want to have water," I
8 would think that you're asking for two
9 different things.  So if you ask for food, I
10 don't hand you water.
11 Q    So foods and waters can fall under the
12 term "fluid" in claim one of the Vita-Mix
13 '021 patent, correct?
14 A    Here it's just saying adding fluid but
15 what is inside the fluid is not necessarily
16 just a simple fluid, yeah.
17 Q    So you agree with my statement that
18 food or water can be considered fluid in
19 accordance with claim one of the Vita-Mix
20 '021 patent?
21 A    It shouldn't be considered as fluid,
22 technically.
23 Q    That's based on your scientific
24 understanding separate from the blender art;
25 is that accurate?

Page 131

1        MR. AYCOCK:  Objection.
2        Mischaracterizes prior statement.
3 A    Well, what is the whole purpose of a
4 blender?  To mix, to stir, to mix and to
5 blend.  So if you have, let's say, a chunk of
6 ice and add fluid to it and water and try to
7 mix it, what you have in the content is not
8 fluid during mixing or even after mixing so
9 what is inside a pitcher may not render
10 itself to the definition of fluid.  That's
11 what I'm saying.  If you put parsley, carrots
12 and other vegetables with water, the end
13 product may not be and definitely will not
14 be, in certain cases, a simple fluid.  So the
15 word "fluid" does not encompass what is
16 inside the pitcher even if it is -- at the
17 end it's a food product.
18 Q    If you had parsley and carrots but no
19 water, did you supply fluid into the pitcher?
20 A    Yes.  I mean, if you are looking for
21 certain recipes that call for fluid or milk
22 or orange juice, you add to it, yeah.
23 Q    Take a look at the next row on page ten
24 on the chart, the left-hand column which
25 states "Elements of Claim 1 of the '021

Page 132

1 Patent"; do you see that?
2 A    That's right.
3 Q    It states, "Positioning a blender"; do
4 you see that?
5 A    That's right.
6 Q    Take a look at the term, "Having a
7 cross-sectional size approximating the cross-
8 sectional size of the member"; do you see
9 that?
10 A    That's right.
11 Q    What's your understanding of that term?
12 A    My understanding is to have something
13 whose cross-section approximates the size
14 of the cross-sectional size of that member
15 that they were talking about before and they
16 have the approximate same size.
17 Q    Take a look at the next term "Adjacent
18 to an above the rotating blades."  Do you see
19 a typographical error there?
20 A    "Adjacent to an above the rotating
21 blades."  Oh, "and."  It should be "and
22 above."
23 Q    So in other words, your report says,
24 "Adjacent to an," a-n, but it should say
25 a-n-d; is that right?

1 A    Yeah.  "Adjacent to and above."  Thank
2 you.
3 Q    What does the term, "Adjacent to and
4 above the rotating blades" mean to you,
5 Dr. Rashidi?
6 A    Adjacent means close in proximity so
7 for me, the synonym for adjacent is proximity
8 and that proximity should not be on the side
9 on the blade or below it, it should be
10 above.  In proximity of the blade and above
11 it, that's what it means to me.
12 Q    And the next term there on the next row
13 under "Elements of Claim 1 of the '021
14 Patent" is, "While maintaining the device
15 free of contact with the pitcher"; do you see
16 that?
17 A    Uh-huh.
18 Q    What's your understanding of that --
19 the meaning of that term, sir?
20 A    That means that this device, whatever
21 it is, is free of contact with the pitcher.
22 Q    Does it matter which wall you're
23 referring to there?
24 A    You mean on the -- inside the blender?
25 Q    Correct.

1 A    If it's cylindrical you cannot contact
2 any wall but if it's rectangular there are
3 four walls.  So if you have a cylinder, you
4 have one wall.
5 Q    Does a pitcher have a bottom wall, sir?
6 A    I don't call it wall.
7 Q    You don't?
8    Does a person of ordinary skill in the
9 art, in the blender art, call the bottom wall
10 of a blender a wall?
11 A    Okay.  This is such a trivial question
12 that I don't know why you're asking but when
13 you have a blade assembly at the bottom, of
14 course you cannot touch the bottom of the --
15 because you have to go through the blade and
16 this blade is rotating.  I mean, this is very
17 trivial.  I don't know where you're going
18 with this question.
19 Q    I'm just asking, is the pitcher -- does
20 the pitcher -- does your understanding of
21 "pitcher" only include side walls in the
22 term, "While maintaining the device free of
23 contact with the pitcher"?
24 A    See, I am understanding of the
25 definition of walls, ceiling and floor so I

1 don't call what we are sitting here is one
2 of -- the bottom wall of the room.  This is
3 the floor of this room.  So a pitcher, in the
4 same way, has a bottom floor, it has a top
5 and it has surrounding walls.  So here it
6 says that it should not touch the surrounding
7 walls.  That's what I understand from this
8 claim.  That's what it tries to teach me.
9 Q    And the term, "While maintaining the
10 device free of contact with the pitcher" is
11 not just limited to side walls; is that
12 accurate?
13 A    "While maintaining the device free of
14 contact with the pitcher," yeah.  Any place,
15 yeah.
16 Q    Do you see the term, "Thereby
17 preventing the formation of an air pocket in
18 the fluid around the rotating blades"?
19 A    I see that, yes.
20 Q    Is that consistent with your previous
21 testimony regarding the interpretation that's
22 in the preamble or in row one of your chart
23 there on page ten of your report?
24 A    Yeah, that's what it is.
25     - - - - -

1     (Plaintiff's Exhibit 106 was
2     marked for identification.)
3     - - - - -
4 Q    I'm going to hand to you what's been
5 marked as Plaintiff's Exhibit 106.
6 A    Sure.
7 Q    At the top it states 2,757,909 and
8 that's US patent number 2,757,909.  The
9 inventor's name is JC Wayne.  Do you see that
10 document in front of you, sir?
11 A    That's right.
12 Q    Have you ever seen this document
13 before?
14 A    Yes.
15 Q    What is it?
16 A    This is the patent application and
17 patent allowed for a food processing blender
18 or mixer that had certain attributes.
19 Q    What's your understanding of -- what's
20 your understanding of what Wayne teaches?
21 A    What Wayne teaches, first of all, it
22 identifies the problem that Vita-Mix asserts
23 that they were the first one to understand
24 about this deleterious air pocket.  Wayne
25 talks about sizable bubbles which may get

Page 137

1 involved with the blender and make the blade
2 inefficient so he tries to resolve that by
3 putting a device above and adjacent to the
4 rotating blades and basically solve the
5 problem.  And on top of that, he has some
6 additional feature and the additional
7 feature, which I call like icing on the cake,
8 is he provides a groove in that device which
9 is above and adjacent to the blade to augment
10 the pumping of the material toward the
11 blade.  That's my understanding of this
12 patent in a nutshell.
13 Q    Does Wayne require that auger or
14 component in order for the Wayne blender to
15 work, do you know?
16 A    Say that again.
17 Q    Sure.
18       Does Wayne require that auger component
19 in order for the blender device set forth in
20 Wayne to actually work?
21 Q    To work effectively or in general?
22 Q    To effectively work.
23 A    Actually, he's kind of disclosing that
24 and he claims that it is going to enhance the
25 performance.

Page 138

1 Q    Take a look at page ten again of your
2 report.
3 A    Yes.
4 Q    On the right-hand side you have a
5 column that's identified as "Wayne"; do you
6 see that?
7 A    That's right.
8 Q    When you state "Wayne," are you
9 referring to the Wayne patent that's
10 identified as Plaintiff's Exhibit 106?
11 A    Exactly.
12 Q    Take a look again at page ten of your
13 report on the right-hand column under
14 "Wayne."
15 A    Uh-huh.
16 Q    Can you identify for me where you
17 disclose in Wayne the statement, "Effectively
18 prevents the formation of any sizable air
19 bubbles in the liquid and sets up a constant
20 pattern of circulation"?
21 A    On the first -- on page -- on the third
22 sheet of Wayne.
23 Q    Let me ask it a different way.
24       Is it set forth in your report where
25 Wayne discloses this?  Do you identify a

Page 139

1 citation in your report where Wayne discloses
2 that sentence?
3 A    Let's -- I mean, I have to read the
4 whole thing and see where I got it from.
5 Q    I'm not asking off the patent; I'm
6 asking off your report.
7       Does your report disclose a citation to
8 Wayne from that sentence?
9 A    Yeah.  That's right.
10 Q    Where is the citation in Wayne -- in
11 your report regarding where Wayne states
12 that?
13 A    It's one of those patent -- isn't it --
14 I mean, it should be in the list of the 69
15 patent.
16 Q    No, I understand that, but you have a
17 chart on page ten of your report; do you see
18 that?
19 A    Yeah.
20 Q    Can you identify me any citations on
21 page ten in that report where you are
22 identifying where Wayne discloses those
23 elements of claim one of the '021 patent?
24 A    In this question do you mean direct
25 quotation, find in the patent where I got it

Page 140

1 from and I'm going to put it here?
2 Q    Correct.  Either a quotation or
3 citation.
4       Do we have anything here in the right-
5 hand column for Wayne that's identifying or
6 citing where you find that disclosure in
7 Wayne?
8 A    Let me read it and find it.  It
9 solves --
10 Q    I'm not asking about the patent; I'm
11 asking about the report.
12       Does your report identify any citations
13 in Wayne for the disclosure?  Look at your
14 report, in other words, sir.  Do you see any
15 citation there?
16 A    I see a quotation -- a statement with a
17 quotation mark.
18 Q    Do you see a citation after that?
19 A    No, no.
20 Q    Okay.
21       So you didn't cite a disclosure -- you
22 didn't cite to where --
23 A    In other words, I didn't reference it
24 as a footnote or something; is that what
25 you're asking?

Page 141

1 Q    Yeah.

2      In other words, is there a citation,

3 "Column one, line three."

4 A    No, no, no, no.

5 Q    Do you understand what I mean by

6 "citation" now?

7 A    Yeah.

8 Q    Okay.

9      Let's look at the next one on row two

10 there.  It states, "Air bubbles or air

11 pockets are created in the Wayne blender from

12 an air channel of a cross-sectional size

13 defined by a member associated with the

14 blades"; do you see that?

15 A    That's right.

16 Q    Again, looking at page ten there in

17 that row, do you have any citation for where

18 Wayne discloses that there?

19 A    Actually I would say that this is

20 disclosing the figure because when you look

21 at the very first figure I see the exact same

22 member associated with the blade which is

23 identified to the hub portion of member 27.

24 So that member creates an air channel and

25 that's what I'm taking this -- so I'm taking

Page 142

1 this from the disclosure in the figure.

2 Q    Where does Mr. Wayne, the inventor

3 here, disclose in his specification that air

4 pockets are created from an air channel of a

5 cross-sectional size defined by a member

6 associated with the blades?  Can you show me

7 that teaching?

8 A    That is basically where I bring the

9 person of ordinary skill in the art.  Anybody

10 who has worked with the blender will know

11 that or does know that when this blade starts

12 to rotate and if the auger is not there, you

13 are going to have an air channel created as a

14 result of the rotation and this is something

15 that both people of ordinary skill in the art

16 and a lot of not such of ordinary skill in

17 the art would intuitively observe that and

18 know that.

19 Q    When you mention or you state or

20 testify that a person of ordinary skill in

21 the art would know this, are you referring in

22 today's terms, 2008, that a person of

23 ordinary skill in the art would know that an

24 --

25 A    Air pocket.

Page 143

1 Q    -- air pocket or air channel is defined

2 by a member associated with the blades?

3 A    I'm talking about existence of air

4 channel to begin with.  I'm saying that an

5 ordinary person skilled in the art knows that

6 a rotating blade of a blender first creates

7 an air channel and then that air channel

8 grows in depth and reaches the blade and

9 depending upon the content of the pitcher, it

10 may or may not translate or have a transition

11 to an air pocket.

12 Q    Your understanding of what a person of

13 ordinary skill in the art would understand in

14 terms of the formation of an air channel

15 defined at least in part by a member

16 associated with the blades is based here in

17 2008 today, right?

18 A    Yeah, as kind of one of the parameters

19 and as I said, the least important parameter.

20 Q    Okay.

21      And now I want you to go back, though,

22 in time to 1956.

23 A    Okay.

24 Q    Here's Wayne -- the Wayne patent in

25 front of you.  Show me where Wayne discloses

Page 144

1 that an air channel is defined by a member

2 associated with the blades.  Can you show me

3 that in that patent?

4 A    As I'm saying, even in 1957, people

5 were observant.  There is no changing

6 observation of people.  He has actually

7 observed air pockets or air bubbles of enough

8 dimensions that causes the blade to be

9 ineffective and he puts a device right at the

10 point of the source of problem which is an

11 air channel.  So if he specifically has not

12 talked about an air channel, it is implicitly

13 readable, in my opinion, from this patent

14 that he is actually solving the exact same

15 problem and he, in some points in his patent,

16 he explicitly talks about that.  So --

17 Q    Other than --

18 A    I'm sorry.  Let me finish.

19 Q    Sure.

20 A    So if we are going to look at one-to-

21 one statement of the observation and

22 solution, we may not find that, but to a

23 person of ordinary skill in the art, that is,

24 in my opinion, what is extracted out of this

25 patent.

Page 145

```
 1        In other words, if I see this patent or
 2 if somebody who has the ordinary skill in the
 3 art sees this patent, knows that the air
 4 pocket is generated from the center of the
 5 blender so if we have a device there to
 6 somehow assist, either by pumping the fluid
 7 just like this and having an auger shape to
 8 it or to have something in there to occupy.
 9        Now, these things said, I reserve the
10 right to say that they are not effective when
11 I come to enablement because these are all
12 perceived, kind of, simplistic view of a
13 solution to this problem.  So when I say
14 these things in my deposition and when I come
15 later on during the deposition and say
16 basically none of the systems work as
17 intended, I reserve the right for that.
18 Q    Are you --
19 A    But I'm just comparing concept to
20 concept.
21 Q    Sure.
22        Just based on that statement, is Wayne
23 enabling, do you believe, in your opinion?
24 A    Probably not.  I don't know.  I'd have
25 to test it.  But here I was just testing -- I
```

Page 146

```
 1 mean, comparing document to document, not
 2 performance to performance.
 3 Q    Okay.
 4        So based on the Wayne patent and what
 5 it discloses, you don't believe today as
 6 we're sitting here, and especially compared
 7 to the Vita-Mix '021 patent, that the Wayne
 8 patent itself is even enabling; is that
 9 accurate?
10 A    That's an accurate -- Wayne may not
11 work either.  In other words, in my opinion,
12 Vita-Mix doesn't work and Wayne may not work
13 either.
14 Q    Okay.
15 A    Here, I'm just kind of comparing
16 statement to statement --
17 Q    Sure.
18 A    -- teaching to teaching, not going to
19 lab and testing.
20 Q    So your opinion, then, is that neither
21 the Vita-Mix '021 patent nor the Wayne patent
22 are enabling to a person of ordinary skill in
23 the art?
24 A    Definitely.  On the Vita-Mix I have
25 tested, on the Wayne I have to test, but
```

Page 147

```
 1 you're absolutely right.  I give 90 percent
 2 that even this doesn't work (indicating).
 3 Q    You said that you tested the Vita-Mix.
 4 What do you mean by that in terms of
 5 enablement?
 6 A    Enablement, I tested -- I created two
 7 types of extreme fluids.  One is very thin
 8 like pure water and I have added a couple of
 9 drops of food coloring just for visualization
10 so it doesn't change the viscosity or
11 anything and then I have ran the Vita-Mix
12 device from low RPM and I have done a series
13 of tests.  One was totally without the
14 plunger and as you increasing the RPM you see
15 the formation of an air channel which dips
16 down and as you increase the RPM, that air
17 channel keeps traveling toward the blade and
18 if you keep the RPM low enough, the air
19 channel is there but the water is
20 transparent.  You can see through.  It's
21 translucent.  If you increase the RPM beyond
22 a certain level, the channel reaches the
23 blade and you have air reaching the blade and
24 that blade breaks up that air channel and
25 makes the water murky so it is no longer
```

Page 148

```
 1 see-through and then when you lower the RPM,
 2 the same thing happens.  That's experiment
 3 number one.
 4        Then if I am a -- kind of observant, I
 5 could have an ordinary skill in the art or I
 6 could be a scientist or ordinary people.  I
 7 say, okay, now that this channel is
 8 generated, if I put a solid piece in there, I
 9 occupy the space so I am going to get rid of
10 that channel, so therefore, I designed this
11 and I go and get a patent for it.
12        But when I do the same test with a
13 plunger in, in vertical position untouched
14 and I start increasing the RPM, the same
15 channel starts -- starts to form again
16 despite the existence of the plunger and it
17 travels down on the sides of the plunger and
18 every now and then, as a result of fluid
19 mechanics action in there, kind of bubbles of
20 air is thrown toward the blade.  And if I
21 increase that, at some point the channel
22 forms as an annular space around the plunger
23 or device and it gets to the blade.  In other
24 words, existence of this plunger is not able
25 to prevent formation of a channel to begin
```

Page 149

1 with which eventually translates to an air
2 pocket.
3 Q    Now -- go ahead.
4 A    So this was for one class of fluids
5 which was kind of Newtonian fluid and low
6 viscosity, relatively low viscosity fluid and
7 so forth.
8       Then if you go to the extreme case
9 which makes your fluid a little bit more
10 viscus like a pancake batter, and usually
11 when you mix flour and water the fluid
12 becomes usually non-Newtonian -- and if you
13 want an accurate definition of that I can
14 tell you later -- but under the same
15 condition now you don't observe anything
16 because the content is not translucent.  But
17 when you turn on the machine, somehow air
18 gets around this infamous plunger, gets to
19 the blade and stays there.  And depending
20 upon many other variables, either you totally
21 make the blender inefficient or partially
22 efficient and then when you turn the system
23 off, one or two big bubbles of air comes up
24 and that is the air that was supposed not to
25 be there because of the plunger.

Page 150

1 Q    So therefore, is that your entire
2 opinion of enablement there, sir?
3 A    In my opinion, if I exercise the claim
4 one of '021 patent, I am not able to extract
5 what is claimed which is prevention of an air
6 pocket.  Now, that air pocket may be
7 deleterious in certain contents, in certain
8 other contents it may be there, but the
9 mixture somehow --
10 Q    Your basis for your opinion of lack of
11 enablement is based on testing of the Vita-
12 Mix blender; is that accurate?
13 A    Vita-Mix.  Exactly.
14 Q    Did you test the Back To Basics
15 blenders to determine --
16 A    Exactly.  Exactly.
17 Q    -- enablement?
18       Let me ask the question again, sir.
19 I'm sorry.  Let me ask it again.
20       Did you test the Back To Basics
21 blenders to determine enablement?
22 A    Exactly.
23 Q    Did you do any other testing other than
24 testing the Vita-Mix blenders or the Back To
25 Basics blenders to determine enablement?

Page 151

1 A    You mean other blenders or these two
2 only?
3 Q    Any other blenders.
4 A    No.  I only worked with Back To Basics
5 and Vita-Mix.
6 Q    So your basis for enablement is based
7 only on the testing of Vita-Mix blenders and
8 of Back To Basics blenders; is that right?
9 A    Exactly.  That's right.
10 Q    So you did no testing, for example, to
11 create your own blender; is that right?
12 A    Absolutely.
13 Q    No?
14 A    I haven't, no.  I just used the two
15 blenders which were available to me.
16 Q    So you didn't do any testing to, for
17 example, create or design your own blender to
18 determine whether or not it could fall under
19 claim one of the '021 patent, right?
20 A    No, no.  I just worked with the Vita-
21 Mix and Back To Basics.
22 Q    So your opinion on enablement is solely
23 based on your testing of the Vita-Mix and the
24 Back To Basics blenders?
25 A    That's true.  That's true.

Page 152

1 Q    Going back to the second row in Wayne
2 where you say that Wayne discloses, "Air
3 bubbles or air pockets are created in the
4 Wayne blender from an air channel of a cross-
5 sectional size defined by a member associated
6 with the blades," what you're saying there is
7 that that is implicit in Wayne but it does
8 not actually explicitly disclose it; is that
9 accurate?
10 A    That is my understanding.  That's
11 accurate.  And here, if I may add, again, I'm
12 just trying to compare apple to apple because
13 personally as a scientist, I don't believe
14 that this particular member associated with
15 the blades is defining that.  It's one of
16 the -- I'm just trying to compare a statement
17 that is implicitly in there.  So for a person
18 of ordinary skill in the art, they could see
19 that.
20 Q    Can you show me where in the Wayne
21 patent Mr. Wayne implicitly knew that an air
22 channel is defined at least in part by a
23 member associated with the blades?
24 A    By positioning his auger right adjacent
25 and above the blade.  In other words, he got

Page 153

1 the same idea of, okay, then there's going to
2 be a space there, an air channel, so let me
3 just put that, and I may mention
4 approximating the member, as you can see, so
5 the size of that auger may touch the fluid
6 content or blend content and pump it back
7 in.
8       Remember, people who are designing
9 these, they are running a blender without
10 anything to begin with so they get some idea
11 about what is the habit of the fluid inside
12 the blender.  So if the channel is a certain
13 size, they're going to say, well, I'm going
14 to put something in there to occupy that
15 void.  What they don't consider is fluid
16 has -- fluids have other habits.  They go
17 around things just like the way it goes
18 around the plunger of Vita-Mix.
19 Q    Can you show me where Wayne discloses a
20 cross-sectional size or teaches, for that
21 matter, explicitly teaches a cross-sectional
22 size for a plunger or a device that can be
23 inserted into a blender?
24 A    Actually this auger, item number A3 in
25 his first figure.

Page 154

1 Q    Okay.
2 A    That is the, basically, teaching of
3 having a device above and adjacent to the
4 blades.
5 Q    Can you show me where you disclosed
6 that in your chart on the right-hand side on
7 page ten, where you disclosed that --
8 A    On the third row on the right-hand
9 side.  "Wayne includes a device that can be
10 inserted into a blender which has a cross-
11 sectional size approximating the cross-
12 sectional size of a member associated with
13 the blades."
14 Q    So your opinion is that the agitator
15 component or that agitator in the Wayne
16 patent shown in figure 1 is the device that
17 can be inserted into a blender?
18 A    Exactly.  That's what I call the
19 device.  You call it the agitator but I call
20 it the device.
21 Q    That's not what I call it; that's what
22 Wayne calls it.
23 A    I know, but based on the definition of
24 the court I would say, okay, this is a device
25 that is above and adjacent to the blades

Page 155

1 because "blade" has a definition.  Those two
2 up and down cutting figures, that's the
3 blade.  It has a hub, and I'm going to
4 momentarily accept the definition of that as
5 the member associated with the blade and very
6 clearly he has item A3 as the device which
7 has substantially approximately the same
8 cross-sectional size as the member below.  So
9 I see all of these things in this figure
10 because for me as an engineer, sometimes
11 drawings are even more important than
12 descriptive words.
13 Q    Other than in figure 1, can you
14 identify for me, by column and line number in
15 the Wayne patent, where it discloses a
16 plunger or a device that can be inserted into
17 a blender having a particular cross-sectional
18 size?
19 A    I am referring only to figure 1 on that
20 particular column for a person of ordinary
21 skill in the art.
22 Q    So it's your opinion that the only
23 place where Wayne discloses a plunger having
24 a particular --
25 A    Not plunger.

Page 156

1 Q    A plunger or a device.
2 A    Device.
3 Q    Having a particular -- let me start
4 over again.  Let's --
5        MR. AYCOCK:  Just one -- let
6     him state his question and if you
7     have a problem with his question,
8     answer it in the answer.
9        THE WITNESS:  Sorry.
10       MR. AYCOCK:  One at a time
11     for Carla's sake.
12       MR. CUPAR:  Thank you,
13     Mr. Aycock.
14 Q    Can you identify for me, by column and
15 line number, where Wayne discloses a plunger
16 or a device that requires a particular cross-
17 sectional size?
18 A    In the very image of the patent he
19 doesn't explicitly refer to that; in the
20 figure he does.
21 Q    So you are only inferring from the
22 figure that Wayne is disclosing or teaching a
23 member having a particular cross-sectional
24 size?
25 A    Absolutely.

Page 157

1 Q    Moving on, then, for the member
2 associated with the blades, where does Wayne
3 disclose a particular cross-sectional size of
4 a member associated with the blades?
5 A    Again, in the first figure I can see
6 the member associated with the blades
7 according to the Vita-Mix assertion and right
8 on top of that, I see the auger or device
9 member A3 in the same figure and they have
10 approximately the same cross-sectional size.
11 Q    So is it your opinion that the cross-
12 sectional size of a member associated with
13 the blades is disclosed in figure 1 of the
14 Wayne patent; is that accurate?
15 A    Absolutely.
16 Q    Can you identify for me where else in
17 the specification, by column or line number,
18 where Wayne discloses a member associated
19 with the blades having a particular cross-
20 sectional size?
21 A    Not in the verbiage but in the figure.
22 Q    So your only basis for your opinion is
23 figure 1 of the Wayne patent; is that
24 accurate?
25 A    Exactly, and that's what I think --

Page 158

1 this figure is enough for a person with
2 ordinary skill in the art to draw these
3 conclusions.
4 Q    Can you identify for me where Wayne
5 discloses that the cross-sectional size of a
6 plunger or device that can be inserted into a
7 blender approximates the cross-sectional size
8 of a member associated with the blades?
9 A    In the figure again, and as I said,
10 people who are doing these kind of inventions
11 and practices, they run the blenders without
12 any device, they observe the column or air
13 channel generated and they try to do
14 something about it and that is exactly the
15 cross-sectional -- I mean, by kind of naked
16 eyes you can see that the diameter of the
17 auger is approximating the diameter of the
18 hub of the blade.
19 Q    That's just based on your opinion based
20 on the visual of figure 1; is that accurate?
21 A    Absolutely.  Because to me, this figure
22 is somewhat to scale in kind of two or more
23 directions.  In other words, it is not shrunk
24 down or it's not widened so this is the
25 typical proper proportions of a blender.

Page 159

1 Q    Do you know if patent drawings are
2 drawn to scale, sir?
3 A    Not necessarily, but from this I can
4 extract that.
5 Q    So you know that patents are not
6 normally -- normally have figures that are
7 not drawn to scale; is that accurate?
8 A    That is accurate.
9 Q    Yet you are of the opinion that this
10 Wayne patent figure 1 is drawn to scale; is
11 that right?
12 A    That is drawn to scale, in my opinion,
13 because of being familiar with blenders, yes.
14 Q    Why can you deduce that this figure is
15 drawn to scale when you know that patent
16 figures are normally not drawn to scale?
17 A    Because of common sense.
18 Q    Anything else?
19 A    No.  Common sense.
20 Q    So other than your common sense you do
21 not know if the Wayne blender shown in figure
22 1 is drawn to scale, correct?
23 A    Because the word "approximate" has been
24 used.  If there is any deviation from this
25 figure, it falls into the definition of

Page 160

1 approximate, so therefore, for me, the
2 teaching is there.
3 Q    Can you identify for me the cross --
4 what's the size of the -- well, let me back
5 up.
6        So it is your opinion that the Wayne
7 patent on figure 1 is drawn to scale,
8 correct?
9 A    To some extent, I mean, covering the
10 word "approximation," yes, I can deduce sizes
11 from this drawing, yes.
12 Q    You said "to some extent."  Is the
13 Wayne patent drawing in figure 1 drawn to
14 scale or not?
15 A    If you're talking about exact with
16 engineering tolerance as plus or minus
17 one-thousandths of an inch, I don't make a
18 comment on that, but to fall into the
19 definition of approximating sizes, definitely
20 they are in scale.
21 Q    Other than in figure 1, can you tell me
22 where in Wayne that Mr. Wayne discloses that
23 the cross-sectional size of the device that
24 can be inserted into a pitcher must
25 approximate the cross-sectional size of a

Page 161

1 member associated with the blades?

2 A     On figure 3, the next page, with the

3 cross-sectional device which is referred to

4 as A3 and the hub of the blade, which I

5 considered, according to the Vita-Mix, as the

6 member associated with the blade and they are

7 approximating to me.

8 Q     Is it your opinion that figure 3 is

9 also drawn to scale?

10 A     It looks like it because it has all the

11 dimensions in a certain scale and proportions

12 that if I include the variations of

13 approximation technology, it is drawn to

14 scale but if you're asking me whether the

15 tolerance of plus or minus one-thousandth of

16 an inch has been observed, there's no need

17 for that because here we are just teaching

18 something in general concept.

19 Q     Other than the figures 1 and 3, can you

20 identify for me where else you believe

21 Mr. Wayne disclosed that the cross-sectional

22 size of the device inserted into the pitcher

23 must be -- must approximate the cross-

24 sectional size of a member associated with

25 the blades?

Page 162

1 A     These are the figures.

2 Q     So nothing else in the Wayne patent

3 discloses that the cross-sectional size of

4 the device inserted into the pitcher

5 approximates the cross-sectional size of a

6 member associated with the blades?

7 A     Your statement is true and these two

8 figures are enough for an ordinary skilled in

9 the art to make deductions.

10 Q     Have you ever measured the agitator

11 component identified in figure 3, the cross-

12 sectional size?  Let me repeat my question.

13     Have you ever measured the cross-

14 sectional size of the agitator component in

15 figure 3?

16 A     I can't even tell you right now by

17 eyeballing.  It's about -- anything between

18 three-quarters of an inch and one inch as

19 shown in this figure.

20 Q     But prior to your eyeballing it today,

21 have you ever measured figure 3 of the Wayne

22 patent?

23 A     I had the same opinion when I

24 previously looked at that.  That's how I came

25 to my conclusion.

Page 163

1 Q     Let me be more specific about my

2 question.

3     Have you ever taken a ruler and

4 measured figure 3 of the Wayne patent?

5 A     No.

6 Q     Never?

7 A     Never, but it's so apparent.

8 Q     So standing -- so sitting here today,

9 not standing, I'm sorry.

10 A     That's okay.

11 Q     Sitting here today, you do not know

12 what the measurement of the cross-sectional

13 size of the agitator auger component is on

14 figure 3 of the Wayne patent?

15 A     I do know.  As I told you, you can --

16 even if I reverse the question and ask you,

17 you can tell me what is the relative size of

18 the device or the plunger, A3, and the hub of

19 the blade and they're approximating each

20 other.

21 Q     That's what I'm asking.

22     By numbers or numerical measure, what

23 is the measurement of the auger or agitator

24 component in figure 3 of the Wayne patent

25 that's identified as 43?

Page 164

1 A     For the A3, I would say an approximated

2 half an inch for the A3 and anything between

3 three-quarters to one inch for the hub of the

4 blade and this is, to me, according to the

5 approximation definition of Vita-Mix.  They

6 are very much approximated to each other

7 because the plunger of Vita-Mix at the bottom

8 is about one inch and plus and the hub of the

9 blade is about half an inch and plus so the

10 same ratios are in there.  So if they call

11 that approximated, I call this one also

12 approximated.

13 Q     But you've never measured with a ruler

14 what the central hub, the bearing housing or

15 the auger component in figure 3 of Wayne is,

16 right?

17 A     I don't need to measure because I'm

18 trying to -- I am going to have -- I'm going

19 to draw conclusions and based on my

20 observation I come up with my conclusions and

21 I can verify that with measurement.

22 Q     What number is the hub in figure 3 of

23 the Wayne patent?

24 A     I don't think they show the hub of the

25 blade as a specific number but I can put my

Page 165

1 fingers on the figure and tell you what is
2 the hub, if that helps, because I don't see
3 any numbers here.
4 Q    I'm going to hand to you a highlighter
5 and I'm going to ask you to identify for me
6 the following.
7 A    Okay.
8 Q    Identify for me the cross-sectional
9 size of the agitator component 43, what you
10 believe is the cross-sectional size of that
11 agitator.
12    Okay.  The cross-sectional size would
13 be this (indicating).
14 Q    Can you show it to the video camera
15 there, please?
16    So you measure the diameter from the
17 left-hand portion of the agitator to the
18 right-hand portion, right?
19 A    That's right.
20 Q    What is that measurement?
21 A    Number-wise?
22 Q    Correct.
23 A    It's around half an inch.
24 Q    You've never taken a ruler to that,
25 what you're pointing to there, as we sit here

Page 166

1 today?
2 A    I don't need to because I'm trying to
3 just come up with the statement of usage of
4 the word approximation and I do that because
5 I have a history for this approach because
6 when I see the plunger for Vita-Mix having a
7 diameter, at the very bottom, about one inch
8 plus and the hub is about half an inch plus,
9 and I see that not error but the deviation
10 could be plus or minus half an inch, I use
11 the same criteria and apply it here.
12 Q    Is it your opinion that a person of
13 ordinary skill in the art does not need to
14 use a ruler to measure the cross-sectional
15 size of a device to be inserted into a
16 pitcher?
17 A    If they are going to design and market
18 the device, they have to go to nitty-gritty
19 measurement but if they are trying to
20 basically extract equivalents, they don't
21 need to measure.
22 Q    What about anticipation analysis?  In
23 order to conduct an anticipation analysis do
24 you need to measure what the cross-sectional
25 size is --

Page 167

1 A    No.
2 Q    -- of the Wayne patent?
3 A    No, you don't need to.
4 Q    So it's your opinion that you don't
5 need to measure the cross-sectional size in
6 the Wayne patent without its cross-
7 sectional size is; is that right?
8 A    The reason the word "approximation" has
9 been used, it eliminates the requirement for
10 exact measurements with any tolerances.  It
11 is approximating with naked eyes.  Vita-Mix
12 asserts that their plunger approximates the
13 hub of the blade assembly so I use the same
14 criteria and exactly put it here.
15 Q    Can you identify for me, by using that
16 pink highlighter again, the -- what the
17 central hub of the blades is on the Wayne
18 patent?
19 A    Okay.  I'm going to draw two vertical
20 lines and then put two arrows next to it.
21 The lower arrow.
22 Q    Can I see that?  Can you show for the
23 video?
24 A    Yeah.  And if I do the same thing to
25 Vita-Mix, I have exact deviation or even

Page 168

1 more.  So if they call that approximately
2 equal or approximating each other, this does
3 definitely fall into that approximation.
4 Q    So the central -- what you're calling
5 the central hub in figure 3 of the Wayne
6 patent is -- can you describe in words for me
7 what you're identifying as the central hub of
8 the blades for the Wayne patent in figure 3?
9 A    Basically the flat portion of the blade
10 and it has a knot on top of it and so forth.
11 Q    Can you identify for me in the Wayne
12 patent the -- excuse me.  Before I go any
13 further, and the marks that you identified as
14 the central hub of the blade, is that the --
15 is that what you would measure to determine
16 the cross-sectional size of the central hub
17 of the blade?
18 A    Uh-huh.  That's the one that basically
19 influenced the flow because the reason that
20 the flow escapes from the blade is a very
21 simple centrifugal force and it basically
22 flings the fluid to the side.
23 Q    Is it your -- can you provide to me or
24 can you tell me where in figure 3 of the
25 Wayne patent it discloses a bearing housing?

Page 169

1 A    Bearing housing is right here and I
2 highlighted it.
3 Q    Okay.
4      And can you identify for me where you
5 would measure the cross-sectional size of the
6 bearing housing in accordance with claim one
7 of the Vita-Mix '021 patent?
8 A    This is the lowest red line.
9 Q    Can you identify, in figure 3 of the
10 Wayne patent, any other member or members
11 associated with the blades that you believe
12 falls within that term as set forth in claim
13 one of the Vita-Mix '021 patent?
14 A    Okay.  I'm glad you're asking this
15 question because anything which is
16 nonrotating, it's not going to fling the
17 fluid away from itself, so any other cross-
18 section, basically, is not going to fling
19 fluid.  Anything which rotates and has a
20 dimension is going to kind of influence the
21 size of the air channel depending upon a
22 whole host of other parameters, RPM, fluid
23 properties and so forth.  So I don't see any
24 other components in this Wayne which I would
25 like to associate it with the blade that

Page 170

1 causes an air channel.
2 Q    Does Wayne disclose anywhere that the
3 agitator or helical component has to
4 approximate the cross-sectional size of a
5 member associated with the blades?
6 A    Not at all.  Not at all.
7 Q    So it does not have to; is that right?
8 A    It does not have to because as a person
9 with ordinary skill in the art, I can extract
10 that.
11 Q    So is it your opinion that the agitator
12 or auger component 43 -- cross-sectional size
13 of that auger component does not have to
14 approximate the cross-sectional size of a
15 member associated with the blades in the
16 Wayne patent; is that right?
17 A    Please repeat the question.
18 Q    Sure.
19      Is it your opinion that the cross-
20 sectional size of the auger component in
21 Wayne does not have to approximate the cross-
22 sectional size of a member associated with
23 the blades for the blender device in Wayne to
24 work?
25 A    It has to approximate because if it is

Page 171

1 too narrow it falls in the cavity of the air
2 channel and it doesn't do anything.  It has
3 to touch the fluid so it has to basically be
4 large enough to contact the fluid and then
5 pump the fluid downward.
6 Q    Other than your prior opinion regarding
7 figures 1 and 3, can you show me where in
8 Wayne that is disclosed or taught?
9 A    As I said, as a person with ordinary
10 skill in the art, I can draw all of these
11 conclusions.  In other words, if I see a
12 blender without any device or plunger having
13 an air channel, when I see that, I say, well,
14 why not.  We should put something in there.
15 Q    So in other words, your opinion is that
16 Wayne does not disclose an auger component
17 having a cross-sectional size that
18 approximates the cross-sectional size of a
19 member but that you can imply or infer that
20 from Wayne; is that accurate?
21 A    That is very accurate and I kind of --
22 if you'll allow me to elaborate on that, if I
23 turn a kind of blend and look at the top view
24 of the contents in the blender and I see that
25 I have a hole or a channel which is about one

Page 172

1 inch in diameter, it is very kind of
2 unrealistic to design an auger which is only
3 a quarter of an inch and expect to do
4 anything.  So you are going to be large
5 enough in the diameter.  That contacts the
6 fluid.  And what is the diameter of that is
7 dictated by many parameters, among them this
8 hub section, and then you want to approximate
9 these two.  So, I mean, this is so common
10 sense in design and engineering that there is
11 no need to look for any explicit statement in
12 the patent because in 1957, the author of
13 this patent was not the author of the Vita-
14 Mix patent for the choice of force.
15      I would like to make one more
16 statement.  The reason the wording of the
17 Vita-Mix patent is as-is is because of the
18 problems that they had during prosecution so
19 they reworded until it is being allowed.  So
20 I'm not expecting to look at word by word
21 kind of one-to-one correspondence and
22 correlation between the two and say he said,
23 explicitly, approximating and they said,
24 explicitly, approximating.
25 Q    So your opinion is that the Wayne

1 patent is not a one-to-one correlation with

2 claim one of the Vita-Mix '021 patent; is

3 that accurate?

4 A      No.  From a design point of view it's a

5 one-to-one correspondence; from various point

6 of view, it doesn't need to be.

7 Q      From the what point of view?

8 A      Performance and configuration.  It's

9 one-to-one correspondence but from verbiage

10 of the explanation of the figure, it doesn't

11 need to be because two authors have two

12 different styles and tastes of writing.

13      And by the way, this is the

14 preferred -- as a person who is studying a

15 patent, I realize that this is a preferred

16 embodiment.  Very easily as a designer, as a

17 person with ordinary skill in the art, I can

18 invert this device and put it on the lid of

19 the device very easily.  In other words, the

20 transition from having it on the rotor, I can

21 have the mirror image inverted on the lid and

22 the difference would be now it doesn't rotate

23 anymore, it's going to be stationary, but it

24 fills the gap or it fills the air channel and

25 because it has some grooves, it may, I don't

1 know at this point, but it may actually help

2 to channel the flow more efficiently toward

3 the blades.

4      MR. CUPAR:  Let's take a

5 break for lunch.

6      - - - -

7      (Luncheon recess had.)

8      - - - -

1                    1:00 p.m.

2 Q      How are you, Dr. Rashidi?

3 A      Very good, thank you.

4 Q      Did you talk about your testimony or

5 the contents of your testimony with

6 Mr. Aycock, the Back To Basics lawyer, during

7 your lunch hour?

8 A      I had one question about Calfee for him

9 because to the point of today, I didn't know

10 that Calfee was somehow involved.  So I asked

11 him about the Calfee issue and he told me

12 that because Mr. Aycock doesn't have the,

13 what do you call it, license or Ohio -- State

14 of Ohio's Bar kind of license, you call it?

15 What is that?  Bar member?  So they need

16 local people to kind of assist them in that

17 regard.  So it resolved the issue of Calfee

18 for me.

19 Q      Take a look at the invoice that's

20 marked as Plaintiff's Exhibit 104.  At the

21 bottom, it says, "Please view the receipts on

22 the next pages"; do you see that?

23 A      Yeah.

24 Q      When we received this copy, do you see

25 in the bottom right-hand corner it says

1 Rashidi004560?

2 A      Uh-huh.

3 Q      The next copy after that, Rashidi004561

4 did not include any receipts on the next

5 pages.  Did you provide a copy of the

6 receipts on the next pages to your lawyers?

7 A      Yes.  I had a copy from the hotel that

8 I stayed, I had a copy of the Cleveland

9 Hopkins parking and I provided a taxi from

10 the hotel to the airport in Utah and I

11 believe that was it.  Three kinds of

12 receipts.

13      MR. CUPAR:  I'd like to see

14 if I can get those, Robert.

15      MR. AYCOCK:  Yeah.  Sorry.

16      MR. CUPAR:  Maybe during a

17 break or something.

18      MR. AYCOCK:  I'm going to

19 e-mail Clint right now and see if I

20 can provide them to you.

21 Q      You did provide those for your lawyers,

22 right?

23 A      I did, yeah.  It was in the same file.

24 Q      Going back to Plaintiff's Exhibit 106

25 which is the Wayne patent, do you have that

Page 177

1 in front of you, sir?

2 A    The patent, yes.

3 Q    I want you to take a look again at

4 figure 3 on Exhibit 106 of the Wayne patent.

5 A    Okay.

6 Q    That's the one you marked up with the

7 pink highlighter marker; is that right?

8 A    That's right.

9 Q    You provided, as you recall, this

10 morning, the locations of the cross-sectional

11 size of the agitator components or auger

12 components, the cross-sectional size of the

13 central hub of the blades and the cross-

14 sectional size of the bearing housing; do you

15 recall that?

16 A    That's right.

17 Q    You also testified earlier today that

18 you did not take any measurements with a

19 ruler of any of those components in the Wayne

20 patent; is that right?

21 A    That's correct.

22 Q    I'm handing to you a ruler here and

23 this is going to be the first time that

24 you're actually measuring with a ruler --

25 A    Uh-huh.

Page 178

1 Q    -- the components of the figures in the

2 Wayne patent; is that accurate?

3 A    That's accurate.

4 Q    I want you to take, first, the

5 measurements of the -- let's do this in

6 millimeters.  The numbers might be easier.

7 A    Sure.

8 Q    Let's do the measurement by millimeters

9 of the cross-sectional size of the agitator

10 or auger component.

11 A    43?

12 Q    Correct.  The one that you identified.

13 A    Okay.

14 Q    Let me know how many millimeters that

15 is for the record.

16 A    I would say 11 millimeters.

17 Q    Now take the measurement of the cross-

18 sectional size of the central hub.

19 A    I would say 21 millimeters.

20 Q    Now take the measurement of the cross-

21 sectional size of the bearing housing in the

22 Wayne patent.

23 A    I would say 24 millimeters.

24 Q    Based on your measurements, the cross-

25 sectional size of the bearing housing which

Page 179

1 is identified as 24 millimeters is about 218

2 percent larger than the cross-sectional size

3 of the auger component; is that accurate?

4 A    That's accurate, yes.

5 Q    Based on your measurement in Wayne, the

6 cross-sectional size of the central hub is

7 about 190 percent larger than the cross-

8 sectional size of the auger component; is

9 that accurate?

10 A    119 or 90?

11 Q    90.  190 percent larger.

12 A    It's almost twice as much, yeah.

13 Q    So it's your opinion here today that

14 the cross-sectional size of the bearing

15 housing which is about 218 percent larger

16 than the cross-sectional size of the auger

17 component approximates one another?

18 A    If I consider the same criteria of

19 Vita-Mix, yes, because if I did the same

20 measurement on the hub and diameter of the

21 plunger at its larger portions, I'll have

22 almost the same type of numbers, and again,

23 the word is "approximate" and it's pretty,

24 kind of, wide open.

25    And then one more thing added to that,

Page 180

1 as I said, when we are looking at inventions

2 and generating a new device, if somebody in

3 the ordinary skill in the art looks at the

4 cross-section of the channel generated and he

5 or she wants to put a device there to prevent

6 that, I'm sure nobody would say, "Let's put

7 something which is lesser than the cross-

8 sectional size of the channel."  So

9 regardless of what these numbers are, they

10 would have a device which basically fills the

11 space and that's exactly what Vita-Mix people

12 have tried to do.

13 Q    Is it your opinion that the accused

14 Back To Basics blenders -- that the cross-

15 sectional size of the stir stick in the Back

16 To Basics blenders approximates the cross-

17 sectional size of the member associated with

18 the blades in the Back To Basics blenders?

19 A    That's right, yes.

20 Q    Going back to the Wayne component, it

21 is your opinion that even though Wayne does

22 not explicitly disclose that the cross-

23 sectional size of a device inserted into the

24 pitcher, such as an auger component,

25 approximates the cross-sectional size of a

Page 181

1 member associated with the blades, that your
2 measurement of the bearing housing being 218
3 percent larger than the cross-sectional size
4 of the auger component nevertheless
5 approximates; is that accurate?
6 A     That's --
7              MR. AYCOCK:  Can I have that
8        question read back, please?
9              (Record read.)
10             MR. AYCOCK:  Objection.
11       Vague.
12 A     My answer to that is we are in the
13 realm of nonquantitative numbers and all of
14 the sudden we are hearing millimeters and
15 percentages because in the patent's teaching,
16 there is no quantitative in the claim
17 language, therefore, no one is there to
18 define what approximates means.  But based on
19 the common sense, nobody will sit down and
20 design member 43 of Wayne smaller than a
21 typical observed air channel, so this is
22 basically contrary to common sense.  So
23 whatever physics happens inside the blender,
24 whoever, which is Wayne, has designed member
25 number 43 or device number 43, it has to be

Page 182

1 large enough to occupy that space.  So our
2 measurements on this figure is not going to
3 kind of bring anything contrary to what I am
4 learning from this patent.
5        In other words, again, if we go to
6 extreme of the case, if I'm blending
7 something for which a channel is generated
8 one and-a-half inch in diameter, I'm not
9 going to sit here and design something which
10 is 11 millimeters.  I'm going to design
11 something or put that device that is at least
12 one and-a-half inch and if you convert it to
13 millimeters, whatever it is, 25 plus 12,
14 30-some millimeters.
15        So what I'm trying to say is when you
16 study the figures of the Wayne disclosure, it
17 gives you or it leads you to invention of a
18 device that is going to occupy the void, the
19 channel.  So as I said, and I repeat myself
20 again, nobody will sit down and design an
21 auger of 43 as big as this marker in diameter
22 when the channel is two inches in diameter.
23 That is contrary to common sense, contrary to
24 the actions and attitude of an ordinary --
25 person with ordinary skill in the art.

Page 183

1        So therefore, getting to numeric of 11
2 versus 21 millimeters, 11 versus 24
3 millimeters and these percentages is not the
4 issue and even Vita-Mix patent has not gone
5 to quantitative measurements in their claim.
6 So we are here and just comparing, for the
7 sake of anticipation, device with device in
8 writing, so I'm saying that this basically
9 leads me to go in that direction.  And as a
10 matter of fact, I am taking one step
11 further.  This very number 43 can be inverted
12 and put it on the lid.  That's for a person
13 with ordinary skill in the art, that is the
14 first thing which comes to my mind.
15 Q     Based on your opinion in your testimony
16 that you just provided, is it accurate, then,
17 in the Wayne patent that a person of ordinary
18 skill in the art, based on the teachings in
19 Wayne, can increase the size of the bearing
20 housing without increasing the size of the
21 auger or agitator component and still end up
22 with the invention set forth in Wayne?
23 A     Actually, as I said before, a person
24 with a skill in ordinary art is going to
25 proportionally size them.  In other words,

Page 184

1 first of all, this auger 43, in my opinion,
2 is one of the last parts that goes to this
3 blender.  So if they have a given hub, a
4 given flat portion for the blade and a given
5 content for the blender, they run it and they
6 observe the size of the channel, the cross-
7 section of the channel, then they say,
8 "Ah-ha.  Let's have something which fills the
9 gap."  So that is something that's kind of so
10 intuitive for a person with skill in
11 ordinary -- with ordinary skill in the art
12 that to me, it is not an issue.
13        So if they increase the size of the
14 bearing housing proportionally and if that is
15 truly defining the -- allegedly defining the
16 size of the cross-section which I still have
17 some reservation for that, then they have to
18 decrease the size of 43 proportionally to
19 fill up the gap.
20        Remember, what motivates for people to
21 go after invention?  Performance.  So if you
22 observe air channel of one and-a-half inch in
23 diameter or 36 millimeter in diameter, you
24 won't sit down and just design 43 of 11
25 millimeter.  You make it 40 -- I mean, 38

Page 185

1 millimeters. So you have a tolerance of 2
2 millimeters, 1 millimeter to each side to
3 occupy the place. But as I said, the fluid
4 has its own behavior which is kind of a
5 little bit beyond all of these performances
6 that everybody claims.
7 Q      Your opinion is that this auger
8 component 43 is the plunger or the device
9 inserted into the blender; is that accurate?
10 A     That is accurate. This is a device
11 which is adjacent and above the blade.
12 Q      How is it adjacent to and above the
13 blades if it's contacting or touching the
14 blades?
15 A      Again, I go back to the definition of
16 the court and this adjacent, above, just
17 means that. It doesn't mean it shouldn't
18 touch or it should touch. If it was an
19 issue, I was expecting to see that. And
20 again, when you see my tables in this
21 anticipation, I am just comparing word by
22 word because there is an allegation of
23 infringement and I'm trying to respond to
24 that through prior art. So personally, I'm
25 not going to accept any other extra

Page 186

1 definition of adjacent and above. Adjacent
2 and above means exactly that.
3 Q      Take a look at page ten, Plaintiff's
4 Exhibit 105 which is your invalidity expert
5 report, sir.
6 A      That's right.
7 Q      There's a chart there on page ten; do
8 you see that chart?
9 A      That's right.
10 Q      On the left column, the third row down,
11 there's a statement, "Positioning"; do you
12 see that?
13 A      Uh-huh.
14 Q      It states, "Positioning" -- it's
15 claim -- it's a term out of claim one of the
16 '021 patent; do you see that?
17 A      Uh-huh.
18 Q      It states, "Positioning a device that
19 can be inserted into a blender having a
20 cross-sectional size approximating the cross-
21 sectional size of the member adjacent to and
22 above the rotating blades"; do you see that?
23 A      Uh-huh.
24 Q      Can you explain to me how in Wayne a
25 person of ordinary skill in the art or anyone

Page 187

1 for that matter can insert the auger
2 component into the blender of Wayne while the
3 blades are rotating?
4 A      Actually, again, there is no mention of
5 when the device is supposed to be inserted.
6 The blade is rotating and for the Wayne, the
7 blade is also rotating, so again --
8 Q      Answer my question.
9        Is there any way to position the device
10 that can be inserted into the blender or the
11 auger component into the blender while the
12 blades are rotating? Is it possible to do
13 that?
14 A      My answer, again, is -- excuse me. My
15 answer is, I look at the motivation for the
16 design. The motivation for the design, in my
17 opinion, for the Vita-Mix people, whoever the
18 inventor was, they observed an air channel
19 and they said, "Let's have a solid piece to
20 occupy that space that otherwise the air
21 channel would have been generated," and that
22 motivation, in my opinion, has been disclosed
23 and taught by Wayne. And Wayne observed, in
24 1957, this air channel problem and devised
25 this device, something that we have to notice

Page 188

1 that even though this is 1956 and the
2 inventor of Vita-Mix was probably 1992, or
3 the exact date, I don't remember. This
4 technology hadn't changed much. In other
5 words, the person of ordinary skill then and
6 now, there is not much difference between
7 their motivations and attitude and approach.
8 If there was an electronic vacuum tube versus
9 transistors and then integrated circuit, I
10 understand that. A person of ordinary skill
11 in the art for electronics would be two
12 different people but in the art of blenders,
13 everything is disclosed here, in my opinion.
14 Q      Based on that, you would agree with me,
15 then, that based on the teachings in Wayne,
16 you cannot insert the auger component into
17 the blender during operation when the blades
18 are rotating; is that accurate?
19 A      That is common sense and that's
20 accurate, sure.
21 Q      That's accurate?
22 A      That is definitely accurate because
23 that's common sense.
24 Q      Right.
25        Also, based on the teaching in Wayne,

Page 189

1 you cannot place the auger component adjacent
2 to and above the rotating blades themselves
3 as opposed to the central hub; is that
4 accurate?
5 A    If you consider the blades rotating,
6 nobody in their right mind would attempt to
7 do that but this blade is adjacent and above
8 a rotating blade in a working blender.
9 Again, remember, we are concerned about a
10 blender which is functioning.  Nobody's
11 interested in a blender that has a stationary
12 blade.  So when this blender is rotating,
13 there existed a device adjacent and above a
14 rotating blade, so that is how I interpret
15 this.
16 Q    Can you show me the portions of the
17 blade that actually do the cutting, chopping
18 or blending?
19 A    Well, anything on the --
20 Q    If you could use a blue pen just to --
21 A    Different, yeah.  Actually, I can draw
22 you a velocity distribution but this is the
23 cutting and chopping portion, inclined
24 portions.
25 Q    Can you raise up, now, for the camera

Page 190

1 here, for the videotape, and show what you
2 just circled?
3 A    From here to the edge of the hub
4 (indicating).
5 Q    Show the other blade, too, that you've
6 darkened.
7 A    From here to here (indicating).
8 Q    So the portions that you colored in,
9 just to be clear for the written record here,
10 is what's identified as 28 and 29 in figure 3
11 of Wayne, correct?
12 A    That's right.
13 Q    Okay.
14    Could you explain to me -- you agree
15 with me that the auger component cannot be
16 adjacent to and above the blades that you
17 just darkened in 29 and 28; is that accurate?
18 A    Again, adjacent and above is a
19 qualitative description.  When you say -- I
20 can be adjacent to you right now, I'm
21 adjacent to Dr. Swanger, I'm even adjacent
22 to -- it depends upon what is our unit of
23 measurement.  You cannot state qualitative
24 and then draw quantitative conclusions.
25 That's in my opinion.  If you want to be

Page 191

1 quantitative from the very beginning, you
2 have to define your scale and then you
3 have -- on top of that, you have to define
4 your tolerances.
5 Q    You would agree with me, too, that the
6 auger component which is attached to this
7 entire blade assembly in figure 3 of the
8 Wayne patent cannot be adjacent to and above
9 the blades that you identified as 28 and 29;
10 is that accurate?
11 A    As I said, I believe that this is
12 adjacent and above, so that, I think, should
13 answer your question.  The auger of 43 of
14 Wayne is adjacent and above.  It is not
15 outside of the blender, it is not on top of
16 the lid, it is very close to the blade
17 adjacent and above.
18 Q    I want you to now take -- do you see
19 the blade that you marked as 28?
20 A    Uh-huh.
21 Q    Is the top tip of the blade 28 that you
22 marked higher -- is it above the auger
23 component, the bottom portion of the auger
24 component?
25 A    Again, we have a range here so

Page 192

1 basically, you can extend this auger to three
2 times as much, and again, it depends upon
3 where you want to put your average value.
4 Even the diameter that I showed you on the
5 auger is an average value because that's a
6 helical cut.  So where do you want to measure
7 it?  Are you going to measure it in a
8 horizontal cross-section, slanted, so you get
9 all sorts of the different numbers?  So you
10 are trying to extract quantitative numbers
11 out of something which is conceptual in both
12 cases, Vita-Mix and this one.
13 Q    You would agree with me that the auger
14 component 43 is actually lower than the blade
15 28 that you -- that you marked with the blue
16 pen; is that accurate?
17 A    No, that's not accurate because part of
18 it is above.  And basically in engineering,
19 what we do, we always average out and find
20 out, the, either, center of mass or center of
21 area that is something which is called center
22 of gravity, center of a geometric area.  So
23 if you put the center of this area because
24 you have lesser material here, the center
25 would be closer to the top, and again, what

Page 193

1  I'm trying to say is what motivates the
2  designer to design this is the size and
3  dimensions of the air channel, so the name of
4  the game is to fill that air channel.  So
5  nobody would come and design an auger which
6  is only two inches high when the air channel
7  starts on the very top.  And depending upon
8  the level of filling in the pitcher -- so if
9  somebody wants to fill the pitcher all the
10 way to the top, the auger must extend all the
11 way to the top to be effective.
12 Q     You would agree with me that the auger
13 component 43, at least a part of it, is lower
14 than the rotating blade 28, correct?
15 A     A part of it is lower than a part of
16 the blade but the overall center of it must
17 be above the blade to be effective even for
18 Wayne.
19 Q     So Wayne does not teach that the entire
20 auger component has to be above the blades;
21 is that accurate?
22 A     Actually, my understanding from Wayne
23 is it must be above the blade; otherwise, it
24 wouldn't work.  In other words, if we take
25 your example and take it to an extreme and

Page 194

1  bend this blade upward toward the tip of
2  the -- to the free level of the content in
3  the pitcher, then this auger would be
4  ineffective.  It would be part of the hub
5  assembly, basically.  So therefore, the auger
6  must extend far above the blade to be
7  effective.
8  Q     But the auger does extend below the
9  blade, too, in the Wayne patent; is that
10 accurate?
11 A     Below part of the blade but definitely
12 all of it above the left side which is
13 slanting down and part of it is below the
14 blade on the right and most of it is above
15 it.  So if we go to the definition of
16 centroid, it has to be, and that is just
17 working with terminology.
18       In order to make Wayne work as he
19 alleges, it has to be way above the blade to
20 work because, remember, what are we doing in
21 a blender?  We are pumping.  These two blades
22 are pumping the fluid in different directions
23 that has an overall component upward and then
24 it comes back down through the center.  So
25 you have to go up there and capture that

Page 195

1  fluid.
2  Q     So you would agree with me that Wayne
3  does not disclose or teach that the entire
4  auger component has to be adjacent to and
5  above the top tip portion of the rotating
6  blade 28, right?
7  A     As I said to you previously, Wayne does
8  not explicitly talk about adjacent and above,
9  it does not talk about cross-sections.  Wayne
10 teaches to have a device which basically
11 fills up the void generated and it has an
12 additional function of an auger which helps
13 to pump the fluid downwards.  So if the sides
14 of this auger are not touching the fluid,
15 Wayne doesn't have an invention.  So nobody
16 will sit down and make a blender according to
17 Wayne and have the blender so narrow and so
18 small in height, then it justifies the
19 purpose.  So any person with ordinary skill
20 in the art would make the item number 43
21 large enough lengthwise and cross-section-
22 wise to be effective because, again, we are
23 talking about a person with ordinary skill
24 here.
25 Q     Take a look at your -- well, what's

Page 196

1  your opinion regarding whether Wayne is
2  maintained -- the auger component Wayne is
3  maintained free from contact with the
4  pitcher?
5  A     Again, common sense.  It is not
6  contacting because when I read Vita-Mix's
7  patent, not contacting the pitcher means that
8  they are based on the prosecution histories
9  and even the statement of the patent it is
10 supposed to extend in the middle so they are
11 not -- they are saying that they are not
12 using that as a stir stick, they are using it
13 as a device that magically prevents air
14 pocket formation.  So by not touching means
15 staying in the center on a vertical axis
16 pointing toward the blade and the same thing
17 is happening here, in my opinion.
18 Q     Is it your opinion, then, that claim
19 one of the '021 Vita-Mix patent is limited to
20 the device inserted in the pitcher has to be
21 in the center of the pitcher?
22 A     Actually, the booklet that Vita-Mix
23 provides teaches against that.  It says use
24 it as a tamping device, stir it.  If
25 something happens, take it out.  So basically

Page 197

1 the description and the kind of instruction
2 for use sometimes deviates from the teaching
3 of their own patent.
4 Q    Do you know what my last question was?
5 A    Yeah.
6 Q    What was it?
7 A    The question was, has this plunger of
8 Vita-Mix been designed solely for not
9 touching the wall.
10 Q    No.
11      My question was, is it your opinion
12 that claim one of the Vita-Mix '021 patent is
13 limited so that the device that's inserted
14 into the blender can only be at the center of
15 the pitcher; is that your opinion?
16 A    Physically that can't be.  It will
17 deviate from that.  But the intent of the
18 patent and the claim is to stay in the
19 center.
20 Q    Can you show me where in claim one of
21 the Vita-Mix '021 patent it is your -- where
22 it supports your opinion that the device
23 inserted in the pitcher must be at the
24 center?
25 A    Again, the word "center" is not there

Page 198

1 but if you -- give me a copy -- I mean, "A
2 method of preventing the formation of an air
3 pocket around rotating blades positioned in a
4 pitcher of a blender," and then down there,
5 "While maintaining the device," here which
6 means the plunger, "free of contact with the
7 pitcher."
8 Q    Can you tell me where it says "center"?
9 A    Well, "free of contact," so it should
10 not touch the wall.
11 Q    But that's not center, is it,
12 Dr. Rashidi?
13 A    Okay.  It's not center.  So I stand
14 corrected and I thank you for that.  It
15 doesn't necessarily mean center.
16 Q    Okay.
17      So in other words, the plunger or
18 device being inserted into the blender can
19 move within the pitcher as long as it's not
20 contacting the sides; is that your opinion?
21 A    Based on the prosecution history, no,
22 that's not my opinion.  My opinion is they
23 are basically asserting that this device is
24 so novel that you can let it go, let sit
25 there and go and do other things and come

Page 199

1 back to it.  So based on my study of the
2 history of the patent prosecution and some
3 other statements that is in the body of the
4 patent itself, for me they are asserting that
5 it has to be in the center and you can leave
6 it.
7      As a matter of fact, there are other
8 statements which basically supports my
9 statement because after I read the expert
10 opinion of Dr. Swanger, he says that the
11 force of the fluid brings it to the center
12 and the whole promise of Vita-Mix is not to
13 touch it.  Don't use it as a stir stick.
14 This automatically occupies the air channel
15 that would lead to deleterious air pocket.
16 So for me, when I read that based on the rest
17 of the history of the patent, I'm inclined to
18 believe that that is what Vita-Mix intends.
19 Q    So your opinion regarding claim one of
20 the '021 patent in terms of where the
21 position of the device that can be inserted
22 into a blender is not based on what's set
23 forth in the words of claim one of the Vita-
24 Mix '021 patent, but rather, the prosecution
25 history of the Vita-Mix '021 patent; is that

Page 200

1 right?
2 A    And the patent itself.
3 Q    Is that right?
4 A    That's right.  That's right, yes.
5 Q    Can you show me, now, where in claim
6 one of the Vita-Mix '021 patent itself it
7 requires that the device can be inserted --
8 the device that is inserted into the blender
9 is not precluded or allowed to be moved about
10 within the blender pitcher?
11 A    I would like to have a personal opinion
12 on that and that is, if -- I mean, what is
13 the inception point of this claim?  There is
14 an invention.  For the invention there is a
15 detailed description.  So when you read those
16 detailed descriptions, this is what you come
17 up with because very systematically, they
18 talk about during the prosecution that this
19 device is not a stir stick and as a matter of
20 fact, that's how they could kind of go around
21 Jacobsen.  So when you don't have something
22 as a stir stick because any rotation becomes
23 a stirring by definition and actually if you
24 look at the court definition, it says, "but
25 not including a method of stirring to

Page 201

1 disperse, dislodge or break up an air
2 pocket," I mean, we have to kind of honor
3 what the court says also on the very top.  So
4 anytime you deviate from the center you are
5 basically going against what the court has
6 claimed -- defined this to be.
7 Q     That's your opinion, right,
8 Dr. Rashidi?
9 A     That is my opinion based on reading
10 what the court says.
11 Q     Can you explain to me how the Wayne
12 device is maintained free of contact with the
13 pitcher?
14 A     It is so obvious that -- I mean, it's
15 like by inspection.  You don't even need to
16 explain.  It's sitting there and it's not
17 contacting the walls of the pitcher.
18 Q     Can you show me where in your report
19 you disclose that the Wayne patent discloses
20 that the device is maintained free of contact
21 with the pitcher?
22 A     Actually, I'm assuming that this has
23 been provided as part of my report.  I'm
24 referring to it, you have access to it and
25 you can see it for yourself so if I don't say

Page 202

1 it explicitly in the right-hand column, it
2 doesn't mean it doesn't exist.  I mean,
3 certain things which are too obvious I don't
4 feel compelled to write it.  This is too
5 obvious, that when you have something on top
6 and above the blade as is in Wayne, it's not
7 going to touch unless it breaks.
8 Q     But you didn't include, in any portion
9 of your report, any explicit disclosure
10 regarding Wayne; is that accurate?
11 A     I am referring to the Wayne patent in
12 this table of comparison.
13 Q     Right.  I'm asking you the specific
14 citations of the disclosures.
15 A     No.
16 Q     You didn't provide that, correct?
17 A     And I didn't feel any necessity to do
18 that because it's so obvious.
19 Q     And that was because it's so obvious?
20 A     It's so obvious.
21 Q     Your understanding, as part of your
22 anticipation analysis, is that you do not
23 need to specifically disclose each and every
24 element out of claim one in the '021 patent
25 to Wayne; is that accurate?

Page 203

1 A     Would you repeat the question again?
2           (Record read.)
3           MR. AYCOCK:  Objection.
4        Mischaracterizes the prior testimony,
5        vague and ambiguous.
6 A     To answer that, who is going to
7 anticipate?  A person with ordinary skill in
8 the art.  So I am basically providing this
9 report and I'm demonstrating that a person
10 with ordinary skill in the art would
11 anticipate all of the things that '021 patent
12 is claiming or asserting so I don't need to
13 have a kind of statement-by-statement
14 correlation.  I'm saying that for a person
15 with ordinary skill in the art looking at the
16 Wayne patent, they can anticipate that there
17 has to be a device or a solid piece in the
18 cavity of the air channel.
19 Q     So you do not believe -- it's your
20 opinion that you do not have to disclose each
21 and every specific element or you do not have
22 to identify each and every specific element
23 out of the Wayne patent to anticipate -- to
24 come up with a determination of anticipation
25 of claim one of the Vita-Mix '021 patent?

Page 204

1           MR. AYCOCK:  Objection.
2        Mischaracterizes prior testimony.
3 A     I think I have done that.  I have done
4 element by element and actually my page ten
5 is self-explanatory.  I'm saying that you
6 have some element on the left column and the
7 right element, sometimes explicit, sometimes
8 implicit, is in Wayne.  In other words, when
9 they talk about the formation of an air
10 pocket, explicitly Wayne talks about air
11 pocket, deleterious air pocket, a large
12 enough bubble that causes problem.  And then
13 on top of that, his drawings implicitly or
14 very vividly shows a person with ordinary
15 skill what to do.
16 Q     Can you identify for me which of the
17 elements out of claim one of the Vita-Mix
18 '021 patent is shown implicitly based on
19 your -- implicitly based on your opinion in
20 the Wayne patent?
21 A     These matter of cross-sections.  The
22 ratios of the cross-sections.  So Wayne never
23 goes explicitly to talk about approximating
24 size of something with something else but
25 it's there, it's implicitly there, and

Page 205

1 anybody with ordinary skill in the art would
2 come up with the right conclusion in a very
3 easy fashion.
4       Again, I think I'm saying something
5 here and somehow we are passing by it.  If
6 you see an air channel and you're an attorney
7 and you may not be a designer but if you see
8 an air channel inside a blender and I ask you
9 what size of a device do you do for Wayne
10 design, I'm sure you say, "At least as big as
11 the air channel," even though you may not be
12 a person of ordinary skill in the art of
13 blender design.  So with the same token, the
14 person with ordinary skill in the art would
15 definitely come up with the right cross-
16 section.  So if he doesn't talk about it
17 explicitly with that language because people
18 are not responsible for the language that one
19 patent attorney uses, they may express it in
20 different ways.
21 Q      Just to be clear, then, you would agree
22 with me, then, while a person of -- you
23 believe a person with ordinary skill in the
24 art would find that obvious, Wayne does not
25 require that the cross-sectional size of the

Page 206

1 plunger be approximating to the cross-
2 sectional size of the member associated with
3 the blades, right?
4 A      I'm glad you put it this way.  We have
5 simple logic.  A equal to B, B equal to C so
6 B is equal to A, okay?  So if according to
7 the Vita-Mix, the air channel is defined, the
8 cross-section of it, by these members, and
9 you have an air channel, you are observing
10 it, you are bound to design a device of 43 of
11 Wayne approximating that size.  Other than
12 that, you don't have any Wayne device.  So
13 therefore, it is so -- such a logical
14 conclusion that because the air channel is
15 defined by that member and now you are going
16 to fill it, so if you fill that, you're
17 automatically designing something which
18 approximates whatever was down there.  So
19 which part of this is kind of ambiguous?
20 Q      Is your obviousness opinion, then,
21 based on the Vita-Mix patent and the Vita-Mix
22 technology?
23 A      Whatever you see in this comparison
24 table is based on language and language, not
25 performance and performance.

Page 207

1 Q      Do you understand my question, though?
2        Is your obviousness analysis and
3 opinion based on what you learned from
4 reading the Vita-Mix patent?
5 A      Uh-huh.
6 Q      And then, in other words, how you did
7 your obviousness analysis was to -- based on
8 your knowledge of Vita-Mix and what it does,
9 you just went back to the prior art given to
10 you by the Back To Basics lawyers and say,
11 "Here it is," right?
12 A      I asked for the --
13 Q      Right.
14 A      I asked for those things.  Because you
15 keep saying, "They gave you."  No.  I asked
16 for all the relevant patents for the case and
17 I got those and then I studied all the
18 patents and I said, "Okay.  Based on all
19 these patents, I can identify four of them
20 and kind of draw conclusions of anticipation
21 and obviousness."
22        MR. AYCOCK:  Dave, when
23        you've got a break, could we take a
24        short break?
25        MR. CUPAR:  Let's do it right

Page 208

1        now.
2        (Recess had.)
3        - - - - -
4        (Plaintiff's Exhibit 107 was
5        marked for identification.)
6        - - - - -
7 Q      Dr. Rashidi, I'm going to hand to you
8 what's been marked as Plaintiff's Exhibit 107
9 and on the first page it's identified as the
10 "Expert Report of Majid Rashidi, Ph.D., P.E.,
11 in Rebuttal to the Expert Report on Patent
12 Infringement Pursuant to Rule 26(a)(2)(B) by
13 Lee A. Swanger, Ph.D., P.E."  Do you see that
14 document in front of you?
15 A      Yes, sir.
16 Q      Do you recognize that document?
17 A      Yes, sir.
18 Q      Take a look at the last page of the
19 document itself before the appendices on page
20 27.  You'll see a signature.
21 A      Let me get there, please.  Okay.  On
22 page 27, yes.
23 Q      Is that your signature there?
24 A      That's my signature.
25 Q      Is this your expert report, sir?

Page 209

1 A      That's right.

2 Q      Can you explain to me what your opinion

3 is or opinions are with respect to this

4 expert report that's marked as Plaintiff's

5 Exhibit 107?  For simplicity, I'm going to

6 call this the rebuttal report, if that's

7 okay.

8 A      Or second report would be easier.

9 Q      I'll probably use those

10 interchangeably.

11 A      Sure.  No problem.

12 Q      Do you recall my question, by the way?

13 A      Yes.  Thank you.  Okay.

14       My opinion about this report?

15 Q      Yeah.  What's your opinion?

16 A      Can you elaborate on that?  That's such

17 a broad question.  Please elaborate on that.

18 Q      Let me ask it in a different way.

19       Are all of your opinions set forth in

20 this rebuttal expert report that's marked as

21 Plaintiff's Exhibit 107?

22 A      Yeah.  This contains all of my opinions

23 up to the date that I have submitted this.

24 Q      Okay.

25       As of today, January 25, 2008, does

Page 210

1 this expert report contain all of the

2 opinions?

3 A      Yes.

4 Q      So as of today, January 25, 2008, does

5 your rebuttal expert report contain a

6 complete statement of all of your opinions

7 that you are expressing?

8 A      As I said at the beginning of it, I

9 reserve the right to amend it for further

10 clarification and supplementary material but

11 this basically tells the gist of my opinion,

12 yes.

13 Q      The gist or is it your entire opinion?

14 A      Well, it is my opinion about the case,

15 so yes, the answer is yes, but I reserve the

16 right to add further statements and maybe

17 even further tests to clarify my position and

18 my opinion.

19 Q      Do you believe that you need further

20 tests to clarify your position at this point?

21 A      Any tests, rebuttal tests, I would like

22 to study those tests and then look at the

23 validity of the tests and then run my own

24 tests and so there might be a need for it

25 just in case.

Page 211

1 Q      Are you saying, then, that you need

2 additional testing to corroborate the

3 opinions set forth in your rebuttal reports

4 that's attached as Plaintiff's Exhibit 107?

5 A      No, I don't need to do further tests.

6 If a test is presented to me by another

7 person to refute what I'm saying, I would

8 like to study those tests and when I'm

9 studying it I may end up conducting tests

10 again so I don't want to deprive myself from

11 that.

12 Q      As of today, you have not supplemented,

13 in any way, your rebuttal expert report

14 that's marked as Plaintiff's Exhibit 107; is

15 that accurate?

16 A      Not in writing, no.

17 Q      What do you mean by not in writing?

18 A      In other words, as I said, I provided

19 some videotapes which basically would be part

20 of my overall opinion about the case which

21 goes -- additional tests with video kind of

22 depiction is not in this report.

23 Q      I'll state for the record I haven't

24 even viewed those, those were produced to me

25 yesterday afternoon, Dr. Rashidi, and I'm

Page 212

1 going to reserve the right to depose you

2 again if you do --

3 A      Absolutely.

4 Q      -- rely upon those tests or videos in

5 furtherance of your report, okay?

6 A      By all means.  And those tests are just

7 for further clarification.  There's no new

8 finding in them.

9       MR. AYCOCK:  I'd like to

10      point out, we'd -- you know, we

11      produced those prior to this

12      deposition, you were in possession of

13      those and had a chance to review them

14      and could ask Dr. Rashidi any

15      question you had on those.  Similar

16      to what happened during the Haas

17      deposition earlier this week, we

18      received documents shortly before

19      that and so based upon prior

20      practice, you know, in the procedure

21      so far in this case, you know,

22      that's -- you know, been within

23      compliance to that.

24 Q      Dr. Rashidi, you haven't supplemented

25 your rebuttal report here marked as

Page 213

1 Plaintiff's Exhibit 107 based on those
2 videotapes that you created two days ago and
3 that were produced in my possession
4 yesterday, correct?
5 A     Correct, because those tapes basically
6 verified what I have said in these two
7 reports so I did not find any new finding or
8 new phenomenon.  It's just for clarification.
9 Q     Who wrote this report?
10 A     Myself.
11 Q     Did you write every word in this
12 report?
13 A     As I said, I wrote the technical
14 aspects of it and my opinion.  As a matter of
15 fact, this very format of taking statements
16 from Dr. Swanger's report and pasting it here
17 and coming up with an answer is my typical
18 format when I'm replying to a report.  So I
19 wrote everything and then again I asked
20 Mr. Robert Aycock if there is any English
21 problem with the wordings, of grammar,
22 misspellings and so forth, please help me
23 with that, but the report in terms of its
24 content, the opinion presented is all mine.
25 Q     Your report here is rebutting

Page 214

1 Dr. Swanger's opinion regarding infringement
2 of the Back To Basics blenders by claim one
3 of the '021 patent; is that accurate?
4 A     That's accurate.
5 Q     In your opinion as set forth in your
6 rebuttal expert report marked as Plaintiff's
7 Exhibit 107, did you make any determination
8 or analysis regarding infringement?
9 A     When you say did I do any analysis,
10 again, I had access to Vita-Mix patent and I
11 am understanding that Vita-Mix is alleging
12 infringement and I looked at the prior art
13 and I looked at the statements of Dr. Swanger
14 and then I came up with the verbiage as
15 written in this --
16 Q     Do you have any opinion regarding
17 patent infringement of claim one of the Vita-
18 Mix '021 patent based on the Back To Basics
19 blenders?
20 A     Based on Back To Basics what?
21 Q     Blenders.
22 A     Blenders, yeah.  Otherwise I wouldn't
23 write this report.
24 Q     What is your opinion regarding whether
25 the Back To Basics blenders infringe claim

Page 215

1 one of the Vita-Mix '021 patent?
2 A     I believe it doesn't infringe.
3 Q     Did you conduct an analysis for
4 determining whether or not the Back To Basics
5 blenders infringe claim one of the Vita-Mix
6 '021 patent?
7 A     Again, when I wrote this rebuttal
8 report, this second one, it is not in vacuum;
9 it is the continuation of the first one.  So
10 I'm using the same anticipation and
11 obviousness and I say that because I did not
12 hear anything to substantially refute that.
13 i'm still on the same conclusion and opinion
14 that there is no infringement involved here.
15 If you call this analysis, then yes, that is
16 my analysis.
17 Q     So your -- just to be -- just so I
18 understand, then, your opinion, your opinion
19 of noninfringement of claim one of the Vita-
20 Mix '021 patent based on the Back To Basics
21 blenders is because you believe that claim
22 one is anticipated or rendered obvious; is
23 that accurate?
24 A     That's very accurate.
25 Q     Other than your opinion regarding

Page 216

1 anticipation or obviousness, do you have any
2 other opinions regarding whether or why the
3 Back To Basics blenders do not infringe claim
4 one of the Vita-Mix '021 patent?
5 A     My basic opinion is based on the fact
6 that other prior arts have anticipated and
7 shown obvious the alleged claim of patent
8 '021, so therefore, for me, any other
9 infringement is null and void.
10 Q     What I'm saying is other than
11 invalidity, which is anticipation and
12 obviousness, what is your opinion as to why
13 the Back To Basics blenders do not infringe
14 claim one of the Vita-Mix '021 patent?
15 A     Because in my opinion, both of the
16 systems are not able to solve the problem and
17 I have shown that experimentally.  So in
18 other words, we are fighting over something
19 that doesn't exist.
20 Q     You said in your patent infringement
21 analysis, "both of the systems."  What do you
22 mean by that?
23 A     Back To Basics and Vita-Mix, neither of
24 the two devices prevents formation of an air
25 pocket in the blender when you have this

Page 217

1 either plunger of Vita-Mix or stir stick of
2 Back To Basics in place as the claim of '021
3 teaches.
4 Q    Please explain to me what methodology
5 is performed in determining patent
6 infringement.
7 A    The patent infringement is basically as
8 we have said.  You have to go through
9 anticipation and obviousness and you have to
10 make sure that one device does not read on
11 the claims of one patent.  In other words,
12 element by element of a patent should not
13 read on any particular literature of patent
14 or any particular device in the real physical
15 world.
16 Q    That's how you determine patent
17 infringement?
18 A    That is my understanding of patent
19 infringement, reading on somebody's claim.
20 Q    So in other words, patent infringement
21 is determined by whether or not prior art
22 reads on a particular claim?
23 A    No, no, no, no.  Whether or not a
24 device -- like for example, let's look at
25 this case that we have at hand.  Vita-Mix has

Page 218

1 a device which has a patent associated with
2 it and then Back To Basics has a device and
3 now, Vita-Mix alleges that the device of Back
4 To Basics, when you use it and practice it,
5 it reads on the claim one of '021 patent.
6 This is called infringement.  So this is how
7 you determine what infringement is and, I
8 mean, that's my understanding of
9 infringement.
10 Q    Do you have to perform any testing on
11 the Vita-Mix device to determine whether or
12 not the Back To Basics plungers infringe to
13 determine infringement?
14 A    For the test -- actually, most of my
15 testing was done for enablement and I
16 basically showed very clearly that the patent
17 '021 of Vita-Mix fails to enable to practice
18 the claimed patent.  So for infringement, I'm
19 just going through the teaching of the
20 literature because Vita-Mix alleges that
21 there is an infringement taking place and I
22 go and dig into the prior art and bring
23 teachings of other patents' prior art to show
24 that the claim of Vita-Mix has been
25 anticipated or it's obvious.

Page 219

1 Q    You said that most of your testing was
2 done for enablement; is that accurate?
3 A    That's accurate, sure.
4 Q    That's accurate?
5 A    That's accurate, yeah.
6 Q    Take a look at your expert report
7 that's labeled as Plaintiff's Exhibit 105.
8 Your enablement analysis on your report --
9 well, you also testified earlier today that
10 your entire enablement opinion and your bases
11 for your opinion are set forth in your
12 December 17, 2007 report; is that accurate?
13 A    That is accurate.  So what is --
14 Q    Starting on page 25 --
15 A    Oh, five is here.
16 Q    Starting on page 25 you'll see a
17 section called "Enablement" in your December
18 17 expert report that's marked as Plaintiff's
19 Exhibit 105.
20 A    Enablement, X, yes, I'm here.
21 Q    Please show me, by page and line
22 number, the testing that you performed to
23 support your claim that the '021 patent lacks
24 enablement.
25 A    I am not mentioning any of the tests in

Page 220

1 this section in this report because I'm just
2 responding to the, basically, obviousness and
3 anticipation of the Vita-Mix patent and here
4 I'm adding at the very end of my report that,
5 by the way, none of the systems work.  So
6 they are basically mutually exclusive and
7 they are not related together.
8    I'm saying that we have two issues
9 here.  On one hand, at the writing level, at
10 the language level and teaching by the
11 written material, the patent of Vita-Mix '021
12 is invalid because it has been anticipated
13 and it has shown to be obvious based on other
14 prior art in writing without any
15 experimentation, and then I go beyond that
16 and I say, by the way, I have done some
17 tests.
18    By the way, in order to make this a
19 kind of useful device -- because we should
20 not lose track of why we have patents.  It
21 has to be novel; it has to be useful; it has
22 to solve a problem.  I'm saying that by the
23 way, the whole thing doesn't work, neither in
24 Vita-Mix's case, nor in Back To Basics's, but
25 I'm not saying it explicitly here.  I say

Page 221

1 that in order to enable, you have to have a
2 lot of other host of variables studied and
3 included and Vita-Mix fails to do that and
4 very simplistically they just attribute an
5 air channel to a member associated with a
6 rotating blade and try to solve it and it
7 just doesn't work that way.
8 Q     Is it your opinion that if the '021
9 patent does not disclose those other
10 variables but that those variables are known
11 to a person of ordinary skill in the art
12 outside of the '021 patent that the '021
13 patent is still nonenabling?
14 A     I'm not talking about the language
15 here.  When I talk about enablement, I say
16 that, okay, we have this patent of '021 of
17 Vita-Mix.  Let me go, as a person of ordinary
18 skill in the art, and put things together and
19 put that into practice.  My opinion is I
20 cannot do that.  Nobody can do that.  Even
21 Vita-Mix has not been able to do that.  When
22 I talk about enablement, I'm not talking
23 about kind of the language here.  I'm talking
24 about physical operation.
25 Q     When did you perform your enablement

Page 222

1 tests?
2 A     That was back in the summer.  I think
3 it was in July in Utah.
4 Q     So it was prior -- you did your
5 enablement -- did you do all of your
6 enablement testing prior --
7 A     Actually, the entire appendix of the
8 second report or rebuttal, these were all
9 done prior to writing this report, yes.
10 Q     So your second report or your rebuttal
11 report identifying testing is enablement
12 testing and not infringement testing; is that
13 accurate?
14 A     That is accurate.
15 Q     Okay.
16 A     Because I'm just trying to show that
17 none of these devices, this perceived
18 solution or alleged solution for this air
19 pocket, whether it is Back to Basics, whether
20 it is Vita-Mix, it just simply doesn't work.
21 Q     So let me just get this straight just
22 so I understand.
23     You performed enablement testing in the
24 summer of 2007; is that right?
25 A     That is correct.

Page 223

1 Q     December 17, 2007, you submitted an
2 expert report in this case; is that right?
3 A     That's right.
4 Q     However, in your expert report, you do
5 not specifically identify any of that
6 enablement testing that you conducted; is
7 that right?
8 A     That is true because I thought that for
9 the obviousness and for the anticipation,
10 that would be enough to convince everybody
11 that we have basically a noninfringement
12 issue.
13 Q     And then the testing that you identify
14 in your rebuttal report that you submitted on
15 January 7, 2008, all of that testing that you
16 identify in your rebuttal report is going to
17 enablement testing and not infringement
18 testing; is that accurate?
19 A     That's exactly the case.  Yeah, that's
20 exactly the case.
21         MR. CUPAR:  Let's go off the
22     record for a second.
23     (Discussion held off the record.)
24 Q     Sir, you'll see on page three of your
25 rebuttal report that's marked as Plaintiff's

Page 224

1 Exhibit 107, it states at the top, "Rebuttal
2 Expert Report of Majid Rashidi, Ph.D., P.E";
3 do you see that?
4 A     That's correct.
5 Q     The second paragraph below that starts,
6 "On December 17"; do you see that?
7 A     That's right.
8 Q     It states, "On December 17, 2007 I
9 submitted the Expert Report of Majid Rashidi,
10 Ph.D., P.E."; do you see that?
11 A     That's right.
12 Q     Do you normally write in third person,
13 sir?
14 A     Actually, we have to.  When we write a
15 technical paper, we're not supposed to write
16 in first person or second person.  So at
17 least I'm kind of from a class of 1980s at
18 Case and that's what they told us, that when
19 you write a report, make sure that you don't
20 write it in the first person.  Don't say, "I
21 ran this."  "The test was run."
22 Q     You say you went to Case, correct?
23 A     That's right.
24 Q     That's Case Western Reserve University;
25 right?

Page 225

1 A    Right.

2 Q    That was in the 1980s, correct?

3 A    Actually, I started in '79 all the way
4 to '86 so I got my bachelor's, master's and
5 Ph.D. all from Case.

6 Q    Okay.

7      Did you learn, while you were at Case
8 Western Reserve University, the importance of
9 maintaining lab notebooks as a mechanical
10 engineer?

11 A    Yes.  Yes.

12 Q    Did you maintain a lab notebook for
13 your testing in any of the analyses you
14 provide in your expert report or your
15 rebuttal expert report marked as Exhibits 105
16 and 107?

17 A    Actually, as I told you, those tests
18 were done in the summer and I had my laptop
19 on with the file ready and I kind of inputted
20 all the explanations and findings and I did
21 not change any of those.  All I did, I
22 declared that as an appendix and then I saved
23 it and then when I wrote this rebuttal
24 report, that became that note.

25 Q    Take a look, again, on page three.

Page 226

1 You'll see a heading stating "Information and
2 Documents Reviewed."  Do you see that?

3 A    That's right.

4 Q    Below that you'll see a series of
5 bullet points.  Do you see those bullet
6 points, sir?

7 A    That's right.

8 Q    Take a look at the first bullet point.
9 It states that, "The December 17, 2007 Expert
10 Report on Patent Infringement pursuant to
11 Rule 26(a)(2)(B) by Lee A. Swanger, Ph.D.,
12 P.E. hereafter referred to as the Expert
13 Report"; do you see that?

14 A    That's right.

15 Q    Then the next sentence states,
16 "Mr. Swanger is hereafter referred to as the
17 expert"; do you see that?

18 A    That's right.

19 Q    Why do you identify Dr. Swanger as
20 Mr. Swanger there?

21 A    I apologize for that.  I'm really
22 sorry.  There was absolutely no intention
23 because Mr. Swanger has a very excellent
24 track record and he has something that no one
25 can deny so this is a definitely a

Page 227

1 shortcoming on my part and I truly apologize
2 in person right here.

3          MR. SWANGER:  Accepted.

4          THE WITNESS:  Thank you.

5 Q    It goes on to call Dr. Swanger, also
6 known as Mr. Swanger, "is hereafter referred
7 to as the Expert."  Why do you refer to
8 Dr. Swanger as the expert?

9 A    Believe it or not, for typing purposes,
10 just saving letters.  It's much easier to say
11 the expert said that than Dr. Swanger said
12 that.  This was just a personal choice.

13 Q    It was not, again, a personal offense
14 on Dr. Swanger?

15 A    Oh, no, no.  As a matter of fact, I'm
16 glad Dr. Swanger is sitting there so there
17 was absolutely no malice, no intentions -- so
18 I respect you and actually, I look at him as
19 a colleague, as an expert and as somebody
20 that I'm sure he has a lot of knowledge in
21 all the aspects.  And when it comes to
22 litigation and cases like that, just
23 naturally we have to say things that we don't
24 agree with each other but that doesn't mean
25 that we don't respect each other or we doubt

Page 228

1 each other's knowledge.  As a matter of fact,
2 I read Dr. Swanger's credentials and we have
3 degrees from the same institution so I
4 consider him as my colleague, if he accepts.

5 Q    Take a look at the bottom of page
6 three.  There's a footnote two; do you see
7 that footnote?

8 A    That's right.

9 Q    Well, before I go into a footnote, the
10 bullet point that refers to that footnote
11 states that you reviewed "the December 17,
12 2007 Survey of Consumer Behavior in Using a
13 Back to Basics Blender For the First Time to
14 Prepare a Drink by Mark B. Traylor of Red Sky
15 Consulting, LLC, hereafter referred to as the
16 Consumer Report"; do you see that?

17 A    That's right.

18 Q    Did you review what you refer to as the
19 consumer report?

20 A    Actually, I reviewed the writeup, yeah,
21 but I didn't see any -- as a matter of fact,
22 I would like to make another correction or an
23 addition to what I said at the very beginning
24 of our deposition so please take a good
25 note.  When you asked me at the very

Page 229

1 beginning, what did you do prior to coming
2 over here, I forgot to tell you that last
3 night I saw four or six DVDs regarding these
4 tests.  So I saw it for the first time last
5 night and that was the time that people with
6 a number on their chest would come and
7 conduct tests and run the Back To Basics
8 system.  So I forgot to say that so please
9 kind of add this to my testimony today that I
10 have seen it for the first time last night.
11 Q     Dr. Rashidi, I did ask you that this
12 morning so I want to be clear --
13 A     Sure.
14 Q     -- just for the record.
15 A     Sure.
16 Q     Other than these DVDs you saw for the
17 first time last night that you just testified
18 about and other than a brand new test DVD
19 that you videotaped two days ago, is there
20 anything else, documents, information,
21 videos, anything that you reviewed, looked
22 at, considered in this case?
23 A     No.
24 Q     Take a look, now, at footnote two on
25 the bottom of page three.

Page 230

1 A     Uh-huh.
2 Q     It states, "I have been informed that a
3 large number of DVDs, which are connected to
4 or related to the Consumer Report, have been
5 recently produced to the Defendants.  These
6 DVDs, however, were not produced in time to
7 allow me or the Defendants to review them;
8 therefore, I reserve the right to supplement
9 my reports to address the content of these
10 DVDs if necessary"; do you see that?
11 A     Yes, I see that.
12 Q     Is that the reason why you saw the DVDs
13 for the first time last night?
14 A     I don't know.  It was -- I saw it for
15 the first time last night.  In other words --
16 Q     When were you provided those DVDs for
17 the first time?
18 A     Last night.
19 Q     Who provided those DVDs to you for the
20 first time?
21 A     Mr. Aycock.  They were like --
22         THE WITNESS:  I forgot.  Was
23     it four or six of them?
24         MR. AYCOCK:  They were the
25     same ones that Mike Snyder identified

Page 231

1       yesterday that Dr. Swanger had just
2       recently reviewed as well.
3 Q     Do you know if Mr. Aycock had a copy of
4 those DVDs before last night?
5 A     No.
6 Q     Do you have any reason to believe that
7 he did?
8 A     I'm sure if it was necessary for him
9 to -- for me to see it, I don't see any
10 reason he would try to hide it from me.
11 Q     But he did not -- he never provided you
12 those DVDs -- Mr. Aycock or none of the Back
13 To Basics lawyers provided you those DVDs
14 prior to last night; is that right?
15 A     Prior to last night or definitely prior
16 to writing of the second report.
17 Q     Did you write this footnote two on the
18 bottom of page three of your rebuttal report
19 marked as Plaintiff's Exhibit 107?
20 A     Yes.
21 Q     How did you understand that these DVDs
22 were not produced in time to allow you or the
23 Defendants to review them?
24 A     Because I asked Mr. Aycock when I was
25 preparing this report that I have a consumer

Page 232

1 report here which was done in -- what's the
2 neighborhood west of Cleveland?  Brunswick?
3 Not Brunswick.  What's the name of the city?
4 Olmsted Falls or someplace, wherever that
5 place is, and I said that it seems that some
6 people have got some material, extra material
7 to depict that and I don't have those so --
8 Q     Why did you comment that the Defendants
9 did not have time to review?  Did Mr. Aycock
10 tell you that?
11 A     Because I asked them, I said, "Do you
12 have anything which is supplemental to this
13 writeup?"
14     And he said, "We don't have anything in
15 our hands yet."
16 Q     So based on your footnote here, is it
17 your understanding that as of January 7, 2008
18 that these DVDs were not produced in time for
19 you or for anyone else from the Defendants?
20 A     January 6, basically.  I knew that
21 after I talked to Mr. Aycock up to January 6
22 there was no DVD provided.  That was what I
23 was told so I just put it down.
24 Q     It says, "or the Defendants to review
25 them"; do you see that?

Page 233

1 A    Yeah.  That's what I'm saying because I
2 asked him.  I'm sorry.  I consider Mr. Aycock
3 as a part of the Defendants so if he doesn't
4 have it I'm assuming that Back To Basics
5 people don't have it.
6 Q    So Mr. Aycock represented to you on
7 January 6 that none of the Defendants had --
8 were able to review the DVDs because they
9 were not produced in time?
10 A    That's basically my understanding.
11        - - - -
12    (Plaintiff's Exhibit 108 was
13      marked for identification.)
14        - - - -
15 Q    I'm going to hand to you what's been
16 marked Plaintiff's Exhibit 108.  This is the
17 expert rebuttal report of Craig M. Joseph.
18 Have you ever seen this before?
19 A    Just by looking at the format of it,
20 no, I haven't seen this report.  The only
21 written report I have seen is Dr. Swanger's
22 report, I mean, in terms of report.
23 Q    I'm sorry.  What did you say?
24 A    In terms of report, the only report I
25 have seen is Dr. Swanger's first report.

Page 234

1 Q    So you did not review an expert report
2 from a person named Mark Traylor, correct?
3 A    No.  I have not seen this report, no.
4 Q    What about a report from Mark Traylor?
5 Do you remember seeing a report from a man
6 named Mark Traylor?
7 A    No, no.
8 Q    Do you know who Craig M. Joseph, Ph.D.
9 is?
10 A    No.
11 Q    Do you know that he was retained by the
12 Back to Basics Defendants like you in this
13 litigation?
14 A    I'm not aware of it.  I'm not aware of
15 the person at all.
16 Q    Do you know that he submitted his
17 expert report on January 7, 2008 that's
18 marked as Plaintiff's Exhibit 108 just like
19 you did?
20 A    Yeah.
21 Q    Take a look at page seven of
22 Dr. Joseph's report.
23        MR. AYCOCK:  I'll just make a
24      standing object here that this is the
25      first time the witness has seen it

Page 235

1      and he's not -- it's not been
2      established that he's ever looked
3      at -- knows the content of this
4      document.
5 Q    Take a look at the paragraph that
6 states, in italics, "Vague instructions to
7 participants."  Do you see that paragraph on
8 page seven of Dr. Joseph's report that's
9 marked as Plaintiff's Exhibit 108?
10 A    Yes, sir, I see that.
11 Q    The last sentence starts with, "The
12 video recordings" in that paragraph; do you
13 see that?
14 A    "The video recording of the session
15 show a --" yeah, I see.
16 Q    Dr. Joseph's January 7, 2008 report
17 states, "The video recordings of the sessions
18 show a table in the middle of the
19 interviewing room with an array of
20 ingredients corresponding to these drinks
21 (e.g. ice cream and chocolate syrup for a
22 milkshake, alcoholic beverages and mixers for
23 a cocktail)"; do you see that?
24 A    That's right.
25 Q    Do you know what video recordings

Page 236

1 Dr. Joseph's referring to here?
2 A    No.
3 Q    Did you know that these are the very
4 video recordings that you say in your
5 footnotes were not provided or produced in
6 time to allow you or Defendants to review
7 them?
8 A    If you say that, I'll take your words.
9 I mean, I'm seeing this for the first time.
10 Q    Based on my representation to you, do
11 you understand that your statement of
12 footnote two is incorrect?
13 A    Then it is definitely incorrect because
14 what I did, I asked for Mr. Aycock to provide
15 anything and he said, "I don't have anything
16 in my hands," so my assumption is, okay,
17 nobody has it, so I put it like that.
18 Basically it is because of lack of my
19 information and I made an assumption that if
20 nobody has it then -- I'm not aware of this
21 person so if he has it, of course I'm going
22 to miss it that he has it.
23 Q    You would agree with me that if
24 Dr. Joseph was able to state in his opinion
25 for an expert report that he reviewed them

Page 237

1 and was able to opine on them that he
2 received them on time from the Defendants; is
3 that accurate?
4 A    I'm sure that's accurate, yeah.  I
5 don't refute that, yeah, but again, I'm
6 hearing this person's name for the first time
7 and I wrote that footnote based on my
8 assumption that if Mr. Aycock doesn't have it
9 to send it to me on January 6 then the
10 Defendant doesn't have it.  I didn't know
11 that there are other experts.
12         MR. CUPAR:  Okay.  We're
13         going to now play a video from you
14         from the consumer report from
15         Dr. Traylor that I want you to watch
16         and I'm going to ask you some
17         questions in regards to.
18         THE WITNESS:  Okay.
19         (Recess had.)
20         MR. CUPAR:  Just so it's
21         clear for the record, this is
22         Participant Number 80 from
23         Dr. Traylor's report and videos from
24         his consumer report of December 17,
25         2007.

Page 238

1         - - - -
2         (Video played.)
3         - - - -
4         (Recess had.)
5         MR. AYCOCK:  Before -- I'd
6         like to make an objection to that
7         prior to your question.  Objection as
8         to an incomplete segment, incomplete
9         portion of the Participant 80's use
10         and also that the video now has been
11         taken off and Mr. Rashidi will be
12         questioned, you know, without the,
13         you know, without being able to
14         comment on that video as that video's
15         been turned off and the projector has
16         been -- the lens cap has been put on.
17 Q    Dr. Rashidi, do you need to watch that
18 video again for any reason?
19 A    Well, I was trying to look inside the
20 blender and see what is happening.
21 Unfortunately, the video quality and the
22 manner of taking that video is pretty vague
23 to me and I -- unless I learn something new,
24 I'm not learning anything from this video.
25 Q    Is this one of the videos that you

Page 239

1 watched last night, Dr. Rashidi, for the
2 first time?
3 A    That's right.
4 Q    Do you recall Participant 80
5 specifically in the Traylor consumer survey
6 video?
7 A    Yes.  That's as much as I remember from
8 last night, yes.
9 Q    Do you recognize this blender in the
10 video used by Participant Number 80 in the
11 Traylor consumer report?
12 A    Yes.
13 Q    What kind of blender is used in the
14 video?
15 A    That belongs to Back To Basics.
16 Q    How do you know that?
17 A    Just shape of the canister and the
18 motor compartment with the hump on the back.
19 Q    Have you ever tested or used a Back To
20 Basics blender such as the one you just saw
21 in the video used by Participant 80 in the
22 Traylor consumer report?
23 A    I have tested at least one of them.
24 Q    Last night when you watched this video
25 of Participant 80 from the Traylor consumer

Page 240

1 report for the first time, did you watch or
2 view the complete testing by Participant 80
3 in that viewing?
4 A    Yeah.  I saw something that at the end
5 something dropped and he was cleaning
6 something.  I remember some other things
7 about this.
8 Q    So you did see the complete test of
9 number 80, of Participant Number 80, prior to
10 today; is that right?
11 A    I don't know.  I saw whatever
12 Mr. Aycock showed me and it was more than
13 this, a little bit.
14 Q    So if Dr. -- if Mr. Aycock showed you
15 the full -- as far as you know, Mr. Aycock
16 showed you the full video of Participant
17 Number 80?
18 A    As I said, it was more than this so I'm
19 going to assume that it was.
20 Q    You have no reason to believe that
21 Mr. Aycock only showed you a portion of the
22 video that shows Participant 80 using the
23 Back To Basics blender, right?
24 A    I have no reason to believe that.
25 Q    Do you recall, in that video, watching

Page 241

1 Participant Number 80 in the Traylor consumer
2 survey reading the instruction manual?
3 A    I remember he was kind of looking at
4 certain cards, I think, if I'm not mistaken,
5 and Mr. Aycock can correct me if I'm wrong,
6 he opened the box and he looked at some of
7 the pictures and so forth and then he was
8 grabbing one card and going there and mixing
9 something and coming back, if my memory tells
10 me.
11 Q    Do you recall seeing the instruction
12 booklet open next to Participant Number 80
13 and next to the Back to Basics blender?
14 A    Yeah.  He was kind of going over
15 something and I don't know whether it was the
16 instructions or something else but he was
17 going over something.
18 Q    Do you recall seeing Participant Number
19 80 inserting food into the pitcher of the
20 blender?
21 A    From this video or last night?
22 Q    Either.
23 A    I didn't see anything.  I think it was
24 already filled today.  I remember something
25 that in his second attempt or first, I don't

Page 242

1 remember, he was going to that table and
2 doing something but on this one I just saw
3 the thing filled up.
4 Q    Do you have any reason to believe that
5 Participant Number 80 did not fill up that
6 pitcher on the Back To Basics blender with
7 food and fluids?
8 A    There was some material in there.  I'm
9 sure there was some material in there.  The
10 water content of it or liquid content of it
11 was so large that none of the problems with
12 or without the stir stick would appear.
13 Q    Did you see Participant 80 hold the
14 plunger or stir stick stationary without
15 touching the sides of the pitcher?
16 A    That's what it shows.
17 Q    Do you recall seeing Participant 80
18 performing each and every step of claim one
19 of the Vita-Mix '021 patent?
20 A    I don't know whether he did that or
21 not.  I was not reading the instructions so I
22 don't know whether he was doing all the steps
23 so I can't make a determination on that.
24 Q    Did he supply fluid into a pitcher?
25 A    I didn't see it but the fluid was in

Page 243

1 the pitcher so somebody had done it.
2 Q    So fluid was supplied into the pitcher?
3 A    Fluid was in there, yeah, and there was
4 too much of it.  That's why for the very core
5 matter of this case I don't consider,
6 genuinely, this test any -- as a valid test
7 because the core issue in this case is
8 formation of a deleterious air pocket and
9 when you have too much fluid content, that
10 does not happen.
11 Q    Participant 80 did not use a method of
12 stirring to disperse, dislodge or break up an
13 air pocket after it has begun to form; is
14 that correct?
15 A    Formation of an air pocket is a moot
16 case in this particular experiment because
17 the liquid or the material in the pitcher is
18 so liquefied that there will not be, there
19 will not be any air. deleterious air, making
20 the blender inefficient.  So whether the
21 plunger -- the stir stick is there or isn't
22 there, it's beside the point, so therefore,
23 I'm not learning anything from this
24 particular number 80 test that any infringing
25 is happening because there is no problem to

Page 244

1 solve.
2 Q    So you would agree with me, then, that
3 Participant 80 did not use a method of
4 stirring to disperse, dislodge or break up an
5 air pocket after it has begun to form; is
6 that right?
7 A    Yeah, because -- exactly, because if
8 you look at the pitcher, nothing stops.
9 There is no bridge, there is no air pocket so
10 there is no motivation to do anything because
11 there is too much liquid content.  And I have
12 written that very clearly in, I believe, both
13 of my reports or one of them, that the issue
14 of air pocket is very much related to the
15 ratio of liquid content to the solid content
16 so we don't see that, so therefore, this test
17 doesn't teach me anything.
18 Q    You already testified that the air
19 pocket is created from an air channel of a
20 cross-sectional size defined by a member
21 associated with the blades; is that correct?
22 A    This is what Vita-Mix says and I'm
23 going to assume that let's accept this
24 assumption for now and proceed forward.
25 Q    Okay.

Page 245

1      And comprising the steps of supplying
2 of fluid into the pitcher; again, either
3 Participant 80 or someone supplied the fluid
4 into the pitcher; is that correct?
5 A      Exactly.  That's correct.  Putting too
6 much fluid basically eliminates the entire
7 problem altogether.
8 Q      And then, did the person position a
9 device that can be inserted into a blender?
10 Did Participant 80 do that in the video you
11 just saw?
12 A      Can we go off the record?
13 Q      You have to answer the question.
14 A      Yeah.  The participant held it -- maybe
15 I can say it even on the camera.  What I'm
16 observing in this tape reminds me of a joke.
17 Somebody was in Downtown Chicago and was
18 doing this (indicating) and his friend said,
19 "What are you doing?"
20      He said, "This keeps the tigers away."
21      And then his friend said, "There are no
22 tigers in Downtown Chicago."
23      He says, "So this is working"
24 (indicating).
25      So what I observe in this video is

Page 246

1 exactly parallel to that.  Okay.  We have a
2 blender.  There is no air pocket formed just
3 because this was in there.  That is the
4 analogy that I was going to say off the
5 record but I'm more than happy to say it on
6 the record.  So this test is an absolutely
7 irrelevant test to show anything on the
8 infringement, anything on prevention of
9 formation of air pocket.  For once, among
10 many other things, one of the main factors is
11 there's too much liquid in there, as simple
12 as that.
13 Q      So you would agree with me that the
14 Participant 80 of the video you just saw
15 right now and the video you saw last night
16 positioned a device that can be inserted into
17 a blender; is that accurate?
18 A      As I said -- I would answer this by
19 keeping the core issue at hand.  The core
20 issue is you -- if you put a plunger in the
21 vertical position in the plunger -- in the
22 pitcher, according to Vita-Mix, it prevents
23 the formation of air pocket but because of
24 the liquid content in there and the
25 consistency of it, there is no air pocket,

Page 247

1 deleterious air pocket, so therefore, holding
2 it in the middle or stirring it or whatever
3 doesn't show or doesn't prove anything.  But
4 in the meantime, to answer your question,
5 yes, it was hanging in the middle and the
6 operator held it in that direction.
7 Q      Did participant -- you already
8 testified that the cross-sectional size of
9 the plunger or device that can be inserted
10 into a blender from Back To Basics
11 approximates the cross-sectional size of the
12 member associated with the blades in the Back
13 To Basics blender, correct?
14           MR. AYCOCK:  Objection.
15      Mischaracterizes prior testimony.
16 A      What I have done in my two reports, I
17 have looked at the infringement issue and
18 enablement issue.  When I talk about cross-
19 sectional size approximating each other,
20 whether from Back To Basics or Wayne, I am
21 assuming that what -- the assertion of Back
22 To Basics is correct, which generally I don't
23 believe so.  For that simple comparison, the
24 cross-sectional issues could be all the same
25 or different but at the end of the day, both

Page 248

1 systems don't work.  So when both systems
2 don't work, for me as an expert, there is no
3 infringement issue.
4      So no problem has been solved but the
5 cross-section of the plunger of the Vita-Mix,
6 they claim that it is approximating the
7 members associated with the blade and what
8 Back To Basics has is a totally different
9 configuration with a plus sign cross-section
10 type of configuration that has a lot of room
11 for -- supposedly air goes around it and then
12 at the bottom there is a disk with an O-ring
13 and that basically is not going to prevent
14 any air coming into contact with the blades.
15 So again, which part of the cross-section of
16 the plunger are you talking about?
17 Q      Dr. Rashidi, what was my last question?
18 A      Do the cross-sectional dimensions of
19 the Back To Basics approximate the cross-
20 sectional dimensions of the member associated
21 with the blades.
22 Q      What's the answer?
23 A      The answer is, because they are not
24 relevant to each other, that's not a
25 parameter for me.  So whether they are equal

Page 249

1 or not equal, that's a different story, but
2 it depends upon where you make your cross-
3 section.
4 Q    You testified earlier that the cross-
5 sectional size of the Back To Basics stir
6 stick approximates the cross-sectional size
7 of the member associated with the blades in
8 the Back To Basics blender; do you recall
9 that testimony?
10 A    So I stand by it if I said that so I'm
11 not going to change that.
12 Q    Did the Participant 80 maintain that
13 stir stick or plunger adjacent to and above
14 the rotating blades in that video that you
15 just saw, in the video you saw last night?
16        MR. AYCOCK:  Again, my
17        standard objection applies that the
18        video's gone during this form of
19        questioning.
20 A    Again, I go back to my tiger
21 prevention.  Yeah, he kept it stationary but
22 it is totally irrelevant.
23 Q    Participant 80, you would agree with
24 me, maintained the plunger or stir stick
25 adjacent to and above the rotating blades

Page 250

1 during operation; is that correct?
2 A    Just like Wayne, just like Jacobsen,
3 exactly.
4 Q    Would you agree with me also that the
5 participant maintained the device or plunger
6 or stir stick free of contact with the
7 pitcher during the blender operation?
8 A    Just like Wayne, just like Jacobsen,
9 exactly.
10 Q    You would agree with me also that no
11 deleterious air pocket was formed during that
12 blender operation that affected the
13 performance of the Back To Basics blender
14 when Participant 80 used it in operation,
15 correct?
16 A    That is incorrect because you are
17 making a kind of wrong conclusion.  An air
18 pocket didn't form because of the consistency
19 of liquid and I can show that either here on
20 this table or in the court or anywhere else.
21 That air pocket, when you put too much fluid,
22 there is no matter of air pocket, deleterious
23 air pocket, so this test, in my opinion,
24 honestly, it's for misleading.  To put too
25 much fluid and no air pocket problem appears

Page 251

1 and then you attribute it to the plunger,
2 this, I call, outright misleading.
3 Q    How do you know that it was all
4 fluid --
5 A    No.  I could see that.  I could see the
6 behavior of the fluid in the pitcher.
7 Q    What did Participant 80 put into the
8 pitcher?
9 A    I have no idea but I was just looking
10 at the consistency of the fluid splashing
11 back and forth.  I mean, I -- you should
12 always remember that people have common sense
13 also so other than equations and other than
14 modeling and other than physical principle,
15 there are intuitions and common sense.  This
16 fluid will not provide any deleterious air
17 pocket with or without the plunger, with or
18 without the stir sticks.
19        To draw a conclusion from this video
20 that because the stir stick was vertically
21 down and held by the user it prevented the
22 air pocket, in my opinion, as an expert,
23 because I'm a P.E. and I have raised my right
24 hand to tell the truth when it comes to a
25 technical matter and I exercise that right

Page 252

1 here that I'm ready to testify at this -- if
2 that conclusion is drawn from this video,
3 there are two possibilities.  Either lack of
4 knowledge or an intent of misleading of
5 people who are observing it.  And I'm ready
6 to back this up with myself and some other
7 expert that can testify to that because this
8 is -- I mean, I have no vested interest in
9 Vita-Mix or Back To Basics but it basically
10 hurts me to see something technical is being
11 misrepresented.
12 Q    Is it your testimony or your opinion
13 that the Back To Basics stir stick or plunger
14 does not improve blender performance?
15 A    When it comes to formation or
16 prevention of an air pocket, it doesn't do a
17 single thing, the same as the plunger of
18 Vita-Mix.  The only way these things are
19 effective is when you have too many solid
20 particles that, like ice, like parsley, like
21 carrots and you want to physically push those
22 things back to the blade.  They don't do
23 anything to the air bubble and I have shown
24 that and I have shown it with repeated
25 testing, not just one test.  Here you are

Page 253

1 showing me one test. I have done close to 20
2 tests of Vita-Mix and 10, 15 of Back To
3 Basics and I'll show you that the bubbles
4 appear and they go up into the surface after
5 you turn the machine down.
6 Q    You have not shown any infringement
7 testing, though, in your rebuttal report; is
8 that accurate, Dr. Rashidi?
9 A    No. Actually all of my tests, as I
10 said, is geared up and intended for
11 enablement. When I see that, I'm not looking
12 at infringement, I'm looking at enablement
13 and in this test, the conditions were not
14 appropriate to show the enablement part of
15 this patent and I -- I mean, personally, I
16 kind of think that it's my responsibility to
17 mention that.
18 Q    Do you believe that the stir stick of
19 the Back To Basics blender is more likely to
20 prevent the formation of air pockets than
21 without?
22 A    Not at all. Actually, totally
23 different. I have shown, with and without,
24 the same size of bubbles bursting to the
25 surface so the same amount of air gets in

Page 254

1 there with Back To Basics and their
2 plunger -- their stir stick and Vita-Mix and
3 their plunger so all these issues of cross-
4 sections, of equality, approximation, they
5 are all out the window at the end of the day.
6 Q    Who do you believe has used a Back To
7 Basics blenders more? You or engineers at
8 Back To Basics?
9 A    I'm sure they have used it more. I'm
10 sure they have used it more.
11 Q    But you haven't reviewed any of the
12 internal documents from Back To Basics in
13 this case, have you?
14 A    No. I'm just looking at the final
15 product.
16 Q    You don't know what the internal
17 documents from the Back To Basics engineers
18 state about the performance of the Back To
19 Basics blenders; is that right?
20 A    I don't know what they say but they are
21 irrelevant to me because people designed
22 rockets and cars and they don't know what's
23 going on sometimes.
24 Q    So based on your 10 to 15 times of
25 using a Back To Basics blender you believe

Page 255

1 you are more knowledgeable than the Back To
2 Basics engineers and designers?
3 A    I'm not drawing that conclusion. All
4 I'm saying is I can say extreme cases that
5 this plunger issue, in terms of solving a
6 long-felt problem, is not a solution and is
7 just, in my opinion, a stir stick because, as
8 I said, I have no vested interest in either
9 company. So if Back To Basics comes and says
10 that this plunger prevents air pockets, I
11 disagree with them also.
12 Q    So you don't believe a properly sized
13 plunger under any circumstances improves
14 blender performance or helps prevent the
15 formation of a deleterious air pocket?
16 A    For whatever which is in the market,
17 the answer is yes. Something is going to be
18 invented in future, I have not seen it, but
19 for whatever which is in the market,
20 existence of a plunger is not going to
21 prevent formation of an air pocket unless
22 they are going to be used as a stir stick.
23 In other words, all these kind of fancy
24 statements that they fill the space of the
25 otherwise air channel and prevents the

Page 256

1 formation of air channel thereby no pocket,
2 totally unacceptable by me, and I don't care
3 how much knowledge people have in the Back To
4 Basics or Vita-Mix in their design.
5 Q    Take a look at page nine of your
6 rebuttal expert report that's marked as
7 Plaintiff's Exhibit 107. You'll see a
8 heading that states "Paragraph 23"; do you
9 see that?
10 A    That's right.
11 Q    And then there's a paragraph below that
12 that states, "As stated in my"; do you see
13 that paragraph?
14 A    Yes, sir.
15 Q    The third sentence in that paragraph
16 starts, "However, the ball"; do you see that?
17 A    The third statement -- third sentence
18 or -- "However, the ball-and-socket design of
19 the stir stick makes it very difficult and
20 unlikely that the stir stick would be
21 maintained in the position while the blender
22 is in use."
23 Q    Do you see that?
24 A    That is when it is unattended. That's
25 what I meant. In other words, if you turn

Page 257

1 the machine on, and I have a video clip on
2 that, you let it go, unlike to what
3 Dr. Swanger alleged in his report, the thing
4 starts wobbling big time.  That's what I'm
5 talking here.  But anytime you can go and
6 physically hold something, that's not what I
7 mean here.
8 Q     And also take a look at the next
9 sentence which states, "Even when an operator
10 of the Smoothie Elite leaves the stir stick
11 in the blender without touching it, the
12 turbulent flow of the contents of the blender
13 causes the stir stick to rattle and spin
14 around the goblet such that it is no longer
15 adjacent to and above the rotating blades";
16 do you see that?
17 A     That's right.
18 Q     Does this rattling and spinning occur
19 every single time that the stir stick is left
20 unattended during the operation of a Back To
21 Basics blender?
22 A     I am so glad you're asking this because
23 I have run tests.  It really depends upon
24 what you have as the contents.  If it's a
25 kind of relatively low viscosity and things

Page 258

1 can move around, it does it big time.  The
2 thicker the material is, the more it tends to
3 stay in the middle and you can make it thick
4 enough that it doesn't move but sometimes,
5 even on the very thick material, I have shown
6 that it kind of wobbles and stays stationary
7 and wobbles and that is exactly the period of
8 formation of those air pockets and bursting
9 them.  So it's a kind of very complex
10 periodic function that cannot be captured by
11 mathematical modeling so it's a very
12 complicated phenomenon and you cannot just
13 attribute it to two cross-sections and so
14 forth.  There's just a host of other
15 parameters involved here.
16 Q     So you would agree with me, then, that
17 the turbulent flow of the contents of the
18 blender that causes the stir stick to rattle
19 and spin around the goblet is not always
20 true; is that right?
21 A     That's depending upon the content
22 viscosity, density, Newtonian, non-Newtonian,
23 you name it, there are many variables
24 involved.
25 Q     Generally, if the fluids included into

Page 259

1 a Back To Basics blender is less viscus,
2 you're less likely to have a deleterious air
3 pocket; is that correct?
4 A     For all of the systems, not just Back
5 To Basics.  For Vita-Mix and any -- the
6 lesser -- actually, the thinner the material,
7 the more liquefied -- there is absolutely no
8 effect and I have shown that.  I mean, I have
9 shown it in my test sections in the second
10 report or rebuttal report.  There is no need
11 for the plunger or stir stick.  I have tested
12 that sometimes when you have certain
13 recipes -- and I invite you to go and do the
14 same tests for yourself.  If you add half a
15 cup of water, all of the sudden you go from a
16 totally stationary canister to totally
17 turning so it is really the amount of fluid
18 which determines that.
19 Q     So you would agree with me that the
20 thicker the materials that you're blending in
21 a Back To Basics blender the more likely you
22 will obtain an air pocket that would affect
23 the blending performance; is that correct?
24 A     This is true for all blenders including
25 Back To Basics and that plunger doesn't do

Page 260

1 anything for that.
2 Q     You would agree with me, then, in the
3 Back To Basics blender, when you have a
4 thicker set of ingredients that are being
5 blended that the stir stick is more likely to
6 stay in the center position without rattling
7 or spinning; is that accurate?
8 A     That is an accurate statement, exactly.
9 Q     In fact, do you recall Participant 80
10 taking his hand off during the operation
11 where the stir stick stayed in the center
12 without any rattling or spinning?
13 A     Well, that was at the very end.  If he
14 starts -- from the very beginning, it
15 starts.  We have something -- and I'm sure
16 Dr. Swanger knows about it.  When you model
17 these things with differential equations you
18 have something called initial condition.
19 These are very complex, chaotic motions and
20 in chaos, minuscule changes in initial
21 condition throws your solution totally in
22 different directions so it is really a
23 haphazard phenomenon that you cannot even
24 make any comment about it.
25     So the whole point for me as an expert,

Page 261

1 the whole dispute and litigation is about
2 formation of an air pocket and prevention of
3 it and all I'm saying is none of these
4 systems, Back To Basics, Vita-Mix, they have
5 been able to provide the solution to
6 eliminate formation of pocket.
7      And actually, I have tests, and I'm
8 sure you haven't seen it yet but take your
9 time and take a look at it, and I have gone
10 from one extreme of fluid which is pretty
11 thin, water with a couple of drops of food
12 coloring, to a pancake batter, and I'm
13 showing all of these things in a very
14 repeated fashion and I am confident enough
15 that I will demonstrate that in the court and
16 we'll mix the ingredients right in front of
17 everybody who's observing because there is no
18 magic.
19      I mean, I consider this more -- no kind
20 of disrespect for anybody, especially not you
21 because somebody else provided this, this is
22 like magic, that you have some people, they
23 are coming and back of the thing is in front
24 of the camera and something happens. I want
25 to see inside of that canister. In none of

Page 262

1 the six tapes that I saw, nothing was shown,
2 whether there are bubbles burping up or not.
3 So it does not address the issue that I'm
4 interested in or is the center point of this
5 dispute.
6 Q     So in all the videos you watched last
7 night, you didn't see any deleterious air
8 pocket form --
9 A     I don't know. I don't know.
10 Q     -- during the operation; is that right?
11 A     I don't know because I was not allowed
12 to look inside the canister. In this one it
13 is so liquefied so even if there is an air
14 bubble, first of all, I don't see it, second
15 of all, it's not deleterious. So these
16 videos do not show me anything for me to
17 change my mind unless I see something in
18 experimentation or in real life that says,
19 okay, this is a particular recipe that if we
20 do it, we got it, then I will consider it and
21 I'll try to find out what are the reasons.
22 Q     Take a look again at your report where
23 you opine that --
24 A     What page, please?
25 Q     Sure. Page nine. It's the same

Page 263

1 sentence we just read.
2 A     I'm sorry.
3 Q     That's okay.
4      It states, again, that you opine that,
5 "The turbulent flow of the contents of the
6 blender causes the stir stick to rattle and
7 spin around in the goblet such that it is not
8 adjacent to and above the rotating blades";
9 do you see that?
10 A     Yes, sir.
11 Q     How do you know that when it rattles
12 and spins that the stir stick is no longer
13 adjacent to and above the rotating blades?
14 A     Basically I'm going to the definition
15 of what we have so all I'm saying is,
16 remember, what is this report? This report
17 is the response to Dr. Swanger's report.
18 Dr. Swanger, in his report, says that when
19 you have these systems operated from Back To
20 Basics, the momentum transfer and change of
21 kind of momentum and so forth brings the
22 blade to the center. All I'm doing here is
23 I'm kind of refuting that. So I'm not saying
24 that this happens all the time. All I'm
25 saying is that this is going to describe a cone

Page 264

1 so it's not what Dr. Swanger is allegedly
2 saying what happened. So this is not a
3 universal sentence; this is a sentence in
4 response to Dr. Swanger.
5 Q     So you would agree with me, then, that
6 there are times that the stir stick does
7 rattle and spin but that it is still adjacent
8 to and above the rotating blades, correct?
9 A     I'm sorry to respond like this but I'm
10 an expert. I'm here -- I'm not a jury and
11 I'm not a judge and I'm not a lawyer. I keep
12 going back to the central problem of air
13 pocket, solution of the deleterious air
14 pocket and I'm saying that I really don't
15 consider whether it touches the side of the
16 canister or whether it's adjacent or above.
17      We have a patent with a single claim
18 that claims that they have solved the problem
19 and I'm saying that it doesn't solve the
20 problem. That is my position. So the rest
21 of it is -- we have to have things that
22 satisfies you, satisfies Mr. Aycock,
23 satisfies a judge and so forth and when it
24 comes to the infringement, I am not relying
25 on any tests.

Page 265

1   So therefore, for me, this video as an
2   expert -- you might be able to use this for a
3   jury or for a judge, but for me as an expert,
4   this video does not phase me out because it
5   does not address anything about
6   infringement.  You infringe if you have
7   solved the problem and somebody has copied
8   you.  When you have not solved the problem,
9   how can somebody infringe on you specifically
10  when their device has the same problem that
11  your kind of alleged patent says they have
12  solved?
13  Q   Do you know what my last question was?
14  A   Please repeat your last question.
15  Q   Do you know what my last question was?
16  Yes or no, sir?
17  A   No, sir.  No.  Please repeat it.
18  Q   My last question was, you have a
19  statement here, "The turbulent flow of the
20  contents of the blender causes the stir stick
21  to rattle and spin around in the goblet such
22  that it is no longer adjacent to and above
23  the blades."  My question to you was, are
24  there times when the stir stick in the Back
25  To Basics blender rattles and spins around in

Page 266

1   the goblet but is still adjacent to and above
2   the rotating blades?
3   A   It's a very simple.  Yes.  Yeah.  I'm
4   not trying to avoid answering you.  Depending
5   upon what content you have in there, it could
6   be so thick that it doesn't even move so it
7   is definitely where it was.  So the answer to
8   that question is yes, but I always go back to
9   the original promise of the patent and
10  teaching of the patent and we should not lose
11  sight of that.
12  Q   You said before -- I mentioned the name
13  Thomas Daniels and you testified before that
14  you didn't know who he was; is that right?
15  A   Actually, I'm very bad in memorizing
16  names.  Let me tell you something which may
17  clarify it.  When I got Dr. Swanger's report,
18  with this I got the report of a consumer
19  study.  If that person is the same person
20  that you're just naming, I have seen his name
21  and I have read his written report so I
22  basically stand corrected and I correct
23  myself.  But I'm terrible with names, I'm
24  sorry about that, because I deal with
25  students and I have hundreds of students so I

Page 267

1   always intentionally have names coming in one
2   ear and sending it out.
3       So if your question is do I -- have I
4   heard or seen the name of the person who did
5   that consumer report, yes, I have seen it, I
6   have read the report with all those matrices,
7   somebody hold it stationary, somebody -- I
8   have seen that report, so therefore,
9   technically and practically I should have
10  seen the name of the person so the answer is
11  yes if that is the same person.
12  Q   It's not.
13  A   Okay, then, so sorry about that.
14  Q   That's okay.
15      MR. AYCOCK:  Could we take a
16      break?
17      MR. CUPAR:  Let's take a
18      break.
19      (Recess had.)
20  Q   Dr. Rashidi, take a look at Appendix 1
21  to the rebuttal report that's marked as
22  Plaintiff's Exhibit 107.
23  A   Appendix 1?  Yes.
24  Q   What's the point of Appendix 1?
25  A   The point of Appendix 1 is, again, it's

Page 268

1   a rebuttal to Dr. Swanger's report that he
2   shows a Back To Basics blade assembly with
3   two arrows and some measuring device like
4   this ruler that you brought and says that,
5   "Look at this blade assembly.  The member
6   associated with the blade and so forth is
7   substantially equivalent to what Vita-Mix
8   has."
9       And when I saw that, I said, "Well, all
10  blenders have that."
11      In other words, for untrained eyes,
12  they may say, "Oh, yeah.  Looking at it.
13  This has the same diameter as Vita-Mix, so
14  therefore, they are copying."  So I'm saying
15  here that all these figures -- I'm saying
16  that if you don't know it, you can say that
17  most of them are even produced by the same
18  manufacturer and they have the same mold and
19  the same configuration.
20      More specifically, if you go to the
21  very end of these figures, something very
22  interesting is apparent and that is the Vita-
23  Mix and the Hamilton Beach.  They're awfully
24  the same as each other.  If you look at
25  Hamilton Beach cutter blade and turn the page

Page 269

1 and look at the Vita-Mix, they have the same
2 trapezoid shaped apron and so forth.
3      So all I'm saying is that just because
4 Dr. Swanger has included that in his report,
5 it may give a wrong notion that some sort of
6 copying of a size and configuration has taken
7 place here and I'm saying that, no, all
8 blenders are like that.  This is not a big
9 issue.  And all these arrows are pointing to
10 the same two arrows that Dr. Swanger has
11 shown in his report as a measured parameter.
12 Q     Can you explain to me what relevance
13 Appendix 1 has with respect to an
14 infringement analysis in this litigation?
15 A     Basically I'm saying that when I read
16 Dr. Swanger's report, my first glance, I put
17 myself in the position of a layman.  Anytime
18 you make a measurement and you become
19 quantitative in something, all of the sudden
20 it starts having an importance.  So I'm
21 saying that, no, those diameters or those
22 dimensions that Dr. Swanger is referring to
23 as a bearing housing, as a flat portion of
24 the blade, they are all almost the same in
25 all blenders.

Page 270

1      So the significance of that is neither
2 Back To Basics nor anybody else is infringing
3 on the configuration of their blade assembly
4 and the member associated with the blade
5 because here, all of the sudden the sizes on
6 a qualitative fashion is declared as
7 important, as substantially or cross-section
8 approximating something.
9 Q     Who provided you these blade assemblies
10 that are identified in Appendix 1?
11 A     I did that.  Actually, I went on the
12 Internet and I just Googled it and these are
13 all from the Internet for parts that are sold
14 in the market.
15 Q     Do you know if any of these blade
16 assemblies were out in the market prior to
17 the earliest filing date of the Vita-Mix '021
18 patent?
19 A     I have seen blade assemblies of
20 blenders from many moons ago, like from 20,
21 30 years ago and they haven't changed.
22 They're all the same, basically.  I mean,
23 there are minute changes.  Some people come
24 and bend the blades a little bit further
25 down, somebody makes a little wrinkle in the

Page 271

1 blade, but basically, there has not been
2 major changes in the blade configuration.
3 Q     Would you agree with me that claim one
4 of the '021 patent, in order to practice it,
5 you would need a plunger or device inserted
6 into the pitcher?
7 A     That's true, yeah, sure.
8 Q     Can you identify for me, out of
9 Appendix 1, which of these blenders that you
10 looked at included a plunger or device that
11 can be inserted into the pitcher?
12 A     As I told you, the intent of this is
13 not just to refute the entire case.  All I'm
14 providing here is to dispute, I believe it
15 is, Appendix 5 or 6 of Dr. Swanger's report
16 that shows one of these with two arrows.
17      I work with people.  Sometimes when you
18 have something and put two arrows and measure
19 it, boom, it's important, so all I'm saying
20 here is that, no, nobody has tried to copy
21 Vita-Mix's blade assembly if it is Back To
22 Basics -- they're all the same.
23      So I'm not -- I'm not trying to say
24 that there was an overall infringement on
25 claim number one.  I'm taking one step here

Page 272

1 to say that there is a member associated with
2 the blade that patent '021 refers to and
3 Dr. Swanger, in his report, measures that
4 from Back To Basics and ascertains that this
5 is substantially the same as Vita-Mix and I'm
6 saying that, no, all of them are the same.
7 Q     You've testified that nobody has tried
8 to copy Vita-Mix blenders.  Do you know if
9 that's true?
10 A     I'm talking about on this portion.  I'm
11 saying that nobody has tried to copy Vita-
12 Mix's blade assembly the way that Dr. Swanger
13 is showing it with arrows and measurements.
14 Q     Is Dr. Swanger's testimony that
15 companies are trying to copy?
16 A     Not at all.  Not at all.  See, you can
17 present the same data in different ways so my
18 first impression was, okay, here we go, Back
19 To Basics has a blade assembly which is
20 substantially the same as Vita-Mix especially
21 on the member associated with the blade.  And
22 then I say, no, if you go to the Internet and
23 if you go to the blender industry, they're
24 all the same.  So all those two arrows are
25 showing the same two members that claim

Page 273

1 number one shows, a member associated with
2 the blade and a bearing housing and so forth.
3 Q    So in other words, in Appendix 1 you've
4 just pulled these figures or photographs off
5 of the Internet; is that accurate?
6 A    That's very correct, yes.
7 Q    So you didn't test any of the blenders
8 that you identified in Appendix 1?
9 A    I'm just showing size comparison and
10 member associated with the blade and its
11 approximate cross-section.
12 Q    So you don't know how or -- you don't
13 know how any of these blenders that you
14 identify in Appendix 1 operate with respect
15 to Vita-Mix blenders or with respect to Back
16 to Basics blenders; is that correct?
17 A    Exactly.  That's correct.  For this, I
18 was not worried about performance, I was
19 worried about the wording and verbiage of
20 equivalents and similarity on paper.
21 Q    You state, "Vita-Mix's assertion --"
22 this is in Appendix 1.
23 A    Will you please tell me the page?
24 Q    Do you see the first full paragraph on
25 Appendix 1 --

Page 274

1 A    Yes.  "This appendix demonstrates --"
2 Q    -- which is, you know, appended to your
3 rebuttal expert report that's identified as
4 Plaintiff's Exhibit 107?
5 A    Yes, sir.
6 Q    There's a paragraph there under
7 Appendix 1; do you see that?
8 A    Yeah, on the top, yeah.
9 Q    The second to last line starts, "If
10 Vita-Mix's assertion"; do you see that?
11 A    Yeah.
12 Q    It states, "If Vita-Mix's assertion
13 were correct, the cross-sectional size of the
14 air channels formed in virtually every
15 blender would be nearly identical"; do you
16 see that?
17 A    Yes.
18 Q    You make that statement without having
19 tested any of these other blenders; is that
20 accurate?
21 A    That's accurate and as I said, the
22 reason that channel develops is just many
23 other parameters so that --
24 Q    So you don't know if the air channels
25 are similar, same or different because you

Page 275

1 did not test any of these other blenders; is
2 that accurate?
3 A    When you put material in the blender
4 and turn it on there is an air channel
5 developed and that air channel's shape
6 depends upon many factors, so on the same
7 blender you may get two different air
8 channels.  For example, get the Vita-Mix
9 blender and put corn syrup in it, put water
10 in it and see what happens.  So they are
11 totally two different air channels so there
12 are many other things that defines the air
13 channel.
14 Q    Is it your opinion that the stir stick
15 of the Back To Basics blender's just a
16 marketing gimmick?
17 A    No.  Actually, it's a very useful
18 device for pushing the solid material back to
19 the blade because if they are shot to the
20 side of the system and it makes the system
21 incapacitated you just push it back and shove
22 it back to the blade and I believe Vita-Mix
23 should use it in the same way and they direct
24 you to use it in the same way.
25 Q    Take a look at Appendix 2 now of your

Page 276

1 rebuttal report that's marked as Plaintiff's
2 Exhibit 107.
3 A    Yes, sir.
4 Q    You testified earlier that every single
5 test you identified in Appendix 2 was not
6 pertaining to infringement but rather
7 enablement; is that accurate?
8 A    Actually what I'm saying is we have
9 done some tests.  If someone would like to
10 extract conclusions on noninfringement, I
11 don't preclude them.  If these tests can
12 demonstrate noninfringement, I would welcome
13 that.  So therefore, one thing that I
14 noticed, the reason I bring the enablement
15 into this is because both of them don't work
16 but when it comes to infringement, if anybody
17 including myself can draw conclusions on the
18 fact that when you use or go through these
19 tests and noninfringement attribute can be
20 extracted from them, I don't prevent that.
21 Actually, I welcome that.  So therefore, the
22 tests would be used for noninfringement as
23 well but at the end of the day, the tests
24 show that both systems, maybe for two
25 different reasons, they don't work.

Page 277

1 Q    The tests that you performed in
2 Appendix 2, though, were based on or was
3 testing enablement; is that accurate?
4 A    Actually I was testing to see the
5 behavior of these systems and my conclusion
6 was enablement but during a test or as a
7 result of a test if you want to draw
8 conclusions on lack of infringement, I would
9 prevent these tests as such as well.  But
10 definitely, something which comes out of
11 these tests is that both systems are not
12 enabling somebody to practice the claim of
13 '021 but on the other hand, there are a lot
14 of situations that you can see that might be
15 or there is no infringement.
16 Q    You said that these tests support your
17 opinion of lack of enablement; is that
18 accurate?
19 A    That's accurate, yeah, it supports that
20 but I'm not excluding supporting of
21 noninfringement either.
22 Q    Did you identify or report any of these
23 tests -- excuse me.
24    You performed these tests prior to your
25 December 17 expert report that's marked as

Page 278

1 Plaintiff's Exhibit 105, right?
2 A    Yes, sir.
3 Q    But you didn't identify any of these
4 tests that are in Appendix 2 to your rebuttal
5 report in your first report of December 17,
6 2007; is that accurate?
7 A    That is accurate, yes, sir.
8 Q    You stated to me that you believe at
9 least some of these tests support a finding
10 of noninfringement; is that accurate?
11 A    Yes.  I mean --
12 Q    Identify for me which tests out of
13 Appendix 2 support --
14 A    We have --
15 Q    Before you do that, let me rephrase my
16 question.
17    Can you list out which tests in
18 Appendix 2 pertain to noninfringement?
19 A    Actually, all of them.  Do you know
20 how?  I can look at all of the tests and show
21 that -- let's just look at the Back To
22 Basics.  When you look at the Back To Basics
23 tests, it shows that existence of the stir
24 stick and nonexistence of it has nothing to
25 do with formation of a deleterious air pocket

Page 279

1 or lack of it.
2    In other words, all I'm saying is there
3 are other parameters, ratios of solid to
4 liquid content and some other issues that
5 creates that air pocket.  So therefore, if
6 you have the plunger of Back To Basics and
7 air pockets still develop, therefore, it's
8 noninfringing because what is the allegation
9 of Vita-Mix?  Vita-Mix says that if Back To
10 Basics has this plunger it solves the problem
11 and here with this test I'm showing you that
12 it doesn't, so therefore, as far as
13 infringement's concerned, no, it's not.
14 Q    Explain to me how you perform an
15 infringement analysis.
16 A    As I said, you have either theoretical
17 going back to the patents and bring prior art
18 and look at the anticipation and obviousness
19 and see if an invention is truly a valid
20 invention and it is stand alone, it's an
21 innovative and useful idea, and that is what
22 I've tried to do on my first report on those
23 tables.  So I'm saying that there exists
24 prior art, that if we just look at the
25 statements and teaching of the patent, forget

Page 280

1 about the performance of testing, if you just
2 look at that and look at the teaching, you
3 can extract '021 patent by a person of
4 ordinary skill in the art.
5 Q    Do you recall what my last question
6 was?
7        MR. AYCOCK:  I was going to
8    ask to have that read back.
9 A    How do you determine infringement.
10 Q    Yeah.  Can you explain that to me?  I
11 want to learn -- tell me how you determine
12 infringement, sir.
13 A    Infringement, if it is going to be in
14 the real world application, I think I said
15 that in one of the questions, you have a
16 company which has a device invented and there
17 is a patent on it and there are a bunch of
18 claims or one which basically discloses and
19 teaches that invention and that technology.
20 Company B goes and invents and manufactures a
21 device that basically reads on those claim
22 issues; in other words, that patent explains
23 this second invention also.  That's -- I
24 mean, that's infringement.
25 Q    Would you agree with me that you're

Page 281

1 supposed to compare the claim of a patent to
2 the accused device?
3 A    That's exactly what I have done in my
4 table of first report, those four tables with
5 Wayne, Jacobsen and so forth to say that this
6 is '021 claim and this is the prior art
7 claim, so therefore, they are anticipating
8 what '021 is asserting.
9 Q    You're saying that you did an
10 infringement analysis in your first report,
11 sir?  I thought that was an invalidity
12 report; is that accurate?
13 A    I'm trying to say that there is no
14 infringement based on invalidity, based on
15 obviousness and anticipation.
16 Q    Other than invalidity, is there any
17 other basis for noninfringement?
18 A    There are physical reasons.  I don't
19 consider the invention or device of Back To
20 Basics reading on the claim of '021 because
21 it is designed not to follow that.  Actually,
22 it is designed to encourage the user to turn
23 the stir stick so it is not attempting to
24 mimic anything like that.  And then for me,
25 the very fact that when you have the stir

Page 282

1 sticks of Back To Basics and still have an
2 air pocket in there, then it's not
3 infringing.
4    In other words, I have to accept, on
5 the face value, the claim '021.  I'm saying
6 that if we assume that that is a true
7 assumption, definitely through my
8 experimentation, I'm showing that this device
9 of Back To Basics is not infringing on that
10 because air bubble accumulates and it just
11 bubbles up with the plunger in the very
12 center.  Whether hold -- held stationary by
13 the person or the viscosity of material, you
14 get an air pocket down there so it's not
15 infringing.  That's my conclusion.
16 Q    But that air pocket that you keep
17 identifying that bubbles up, it only bubbles
18 up after you turn off the blender; is that
19 accurate?
20 A    Exactly.  Exactly.  That's --
21 Q    So the blades are no longer rotating
22 when those bubbles come up to the top of the
23 ingredients?
24 A    That's true, yeah.
25 Q    So you don't know whether or not, when

Page 283

1 the blades are rotating, whether or not those
2 air pockets are existing, do you?
3 A    They must exist.  It's there.  I mean,
4 if you read my first report, I say that based
5 on the consistency of the material when air
6 gets in there, depending upon how viscus and
7 how many solid particles, adhesion between
8 the solid particles, a bridge is generated,
9 like a scaffolding, and holds the air there.
10 And depending upon the amount of it and the
11 consistency, it may incapacitate the blade or
12 may not.
13 Q    You would agree with me that an air
14 pocket, however, like the ones you see
15 bubbling up, can form after you turn off the
16 blender because the mass of the ingredients
17 are going down because gravity takes over
18 when the blades stop rotating --
19 A    Okay.
20 Q    -- air accumulates within the
21 ingredients and then moves and travels upward
22 and bubbles up at the top.
23 A    But the air was inside already.  In
24 other words, the air doesn't go in because
25 you turn the system off; actually, the air

Page 284

1 goes in because you turn the system on.  So
2 if this stir stick of Back To Basics was
3 supposed to work as Vita-Mix alleges for
4 infringement, there should be no air going in
5 there just because it's in there.
6 Q    Is it your opinion, then, that the only
7 way a blender like this can work is if it
8 works in a vacuum-type setting?
9 A    I don't make that call right now but
10 I'm more than happy to study this problem.  I
11 mean, I cannot answer it in this one session
12 but there has to be some way to solve this
13 problem.
14 Q    Is it your opinion --
15 A    Back To Basics has not been able to
16 solve this problem.
17 Q    Is it your opinion or understanding
18 that the point of the '021 patent is that no
19 air enters into the ingredients during
20 operation?
21 A    No.  I'm just reading the very -- not
22 simple, but very summary statement of the
23 claim that says after you exercise line by
24 line of that particular claim, at the very
25 end, the sentence says that no air --

Page 285

1 eliminates the formation of air pocket and
2 I'm saying that Back To Basics cannot do that
3 with their system with the stir stick so
4 therefore they are not infringing.
5 Q    These air pockets that you saw form and
6 then bubble up when you -- you only saw them
7 form and bubble up after you turned off the
8 machine; is that accurate?
9 A    Yeah.
10 Q    You didn't see them during the
11 operation, right?
12 A    As a matter of fact, I have some videos
13 that shows there's a band of air that
14 basically shows -- when you look at the
15 specifically Back To Basics, you see the
16 bottom portion of the canister agitating and
17 as you travel up in the canister, the
18 velocity profile kind of diminishes and the
19 top portion has a very low speed, the bottom
20 portion has very high speed.
21 Q    Is this the video that you made for the
22 first time two days ago that I haven't seen?
23 A    Yeah. Just take a look at it. And
24 then sometimes you see a band of air so the
25 air is there, it's trapped, and that's how I

Page 286

1 say that Back To Basics's stir stick was not
2 able to prevent air pocket formation. So
3 therefore, right up here, I can make a
4 conclusion that there was no infringement
5 because Vita-Mix says when you exercise that,
6 there is no air so you solve the problem that
7 we have solved with our plunger.
8 Q    However, those air pockets that you
9 witnessed and the air pockets you said
10 that --
11 A    That's bubbling up, yeah.
12 Q    -- were on your video that formed two
13 days ago aren't deleterious to the
14 performance of the blender; is that accurate?
15 A    That is -- I'm glad you asked this
16 question. That is, again, because of the
17 configuration of the blade difference between
18 Back To Basics and between Vita-Mix.
19 Q    Did you hear my -- did you understand
20 my question, though?
21 A    Yes, yes, yes.
22 Q    I'm going to ask it again.
23     You did not witness and you did not
24 videotape two days ago any air pockets that
25 are deleterious or that affect the

Page 287

1 performance of the Back To Basics blenders;
2 is that right?
3 A    That is correct because the purpose of
4 my two-days-ago test was different but in the
5 summer when I ran those tests, I was able to
6 kind of create situations that if it becomes
7 deleterious, the mixing stops.
8 Q    Okay.
9     That's without the stir stick, right?
10 A    With and without. See, I can perform a
11 recipe that when you use Back To Basics, as
12 is with any type of stir sticks for that
13 particular recipe, you can make totally the
14 whole system kind of ineffective.
15 Q    What recipe is that?
16 A    If you add, let's say, too much of
17 vegetable and too much of ice. In other
18 words, if you have a good portion of ice and
19 some orange juice and then you follow a,
20 let's call it for the sake of this argument,
21 a wrong mixture of the two then the whole
22 thing stops. So everything is pushed back
23 and the ice and everything stays on the wall
24 and this blade basically spins in the air --
25 in an air pocket and then basically you're

Page 288

1 done. So you have two choices. One is to
2 get the stir stick and manually push those
3 ice particles to the blade and let the blade
4 work on the ice, liquify it, and now that you
5 are changing the ratio of the liquid, then
6 the natural phenomenon takes place and then
7 when you have that and you pull it out,
8 everybody's happy, or just add half a cup of
9 water to that.
10 Q    Dr. Rashidi, you didn't, unfortunately,
11 videotape those tests, did you?
12 A    Well, I can reproduce it. I would be
13 more than happy to reproduce that and if you
14 want I can bring it to you or I can take a
15 video and share it with everybody.
16 Q    You didn't identify any of those tests
17 in your rebuttal report of Plaintiff's
18 Exhibit 107?
19 A    I have, actually. I have some of these
20 tests that is that existence of the plunger
21 and nonexistence, it doesn't matter. And
22 actually, I have said that there are some
23 tests here, to the best of my recollection,
24 that when you put the stir stick it makes the
25 situation worse. When you put the plunger of

Page 289

1 Vita-Mix it makes the situation worse because
2 now you have solid particles rotating at the
3 moment you introduce a stationary boundary
4 condition, you basically even stop the
5 process. So I have it. It's in there. I
6 mean, you have this report in your
7 possession. I cannot just go and find it
8 right now, but read it. It's in there.
9 Q    Well, let's go one by one, then, of
10 Appendix 2 here. The first test after the
11 cover page for Appendix 2 states at the top
12 left, "Blender: Vita-Mix 5000" and the top
13 right, "Blender: Back To Basics 700"; do you
14 see that?
15 A    That's right.
16 Q    Is it your understanding that for an
17 infringement analysis that you must test a
18 patented blender to determine infringement?
19             MR. AYCOCK:  Objection.
20       Vague.
21 A    I don't understand.
22             MR. AYCOCK:  Calls for a
23       legal conclusion.
24 Q    Is it your understanding that in order
25 to determine patent infringement you must

Page 290

1 test a patented blender or patented product?
2 A    I mean, I can answer this by my
3 observation that I have seen different
4 blenders of Back To Basics, they are almost
5 all identical except the little bulge at the
6 bottom of the stir stick and that's the only
7 way I can see visually. Now, if there are
8 any changes in the motor and their horsepower
9 or wattage, I don't know, but that's the only
10 difference I observe, and then I get to Vita-
11 Mix, it's the same thing. So for me, I'm
12 just trying to make an assertion of the fact
13 that when you have a stir stick basically it
14 doesn't perform as the claim of '021 of Vita-
15 Mix says so that's why I ran these tests. So
16 my motivation for those tests is to show that
17 Back to Basics's products does not read on
18 the '021 patent and to my surprise, I found
19 out that Vita-Mix doesn't do it either.
20 That's why I was inclined to use the results
21 of those tests not only for lack of
22 infringement but also enablement.
23 Q    Do you know if you're supposed to use a
24 patented product in determining infringement
25 in infringement analysis?

Page 291

1 A    I'm not familiar with that, no.
2 Q    Let's say Vita-Mix didn't sell any
3 blenders. Can there still be infringement,
4 in theory, by Back To Basics under that
5 scenario?
6 A    Based on common sense, I believe so.
7 Q    So in other words, a patent owner does
8 not have to actually produce a product --
9 A    Oh, absolutely.
10 Q    -- covered under a patent?
11 A    Absolutely. Most backyard mechanics
12 have patents like that and wait for someone
13 to infringe and then go and sue. As a matter
14 of fact, the person who did the --
15 Q    So you would agree with me, then, that
16 you do not need to test a patented product to
17 determine infringement; is that right?
18 A    I think I have done that through my
19 first report based on the invalidity.
20 Q    But you didn't identify any testing in
21 your first report; is that accurate?
22 A    That's accurate because I thought that
23 that would convince everybody as-is so I
24 don't need to disclose any tests.
25 Q    Despite the fact that you didn't

Page 292

1 disclose any tests in your first report, you
2 conducted a series of tests prior to serving
3 or making public your first report; is that
4 right?
5 A    That's true because I was going to make
6 sure that what I'm writing in my report makes
7 sense so I didn't want to just work based on
8 theoretical understanding.
9 Q    So take a look again here at the first
10 page of Appendix 2 where you have this test.
11 A    That's right.
12 Q    You didn't have to test the Vita-Mix
13 5000 blender here to determine infringement;
14 is that accurate?
15 A    As I said, I just wanted to have a kind
16 of apple-to-apple comparison and see if the
17 device of Back To Basics reads on the '021
18 patent and because I had a Vita-Mix blender
19 available, I said, why not test this also and
20 just look at the validity of the claim. So
21 as a kind of investigator I'm inclined to do
22 this test.
23 Q    In other words, you're comparing the
24 Back To Basics 700 blender's performance to
25 the Vita-Mix 5000 blender performance in this

Page 293

1 test?

2        MR. AYCOCK:  Objection.

3        Lacks -- excuse me.  Not lacks

4        foundation.  Excuse me.

5        Mischaracterizes prior testimony.

6 A    As I said, my reason for doing these

7 tests was I had one objective, one basic

8 objective, because I was representing as

9 the -- Back To Basics as the expert.  I was

10 trying to see whether Back to Basics's

11 products exercises or performs according to

12 the reading of the '021 patent and I was

13 trying to see -- my main concern was to see

14 whether Back To Basics's stir stick prevents

15 formation of pocket as '021 claims and then

16 in the meantime, I created the left column.

17 So if you want, you can put your hand on the

18 left column and just read the Back To Basics

19 material and then draw your own conclusion

20 but it's not a matter here to see what the

21 main product is doing also.

22 Q    So you don't need to look at any of the

23 testing you performed for the Vita-Mix 5000

24 blender to determine whether or not there's

25 infringement by the Back To Basics blenders

Page 294

1 with respect to claim one of the '021 patent;

2 is that accurate?

3 A    Really, this is a legal question that I

4 may not know the answer but as a researcher,

5 I would definitely like to do both but in

6 terms of infringement, I would look at the

7 Back To Basics and see if it exercises what

8 '021 claims.

9 Q    So you don't -- in order to do that

10 infringement analysis, you don't need to --

11 A    I don't know.

12 Q    -- test or conduct any testing on any

13 Vita-Mix blender, right?

14 A    I don't know about that and maybe my

15 common sense would say no but don't hold me

16 against that because if somebody has a

17 written patent and somebody goes and makes

18 it, there may be even no product there, so

19 therefore, you can have a patent with no

20 product and if somebody infringes, yeah,

21 you're in trouble.  So the answer with my

22 kind of intuitive common sense would say

23 you're right; you don't need to compare.

24 Just look at the right-hand side and cover

25 the left column.

Page 295

1 Q    Like you said, so cover the left

2 column -- if you cover the left column on all

3 of your tests here in Appendix 2 --

4 A    For noninfringement, I would draw

5 conclusion that Back To Basics is not

6 infringing.

7 Q    Let's take a look at this first test

8 under Appendix 2.

9 A    And right column.

10 Q    It states, under "Blender," "Back To

11 Basics --" excuse me.  It states,

12 "Blender: Back To Basics 700"; do you see

13 that?

14 A    That's right.

15 Q    What is that referring to?

16 A    The blender.

17 Q    Is it the Back To Basics Plus 700

18 blender?

19 A    I don't recollect.

20 Q    When did you test this Back To Basics

21 700 blender?

22 A    These are all the tests that I

23 performed in Utah.

24 Q    When was that?  In the summertime of

25 2007?

Page 296

1 A    I think it was either July or beginning

2 of August or end of June.  It was in that

3 period.  I think it was in July.  I can go

4 and check my travel reports and kind of

5 receipts that's coming to add to my invoice.

6 The date is there so that's the date.

7 Q    Was that the first time you've ever

8 used a Back To Basics blender or smoothie

9 maker?

10 A    When I was in Cleveland and I -- we did

11 those tests with the Vita-Mix, I don't recall

12 whether we did water with those or what, but

13 if I had done anything with Back To Basics it

14 would have been pure water.  It was not

15 recipe.  But this was, yes, the first time I

16 did recipe with Back To Basics.

17 Q    It was in August of 2007, right?

18 A    I don't know.  July or August.  I don't

19 know.

20 Q    Okay.  That was --

21 A    Actually, it says the Utah trip.

22 Q    Four or five months after you were

23 first retained in this case by the Back To

24 Basics or Defendants' lawyers, right?

25 A    That's right.  That's right.

Page 297

1 Q      That was the first time you actually
2 tested a Back To Basics blender?
3 A      That's right.
4 Q      It states under "Blender" -- do you
5 recall or have you tested any other Back To
6 Basics blenders other than this 700 blender?
7 A      Let's take a look.  There is another
8 one -- see, for several pages it's just Back
9 To Basics 700 and then after that, it changes
10 to Back to Basics Smoothie Pro 700 with a
11 fifth footnote and then, I believe, these are
12 the two.  And again, as far as I'm concerned
13 as an investigator, they are all the same
14 except the minuscule differences on the stir
15 stick.
16        And I -- basically I think, to the best
17 of my knowledge, I took the worst-case
18 scenario which has an O-ring or a round disk
19 at the bottom of the stir stick because some
20 of them are really like a spoon and it's very
21 difficult to claim infringement on those so I
22 got the worst-case scenario.
23 Q      So you only tested the Back To Basics
24 700 or the Back To Basics Smoothie Pro 700
25 blenders; is that right?

Page 298

1 A      Those two, yeah.  And I'm basically
2 more than happy to test any other Back To
3 Basics and I can predict that with 99 percent
4 certainty I will have the same results.
5 Q      As of today, though, you have not
6 performed any testing on any other Back To
7 Basics blender other than the 700 and the
8 Smoothie Pro 700 blenders for Back To Basics?
9 A      That's -- I believe that's a true
10 statement, yeah.
11 Q      Going back to this first test behind
12 Appendix 2 to your rebuttal report that's
13 marked as Exhibit 107, it states, "Test
14 purpose: To determine effectiveness of the
15 stir stick on prevention of air channel
16 formation"; do you see that?
17 A      That's right.
18 Q      Can you show me where in claim one of
19 the '021 patent that identifies a prevention
20 of an air channel formation?  Let me help you
21 with that by --
22 A      No, I understand.  I understand.  '021
23 patent claims that an air pocket is generated
24 as a result of air channel so I am going to
25 the root cause of this and because the

Page 299

1 inventor of '021 patent demonstrates or
2 claims that the air pocket is the result of
3 an air channel, I'm going to the root cause
4 and see -- because they say their plunger
5 prevents air channel which is going to evolve
6 to an air pocket so I'm saying that let's
7 take one step backward and see if any air
8 channel is generated.  So my test purpose, in
9 my opinion, is very relevant and very valid.
10 So I want to see if there's any air channel
11 that later on is going to become air pocket.
12 Q      Dr. Rashidi, let's take a look at --
13 I'm going to hand to you what's going to be
14 marked here as the next exhibit.
15            - - - -
16        (Plaintiff's Exhibit 109 was
17         marked for identification.)
18            - - - -
19 Q      I'm going to hand to you what's been
20 marked as Plaintiff's Exhibit 109.
21 A      That's right.
22 Q      That states on the first page, US
23 patent number 5,302,021; do you see that?
24 A      That's right.
25 Q      Have you seen this Vita-Mix '021 patent

Page 300

1 before?
2 A      That is the very first document that I
3 saw.
4 Q      Can you tell me where claim one of the
5 '021 patent is?
6 A      The very end, "We claim."
7 Q      Can you identify there, in claim one,
8 where it recites the term prevention of a --
9 of air channel formation?
10 A      Okay.  The claim reads, "A method of
11 preventing a formation of air pocket," not
12 air channel, air pocket, "around rotating
13 blades positioned in a pitcher of a blender,
14 the air pocket being created from an air
15 channel," so if -- see, you are taking my
16 word "creation of an air channel" and you're
17 translating it into a patent claim.  No.
18 With this creation, I don't mean the same
19 creation here.  Existence.  You can basically
20 go to the word and click on creation and then
21 put the synonym there and my report stays the
22 same.
23        So I'm saying that if they say that,
24 "Being created from an air channel --" so
25 creation goes back to air pocket according to

Page 301

1 this claim but there is an air channel which
2 basically gives birth to this air channel.  So
3 I'm saying that, okay, I'm going to be fancy
4 in choice of vocabulary and say I'm going to
5 look at "creation of air channel," which is
6 going to be later, an air pocket being
7 created from it.  So please read this in the
8 context and I am more than happy to replace
9 the word "creation" or "prevention" to
10 anything you want.  I want to see whether the
11 first cause or root cause of air pocket is
12 generated.
13 Q    Do you know what my last question was?
14 A    Yes.  Is there anything here that just
15 talks -- in this claim which talks about
16 prevention of an air channel.
17 Q    And is there?  Is there any --
18 A    Implicitly, it is, absolutely, yes.
19         MR. AYCOCK:  Objection.
20         Asked and answered.
21 Q    Let me ask the question just to make it
22 clear for the record.
23     Does claim one of the Vita-Mix '021
24 patent recite, "Prevention of air channel
25 formation" anywhere?

Page 302

1 A    I'm sorry.  I think we are
2 miscommunicating here.  Here, I'm not trying
3 to have a one-to-one answer to the claim.
4 I'm just trying to look at the performance of
5 the machine as this claim is going to read
6 into.  So I'm not going to word this purpose
7 exactly to match that.  I want to see whether
8 I'm -- I am able to prevent an air channel
9 which later I'm going to create an air
10 pocket.
11 Q    Is it accurate to state, then, that
12 this testing, this first test here in
13 Appendix 2 wasn't an infringement test, it
14 was a test for you to determine how this
15 blender works?
16         MR. AYCOCK:  Objection.
17         Mischaracterizes prior testimony,
18         asked and answered.
19 A    I am going to draw conclusions from it
20 for infringement and for enablement so I'm
21 not just doing this test up in the air.  I
22 want to be able to draw conclusion that --
23 whether any infringement is taking place or
24 not.  So if an air channel -- so let's have a
25 hypothetical situation.  Let's say I ran the

Page 303

1 first test and I put the stir stick of Back
2 To Basics and no air channel is generated.  I
3 wouldn't write this report.  I wouldn't
4 continue accepting this case.  I would go to
5 Mr. Aycock and say, "Mr. Aycock, you know,
6 you're a nice gentleman, I promised you I'd
7 work with you, but I'm not going to quote
8 with something that he can prove otherwise."
9     So I am after the root cause to see
10 whether an air channel is generated, how
11 effective this stir stick is and then draw
12 conclusions for infringement and for
13 enablement.  So for me as a researcher, it is
14 totally relevant.  In the legal system and
15 kind of language, with all due respect, I
16 don't care about that.  I want to see -- I'm
17 on a fact-finding mission.
18     If I had a different result I would go
19 to Dr. -- to Mr. Aycock and say, "Mr. Aycock,
20 I'm going to stop here.  Go and find another
21 expert."
22 Q    Is it accurate to state, then -- is it
23 accurate, then, that this test you performed
24 on the first page of Appendix 2 for a fact-
25 finding mission is in regards to a fact

Page 304

1 that's not identified or recited in claim one
2 of the Vita-Mix '021 patent?
3         MR. AYCOCK:  Objection.
4         Mischaracterizes document and
5         mischaracterizes prior testimony.
6 A    It is implicit all over this claim
7 '021, all over this claim.  I mean, it's a
8 very simple language that says that the air
9 pocket being created from an air channel so
10 existence of an air channel, effectiveness of
11 an air -- stir sticks for the formation of an
12 air channel is directly the heart of this
13 issue.
14     So I'm trying to prove noninfringement
15 and enablement from this test so if -- as
16 I -- I mean, I repeat myself and I think this
17 is very clear.  If the result of this test
18 was different, I would not be sitting here
19 today because I consider myself having a
20 reputation and I don't want to go to the
21 judge or to juries or to another expert and
22 they prove me otherwise.  So therefore, we
23 can sit here and talk about the language
24 until the end of the day but I am trying to
25 look at this as an expert, so therefore, for

Page 305

1 me, this test is directly related to this
2 '021 patent.
3 Q    But you'd agree with me, though, that
4 the term, "Prevention of air channel
5 formation" is not in claim one of the Vita-
6 Mix '021 patent; is that correct?
7 A    If you are just looking at the
8 simplistic point of view, who is going to say
9 no?  This is so obvious.
10 Q    Thank you.
11    Take a look at the second test that you
12 identify in Appendix 2.  Again, do you have,
13 in this second test, any identification of
14 claim one of the Vita-Mix '021 patent?
15 A    Again, the same, and you can basically
16 cut and paste whatever answer I said
17 previously in the interest of time.  It's all
18 the same.  And the very final answer would be
19 complying with you and say, yeah, you're
20 right, but these tests are directly
21 addressing the core issue.
22 Q    So in other words, all of your tests
23 here in your Appendix 2 of your rebuttal
24 report is to determine whether or not an air
25 channel's prevented; is that accurate?

Page 306

1 A    No, no, this is inaccurate because
2 later on, I create air pockets and it makes
3 the blender ineffective.  So this is just at
4 the very beginning so we are kind of going
5 through other recipes and then evolve.
6 Q    Okay.
7    So the first -- so the first step --
8 for the first test, you are determining the
9 prevention of an air channel formation which
10 is not identified in claim one of the '021
11 patent; is that correct?
12    MR. AYCOCK:  Objection.
13    Mischaracterizes the document,
14    mischaracterizes his prior testimony.
15 A    I don't know what you're looking for in
16 terms of an answer because this is very
17 straightforward.  All I'm saying here is
18 that -- let's summarize these two tests.  If
19 you have pure water, whether you have stir
20 sticks of Back To Basics in the pitcher or
21 not in the pitcher, air channel is developed,
22 it gets to the blade and that air channel is
23 broken up so that the water becomes murky and
24 it is no longer translucent.  That's all I'm
25 saying.

Page 307

1    Now, if your liquid or if your fluid or
2 content was more viscus and had other
3 properties which is not in pure water then an
4 air pocket would develop and depending upon
5 the consistency of that, you get to the air
6 pocket.  So all I'm saying in these two
7 tests, whether stir stick is effective for
8 prevention of all of these bad things.
9 Q    Let's look at the first test --
10 A    Yes, sir.
11 Q    -- the second test --
12 A    Uh-huh.
13 Q    -- the third test --
14 A    Okay.
15 Q    -- the fourth test --
16 A    Uh-huh.
17 Q    -- the fifth test --
18 A    Uh-huh.
19 Q    -- the sixth test --
20 A    Okay.
21 Q    -- the seventh test --
22 A    Yes.
23 Q    -- the eighth test.
24 A    Uh-huh.
25 Q    Let's go with those first eight tests.

Page 308

1    Each of those identify that you were --
2 the purpose of those tests were to determine
3 whether you're preventing the formation of an
4 air channel; do you see that?
5 A    That's right.
6 Q    For each of those -- while the test
7 purpose in each of those tests was to
8 determine whether an air channel is
9 prevented, claim one of the Vita-Mix '021
10 patent does not require the prevention of an
11 air channel; is that correct?
12 A    Definitely it requires because it says,
13 "The air pocket which is created from an air
14 channel," so if you don't have an air
15 channel, no air pocket will develop.  I mean,
16 what part of this is difficult to kind of
17 analyze?
18 Q    Sure.
19    I'm just trying to figure out where it
20 says in claim one that you must prevent an
21 air channel from forming to prevent an air
22 pocket.
23 A    You must prevent an air channel before
24 preventing an air pocket because the language
25 of the claim says, "The air pocket being

Page 309

1 created from an air channel."  So if you have
2 no air channel, can you have an air pocket
3 according to this claim?  That's exactly what
4 the inventors say.  They say that you create
5 the plunger which occupies the space at
6 which, otherwise, the air channel would have
7 been prevented.  I mean, this is -- I mean,
8 this is very trivial.  If you have no air
9 channel, can you have an air pocket?
10 Q    Do you know if Back To Basics argued
11 your point in claim construction?
12 A    I don't care what they say.  I'm not
13 kind of -- see, I am representing my
14 scientific point of view here.  I have no
15 allegiance to Back To Basics.
16 Q    Also, do you know whether or not the
17 court has determined here in claim
18 construction whether or not an air pocket or
19 air channel must be prevented in order for an
20 air pocket to be prevented?
21 A    Again, I'm going with the statement of
22 the patent and I don't -- I mean, I know our
23 job here is for you to ask the question and
24 for me to answer but, I mean, I cannot help
25 it.

Page 310

1     I ask you, is it possible to have an
2 air pocket when there is no air channel?
3 Q    I don't know.
4     Is that -- can you answer your own
5 question, sir?
6 A    Yes, I can answer that.
7 Q    Okay.
8 A    If you don't have an air channel, you
9 cannot have a big, deleterious air pocket
10 because this patent clearly says that, being
11 created from -- I mean, being created from an
12 air channel.  An air pocket being created
13 from an air channel.  You take the air
14 channel out, you don't create that, you don't
15 form that, this statement falls apart and
16 then there is no air pocket.
17 Q    Do air channels always result in air
18 pockets?
19 A    Not necessarily.  Exactly.  Not
20 necessarily.  That's why I kind of object to
21 this videotape that you showed me.  If the
22 content of liquid is too much you can have
23 lots of air channel and they never have room
24 or allowance to form a bridge so they kind of
25 come from other sides and bubble and the

Page 311

1 thing is boiling as if you have a heat
2 underneath it.  So it becomes deleterious
3 when you have certain consistencies, certain
4 solid particles.
5 Q    Well, so if an air -- so if an air
6 channel does not necessarily form an air
7 pocket why do you need an absence of an air
8 channel -- why is it that only an absence of
9 an air channel would create an absence of an
10 air pocket?
11 A    Because the opposite is not true.  See,
12 to have an air pocket, you need an air
13 channel but if you have an air channel, you
14 don't necessarily have an air pocket.  This
15 is so simple.  In other words, it's a matter
16 of necessary and sufficient condition.  The
17 necessary condition for an air pocket is an
18 air channel.  It is necessary but it's not
19 sufficient.  The sufficiency comes from the
20 other attributes that no one talks about.
21 Q    Do you agree that claim one states "the
22 air pocket being created from an air
23 channel"?
24 A    Yes.  It's right there.
25 Q    What else does claim one identify or

Page 312

1 state regarding the air channel with respect
2 to the air pocket other than that the air
3 pocket is being created from an air channel?
4 A    So let's read it again because this
5 is -- it says, "A method of preventing the
6 formation of an air pocket," which is the
7 final goal, "around rotating blades
8 positioned in a pitcher of a blender,"
9 describing the situation, "the air pocket
10 being created from an air channel."  So it
11 shows the origin of the air pocket, it shows
12 the necessary condition and then it goes into
13 the geometry, that the cross-sectional size
14 of this, blah, blah, blah and the rest.  And
15 then at the end, it basically says that --
16 "Thereby preventing formation of an air
17 pocket in the fluid around the rotating
18 blades."
19     So the cause of the problem was
20 explained, the geometric parameters were
21 defined and then the method of not touching
22 the walls of the blender was explained and
23 then the conclusion was drawn that, okay, no
24 air pocket, therefore, is generated.  So it
25 is -- I mean, one of the things that we have

Page 313

1 to realize is that these things are supposed
2 to be enabling somebody to teach, to
3 practice.
4 Q    I'm just asking you, though, where it
5 states in claim one that you must prevent or
6 preclude the formation of an air pocket.
7 A    The first three lines.  That's the
8 first three lines.  It says, "The air pocket
9 being created from an air channel."
10 Q    I'm asking where in claim one, though,
11 does it require that an air channel be
12 prevented?
13 A    Right there.  Right on the third line.
14 Q    Can you state the words that you
15 believe show that an air channel must be
16 prevented to perform claim one?  Just tell me
17 the words that you see that state that.
18 A    Are you familiar with cause and
19 effect?  I mean, the cause of the air pocket
20 is air channel.  The necessary condition for
21 the air pocket is the air channel.  It's not
22 sufficient but it's necessary.  So I mean, I
23 think the --
24 Q    I'm asking you, are there times where a
25 plunger can, for example, move the air

Page 314

1 channel out of the center and towards the
2 blades to mix up that air thereby preventing
3 the formation of an air pocket?  Have you
4 considered that, Dr. Rashidi?
5         MR. AYCOCK:  Objection.
6         Assumes facts not in evidence --
7 A    Repeat --
8         MR. AYCOCK:  Excuse me.  I'll
9         withdraw the objection based on --
10 A    Repeat that question again.
11 Q    Sure.
12         (Record read.)
13 Q    You can answer.
14         MR. AYCOCK:  Which question?
15 Q    Answer the question.
16         MR. AYCOCK:  There's two
17         questions there.
18         MR. CUPAR:  I disagree.
19 Q    Go ahead and answer the question.
20 A    So I'm going to repeat your question
21 and --
22 Q    Go ahead.
23 A    You're saying that is there any
24 situation that the device, stir stick or
25 plunger, can move away the air channel so

Page 315

1 that no air pocket is developed?
2 Q    Correct.
3 A    Is that the question?
4 Q    Yes.
5 A    The speeds in these things are so high
6 that the answer is no.
7 Q    How do you know that?
8 A    Because I have tested it.  It is
9 absolutely -- I mean, with this RPM of the
10 motor and the consistency -- see, I'm sorry
11 to say it like that, but you have the same
12 vision of the Vita-Mix inventors.  You think
13 that you have a sponge there that is an air
14 channel moving in a quasi-solid material, you
15 can push it aside and then everybody's
16 happy.  The fluid comes and then everything
17 repeats again.  This guy is rotating
18 probably, at minimum, 10,000 RPM.  I don't
19 know.  I have never measured it.  So no, you
20 cannot do that.
21 Q    What testing do you have to refute my
22 statement?
23 A    Just doing it.
24 Q    Can you show me what test refutes my
25 question?

Page 316

1 A    When you have the air -- when you have
2 the plunger in or the stir stick in and you
3 still have bubbles.  That refutes that.
4 Q    But those bubbles aren't affecting the
5 performance of a -- of the blender; is that
6 accurate?
7 A    There are some tests that they do.  At
8 the end of the report there are.  There are
9 some tests that the plunger or the stir
10 sticks -- forget about the plunger.  The stir
11 sticks of the Back To Basics is there and
12 things become bad and ineffective unless you
13 either physically push the ice or vegetables
14 and parsleys into the blade or add water.
15 There are tests.
16 Q    Show me what test supports --
17 A    Let's go to the end of this and --
18 Q    -- your opinion there, Dr. Rashidi.
19 A    -- to the best of my knowledge --
20 okay.  Let's see.  Okay.  Actually, go to the
21 very last page before that signature thing.
22 Second page from the end.  It says, "To
23 determine the effect of the stir stick on
24 preventing air pocket around the rotating
25 blade," so now we are changing the

Page 317

1 terminology from air channel to air pocket.

2      We have a recipe which is explained.  I
3 don't need to go through it or if you want I
4 do.  Three sticks of celery, eight inches
5 each, half a can of corn, half a can of green
6 peas, a cup of chick peas, 12 baby carrots in
7 all dimensions and four leaves of spinach
8 with stems, and the level is according to the
9 recipe.

10      Then "Observation: With no stick stir
11 -- stir stick in the pitcher, the content was
12 successfully mixed.  With the stir stick in
13 the pitcher, no mixing was taking place in
14 the pitcher with the contents stagnated,"
15 which means that actually it is doing exactly
16 opposite of what '021 patent is proclaiming
17 which means that the conclusion, "Only if the
18 stir stick is moved around (turned) can
19 mixing be influenced.  Contrary to claim 1 of
20 '021 patent, the stir stick of Back To Basics
21 actually impedes mixing.  One explanation for
22 this case is the frictional interactions
23 between the content in the blender and
24 exterior surface of the inserted stir stick,"
25 because remember it has zero velocity.  "In

---

Page 318

1 other words, one additional stationary
2 boundary condition was generated in the
3 pitcher as a result of its presence."

4      So when you have this stir stick in
5 there it does exactly opposite of this so I
6 really don't care what the Back To Basics
7 says, what the Vita-Mix says.  This is the
8 technical aspects of the matter.

9 Q      So this is the only test that you can
10 point to -- is this the only test that you
11 can point to that identifies the formation of
12 an air pocket, sir?

13 A      I don't know whether I have another one
14 in this one.  I have -- I mean, I haven't
15 memorized my reports so let's look at the
16 other tests.

17 Q      So you don't know?

18 A      No, no.  I do know.  I do know.  This
19 is one of the tests.

20 Q      Sure.

21      Let's look at your test here on the
22 second to last page of your report and this
23 is actually the last page of the appendix.
24 Can you identify for me anywhere in this
25 testing where you observed or saw an air

---

Page 319

1 pocket?

2 A      When the mixing stops it means that the
3 blade is rotating almost up in the air so
4 there is a definite air pocket there so no
5 mixing is taking place.  Everything
6 stagnates.

7 Q      But how do you know that was an air
8 pocket?

9 A      It is an air pocket.

10 Q      How do you know it wasn't just food
11 stuck in the blender?

12 A      Because I have done other tests with
13 other material that you want to look at the
14 other tests.  That's exactly what I'm saying.

15 Q      Identify for me anywhere in your
16 observations or your conclusions here in your
17 last test where you identify that you saw an
18 air pocket.

19 A      I saw an air pocket there because
20 the -- look at the number of material which
21 has gone in there.  It is a substantial
22 amount of material.

23 Q      I understand that.

24      I'm asking you, though, in your
25 observation and conclusion sections you did

---

Page 320

1 not state anywhere that you observed an air
2 pocket, did you, Dr. Rashidi?

3 A      If the stirring is stopped it's as a
4 result of accumulation of air around the
5 blade.  If you don't want -- like me to call
6 it air pocket, you name it whatever you
7 want.  I'm not here to kind of fight over
8 terminology.  There is an air pocket around
9 the blade because the content -- that's
10 exactly the reason I use the word "bridge"
11 because I could see that there is a canopy on
12 top of the blades, so there is air entrapped
13 there.  So what do you want to call this?
14 Air pocket?  Air cavity?  Whatever you want
15 to call it.

16 Q      Well, I'm not asking you to say
17 whatever -- you know, I'm not asking you to
18 do that.  I'm just asking you, based on your
19 observations here and based on your
20 conclusions that you identify here from the
21 testing, you do not state anywhere that you
22 witnessed an air pocket, do you?

23 A      This is the result of an air pocket.
24 If you want, we can add that with my
25 permission and I have no problem with that.

Page 321

```
1  In other words, I objected -- as a matter of
2  fact, if you read my report, have you ever
3  seen the word "bridge," "bridging over the
4  blade"?  That's exactly what happened here.
5  There was a bridge.  So we have a glob of air
6  on top of the blade.  You call it whatever
7  you want.
8  Q    Do you know if you've ever used the
9  term "bridge" or "bridging" in either your
10 invalidity report or in your rebuttal report,
11 sir?
12 A    I believe I have used it in the first
13 report or maybe second or both, I don't
14 remember which one, but I have used the word
15 "bridge" somewhere and that is what I've
16 observed here.
17 Q    All you stated in your observations on
18 this last test is that, "With the stir stick
19 in the pitcher, no mixing was taking place in
20 the pitcher with the content stagnated"; do
21 you see that?
22 A    Uh-huh.
23 Q    Are you saying that -- strike that.
24      There's no mention in there, though,
25 that there was an air pocket that was formed;
```

Page 322

```
1  is that accurate?
2  A    I consider it implicit because all of
3  these inventors, they are saying that when
4  the blade becomes ineffective it's because of
5  existence of an air pocket or sizable bubble;
6  otherwise, I have developed a new problem.
7  No, it's the same problem.  We have an air
8  pocket around the rotating blades which makes
9  the blades ineffective and thereby, in this
10 particular recipe, it stagnates.
11 Q    Take a look at your other observation
12 just above it.  "With no stir stick in the
13 pitcher the content was successfully mixed";
14 do you see that?
15 A    Exactly.  Exactly.
16 Q    Okay.
17      So you would agree with me that you can
18 perform this recipe and testing successfully
19 without an air pocket; is that right?
20 A    Absolutely.  Absolutely.
21 Q    What was the purpose of this test with
22 regards to an air pocket, then, sir?
23 A    Just to show that existence of the stir
24 stick is actually doing opposite of what '021
25 patent alleges for infringement on Back To
```

Page 323

```
1  Basics's product because let's look at the
2  matter of infringement.  They say because
3  they have a stir stick, therefore, they
4  prevent formation of a bubble and their
5  machine works very nice because they are
6  copying us, that's what Vita-Mix alleges, and
7  with this experiment I'm showing you exactly
8  the opposite.  And as a matter of fact, if
9  you just read the left column, you almost see
10 the same observation.
11 Q    Where did you get this recipe from?
12 A    I just made it up because I'm trying to
13 basically check extreme cases.
14 Q    What fluids are in this recipe?
15 A    Whatever we have in the recipe's in
16 there because the -- oh, let me see.  With
17 the corn and with the chick peas and green
18 peas and the spinach leaf and those celeries,
19 I'm just trying to show that when the water
20 content of this mixer -- mixture is low, bad
21 things happen.  So therefore, all these
22 matters of cross-sectional equivalency and
23 approximations is out the door.  It's just a
24 matter of what you have in there which makes
25 your blender effective or not so effective.
```

Page 324

```
1  Q    So this last test that you performed
2  here, it has a very low liquid content; is
3  that accurate?
4  A    Absolutely, yeah.  That's what I'm
5  trying to show.
6  Q    Smoothies normally don't have a low
7  liquid content; is that accurate?
8  A    It depends on who is making the
9  smoothies and to what level of thickness.  So
10 you can make smoothies which are very thick
11 and then you get into a problematic
12 situation; you can make something that this
13 gentleman number 80 was doing, fill up the
14 entire pitcher, 80 percent of it with some
15 sort of liquid, milk or whatever, and nothing
16 bad happens.
17 Q    What about if you follow the --
18 A    A particular recipe?
19 Q    What about if you follow the steps in
20 accordance with Back To Basics's
21 instructions?  Have you ever seen what you
22 saw in this last test occur?
23 A    Yeah.  It depends upon the recipe.
24 Q    Which recipe from Back To Basics did
25 you witness --
```

Page 325

1 A    Let's read it.

2 Q    -- that the stir stick did not perform

3 as well, then, without the stir stick?  Can

4 you identify which test that was?

5 A    Let me find it.  Okay.  If you go to

6 the third page from the back, now I have a

7 different recipe.  The third page from the

8 back.

9 Q    Which recipe is that?

10 A    It is four cups of uncooked rice, one

11 cup of water at room temperature.

12 Q    That's from a Back To Basics

13 instruction manual?

14 A    No.  This is my own instruction.  I'm

15 trying to create thick liquids.

16 Q    I'm not asking about your own

17 instructions.  I'm asking which recipes from

18 Back To Basics did you use that ended up

19 showing that the stir stick actually worked

20 worse or was more unsuccessful than without

21 the stir stick?

22 A    At the very beginning, I think we

23 followed the recipes.  I think some of these

24 initial tests after the pure water are coming

25 from -- yeah, here.  For example -- let's

Page 326

1 see.  What page is that from?  Okay.

2     If you go to the beginning of this

3 appendix, okay, you have the first and the

4 second there is a recipe.  Recipe's

5 strawberry banana shake from Better Living

6 magazine, page 71, the second test.  So I'm

7 saying that for that recipe if you don't have

8 the stir stick, nothing bad happens.  See,

9 I'm only after showing the effectiveness of

10 the stir stick, just look at the test

11 purpose, and then from my test purpose, I'm

12 going to draw my conclusions for

13 infringement.

14 Q    But I'm asking you, the last test you

15 identify with all of the solids in it and

16 basically no liquid content, I'm asking you

17 now where did you perform a test with respect

18 to a Back To Basics recipe where you ended up

19 with those same results?

20 A    Okay.  Well, my answer to that is

21 that's why I have opened -- I have left room

22 open for further tests so if you recall, I'll

23 go and do it.

24 Q    But you haven't done them up to this

25 point, right?

Page 327

1 A    I think I have covered more than enough

2 on the range of the fluids and whatever you

3 tell me falls in between these so in -- I

4 would be more than happy, as a result of this

5 very conversation that we have, I have left

6 room open and reserved the right to do more

7 tests.  So you give me a recipe, I'll do it

8 and I'll give you the video of it or we'll do

9 it together and you find a recipe and then we

10 show that and this is the purpose of the

11 test, with or without the stir stick, I would

12 get almost the same result.  If they are

13 different, it would be in favor of not having

14 the stir stick if it is used only as a

15 prevention of '021 patent.

16 Q    Dr. Rashidi, you only identify here 14

17 tests in Appendix 2.  Are those the only

18 tests that you performed on the Back To

19 Basics blenders or smoothie makers?

20 A    Other than the tests that I did two or

21 three nights ago, yes, these are the only

22 tests, yes, but I have done something very

23 recently to demonstrate the concept again.

24 Q    Dr. Rashidi, can you see an air channel

25 during operation when you're making a

Page 328

1 smoothie?

2 A    It depends upon the content.  Actually,

3 when you have the stir stick or plunger, you

4 don't see it but what happens is when you

5 turn the machine on there is a sudden very

6 transient motion that captures the air and

7 brings it to the blade and then after that,

8 you don't see anything.  And then the reason

9 that I'm relying on the air getting in there

10 is when you turn the machine off, that bubble

11 basically comes to the surface in a very

12 noticeable fashion and when you look at my

13 videos, you'll see that.

14 Q    How do you know, though, that there's

15 an air channel near the blades during

16 operation when there's a stir stick or a

17 plunger in the pitcher?

18 A    The air is brought in.  The air is

19 brought in and if it is a thin fluid, you

20 kind of see that.  When you look at my video,

21 my recent video, you see that when it is

22 thick material because the fluids are acting

23 differently.  There is a sudden chance -- I

24 mean, sudden kind of burst of air going in

25 there and it is being trapped down there

Page 329

1 because the fluid is very viscus.  Otherwise,
2 it would come from the other side and get
3 mixed with the blade.
4 Q    But the air channel that you claim
5 you're witnessing there is different than the
6 air channel that's formed without the stir
7 stick, isn't it, Dr. Rashidi?
8 A    No.  This is the -- anything which goes
9 from the center of the blender, I call it an
10 air channel.  For different blends, this air
11 channel behaves differently so that's --
12 that's exactly what my point is, that this
13 air channel is really not uniquely defined by
14 those cross-sectional things; it really is
15 defined by the material properties, RPM, you
16 name it.  So if you thicken your material and
17 deviate from Newtonian or non-Newtonian,
18 other things happen, then the air is globbed
19 in, goes to the blades stays there and
20 depending upon your blade construction,
21 whether you have different geometry of the
22 blade, certain things happen to that air
23 pocket.  So sometimes, depending upon the
24 consistency, it is not deleterious, sometimes
25 it becomes deleterious.

Page 330

1 Q    You would agree with me that the
2 plunger or stir stick from the Back To Basics
3 blender does affect the formation of the air
4 pocket though; is that accurate?
5        MR. AYCOCK:  Objection.
6 A    No, I don't agree with that.
7 Q    So in other words, your testimony today
8 and your opinion here today is that there is
9 no difference in the formation of an air
10 channel whether or not a stir stick is
11 present?
12        MR. AYCOCK:  Objection.
13        Mischaracterizes prior testimony --
14 A    What we are --
15        MR. AYCOCK:  Excuse me.
16        -- and the opinion as stated
17     in Dr. Rashidi's reports.
18 A    What we observe when we have air --
19 stir stick of Back To Basics, depending upon
20 the consistency of your content in the
21 pitcher, you observe different formation and
22 duration of an air channel.  For example, if
23 you don't have the stir stick, you get a
24 stable air channel you can see; if you do
25 have a stir stick, the air gets in there

Page 331

1 around it and then the viscus fluid comes and
2 covers the top portion but the air is there
3 and then when you turn the machine off, the
4 air comes up.  So in other words, you cannot
5 prevent formation of air pocket around the
6 rotating blade just because you have a stir
7 stick in it.  So that is my testimony today.
8 Q    Can you identify one test out of your
9 14 which are the only 14 tests you did and
10 the only -- other than the one from two days
11 ago, can you identify for me one test where a
12 stir stick or a plunger from Back To Basics
13 performed better when the stir stick was
14 being used than without?
15 A    The blender worked better when the stir
16 stick was in there?
17 Q    Yes.
18    Can you identify one test for me out of
19 these 14?
20 A    I really didn't observe that.  Believe
21 it or not, to the best of my recollection, I
22 didn't see any benefit from the stir stick to
23 help the blender of Back To Basics.  And to
24 my surprise, when you go to the left column,
25 the same thing is true about Vita-Mix but I

Page 332

1 don't want to get into that.
2 Q    One of your tests here was using 32
3 ounces of clear corn syrup; do you see that?
4 A    Yes.
5 Q    Is that some sort of normal recipe that
6 people --
7 A    No.
8 Q    -- use?
9 A    I had a purpose for that.  I was trying
10 to demonstrate that the size of the air
11 channel is very much dictated by the liquid
12 consistency.  Because the member associated
13 blade is the same size, the RPM is almost the
14 same, it's a little bit less because of the
15 viscosity, but I'm trying to say that
16 everything else constant in this machine, the
17 very fact that you change your liquid, your
18 air channel totally kind of changes in
19 configuration.
20    So I'm kind of indirectly disputing
21 '021 claim, that the air channel which is
22 defined by these two members.  Because if
23 that -- if those things are the determining
24 factor and defining factors, the air channel
25 should stay the same size, so that is what

Page 333

1  I'm trying to do with the corn syrup.  So I'm
2  not trying to invite anybody to drink corn
3  syrup; I'm just trying to have an
4  experimental approach to say that viscosity,
5  density and other things are more important
6  than a member associated with the blade.
7  Q    So in other words, these 32-ounce corn
8  syrup analyses are not exactly pertinent to
9  whether or not the Back To Basics blenders
10 infringe claim one of the '021 patent; is
11 that accurate?
12         MR. AYCOCK:  Objection.
13         Lacks foundation.
14 A    It does.  Actually, it does, because
15 I'm saying that there actually exists no
16 member which singularly defined that air
17 channel.  So I'm saying that your air channel
18 is totally different, for the same machine,
19 for the same cross-sectional areas on the
20 bearing housing and on the hub of the blade
21 and all of the sudden you get an air channel
22 which is very thin in diameter, very small in
23 diameter.  So what happened here?
24      So all I'm saying is because, again,
25 for me as a researcher, I would say one

Page 334

1  company claims that they have solved the
2  problem, formation of an air pocket from an
3  air channel, the air channel whose cross-
4  section is approximating the cross-section of
5  some members of some components of the
6  machine, and I'm saying that the same machine
7  provides different cross-sections depending
8  upon what I put in there.  So I'm not trying
9  to have a recipe for consumption, I'm just
10 trying to challenge this claim.
11 Q    Take a look at the ninth test.  It's
12 for 32 ounces of clear corn syrup.
13 A    Okay.  Yes, I have it.
14         MR. CUPAR:  Let's go off the
15         record.
16         (Recess had.)
17 Q    Dr. Rashidi, have you found the ninth
18 test in your Appendix 2 of your rebuttal
19 report that's marked as Plaintiff's Exhibit
20 107?
21 A    Yes, sir.
22 Q    It states, "Recipe: 32 ounces of clear
23 corn syrup, Kroger"; do you see that?
24 A    That's right.
25 Q    And then below that it states,

Page 335

1  "Observations: With no stir stick in the
2  pitcher, a cross-section of the air channel
3  was substantially smaller than the case for
4  pure water.  No air pocket was formed"; do
5  you see that?
6  A    Uh-huh.
7  Q    Is that accurate?
8  A    That is what I observed.
9  Q    The fourth bullet point, it states,
10 "With the stir stick outside of the pitcher,
11 an air pocket as large as a golf ball was
12 generated above and around the blade.  The
13 air pocket surfaced soon after the blender
14 was turned off"; do you see that?
15 A    That's right.
16 Q    Did this air pocket as large as a golf
17 ball affect the performance of the Back to
18 Basics Smoothie Pro 700 blender?
19 A    Basically as I said, this liquid was so
20 viscus that the blade was rotating, the lower
21 part of the pitcher was circulating, the
22 upper part was not circulating very much and
23 we had that pocket there.
24 Q    So it was still circulating; is that
25 correct?

Page 336

1  A    Yes, that's right.
2  Q    In other words, the air pocket here
3  that you're identifying did not stop the flow
4  of the clear corn syrup; is that correct?
5  A    That is correct.
6  Q    Take a look at -- in one of the your
7  tests you identified a SOHO blender
8  instruction manual.
9  A    Is that 107 document --
10 Q    It's still Exhibit 107.  It's one of
11 the tests -- by the way, is it 13 tests or 14
12 tests that you conducted?
13 A    We'd have to count them.
14 Q    I want to get that clear for the
15 record.
16      Can you count the number of tests you
17 performed?
18 A    Let's do it.  Let's do it.  Yeah,
19 you're right, because some of the headings
20 kind of repeat and it kind of tends to --
21 okay.
22      Pure water is test number 1 with its
23 conclusion.  Test number 2 is a strawberry
24 banana from page 71 with the conclusion.
25 Test number 4 and -- test number 4, test

Page 341

```
 1  derivate, and you cannot have a one fit size
 2  all -- one size fits all in a recipe book so
 3  you as a person would do what is needed to be
 4  done.  That's my opinion.  And they have
 5  provided all the elements for that, a socket-
 6  ball junction, an O-ring and that's what they
 7  are basically encouraging the users to do.
 8  Q     In conducting this fourth test for the
 9  Back To Basics Pro 700 smoothie maker blender
10  and you followed this recipe from the Back To
11  Basics SOHO blenders user guide, did you
12  follow the steps in the Back To Basics SOHO
13  blender guide to perform this test?
14  A     Because --
15              MR. AYCOCK:  Objection.  Did
16        you say followed the recipe out of
17        the SOHO blender recipe book?
18              MR. CUPAR:  Correct.
19              MR. AYCOCK:  Then I object as
20        it mischaracterizes the document.
21              MR. CUPAR:  I don't
22        understand that.  I'm just asking if
23        he did that.  I don't know if I'm --
24        I'm not asking anything out of the
25        document, just to be clear.
```

Page 342

```
 1              MR. AYCOCK:  I think you
 2        related it to the test and I think
 3        that is an inaccurate representation
 4        of that test.
 5  Q     Go ahead.
 6        Do you understand my question,
 7  Dr. Rashidi?
 8  A     Yes, yes.
 9        Did I follow the recipe book and the
10  step-by-step instructions to do these
11  things?
12  Q     For this specific test.
13              MR. AYCOCK:  Objection as to
14        mischaracterization of the document
15        as saying it was the SOHO blender
16        recipe book.
17  A     When it comes to testing itself, if you
18  realize, under "Observation," I have two
19  bullet points so in one of them is with the
20  plunger, in one of them is without the
21  plunger, okay?  Does that make sense?
22  Q     It does.
23  A     I have two bullet points, one with the
24  stir stick, one without the stir stick, so
25  therefore, I doubt that the instruction gives
```

Page 343

```
 1  both options so in one of them it must have
 2  deviated because I'm after another purpose.
 3  I'm just trying to examine the purpose of
 4  the -- or effectiveness of the stir stick, so
 5  therefore, for -- if the instruction says
 6  work with the stir stick, I'm sure I have
 7  followed that but when I took it out, it
 8  means I'm deviating from that because I have
 9  a purpose for that.  My purpose is not just
10  to make a smoothie, my purpose is to
11  determine the effectiveness of the stir
12  stick.
13  Q     I'm going to hand to you what's been
14  previously marked as Plaintiff's Exhibit 47.
15        On the first page it says, "User's
16  Guide, SOHO Blender, Back To Basics"; do you
17  see that?
18  A     First page?  Yeah, I see that.
19  Q     Have you ever seen this document
20  before?
21  A     I have seen a lot of documents on the
22  user manuals so this must have been one of
23  them.  I'm sure I have.
24  Q     Take a look at page six of the user's
25  guide to the SOHO blender.
```

Page 344

```
 1  A     Okay.
 2  Q     It states at the top, "Operation,"
 3  blender operation; do you see that?
 4  A     Blender operation, yes.
 5  Q     Can you identify for me where it states
 6  that the stir stick must be turned or stirred
 7  in these steps to perform the operation of
 8  the blender here, of the Back To Basics
 9  blenders?
10  A     As I said, if it's not in here, I
11  personally don't have any problem with it
12  because it is really driven by the content.
13  In other words, if you put a very high
14  viscosity, very not-so-well-behaving content
15  in there, you have no choice but to stir.  If
16  the matter is like person number 80, you
17  don't need to do anything.  So it's really a
18  kind of trivial matter.  In other words, if
19  they say you must stir this and somebody like
20  number 80 has that recipe, it just doesn't
21  make sense, why you want to stir something
22  that's right -- agitating very effectively
23  already.
24  Q     What basis do you have to support that
25  claim, Dr. Rashidi?
```

Page 345

1 A    Just observation. My own observation,
2 your tests, whatever we are seeing here. You
3 showed me a video that the guy holds it like
4 that and everything was happy. You take that
5 out, the same thing happens and I'm trying to
6 show, with my 13 tests, exact same concept,
7 that if your liquid content is high, really
8 it doesn't matter whether you have a stir
9 stick or not.
10 Q    What factual basis do you have to
11 support your opinion that Participant 80
12 would have ended up with the same drink
13 whether or not he used a stir stick?
14 A    Because I have done the test. I have
15 done the test for those kind of liquid
16 consistency and I have observed in my test --
17 and fortunately it's repeatable so I'm not
18 going to say I have done it and --
19 fortunately it's repeatable.
20    I can demonstrate that when the liquid
21 content is high, then you don't need
22 anything. Things happen normally. If the
23 liquid -- I mean, if the content has certain
24 unusual properties that I have enumerated in
25 my first and second report, then you need to

Page 346

1 use it literally as a stir stick, not as a
2 preventative device to start with prevention
3 of the formation of channel which is going to
4 later on change to pocket. So this thing is
5 either used as a stir stick or it's not
6 needed. That is my opinion about this whole
7 case.
8 Q    Do you know that this SOHO blender
9 that's marked as Plaintiff's Exhibit Number
10 47 does not identify any act of stirring or
11 turning in the operation or blender operation
12 instructions?
13    MR. AYCOCK: Objection.
14    Mischaracterizes the document.
15 A    So if it's not there, I have no kind of
16 comment to make on that because depending
17 upon what you make, you may need it or you
18 may not need it.
19 Q    Out of the 13 tests that you have
20 conducted with respect to the Back To Basics
21 Pro 700 blender, how many of those were for
22 smoothies or smoothie-like recipes?
23 A    I think the one we showed in the middle
24 probably after -- the raspberry cream starts,
25 I think, on that SOHO -- actually, before

Page 347

1 that strawberry banana supreme smoothie from
2 user guide, Smoothie Elite, page 8, page 71.
3 There are some -- let's see. I think it
4 starts from the second test after pure
5 water. Go to the second -- actually, third
6 page which is the second -- beginning of the
7 second test after pure water.
8 Q    Any other tests that you performed with
9 respect to smoothies or smoothie-like recipes
10 other than the second test?
11 A    Actually, the second test, the
12 strawberry banana and then I have raspberry
13 cream smoothie which is the third test and
14 then from then on I started to kind of create
15 very different types of mixtures with my own
16 recipes including ice and see what's the
17 effect of solid particles of water and so
18 forth.
19 Q    So other than the second test --
20 A    And the third.
21 Q    -- the third test, looks like the
22 fourth test is the raspberry cream smoothie,
23 only those four tests were smoothie or
24 smoothie-like mixtures?
25 A    That's right. And then the tests that

Page 348

1 I have done with the Jell-O very much kind
2 of -- jell-O brand instant pudding and pie
3 filling, those are kind of comparable with
4 smoothies somehow. So don't forget I'm
5 trying to create different consistencies in
6 the pitcher so if I make all the 25 smoothie
7 recipes, they are more or less on the same
8 type of shape of consistency or form of
9 consistency. I'm going to be all over the
10 place and check extremes. So I'm trying to
11 basically push the device to the limit and
12 then look at the effectiveness of this stir
13 stick.
14 Q    So the only times you tested the -- any
15 smoothie recipes was to determine whether or
16 not the Back To Basics blender or smoothie
17 maker prevented an air channel; is that
18 correct?
19 A    Exactly. I'm trying to test whether it
20 is infringing on the reading of the patent
21 and I found out that existence of it or
22 nonexistence of it is really a nonissue.
23 Q    Your interpretation of whether or not
24 an accused product infringes here is based on
25 whether or not an air channel forms; is that

1 correct?

2 A    No.  Actually what I'm saying is I'm

3 trying to see whether the accused product is

4 reading on the claims that the court has

5 determined by the very accurate definition of

6 the court.  So if it's not reading on that,

7 then I conclude that's not infringing.

8 Q    Is it your understanding that the court

9 concluded that claim one of the '021 patent

10 requires that an air channel is prevented?

11 A    That is the heart of the matter.  What

12 they define as, let's say, stirring, at the

13 very first opening statement of the patent

14 the court says it should not include any

15 stirring, any action except leaving it there.

16 Q    Do you understand why that's in there?

17 A    Yeah.

18 Q    Why?

19 A    Because -- because it wants to

20 basically be more accurate to the reading of

21 the claim number one in the document of the

22 patent.

23 Q    Is it your understanding --

24 A    That's the interpretation of the court.

25 Q    Is it your understanding that in the

1 prior art that in the past people did not use

2 these types of sticks or devices to be

3 inserted into a plunger until an air pocket

4 would form and then users would insert the

5 device or spoon to remove or break up the air

6 pocket?

7             MR. AYCOCK:  Objection.

8             Vague and ambiguous, lacks

9             foundation.

10 A    I really didn't understand the

11 question.

12 Q    Sure.

13      Do you understand what was occurring in

14 the prior art before the Vita-Mix '021

15 patent?

16 A    Some people like Wayne kind of started

17 complaining about an air bubble, sizable air

18 bubble around the rotating blades and then he

19 offered the solution for it so that's what

20 was happening.

21 Q    So it is your opinion that Wayne --

22 Mr. Wayne has taught a solution for

23 preventing the formation of an air pocket; is

24 that accurate?

25 A    On the language level and comparison

1 between that and '021 patent, he has, but

2 whether it physically does the job, I don't

3 know.  I'd have to check that out.

4 Q    So you don't know -- well, let me

5 strike that.

6      Let me go to -- let's go to page 13 of

7 your rebuttal report.

8 A    Page 13.  107?

9 Q    Exactly, of Plaintiff's Exhibit 107.

10 A    Page 13.  Yes.

11 Q    It states -- there's a heading,

12 "Paragraphs 29 Through 32"; do you see that?

13 A    Yes, sir.

14 Q    It states, in the second sentence,

15 "Instead of addressing and providing the

16 bases of the technical matters relating to

17 the disputed case, the expert turns to a

18 dictionary to explain the complex question of

19 how a consumer would understand the

20 Defendants' instructions"; do you see that?

21 A    That's right.

22 Q    Do you believe it's a complex question

23 of how a consumer would understand the

24 instructions of the Back To Basics blenders

25 and smoothie makers?

1 A    Absolutely.  Actually, the six tapes

2 that you have provided, and I had a chance to

3 look at them, proves this very matter because

4 some of them were turning, some of them, like

5 person number 80, didn't, so you have no idea

6 how the consumers are going to react to that

7 teaching or to that instruction and as a

8 matter of fact, your own tape shows that.  I

9 saw a copy of ladies -- one of them actually

10 was doing something very interesting.  She

11 was turning it clockwise and

12 counterclockwise.  So different people do

13 different things to those teachings so it's a

14 very complex behavior matter and I just -- I

15 had problems with accepting Dr. Swanger's

16 kind of conclusion that, yes, according to

17 dictionary, "turn" means this, so everybody

18 does that.  As a matter of -- oh, sorry.

19 Q    What is your understanding of

20 Dr. Swanger's understanding regarding how the

21 instruction manuals of the Back To Basics

22 smoothie makers are read?

23 A    Actually, Dr. Swanger has -- if you go

24 to page 16 of my rebuttal report, according

25 to my understanding of Dr. Swanger's report,

Page 353

1 figure 2A shows the interpretation of
2 Dr. Swanger's word "turn" which means that
3 you have a stir stick and you twist it.  The
4 more accurate word would be, for our case
5 here, twist it around the vertical axis and
6 he said -- he writes that even though you are
7 turning but effectively you are practicing
8 the claim '021 because your stir stick is in
9 the center and by the very nature of it, it
10 prevents formation of air pocket.
11 Q    Do you understand Dr. Swanger's opinion
12 to mean that he was only stating or opining
13 that there's only one way you can read the
14 instructions of the Back To Basics user
15 manuals for operation?
16 A    My understanding of that particular
17 paragraph of Dr. Swanger was he went through
18 the dictionary and he concluded that based on
19 the dictionary, figure 2-1 is what consumers
20 are going to act upon based on that teaching
21 of Back To Basics and I'm saying that that's
22 really a very complex matter because your own
23 six videos shows that six people did it in
24 six different ways.  As a matter of fact, one
25 of them was just holding it stationary to the

Page 354

1 wall.
2 Q    You're saying that Dr. Swanger did not
3 opine on that; is that your testimony today?
4 A    I'm saying that Dr. Swanger used the
5 word turning based on his own interpretation
6 of turning and he might be interpreting the
7 word turning exactly what he says and if you
8 instruct him by writing document, "to turn,"
9 he may exercise figure 2A, but extending that
10 to the rest of the population of the world, I
11 think it's a very complex issue.
12 Q    Other than the term "turning," did
13 Dr. Swanger identify any other ways that the
14 Back To Basics smoothie makers or blenders
15 can be operated based on the instructions?
16 A    Actually, he had said that even if you
17 describe a cone and every now and then touch
18 the wall, you are infringing.  I have read
19 Dr. Swanger's report.  And then in my
20 opinion, that's contrary to what the court
21 has instructed, that you should not include
22 any stirring, any movement, any destruction,
23 any kind of dispersion of the air pocket or
24 air channel.
25 Q    Just so I understand, you're saying

Page 355

1 here that consumers can use --
2          MR. AYCOCK:  Where again,
3     David?
4          THE WITNESS:  On page, I
5     think --
6          MR. CUPAR:  13.
7          THE WITNESS:  -- 13.
8 Q    You're saying here, you know, it's a
9 complex question of how a consumer would
10 understand the Defendants' instructions and
11 just so I understand, what you're saying
12 there is that consumers can use the Back To
13 Basics smoothie makers and blenders a lot of
14 different ways based on Defendants'
15 instructions; is that accurate?
16          MR. AYCOCK:  Objection.
17     Mischaracterizes the report and prior
18     testimony.
19 A    What I'm saying here is that the
20 consumers don't do what -- necessarily what
21 Dr. Swanger is saying and as a matter of
22 fact, you have six videos which demonstrate
23 that.  You have six different people who turn
24 in six different ways.  So therefore, kind of
25 extending that and extrapolating it to the

Page 356

1 rest of the population and allege that the
2 teaching of the Back To Basics by the word
3 "turn" means this, I consider it as a very
4 complex issue and almost next to impossible
5 to determine.
6 Q    Are you saying that Dr. Swanger opined
7 that there's only one way to operate a Back
8 To Basics smoothie maker?
9          MR. AYCOCK:  Objection.
10     Mischaracterizes prior testimony and
11     report.
12 A    He mentions in his report, Dr. Swanger,
13 that even if you turn and even if you
14 inadvertently touch the wall of the pitcher,
15 you're still infringing.  So the answer to
16 your question, I think, I'm saying it right
17 now, he says that as well, but what he
18 considers noninfringement, only and only, you
19 grab this stir stick and continuously touch
20 the wall of the pitcher.  If Back To Basics
21 instructs to do that, then he's comfortable
22 with noninfringement and I'm saying that
23 that's not the case.  First of all --
24 Q    What other ways did Dr. Swanger --
25          MR. AYCOCK:  Are you done

Page 357

1      with your answer?

2          THE WITNESS:  Yes.

3  Q    What other ways did Dr. Swanger

4  identify that Back To Basics smoothie maker

5  or blender can be operated other than turning

6  or stirring?

7  A    I have to go back to his report and

8  look at the statement.

9  Q    As we sit here today, do you know if

10  Dr. Swanger identified any other ways that

11  the Back To Basics smoothie maker or blender

12  can be operated other than by turning or

13  stirring?

14          MR. AYCOCK:  Can I have that

15      question read back, please?

16          (Record read.)

17  A    See, he considers turning and stirring,

18  if it doesn't touch the wall continuously,

19  infringement.  If you just move it around,

20  it's not enough and if you hold it in the

21  center stationary, it's not good and if you

22  even -- if you twist it, it's not good.  So

23  he talks about several ways -- in other

24  words, he opens up the window of

25  infringement, in his opinion, and he's saying

Page 358

1  that even if you practice all these things,

2  you are still infringing.  That's, I think,

3  my understanding of Dr. Swanger's opinion.

4  Q    Dr. Swanger is opining that there are

5  many ways a consumer could potentially use

6  the -- is it your understanding that

7  Dr. Swanger's opining that a consumer could

8  potentially use the Back To Basics smoothie

9  maker a number of different ways based on the

10  instructions?

11  A    That's, I think, my understanding.

12  Q    Do you agree with that?

13  A    Actually, my assessment is that when a

14  consumer is using one of these devices,

15  because of the socket-and-ball junction and

16  as a result of the consistency of the

17  material, they are going to intuitively do

18  the right thing and basically operate Back To

19  Basics's device in such a natural way that it

20  is noninfringing.  That's my opinion.

21      So I don't agree with what Dr. Swanger

22  says because if you have kind of -- if you

23  are trying to cover all the bases and prove

24  infringement, that's one thing, but in real

25  life, as I said with six people that you have

Page 359

1  shown, six people use almost six different

2  ways.  I don't know whether exactly there

3  were two people who use it the same way but

4  in a very small population that I saw, people

5  were using it in different ways.

6  Q    You would agree, though, that the

7  Participant 80 you watched during your

8  testimony today did not use it in a manner in

9  accordance with your opinion; is that right?

10          MR. AYCOCK:  Objection.

11      Based upon the reference in the

12      video, again, my objection stands

13      that the video was just a portion of

14      that.

15  Q    You can answer.

16  A    In the segment that I saw, he just held

17  it at the center and at the end when he left

18  it, it started wobbling but it was too late

19  because he turned the machine off.

20          (Recess had.)

21  Q    Is it your opinion that you are not

22  competent to provide expert testimony on how

23  end users would interpret instructions in the

24  Defendants' blenders?

25  A    Actually, I'm not qualified.  I believe

Page 360

1  Dr. Swanger is not qualified either.

2  Q    Do you know who wrote the Back To

3  Basics instruction manuals?

4  A    I don't.

5  Q    Did you know that Back To Basics

6  engineers and designers actually prepared the

7  instruction manuals?

8          MR. AYCOCK:  Objection.

9      Lacks foundation.

10  A    I have no knowledge of that.

11  Q    Why do you -- who do you think the Back

12  To Basics designers and engineers had in mind

13  when they prepared and wrote the Back To

14  Basics instruction manuals?

15          MR. AYCOCK:  Objection.

16      Lacks foundation.

17  A    I can start from the designer.  The

18  very fact that they have a socket-ball

19  junction there on the top and an O-ring, what

20  they had in mind was to make sure that they

21  use it as a stir stick.  That is very

22  natural.  As a matter of fact, it's very

23  difficult to do otherwise because when you

24  are mixing thick material and things start

25  stopping, naturally you start stirring, and

Page 361

1 as a matter of fact, the very name encourages
2 you to stir.
3 Q     Do you know what my last question was?
4 A     Yeah.  What was in the mind of people
5 who wrote the instruction for use, what they
6 had in mind, and my answer was no, I don't,
7 but I can tell what was in the engineers'
8 intention.
9 Q     What was the intention of preparing
10 instruction manuals for the Back To Basics
11 smoothie makers and blenders, do you believe?
12            MR. AYCOCK:  Objection.
13       Lacks foundation, calls for
14       speculation.
15 A     Those who wrote that, I have no idea
16 their intention.
17 Q     Do you have any reason to believe that
18 the Back To Basics designers and engineers
19 wrote those instruction manuals so that end
20 users would understand how to use the
21 product?
22            MR. AYCOCK:  Objection.
23       Lacks foundation, calls for
24       speculation.
25 A     I don't know.

Page 362

1 Q     Take a look at page 16 of your rebuttal
2 report.  You have figure 1 there.
3 A     Figure 1.
4 Q     You also have a figure 2A on page 16,
5 on the following page, figure 2B on page 17;
6 do you see those figures?
7 A     That's right.
8 Q     In figures 2A and 2B what is -- what
9 are those figures?
10 A     Basically I provided the figure 2A on
11 the bottom of page 16 to explain if somebody
12 wants to exercise the interpretation of
13 Dr. Swanger of the word "turn," in certain
14 cases, what can happen.  You are twisting a
15 stir stick in a void of an air channel so
16 nothing happens, so therefore, there's no
17 effect, so therefore, even if you want to do
18 something positive, nothing happens and the
19 only thing something good can happen is if
20 you exercise figure 2B and vigorously
21 precess, that's the mechanical engineering
22 word for the stir stick, and describe a cone
23 and that's how you can basically affect the
24 performance.
25 Q     Dr. Rashidi, are figures 2A and 2B

Page 363

1 supposed to be figures of a Back To Basics
2 blender?
3 A     No.  These are generic.  No.  These
4 are -- basically, I'm just -- my purpose in
5 these two figures are the behavior of the
6 liquid and the behavior of the air channel
7 and the behavior of the stir stick so these
8 are just generic.  That's why there's not any
9 label on them.
10 Q     Because figures 2A and 2B are generic,
11 you would agree with me, then, that they are
12 not drawn to scale by any means, correct?
13 A     No.  Exactly.  You're right.
14 Q     They are not drawn to scale based on
15 any of the testing you performed; is that
16 correct?
17 A     You're absolutely right on that.
18 Q     So the air channel you're identifying
19 in figures 2A and 2B can appear differently;
20 is that correct?
21 A     That's true, but there exists the
22 possibility that it can recreate exact same
23 condition.  I can give you an RPM and
24 consistencies that gives you exactly this
25 figure 2A and 2B.

Page 364

1 Q     You can agree with me, based on figures
2 2A and 2B, that the air channel more closely
3 approximates the member associated with the
4 blades and the air channel's nearer the
5 member associated with the blades than
6 further away; is that accurate?
7 A     Would you repeat the question?
8        Are we talking about the conical shape
9 of the air channel?
10 Q     Correct.
11 A     Yeah.  Of course the air channel is
12 always closer in cross-section on the bottom
13 than the top.  That's the nature of it.
14 Q     In other words, because of that conical
15 appearance, the air channel size is more
16 consistent with the size of a member
17 associated with the blades when the air
18 channel's near the member associated with the
19 blades; is that correct?
20 A     This is absolutely wrong because as I
21 have shown with the corn syrup, it really
22 depends upon the fluid consistency.  If you
23 put corn syrup, the air channel down there
24 becomes maybe as big as one-eighth of an
25 inch.  You can test that yourself.  I can --

Page 365

1  Q     Take a look at page 17, figure 2B.

2  A     That's right.

3  Q     You'll see a description under the
4  figure there.

5  A     That's right.

6  Q     Do you see that?  It states, "Contrary
7  to the expert's prediction, only rotation of
8  the stir stick about the horizontals axes has
9  useful effects on disrupting the air
10 channel"; do you see that?

11 A     That's right.

12 Q     Is that an incorrect statement?

13 A     No.

14 Q     Why did you say horizontal axes?  Did
15 you -- is that --

16 A     Do you see the two horizontal axes?
17 Actually I have shown that rotation about two
18 horizontal axes in a square box with two kind
19 of leaders going to those axes.  When you are
20 describing a cone, you have rotation in one
21 axis and rotation in another and a
22 combination of the two gives you the cone,
23 that's simple kinematics, and if you do
24 twisting about the vertical axis you get
25 figure 2A.

Page 366

1  Q     But you're also twisting about a
2  vertical axis in 2B, aren't you?

3  A     No, no.  That's precision.  That's a
4  matter of kinematics that be resolved very
5  simply.  Just look at this marker, please.
6  When you do this (indicating), this is the
7  result -- look at it in a kind of
8  superimposed fashion.  If I consider an axis
9  toward the camera -- you have to really look
10 here because you are not able to look in my
11 hand (indicating).

12 Q     Go ahead.

13 A     You have to look at it.  I cannot go
14 ahead.

15 Q     I'm looking at my next question but you
16 can go ahead and answer for the camera.

17 A     There's an axis toward the camera and
18 there is an axis toward the lady who's taking
19 the notes so if I rotate above the axis to
20 the camera -- you're not looking.  Come on.

21 Q     Go ahead.

22 A     No, I'm not going to -- I want for your
23 visual kind of benefit so you don't continue
24 asking.  If I rotate it this way (indicating)
25 -- I'm a teacher and for students who don't

Page 367

1  pay attention -- so if you don't pay
2  attention --

3  Q     I'm listening.

4  A     That is not listening.  This is
5  watching.  If you rotate about the axis that
6  goes toward the camera, I get this.  If I
7  rotate about the axis that goes toward her,
8  it does this.  If I do both, it describes the
9  cone and this is not to a simple axis.  This
10 is a simple kinematic matter and I'm sure you
11 have knowledge (indicating).

12 Q     Going to page 20 of your rebuttal
13 report that's marked as Plaintiff's Exhibit
14 107 --

15 A     Yes, sir.

16 Q     -- you are responding to an opinion
17 from Dr. Swanger where Dr. Swanger opined
18 that disrupting the vortex means the user is
19 supposed to rotate the stir stick at the
20 center of the container and this is
21 consistent with the '021 patent where the
22 plunger disturbs the air, you say, "cannel,"
23 but I think it's channel, to prevent the
24 formation of the air pocket; do you see that?

25 A     Yes.

Page 368

1  Q     Then you characterize, on page 20 of
2  your report, this is contradiction, bunkum
3  and misleading; do you see that?

4  A     Exactly.

5  Q     Do you know what bunkum means?

6  A     Yes.

7  Q     What's bunkum?

8  A     Like bologna, full of -- like something
9  that's just -- has no relevance, just talk.

10 Q     Are you just saying you disagree with
11 Dr. Swanger's opinion?

12 A     Strongly on this point.

13 Q     Why don't you say you disagreed with
14 it, then?  Do you normally use words like
15 bunkum in your testimony?

16 A     By the time I got to this point I was
17 really upset with the rendition of opinion so
18 that is my choice of words.  If you think
19 it's inappropriate from a matter of
20 politeness point of view, I'll withdraw and
21 put something else.  I have no intention of
22 being disrespectful.  The statement, to me,
23 is kind of -- has no relevance.

24 Q     But these are your words, not the Back
25 To Basics's lawyers' words?

Page 369

1 A     No, no.  These are all my words.
2 Actually I thought this was more polite than
3 "bologna" so I just put that.
4 Q     Going to the first section that you
5 label as "Contradiction" there on page 20, do
6 you see that?
7 A     Uh-huh.  Uh-huh.  Uh-huh.
8 Q     Please explain to me how Dr. Swanger's
9 opinion that the stir stick can disrupt or
10 disturb the air channel thereby preventing
11 the formation of an air pocket contradicts
12 claim one of the '021 patent.
13 A     Because according to the claim '021
14 patent, when you have a stir stick or a
15 plunger in a vertical position you are
16 occupying the space that the air channel
17 would have been generating.  So when you have
18 this in this configuration, no air channel is
19 going to be generated and no air pocket is
20 going to be created from that.  So for the
21 first time he's going to agree with me that,
22 yes, it is possible to have -- based on his
23 assertion, it is possible to have an air
24 channel and then you can twist it and disturb
25 it or disrupt it.

Page 370

1     So this is in contradiction with the
2 teaching of the '021 patent because '021
3 patent says that if you have figure 2A, no
4 air channel is going to be generated.  That's
5 the whole purpose of our teaching of '021
6 patent.  So if you go to page 16, that by
7 itself is a contradiction.  Actually, that's
8 the real thing.  He's right on this one but
9 the patent is wrong because when you have
10 this, '021 patent says no air pocket is
11 generated or no air channel from which an air
12 pocket is generated, but here, Dr. Swanger
13 says that, okay, air channel is generated and
14 you disrupt it by turning, by the definition
15 of "turn" according to the dictionary.
16 Q     Have you ever heard of the physics
17 principle that no two masses can be at the
18 same space or occupy the same space at the
19 same time?
20 A     I would like to go on that and let's go
21 on this one.
22 Q     I'm just saying, do you agree with
23 that?
24 A     Repeat the question again.
25 Q     Sure.

Page 371

1     No two spaces can occupy the same space
2 at the same time?
3 A     That is true.
4 Q     How can, if there's a stir stick at the
5 center of the pitcher, how can you say here
6 that the air channel's still at the center of
7 the pitcher as well?
8 A     That's so easy.  Exactly.  Just look at
9 the figure.  I can have a very wide air
10 channel and have a stir stick in there and
11 both of them are in the same cavity.  In
12 other words, there is no contact between the
13 stir stick and the fluid.  That's what I'm
14 trying to show here.  The figure is very
15 self-explanatory.
16 Q     Your opinion is that the air channel
17 never changes whether or not you have a stir
18 stick or plunger in the pitcher; is that
19 accurate?
20 A     Dr. Swanger writes a statement.  Let's
21 read it.  It says, "Rotation of the stir
22 stick to disrupt the vortex means that the
23 user is supposed to rotate the stir stick at
24 the center of the container," and he has
25 already defined what turn means.  A simpler

Page 372

1 version of turn means twist according to his
2 definition and the dictionary definition
3 about a vertical axis.
4     This teaching is consistent with '021
5 patent and I'm saying that there is a
6 definite contradiction here because the
7 teaching of '021 patent says when you have
8 the plunger or the stir stick in that
9 configuration, there is no air channel.  The
10 air channel has been eliminated, it doesn't
11 exist, so therefore, there cannot be any air
12 pocket borne from it or created from it.  So
13 therefore, I say that he agrees with my
14 opinion that stir stick can be there in
15 vertical position and an air channel is there
16 to disrupt it.
17 Q     Can you show me where Dr. Swanger, in
18 that paragraph you're referring to, uses the
19 word "turn" or "turning"?
20 A     Rotate.
21 Q     But it's not "turning."
22 A     Oh, come on.  He has went out of his
23 way to go to a dictionary to define the
24 instruction of Back To Basics as turn, what
25 it means, and then he actually talks about

Page 373

1 the center.  These teachings are consistent
2 with the '021 patent where the plunger
3 disturbs the air channel to prevent the
4 formation of an air pocket.
5     Q     Now do you think Dr. Swanger's talking
6 about there?
7     A     That's exactly -- I'm showing it in
8 figure 2A.  That's exactly what he's trying
9 to say.  If he wants to change his testimony,
10 I have no problem with that and I welcome
11 that, but that's exactly what he says in his
12 report.  He goes to a dictionary and defines
13 the matter of the word "turn" and then he
14 says that turn means, basically, rotation
15 about a vertical axis.
16    Q     So your understanding of paragraph 34
17 of Dr. Swanger's report is that the term
18 "rotating" there that he's using is keeping
19 the stir stick or plunger in a vertical axis
20 and turning it about the vertical axis; is
21 that accurate?
22    A     That's exactly what the rotation about
23 a vertical axis means.  Go to kinematics
24 books and that's exactly -- and I basically
25 kind of respect him for his the mechanical

Page 374

1 engineering knowledge so I don't think he'd
2 make mistakes that gross.  He knows that
3 turning about a vertical axis is exactly
4 twisting.  That's exactly what it means.  Go
5 to any kinematics book, any mechanics books
6 and he's a mechanical engineer and if I doubt
7 that then I'm really -- so yeah, I think
8 that's what it means.
9     Q     Did you know that when Dr. Swanger
10 prepared and wrote his opinion in paragraph
11 34 he was identifying another patent that
12 identified this rotating phenomenon?
13    A     I'm reading his words.  I don't care
14 what else he's doing.  I'm reading his
15 report.
16    Q     Do you know what patent he's referring
17 to in paragraph 34 when he's providing his
18 opinion?
19    A     I am reading Dr. Swanger's report.  He
20 says turning about a vertical axis and
21 turning about a vertical axis has a kinematic
22 definition.
23    Q     Do you know what my last question was?
24    A     Yes.
25    Q     What was it?

Page 375

1 A     He was reading some other patents and
2 he was referring to that.  It's not -- it's
3 immaterial to my reading of his report.
4     Q     What patent was he referring to in
5 paragraph 34 of his report?
6     A     Let's go and find out.  You tell me and
7 I accept it.  What is the patent he's
8 referring to?
9     Q     Do you know?
10    A     I'm reading his report and I'm
11 responding to it so you tell me.  If I don't
12 know, I accept it.
13    Q     Okay.
14       Provide to me where -- you said your
15 opinion -- your report sets forth your full
16 opinion before; is that right?
17    A     That's right.
18    Q     Can you identify for me where the --
19 what patent Dr. Swanger's identifying and
20 referring to in his opinion in paragraph 34
21 of his report?
22    A     I have cut and pasted his statement so
23 I'm responding to that so help me to
24 understand which patent he's referring to.
25    Q     Can you identify it based on your

Page 376

1 report here?
2     A     I'm just responding to paragraph 34.
3 You just tell me what it is.
4     Q     So you don't know, as we sit here
5 today, which patent Dr. Swanger's identifying
6 or opining on with respect to paragraph 34 of
7 his report; is that right?
8     A     To the best of my knowledge,
9 Dr. Swanger is criticizing the Back To Basics
10 wording in the user manual and he takes the
11 word "turn," he goes to a dictionary, he
12 finds a definition and he comes and
13 interprets that personally as turning the
14 stir sticks about a vertical axis.  If I take
15 all of these things and put it together, I
16 get the picture of 2A.
17    Q     Take a look at the next section and
18 we're going to get into figure 2A here where
19 you refer to Dr. Swanger's opinion regarding
20 paragraph 34 as bunkum; do you see that?
21    A     Yeah.
22    Q     The only basis you identify for your
23 characterization that Dr. Swanger's opinion
24 is bunkum is based on figures 2A and 2B; do
25 you see that?

Page 377

1 A    Uh-huh.

2 Q    You had previously testified that

3 figures 2A and 2B are not drawn to scale; is

4 that right?

5 A    Here I'm trying to teach a concept.

6 I'm not trying to make any kind of blenders

7 or come up with any design here.  Here I'm

8 trying to say that if there is an air channel

9 and you twist or turn according to

10 Dr. Swanger's definition of "turn" and

11 interpretation of Back To Basics, nothing

12 happens and figure 2A clearly shows that and

13 I don't know which part of this is difficult

14 to comprehend.

15 Q    These figures 2A and 2B do not

16 accurately represent a Back To Basics

17 blender; is that accurate?

18 A    These are schematic figures to explain

19 what Dr. Swanger has put in his report.  I'm

20 not going to go and run tests for everything

21 that we're talking about.

22 Q    Why didn't you respond with the figures

23 set forth in the patent that Dr. Swanger was

24 opining on in paragraph 34 of his report?

25 A    Dr. Swanger has offered an opinion on

Page 378

1 paragraph 34 of his report and simply I'm

2 responding to that and I'm saying that first

3 it contradicts the teaching of '021 patent.

4 So for the first time he agrees with me that

5 there is a possibility of air channel when

6 you have a stir stick.  And second, if you

7 have that configuration which leads you to

8 figure 2A, nothing happens if you twist, if

9 you turn according to the definition of

10 "turn" by the dictionary that Dr. Swanger has

11 found.  So therefore, it's just -- to me,

12 with no intention of being disrespectful,

13 this is nonsense.

14 Q    Other than the patents you specifically

15 identify in your first report of December 17,

16 2007 and your second rebuttal report, January

17 7, 2008 that you opine on, you had no opinion

18 of any of the other patents that you cited

19 but you didn't discuss, correct?

20 A    That's correct.  I have -- yeah.

21 Q    Take a look at the third paragraph on

22 page 20 at the bottom.  It's called

23 "Misleading."

24 A    That's right.

25 Q    You state that the, quote -- and it

Page 379

1 goes into page 21.  My apologies.  It starts

2 on 20.

3     "The primary alleged assertion of this

4 '021 patent is the matter of plunger

5 occupying the space of an air channel --"

6 A    That's right.

7 Q    "-- and allegedly preventing the air

8 channel from being formed to begin with"; do

9 you see that?

10 A    Exactly.

11 Q    And again, the term "preventing the air

12 channel" is not set forth in claim one of the

13 '021 patent, is it, Dr. Rashidi?

14 A    It is in the entire document of the

15 patent that this system of Vita-Mix works

16 because formation of air channel is prevented

17 to begin with, so therefore, the necessary

18 condition is eliminated.

19 Q    But again, there's no explicit

20 statement like that in claim one of the '021

21 patent; is that accurate?  You would agree

22 with me on that?

23 A    Not really.  I don't agree with you

24 because if you look on the first three lines

25 of the claim, it says, "The air pocket being

Page 380

1 created from an air channel" and then the air

2 channel is supposedly replaced by a plunger

3 which has occupied its place.  Just like what

4 you said, two masses cannot occupy the same

5 space.  That's exactly correct and that's

6 what they allege.  That's why you keep seeing

7 the word "allegedly," "allegedly," because

8 allegedly this is in there and occupies the

9 space of an air channel and therefore, that's

10 what I have written here.

11 Q    Take a look at page 18 of your rebuttal

12 report that's marked as Plaintiff's Exhibit

13 107.  The very first sentence at the top

14 states, "It is my opinion that the lack of an

15 explicit instruction to touch the sides of

16 the blender with the stir stick is irrelevant

17 to this case"; do you see that?

18 A    That's exactly the case, yes.

19 Q    That's accurate, correct?

20 A    That's very accurate.

21 Q    I want you to go back to Plaintiff's

22 Exhibit 105 which is your December 17 report.

23 A    Okay.

24 Q    Take a look at page 14 of your expert

25 report there.

Page 381

1  A    Yes, sir.

2  Q    You'll see a heading that states

3  "Obviousness"; do you see that?

4  A    That's right.

5  Q    The next -- excuse me.  The -- I guess

6  it's the second -- before we go into that,

7  what's your understanding of how to determine

8  obviousness?

9  A    To determine obviousness is if somebody

10  comes up with supposedly a new invention, if

11  you can demonstrate that the variations are

12  very small compared to the previous prior art

13  and people who are having ordinary skill in

14  the art can come up with that invention or

15  supposedly idea, then it is obvious.  In

16  other words, you don't need to necessarily

17  explicitly, in your patent, claim that or

18  disclose it but it's a natural extension of

19  your invention so that's obvious.

20  Q    At what point in time did you conduct

21  your obviousness analysis?  Does it matter?

22  A    I don't understand what you mean.

23         MR. AYCOCK:  Objection.

24         Vague and ambiguous.

25  Q    Sure.

Page 382

1       I mean, how do you look at it?  From

2  what standpoint?  From today's standpoint in

3  2008, for example?

4  A    As I said, in these types of

5  technology, because there has been no unusual

6  changes in the approach to designing

7  blenders, I consider the entire duration from

8  Wayne to now, nothing earth-shattering has

9  happened.  It's not like electronic

10  technology that you had vacuum tube, then

11  transistors, then integrated circuit.

12       So obviousness to somebody for an

13  integrated circuit is not the same as

14  obviousness for a vacuum tube, but in this

15  case, it is a rotating blade inside a pitcher

16  driven by an electric motor with a bearing

17  and it has a lid so that the contents doesn't

18  come out and then the rest of it is bells and

19  whistles.  If somebody twists these blades

20  another ten degrees, that's an obvious kind

21  of situation and that's what -- basically

22  what obviousness means to me.

23  Q    Take a look at page 14, second

24  paragraph under the heading "Obviousness."

25  A    I am.

Page 383

1  Q    It states, "If the prior art patents of

2  Wayne, Jacobsen and Harris and the Vita-Mix

3  3600 and 4000 blenders with tamper sticks and

4  the recipe and instruction booklets are not

5  found to anticipate, then viewed as a whole

6  render claim one of the '021 patent obvious";

7  do you see that?

8  A    That's right.

9  Q    Is that your only opinion regarding

10  obviousness that you're rendering in this

11  litigation?

12         MR. AYCOCK:  Objection.

13         Mischaracterizes his report.

14  A    I mean, I'm saying that, for example,

15  if you look at the Wayne patent, it's very

16  obvious to an ordinary -- to a person in

17  ordinary skill to invert that auger or device

18  up to the lid and so as a person who is

19  involved with the design of this, that's the

20  first thing that comes to mind and the other

21  one is experimentation with the diameter of

22  it.  If you make it too small and then you

23  see that it's not touching the wall of the

24  air channel, then you say, okay, let's go and

25  make it bigger in diameter or make it

Page 384

1  taller.  So these are the obvious

2  modifications that you can do to achieve the

3  same purpose.

4  Q    Do you know what my last question was?

5  A    Yes.  Is this the only obviousness that

6  I'm referring to and let it be.  Yeah.  And I

7  have basically enumerated them in my report

8  so these are the obviousness that came to my

9  mind.  If there are other obviousness, well,

10  there may be, but I have referred only to

11  this.

12  Q    So it is your opinion, then, that you

13  need to combine Wayne, Jacobsen, Harris, the

14  Vita-Mix 3600 and 4000 blenders and Barros to

15  render obvious claim one of the Vita-Mix '021

16  patent?

17         MR. AYCOCK:  Objection.

18         Mischaracterizes his report and his

19         prior testimony.

20  Q    You can answer.

21  A    Basically I believe that each one of

22  these patents by themselves, you don't even

23  need to combine them, by themselves pave the

24  path to come up with what Vita-Mix is

25  alleging that they have come up with in the

Page 385

1 '021 patent.  The most important one is the
2 Wayne.  The Wayne is a very strong prior art
3 in 1959 that basically encourages or
4 motivates a person to go after a plunger.
5 Q    Did you know your obviousness analysis
6 here from pages 14 through 25 or 27, excuse
7 me, identifies only one basis for
8 obviousness?
9 A    Okay.  So --
10 Q    That's the combination of Wayne,
11 Jacobsen, Harris, the Vita-Mix 3600 and 4000,
12 and Barros; do you understand that?
13 A    Yes, sir.
14 Q    Did you know that the Jacobsen patent
15 was already examined by the United States
16 Patent and Trademark Office during the
17 prosecution of the Vita-Mix '021 patent?
18 A    Yes, sir.
19 Q    Did you know that the United States
20 Patent and Trademark Office also examined the
21 Harris, the Barros, and the Vita-Mix 3600,
22 4000 blenders during prosecution of the Vita-
23 Mix '021 patent?
24 A    Yes, I'm aware of that.
25 Q    Did you know that the United States

Page 386

1 Patent and Trademark Office ruled that claim
2 one of the Vita-Mix '021 patent is nonobvious
3 over Jacobsen, Harris, Barros and the Vita-
4 Mix 3600, 4000 blenders?
5 A    Yes, but there was a reason for that.
6 Because Wayne was not available and the way
7 the inventors and the prosecution attorney
8 was able to basically pull that through was
9 in none of these patents that you mentioned
10 there is any mention of the existence of the
11 problem.  So the inventors are claiming that
12 if they are not aware of the problem, how
13 could they have a solution.  So that was the
14 basic premise of allowance of this patent.
15      But if you look at Wayne which was not
16 available to the prosecutor, if you include
17 that and combine that, then all of the sudden
18 you see that, yes, that problem was
19 identified contrary to what the inventors of
20 Vita-Mix are alleging.  So when you combine
21 these things, then it becomes obvious and it
22 is kind of presumed that anybody who is
23 inventing something, he or she's aware of the
24 prior art.
25 Q    What time frame is the -- is your

Page 387

1 obviousness opinion based on?  Do you
2 understand my question?
3 A    Not really.  What do you mean?
4 Q    Yeah.
5      Based on your analysis, what time frame
6 are you looking at?  Is it between -- you
7 know, what time frame are you --
8 A    You mean in the world of blenders?
9 Q    You got it.
10 A    Sure.  From Wayne to whenever the
11 invention was.  From '59, '58, 1950 to 1995.
12 That's the domain, and in that domain, this
13 technology hasn't changed much.
14 Q    Did you use any analysis after 1995 to
15 come to your conclusion regarding
16 obviousness?
17      MR. AYCOCK:  Objection.
18      Vague and ambiguous.
19 A    I think I have included -- I have
20 actually asked for examples of patents that
21 includes that and it is in my report
22 somewhere closer to the end, "Secondary
23 Considerations of Nonobviousness."  So that
24 is -- that's in there.
25 Q    Take a look at page 15 of your report

Page 388

1 that identifies Jacobsen.
2 A    Page 15.  That's right.  Yes, sir.
3 Q    You identify, in the second paragraph,
4 the prosecution history of the '021 patent;
5 do you see that?
6 A    Uh-huh.
7 Q    And then the third paragraph you go on
8 to talk about the amendment in the
9 prosecution history of the '021 patent; do
10 you see that?
11 A    That's right.
12 Q    Are you basing your obviousness opinion
13 here regarding Jacobsen on the prosecution
14 history of the '021 patent?
15      MR. AYCOCK:  Objection.
16      Mischaracterizes the document.
17 A    Basically I think the report is really
18 self-explanatory.  I'm saying that when the
19 examiner brought the matter of Jacobsen to
20 the inventors they turned around and they
21 said, well, they have not referred to the
22 existence of the problem.  All they are
23 saying is they are talking about stirring the
24 content and we are talking about a problem
25 and how could somebody not knowing the

Page 389

1 problem have a solution, so this was not
2 obvious.  So that was the argument, but
3 again, this is tied back to Wayne.  Wayne
4 comes and discloses this problem many years
5 before that.
6 Q     So you did rely upon the patent
7 prosecution of the '021 patent to -- in your
8 obviousness analysis?
9 A     I have to, yeah.
10 Q     In that second paragraph, the one that
11 starts, "During the prosecution" on page 15
12 of your December 17 report --
13 A     Yes.  Second paragraph, yes, sir.
14 Q     -- you state in the second sentence,
15 "Vita-Mix attempted to overcome this
16 anticipation rejection by Jacobsen by
17 amending the then pending claims to require
18 the plunger to be 'at all times out of the
19 contact -- out of contact with the pitcher'
20 and to, 'without moving, it prevents the
21 formation of the air pocket'"; do you see
22 that?
23 A     Exactly.
24 Q     Were those terms added into claim one
25 of the '021 patent?

Page 390

1 A     That was basically the discussion
2 during the prosecution.  Without moving --
3 and all these things are not in the claim but
4 this is the basis that I am basically putting
5 my opinion together.  That what Vita-Mix
6 inventors alleged was if you have a plunger
7 and don't touch it, don't move it, good
8 things happen.  That's what they said and
9 that is what I have problems with.
10 Q     So in other words, you're analyzing the
11 things that Jacobsen is missing based on
12 Vita-Mix's arguments during the patent
13 prosecution of the '021 patent and then
14 you're filling in those blanks, so to speak,
15 with the Wayne patent; is that accurate?
16 A     What I'm saying is, for example, if we
17 look at the claims of '021 patent, if you use
18 a Jacobsen device, you are going to read on
19 that patent.  In other words -- do you see
20 what I'm saying?  If you use a Jacobsen
21 device, it basically reads on the '021 patent
22 so if somebody's infringing on anybody --
23 these two are more related than Back To
24 Basics.
25 Q     You agree with me that Jacobsen does

Page 391

1 not teach or disclose a method for preventing
2 a formation of an air pocket; is that
3 accurate?
4 A     Actually, he doesn't even talk about it
5 so that's exactly the basis for the argument
6 with the patent examiner, that how can he
7 come up with a solution if he doesn't even
8 recognize a problem, but Wayne does.  But
9 Wayne does, yeah.
10 Q     Okay.
11     So in other words, you're centering
12 your arguments for combining Jacobsen and
13 Wayne based on the -- on the statements made
14 during the prosecution of the '021 patent; is
15 that accurate?
16 A     That's accurate.
17 Q     So the basis for your opinion regarding
18 obviousness is to combine Jacobsen and Wayne
19 based on statements made during the
20 prosecution of the '021 patent; is that
21 accurate?
22 A     That's accurate, yes.  That's one of
23 the issues.
24           - - - - -
25     (Plaintiff's Exhibit 110 was

Page 392

1           marked for identification.)
2           - - - - -
3 Q     I'm going to hand you to you what's
4 been marked Plaintiff's Exhibit 110.  It's US
5 patent number 4,561,782 to Jacobsen et al.
6 Have you seen this patent before?
7 A     Yes, sir.
8 Q     Can you identify for me where Jacobsen
9 discloses or teaches a cross-sectional size
10 for a plunger or a device to be inserted into
11 the pitcher?
12 A     Actually if you look at this larger
13 figure on figure 3, right at the bottom
14 portion you see --
15 Q     Are you referring to figure 2?
16 A     Figure 3, actually.
17 Q     Figure 3's that cap.
18 A     I'm sorry.  Figure 3.  Okay.  Figure 2
19 then.  I'm referring to figure 2.  If you
20 look at the item 21 with two twisting arrows
21 which matches exactly what Dr. Swanger
22 interpreted the word "turning," if you look
23 at the diameter of item 20, number 20, and if
24 you look at the hub portion of the blade that
25 is the member associated with the blade and

Page 393

1 even by naked eyes they are very close to
2 each other so they are approximating each
3 other. And you can, again, become technical
4 on measuring the millimeters and coming up
5 with the ratios and percentage but this is
6 approximating the member associated with the
7 blade. And actually, it does not even teach
8 to rotate in terms of describing a cone. It
9 teaches exactly the same way that Dr. Swanger
10 alleges that teaching of the Back To Basics
11 encourages the customers to do it, so --
12 Q    What basis do you have to state that
13 the cross-sectional size of Jacobsen should
14 be measured from the elongated portion 20 as
15 opposed to that rubber spatula 23?
16 A    Because that is the location that the
17 air channel forms. In other words, the air
18 channel starts from the top and for a long
19 distance the air channel is not even aware of
20 this rubber piece and it comes down and then,
21 according to Vita-Mix allegation, the cross-
22 sectional size of that air channel is defined
23 by the hub portion of this blade. And that
24 hub portion is substantially or approximately
25 equal to the diameter of item number 20

Page 394

1 because the air channel comes from the top so
2 it has to travel the axial direction of this
3 member number 20. So it basically --
4 Q    What's more adjacent to the rotating
5 blades, the cylindrical portion 20 or the
6 rubber foot 23?
7 A    Again, this is beside the point because
8 if you look at the cross-section of this, if
9 you look at the end view, if you turn your
10 view 90 degrees, you see the rubber piece 23
11 as a point or as a little dot but you see the
12 same diameter 20. So if you change your --
13 so this is only on a very single line or
14 plane but the stir stick or whatever of
15 number 20 is elongated just like a plunger,
16 so therefore, that's the reason I'm using
17 that.
18 Q    Do you know what my last question was?
19 A    Yeah. Which one is closer to the
20 blade. I'm saying that even if this is
21 closer to the blade or more closer, it's
22 irrelevant.
23 Q    You would agree with me that the rubber
24 foot at the distal end, 23, is closer and
25 more adjacent to and above the rotating

Page 395

1 blades that is the cylindrical portion 20,
2 correct?
3 A    Only in one line of the total top view,
4 but if you look at the top view, you see the
5 entire cross-section of the stir stick.
6 Q    You would agree with me that at no
7 point is the cylindrical portion 20 closer to
8 the rotating blades than the distal foot 23,
9 correct?
10 A    That's all right, yes. I agree with
11 you on that.
12 Q    Can you show me where Jacobsen
13 discloses or teaches that the foot or the
14 stirring rod, 10, the cross-sectional size
15 must approximate the cross-sectional size of
16 a member associated with the blades?
17 A    Again, none of these patents explicitly
18 talk about equivalency or approximation of
19 the cross-sectional sizes but to a person of
20 ordinary skill in the art, these are obvious.
21 Q    Can you tell me where Jacobsen even
22 discloses a member associated with the blades
23 in its specifications?
24 A    He doesn't, he doesn't, but it is
25 there, so for a person of ordinary skill in

Page 396

1 the art, they can see it.
2 Q    So even though Jacobsen -- the
3 specification does not identify or reference
4 any member associated with the blades, it's
5 still your opinion that it's -- that Jacobsen
6 teaches that its cross-sectional size must
7 approximate the cross-sectional size of
8 stirring rod 10?
9 A    I'm not saying that. I'm saying for a
10 person of ordinary skill in the art, they see
11 that there is a member associated with the
12 blade which is a hub diameter and there is a
13 rod which they have the approximate cross-
14 sectional sizes.
15      MR. AYCOCK: Dave, I note
16      that we're, I think, coming right up
17      to the seven hours or over.
18      MR. CUPAR: Let's stop here
19      and go off the record for a second.
20      (Recess had.)
21      - - - - -
22      (Plaintiff's Exhibit 111 was
23      marked for identification.)
24      - - - - -
25 Q    Dr. Rashidi, I'm going to hand to you

Page 397

1 what's been marked as Plaintiff's Exhibit
2 111. It is US patent number 2,785,547 to
3 Barros; do you see that?
4 A    That's right.
5 Q    How does Barros have anything to do
6 with your obviousness analysis?
7 A    Very clear, actually. Here you have a
8 very exaggerated example of, first of all, a
9 cross-section at the bottom of this basket
10 which is substantially approximating the hub
11 portion of the blade and also it is doing
12 exactly what '021 patent inventors perceived
13 for the solution, that something is occupying
14 a space that otherwise an air channel would
15 have prevented. So in other words, this
16 patent eliminates the necessary cause of the
17 air channel.
18 Q    Explain to me what the point is of the
19 receptacle in the Barros patent that's marked
20 as Plaintiff's Exhibit 111.
21 A    Just put ice in it and basically make
22 some heat transfer issues.
23 Q    So if you put ice in this receptacle or
24 basket you're not mixing ice with the blades
25 of the blender in figure 3; is that accurate?

Page 398

1 A    Apparently not. If the ice is bigger
2 than the perforations, they stay in the
3 basket.
4 Q    So the point of the Barros patent is to
5 actually separate ice from the liquid so that
6 the ice is not blended in the blender shown
7 in figure 3?
8 A    That is true, that is true, but if I'm
9 observing a blender without anything and I'm
10 observing a channeling there and I look at
11 this, I say, ah-ha, this takes the
12 position -- if I'm coming from the mind-set
13 that I need something in there to prevent
14 formation of air channel, this is teaching me
15 even though the inventor has not intended for
16 that.
17 Q.   And it is -- doesn't Barros actually,
18 then, teach away from the claim one of the
19 '021 patent because the point of the -- claim
20 one of the '021 patent is actually to blend
21 all of the ingredients.
22 A    I understand.
23 Q    So isn't that true that Barros is
24 actually teaching away from that in that
25 aspect?

Page 399

1 A    Not necessarily. Only in terms of
2 ice. Only in terms of one example but --
3 Q    Isn't ice an important ingredient in
4 blenders?
5 A    Not necessarily. It could be your
6 opinion a lot of other -- every time I
7 blend something I don't put any ice in it,
8 but anyhow, that's beside the point. What
9 I'm saying here is the name of the game here
10 is occupying a space, occupying a place that
11 otherwise a channel would have been formed
12 and this is clearly showing that.
13 Q    So is it your opinion that if you use
14 Barros and you put ice into the receptacle or
15 frozen fruit into the receptacle you can make
16 a smoothie?
17 A    Repeat the ingredients again.
18 Q    Sure. Ice or frozen fruit.
19      If you put ice or frozen fruit into the
20 receptacle shown in Barros, can you make a
21 smoothie, for example?
22 A    Without ice?
23 Q    No.
24      If you're putting ice into the
25 receptacle or frozen fruit.

Page 400

1 A    Frozen fruit wouldn't come out, no.
2 You have to drop the frozen fruit outside of
3 the receptacle.
4 Q    Okay.
5      So in other words, you can't make a
6 smoothie if you use this receptacle and
7 insert into the receptacle ice or frozen
8 fruit?
9 A    Right. That's only for ice, as I said,
10 for heat transfer and making sure that the
11 ice pieces don't hit the blade.
12 Q    Take a look at figure 3. Is this
13 receptacle contacting the pitcher?
14 A    No. On the top portion it is resting
15 but it's not contacting the pitcher, as the
16 inventor of '021 have defined what contact
17 means because they are talking about
18 centering, staying in the center, and if you
19 read the report of Dr. Swanger he also talks
20 about centering so the -- when they talk
21 about centering it doesn't matter what is
22 happening on the top in terms of touching,
23 it's the matter of the -- this solid device
24 not touching the interior wall of the --
25 Q    So it's your opinion that the flange

Page 401

1 identified as 4 in the Barros patent is not
2 identifying the size of the pitcher; is that
3 correct?
4 A    Say that again.
5 Q    It's your opinion that the flange
6 identified as number 4 in the Barros patent
7 is not contacting the sides of the pitcher in
8 figure 3; is that correct?
9 A    It is resting on top of the pitcher as
10 shown but it is not contacting the sides of
11 the pitcher as intended by the inventor of
12 '021 and as Dr. Swanger, every now and then,
13 his report basically refers to, it is staying
14 at the center exactly as a plunger would.
15 Q    Take a look again at the Wayne patent
16 which has been marked as Plaintiff's Exhibit
17 106.
18 A    Yes.  What page?
19 Q    I'm looking at figure 3 of the Wayne
20 patent on the second page.
21 A    Yes.
22 Q    Is it your opinion, Dr. Rashidi, that
23 the auger component 43 is maintained free
24 from contact from the pitcher in Wayne?
25 A    That is my opinion, yes.

Page 402

1 Q    Take a look at the bottom of the Wayne
2 patent on column one --
3 A    Uh-huh.
4 Q    -- starting at line 70.
5 A    Okay.  Let me -- on the verbiage?
6 Q    Sure.
7     It states, "Means as provided for
8 securing the agitator" --
9 A    Excuse me.  What paragraph?
10 Q    Sure.  It's column one starting at line
11 70.
12 A    Line 70.  Okay.  "Means in provide" --
13 okay.
14 Q    "Means as provided for securing the
15 agitator in upright position to the bottom of
16 the container 10"; do you see that?
17 A    That's right.
18 Q    Isn't Wayne teaching that the agitator
19 component here is supposed to be connected to
20 the bottom of the container?
21 A    Not for the same purpose of preventing
22 of an air channel and differentiating from
23 stir stick, no, because you can have probably
24 the same argument to Vita-Mix and say that
25 there is a lid and there is -- the plunger is

Page 403

1 eventually attached to the container so you
2 can just have a -- see, Vita-Mix has a mirror
3 image of that so if I want to accept your
4 argument, then Vita-Mix is also touching the
5 container and it is totally against their
6 patent because who cares what you call that
7 as a lid.
8     Here, you are calling it a lot of other
9 components, bearings and shafts and washers
10 and other things, and then say all of them
11 are touching each other and eventually the
12 bottom of the container, therefore, the auger
13 is touching on the back and I would say -- I
14 don't go through all these components in one
15 shot.  Vita-Mix plunger is attached to the --
16 it's touching the container through the lid.
17 Q    Is there any way you can remove the
18 auger component 43 from the pitcher in Wayne
19 during operation?
20 A    No, but again, that's not my motivation
21 for using this.
22 Q    Is there any way you can insert the
23 auger component 43 identified in Wayne into
24 the pitcher during operation while the blades
25 are rotating?

Page 404

1         MR. AYCOCK:  Objection.
2     Asked and answered.
3 A    The answer is no.  Yeah.
4 Q    Is there any way that the Wayne -- take
5 a look at figure 3.
6 A    I'm looking at it.
7 Q    Do you agree that the auger component
8 43 acts as a nut to connect the blade
9 assembly to that screw component 30?
10 A    That is what is depicted here, yes.
11 Q    So in other words, without the auger
12 component 43, the blades would not stay on
13 that blade assembly during operation; is that
14 accurate?
15 A    That's accurate unless you use a
16 regular nut, yes, so what Wayne has done, he
17 has extended the nut vertically up and
18 expanded it as an auger.
19 Q    What does -- do you know what Wayne
20 teaches with respect to the helical portion
21 of the auger component?  What's the purpose
22 of that?
23 A    Basically he's trying to create a
24 positive pumping flow downward toward the
25 blade and therefore, that's why I am

Page 405

1 asserting that these diameters are going to
2 match the '021 patent in terms of cross-
3 section because unless the auger diameter is
4 large enough to contact a given air channel,
5 it's not going to work and I'm sure the
6 inventor of a device has thought of that
7 already.  So according to Wayne, the damage
8 of the air channel was about this and the air
9 channel is defined by the defining member so
10 A equal to B, B equal to C, therefore, A's
11 equal to B.
12 Q    You would agree that in operation, the
13 cutting blades of the helical member rotate
14 at the same angular velocity as disclosed in
15 Wayne?
16 A    Absolutely.  Absolutely.
17 Q    It's the shape of the helix plus the
18 angular velocity of the auger component in
19 Wayne that Wayne believes prevents the
20 formation of air pockets?
21        MR. AYCOCK:  Objection.
22        Vague, ambiguous.
23 Q    You can answer.
24 A    I mean, you have this rigidly attached
25 to the rotating shaft.  It is very obvious

Page 406

1 that it's going to pick up the same angular
2 velocity and when you have grooves into that
3 auger, if there is a contact between the
4 fluid content and this, there is going to be
5 some disturbance of the flow.  What the flow
6 is -- how the flow is going to be augmented,
7 I don't know.  We have to run tests.
8 Q    And so therefore, the flow is disturbed
9 in Wayne based on the auger component having
10 that helical configuration and the fact that
11 that helical member rotates at the same
12 angular velocity as the cutting blades,
13 correct?
14 A    There has to be contact in how it
15 influences the flow or how it affects it
16 remains to be seen.  There are a lot of
17 parameters there, the size of the groove on
18 the auger and so forth, so there are a lot of
19 other variables that influences that.
20 Q    Can you explain to me how a person of
21 ordinary skill in the art would understand,
22 based on Wayne, to detach the auger component
23 from the blade assembly to create a plunger
24 or a device inserted into the pitcher?
25 A    Yes, sir.  I'm going to explain that.

Page 407

1 If I am a person of ordinary skill in the art
2 of blender design, I keep going back to the
3 need.  I look at a blender without any device
4 in it and I see that an air channel is
5 generated and then something dawns on me that
6 if I have something in there, I occupy the
7 space, and then I look at the Wayne patent
8 and it says somebody has put something in
9 there already, and actually, I don't want to
10 even to have the rotational portion of it so
11 all I do is to have the mirror image of it
12 and hang it from the top.  So that's how an
13 ordinary skill would come up with that.
14        - - - - -
15        (Plaintiff's Exhibit 112 was
16        marked for identification.)
17        - - - - -
18 Q    Dr. Rashidi, I'm going to hand to you
19 what's been marked as Plaintiff's Exhibit
20 112.  It's the Harris patent, patent number
21 3,346,029.
22 A    Uh-huh.
23 Q    Take a look at figure 1.  Is it your
24 opinion that the spatula 10, the bottom of it
25 approximates the member associated with the

Page 408

1 blades?
2 A    Actually it's larger than the hub
3 portion of the blade so --
4 Q    So it does not approximate?
5 A    It does not approximate, but if the
6 allegation of '021 patent is correct, this is
7 supposed to work even better than Vita-Mix.
8 Q    How would this work better if this --
9 see the large spatula portion 15 there, sir?
10 A    Yeah.  I was going to explain that.
11 Q    Go ahead.  Explain that.
12 A    Because the name of the game is to
13 occupy space and actually this is what Vita-
14 Mix has done, to make the plunger much larger
15 in diameter compared to the wooden stick so
16 that it occupies a space.  So if '021 -- if
17 Vita-Mix is alleging the little disk at the
18 bottom of the Back To Basics as approximating
19 the size, if you make that size bigger it's
20 even better.  Here --
21 Q    Can you draw by arrows --
22 A    I'll use this one.
23 Q    Yeah.
24        Can you draw by arrows a flow diagram
25 of how the fluids or liquids would flow in

Page 409

1 this blender during operation as set forth in
2 Harris?
3 A    I cannot do that because I don't know
4 what's in there.  You have to tell me what
5 you have in there.
6 Q    Sure.  Let's just say water, for
7 example.
8 A    Okay.
9 Q    No.  Let's make it a little more
10 straightforward.  Let's say a smoothie with
11 orange juice --
12 A    That's not more straightforward.  Water
13 was better.
14 Q    Let's just say a smoothie with orange
15 juice, some fruit, peaches, let's say, and
16 some ice.
17 A    That's an unfair question.  I cannot
18 answer that.
19 Q    Can you explain to me, based on that
20 spatula 15 there, how ice can get to the
21 blades to be chopped?  Wouldn't the ice just
22 fall within the spatula 15 and not be
23 blended?
24 A    Not necessarily because there are ice
25 crushers even in your refrigerator so instead

Page 410

1 of getting an ice cube you can get a cup of
2 slush your refrigerator and when you put
3 it in there, when you tilt it, you can go on
4 the left side of the conical upside-down
5 shape and it can get there and if you just
6 wiggle it, you can transfer the ice slush
7 from top to bottom.
8 Q    Wouldn't you agree with me that this
9 spatula having this peripheral edge 15 would
10 actually prohibit some mixing during
11 operation?
12 A    I really cannot.  This is one of those
13 things that we have to test.  This can be one
14 of the best designs.  I don't know.  I don't
15 know.  I cannot answer that.
16 Q    Do you know what I'm asking by that
17 question, though?
18 A    I absolutely understand but what I'm
19 saying is I am using a simple logic of
20 inventors of Vita-Mix '021 patent.  They say
21 we need something to occupy the space and
22 this is the largest occupation you can find.
23 Even bigger.  In other words, if you go and
24 interview the Vita-Mix patents, the larger
25 you make the plunger, the better the,

Page 411

1 supposedly, solution is going to be.  There
2 is no harm in increasing the diameter of the
3 plunger.  The reason they don't increase it
4 to the absolute limit is because they still
5 need some room for material to be there.
6     So if the logic of '021 patent is
7 correct, the best thing is to have a plunger
8 which is three inches in diameter but there
9 is no room for material anymore so they have
10 found a happy medium of an optimum --
11 supposedly, somehow they attach it to the
12 associated to the blade member and so forth.
13 Therefore, based on that argument, I'm saying
14 that yes, here, you have something which
15 works very well.
16 Q    Is it your opinion that a person of
17 ordinary skill in the art would have to
18 change the design in Wayne to practice the
19 method set forth in claim one of the '021
20 patent?
21 A    To change the design?  What do you mean
22 by that?
23 Q    Does a person of ordinary skill in the
24 art have to change the design in Wayne to
25 practice the method set forth in claim one of

Page 412

1 the '021 patent?
2 A    In other words, somebody change the
3 design of Wayne in order to infringe on '021
4 patent?  Is that what your question is?
5 Q    No.  In order to practice it.
6 A    In order to practice it which leads to
7 infringement or just to have a useful
8 device?
9 Q    I'm just trying to understand your
10 obviousness analysis, Dr. Rashidi, so --
11 A    My obviousness analysis, I think I said
12 that at least 20 or 10 times.  We have a
13 channel and what comes to the first mind or
14 first thing to the mind is what if I have
15 something which occupies that space and if I
16 have that, then I don't let the air get to
17 the blades, which it does happen.  And
18 therefore, when I say Wayne, I say, well, if
19 it is problematic to have this as a knot with
20 a stationary and picking up speed and there
21 might be some deleterious problem with it,
22 why don't I just make it stationary and put
23 it on top, just occupy the space?
24 Q    Is the motivation to -- is the
25 motivation you're identifying or you believe

Page 413

1 exists to combine Wayne with Barros, Harris,
2 Jacobsen and the Vita-Mix 3600 and 4000
3 blenders based on the prosecution history of
4 the '021 patent?
5           MR. AYCOCK:  Objection.
6       Mischaracterizes prior testimony and
7       his report.
8 A     Basically what I'm saying is motivation
9 for offering design modifications or
10 variations is to fill up a void, to fill up a
11 gap, to fill up a vortex or channel and all
12 of these things are basically alluding to
13 that and leading people -- anticipating --
14 and if you go to the obviousness it's pretty
15 obvious that if you have one of these things
16 you are occupying that space.
17           MR. AYCOCK:  Just note that
18       we're at seven hours and we're done.
19           MR. CUPAR:  I'm almost done.
20           MR. AYCOCK:  Well, Dave, I
21       mean, Mike Snyder ended it yesterday
22       at seven.
23           MR. CUPAR:  I'm almost done
24       here, if you want --
25           MR. AYCOCK:  Well, I'm going

Page 414

1       to miss my plane and you've done this
2       to me in the past so --
3           MR. CUPAR:  I'm almost done
4       here so if you could wait a minute --
5           MR. AYCOCK:  How many?  How
6       many?
7           MR. CUPAR:  Just a couple
8       more questions, a couple more
9       minutes.
10           MR. AYCOCK:  I mean, the last
11       time --
12           MR. CUPAR:  Less than five
13       minutes.
14           MR. AYCOCK:  Less than five?
15           MR. CUPAR:  Yeah.
16           MR. AYCOCK:  Okay.  I'll give
17       you that indulgence, Dave.
18           MR. CUPAR:  Thank you.
19 Q     Does your opinion identify any design
20 change in Wayne, Dr. Rashidi?
21 A     As I said, when you say "design," not
22 substantial design change, but what I do with
23 Wayne to come up with a space filler
24 basically is just invert it and put it on the
25 lid.

Page 415

1 Q     In your obviousness opinion do you need
2 to change the design of Wayne to end up with
3 claim one of the '021 patent?
4           MR. AYCOCK:  Objection.
5       Vague.
6 A     For me, the design change is a very
7 accurate meaning and I really don't
8 understand what your definition of design
9 change means.  If you -- by design you mean
10 something to occupy a void of space, no,
11 there is not much design change but if you
12 are talking about machining a piece and
13 adding new tolerances and some other issues
14 of design and do the stress analysis, dynamic
15 analysis because one is stationary, one is
16 rotating, there are differences.  But in
17 terms of filling up a void, it's basically
18 all you need to do is put a mirror there and
19 get a mirror image, and happily it doesn't
20 rotate when it's up there, which is better to
21 some extent because the less moving parts you
22 have in a system, the better it is, the
23 simpler the system is.
24 Q     Does your report identify any changes
25 in the design to Wayne in your obviousness

Page 416

1 analysis?
2 A     As I said, I'm not --
3           MR. AYCOCK:  Objection.
4       Asked and answered.
5 A     I'm not here to offer a better design
6 for blenders.  All I'm trying to do here is
7 that there is no matter of infringement
8 because of prior art, because of the
9 statement of the writeups, because of the
10 anticipation of obviousness.  I'm not going
11 to come up with a new design and go and make
12 some changes to Wayne -- change Wayne's
13 design to come up with a better blender.  I'm
14 not going to do that.  I'm just trying to say
15 that what '021 patent claims is obvious if
16 you study the prior art and it is anticipated
17 by the prior art, that's all I'm saying, and
18 these are all at a theoretical level.
19 Q     You opined in your report that you
20 understand there's no evidence of any success
21 of Vita-Mix products having a plunger claimed
22 by Vita-Mix; is that accurate?
23 A     That is my opinion.
24 Q     Who told you that?
25 A     Basically I did some investigation on

Page 417

1 the Internet and there was one very
2 interesting observation about the price
3 difference.  Vita-Mix sells its product at
4 $480 and other people at $40 and $60 so --
5 and I have a friend that uses a Vita-Mix and
6 I never had anything from him, that this
7 plunger is really the one that he's using as
8 a distinguishing blender with others that he
9 bought, that it looks nicer, it has a
10 stronger motor and the plastic is a more
11 sturdy one.  So there are some bells and
12 whistles and that variable speed, people like
13 that.
14 Q     Other than your Internet analysis, do
15 you have any other evidence regarding
16 commercial success?
17        MR. AYCOCK:  Objection.
18        Mischaracterizes prior testimony.
19 A     As I said, at least Vita-Mix has not
20 presented any evidence that they have success
21 because of that other than claiming it.  In
22 other words, they have not done any
23 statistical data to present it with an
24 important case and when I was reading any
25 material on the case, I didn't see any

Page 418

1 document from Vita-Mix that says, yes, we
2 have a very good sales record because of this
3 attribute of our new design.  I have never
4 seen that.
5 Q     Did you review any documents produced
6 by Vita-Mix in this litigation?
7 A     All I have seen is what I told you and
8 I have put it in my report.  This is what I
9 have seen.
10 Q     So you have not reviewed any of Vita-
11 Mix's financial records or --
12 A     No, I have not done that and --
13 Q     You've not reviewed any of the damages
14 experts' or financial experts' reports in
15 this litigation?
16 A     No, I have not seen any of the
17 financial aspects.
18 Q     Have you ever opined before on
19 commercial success?
20 A     As a person buying consumer products I
21 have some sort of opinion of my own purchases
22 and so forth but I have not done any formal
23 study of commercial successes, no.
24 Q     You're not competent to opine on
25 commercial success?

Page 419

1 A     Absolutely right.  I am not competent
2 to do that.
3        MR. CUPAR:  Thank you,
4     Dr. Rashidi.  That's all I have at
5     this time.
6        - - - - -
7     (Deposition concluded.)
8        - - - - -
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

Page 420

1 The State of Ohio,      )
2 County of Cuyahoga.     )  SS:  CERTIFICATE
3        I, Carla A. Virgili, a Notary Public
4 within and for the State of Ohio, duly
5 commissioned and qualified, do hereby certify
6 that the within-named MAJID RASHIDI, Ph.D.,
7 P.E. was by me first duly sworn to testify
8 the truth, the whole truth and nothing but
9 the truth in the cause aforesaid; that the
10 testimony then given by him/her was by me
11 reduced to stenotypy in the presence of said
12 witness, afterwards transcribed upon a
13 computer, and that the foregoing is a true
14 and correct transcript of the testimony so
15 given by him/her as aforesaid.
16        I do further certify that his
17 deposition was taken at the time and place in
18 the foregoing caption specified.
19        I do further certify that I am not a
20 relative, counsel or attorney of either party
21 or otherwise interested in the event of this
22 action, nor am I, nor is the court reporting
23 firm with which I am affiliated, under a
24 contract as defined in Rule 28(D).
25

Page 421

1        IN WITNESS WHEREOF, I have hereunto set

2 my hand and affixed my seal of office at

3 Cleveland, Ohio on this 4th day of February

4 2008.

5

6

7

8

9

10    _____
      Carla A. Virgili, Notary
11    Public in and for the State of
      Ohio.
12
      My Commission expires 03-01-09.
13
                    14
15

16

17

18

19

20

21

22

23

24

25