**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF OHIO**
**EASTERN DIVISION**


Vita-Mix Corp.,                          )          **CASE NO. 1:06 CV 2622**
                                         )
                    Plaintiff,           )          **JUDGE PATRICIA A. GAUGHAN**
                                         )
        vs.                              )
                                         )
Basic Holdings, Inc., *et al.*,          )          <u>**Memorandum of Opinion and Order**</u>
                                         )
                    Defendants.          )


<u>**INTRODUCTION**</u>

This matter is before the Court upon 15 motions - ten motions for summary judgment and

five related motions:  (1) defendant Focus Products' motion for summary judgment on all claims

(Doc. 126); (2) defendants' motion for summary judgment of no patent infringement (Doc. 90);

(3) plaintiff's cross-motion for summary judgment of patent infringement (Doc. 112); (4)

defendants' motion to strike the expert report of Dr. Traylor (Doc. 148); (5) plaintiff's motion

for leave to file a surreply to defendants' motion for summary judgment of no patent

infringement (Doc. 155); (6) defendants' motion for leave to file a surreply to plaintiff's cross-

motion for summary judgment of patent infringement; (7) defendants' motion for partial

1

summary judgment to limit patent damages (Doc. 117); (8) defendants' motion for summary judgment of patent invalidity (Doc. 116); (9) plaintiff's motion for summary judgment of no patent invalidity (Doc. 125); (10) plaintiff's motion to strike defendants' patent infringement arguments made in defendants' motion for summary judgment of patent invalidity (Doc. 157); (11) defendants' motion for leave to file a surreply to plaintiff's motion to strike defendants' patent infringement arguments (Doc. 198); (12) plaintiff's motion for summary judgment of no inequitable conduct (Doc. 123); (13) plaintiff's motion for summary judgment of no patent misuse, unclean hands, waiver, laches, estoppel and failure to mitigate (Doc. 119); (14) plaintiff's motion for summary judgment of no deceptive trade practices (Doc. 121); and (15) defendants' motion for summary judgment of no trademark infringement (Doc. 118).[1]

For the reasons that follow, Focus Products' motion for summary judgment on all claims is GRANTED.  Defendants' motion for summary judgment of no patent infringement is GRANTED.  Plaintiff's cross-motion for summary judgment of patent infringement is DENIED. Defendants' motion to strike the expert report of Dr. Traylor is GRANTED.  Plaintiff's motion for leave to file a surreply is GRANTED.  Defendants' motion for leave to file a surreply to plaintiff's cross-motion for summary judgment of no patent infringement is DENIED. Defendants' motion to limit patent infringement damages is MOOT.  Defendants' motion for summary judgment of patent invalidity is DENIED.  Plaintiff's motion for summary judgment of no patent invalidity is GRANTED.  Plaintiff's motion to strike defendants' infringement arguments made in connection with patent invalidity is GRANTED.  Defendants' motion for

---

[1]
 While defendant Focus Products moves for summary judgment on all claims, it also joins in the other defendants' motions for summary judgment.

leave to file a surreply to plaintiff's motion to strike is DENIED.  Plaintiff's motion for summary judgment of no inequitable conduct is GRANTED.  Plaintiff's motion for summary judgment on certain of defendants' affirmative defenses is GRANTED.  Plaintiff's motion for summary judgment of no unfair trade practices is GRANTED.  Defendants' motion for summary judgment of no trademark infringement is GRANTED.

**FACTS**

Plaintiff, Vita-Mix Corporation ("Vita-Mix" or "plaintiff"), brings this action against defendants, Basic Holding, Inc., f/k/a Back to Basics Products, Inc. ("Back to Basics"), Focus Electrics, LLC ("Focus Electrics"), Focus Products Group, LLC ("Focus Products"), and West Bend Housewares, LLC ("West Bend") (collectively, "defendants").

In its first amended complaint, plaintiff alleges infringement of Claim 1 of U.S. Patent No. 5,302,021 ("the '021 Patent"); false designation of origin under § 43(a) of the Lanham Act, 15 U.S.C. § 1125(a); violation of Ohio's deceptive trade practices act, Ohio Rev. Code §§ 4165.01 and 4165.02; and common law trademark infringement and unfair competition.

Defendants assert four counterclaims alleging non-infringement, invalidity, and unenforceability of the '021 patent; inequitable conduct; false or misleading descriptions in violation of the Lanham Act; and violation of Ohio's deceptive trade practices act.

Plaintiff manufactures and sells high-end kitchen blenders.  In 1969, plaintiff introduced its Vita-Mix 3600 blender.  The Vita-Mix 3600 included what plaintiff called a "Tamper."  When mixing especially thick liquids and mixtures, an air pocket would form around the blades of the blender.  The Tamper was used to stir the materials in the blender and permit more effective mixing of thick liquids by breaking up any air pockets after they formed.  However, the

3

Tamper provided only a temporary solution, as the air pocket could reappear requiring further user intervention to eliminate the air pocket again and again.

Plaintiff then set out to provide a different solution to the air pocket problem.  Plaintiff determined that the air pocket is caused by an air channel which, in turn, is formed by a "member" associated with the blades of the blender.  Plaintiff determined that the air pocket cannot form if the air channel is blocked.  The '021 Patent, which is at the heart of this suit, is directed to a method for preventing the formation of an air pocket in a blender by placing a "Plunger" in the pitcher of a blender to block the air channel.  The '021 Patent issued on April 12, 1994.

In 1971, defendant Back to Basics' predecessor, Stak-On International ("Stak-On"), began selling and distributing food preparation products.  Stak-On distributed Vita-Mix blenders, including the Vita-Mix 3600 with the Tamper, for approximately ten years during the 1970's and 1980's.  In 1987, Stak-On became Back to Basics.  After defendants ceased distributing Vita-Mix blenders, Mr. Daniels, an employee of Back to Basics, designed a blender with what he called a "Stir Stick."  Each of defendants' blenders sold with a Stir Stick is accused of being used to infringe Claim 1 of the '021 Patent (the "Accused Blenders").  Defendants began selling the Accused Blenders in March 2001.  In 2006, plaintiff initiated this suit.  Additional facts pertinent to particular motions are discussed in connection with those motions below.

**STANDARD OF REVIEW**

Summary judgment is appropriate when no genuine issues of material fact exist and the moving party is entitled to judgment as a matter of law.  *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986) (citing Fed. R. Civ. P. 56(c)); *see also LaPointe v. United Autoworkers Local 600*,

8 F.3d 376, 378 (6th Cir. 1993). The burden of showing the absence of any such genuine issues

of material fact rests with the moving party:

> [A] party seeking summary judgment always bears the initial
> responsibility of informing the district court of the basis for its
> motion, and identifying those portions of "the pleadings, depositions,
> answers to interrogatories, and admissions on file, together with the
> affidavits, if any," which it believes demonstrate the absence of a
> genuine issue of material fact.

*Celotex*, 477 U.S. at 323 (quoting Fed. R. Civ. P. 56(c)). A fact is material only if its resolution

will affect the outcome of the lawsuit. *Anderson v. Liberty Lobby*, 477 U.S. 242, 248 (1986).

Once the moving party has satisfied its burden of proof, the burden then shifts to the

nonmoving party:

> When a motion for summary judgment is made and supported as
> provided in this rule, an adverse party may not rest upon the mere
> allegations or denials of the adverse party's pleading, but the adverse
> party's response, by affidavits or as otherwise provided in this rule,
> must set forth specific facts showing that there is a genuine issue for
> trial. If the adverse party does not so respond, summary judgment,
> if appropriate, shall be entered against the adverse party.

Fed. R. Civ. P. 56(e). The court must afford all reasonable inferences and construe the evidence

in the light most favorable to the nonmoving party. *Cox v. Kentucky Dep't. of Transp.*, 53 F.3d

146, 150 (6th Cir. 1995) (citing *Anderson*, 477 U.S. at 255); *see also United States v. Hodges X-

Ray, Inc.*, 759 F.2d 557, 562 (6th Cir. 1985).

Summary judgment is appropriate when a party who bears the burden of proof at trial

fails to make a showing sufficient to establish an essential element of his case. *Tolton v.

American Biodyne, Inc.*, 48 F.3d 937, 941 (6th Cir. 1995) (citing *Celotex*, 477 U.S. at 322).

When the non-moving party bears the burden of proof, "the burden on the moving party may be

discharged by 'showing' -- that is, pointing out to the district court -- that there is an absence of

evidence to support the nonmoving party's case." *Celotex Corp. v. Catrett*, 477 U.S. 317, 325

(1986).  "The mere existence of a scintilla of evidence to support plaintiff's position will be

insufficient; there must be evidence on which the jury could reasonably find for the plaintiff."

*Copeland v. Machulis*, 57 F.3d 476, 479 (6th Cir. 1995) (quoting *Anderson*, 477 U.S. at 252).

Moreover, if the evidence is "merely colorable" or is not "significantly probative," the court may

grant summary judgment.  *Anderson*, 477 U.S. at 249-50.

## DISCUSSION

At the outset, the Court feels compelled to address the sheer volume of paper filed in

connection with the parties' dispositive motions.  It is a great understatement to say that the

Court is dismayed that the parties collectively filed ten motions for summary judgment totaling

almost 200 pages without seeking leave from the Court.  Pursuant to the local rules of this Court,

each party is permitted one memorandum in support of its dispositive motion totaling 30 pages.

While plaintiff complains that two of defendants' motions to strike exceeded the 15-page limit

for such non-dispositive motions, plaintiff itself filed five separate dispositive motions on issues

that should have been addressed in one motion.  Clearly, this was done to avoid the page

limitation.  None of the parties is innocent in this respect.  Even so, the Court will not strike the

motions for summary judgment.  But, the attorneys are hereby put on notice that this issue did

not go unnoticed by the Court and are cautioned to follow the rules of this Court.

1.      *Focus Products' Motion for Summary Judgment on all Claims*

Focus Products previously moved to dismiss all claims against it on the ground that

plaintiff failed to allege any facts supporting a theory of liability holding Focus Products liable

for the acts of the other defendants.  (Doc. 49)  While the Court found that plaintiff had

6

disclaimed any such theory of vicarious liability, the Court nonetheless denied Focus Products'

motion to dismiss because plaintiff had pled facts supporting a theory of direct liability.  (Doc.

83)  The Court also denied without prejudice Focus Products' alternative motion for summary

judgment as Focus Products and plaintiff agreed that additional discovery was warranted.  (Doc.

83)  Focus Products now moves this Court again for summary judgment on all claims.

It is an act of patent infringement to make, use, sell, offer to sell or import a patented

invention into the United States.  35 U.S.C. § 271(a).  One can also be a contributory infringer

by importing an apparatus for use in a patented process.  35 U.S.C. § 271(c).  Similarly, the use

in commerce of another's trademark may render one liable for trademark infringement.  15

U.S.C. § 1125(a).  And, goods marked in contravention of 15 U.S.C. § 1125(a) shall not be

imported into the United States.  15 U.S.C. § 1125(b).

An entity is deemed to "import" an article when it "brings an article into a country from

the outside.  If there be an actual bringing in it is importation regardless of the mode in which it

is effected.  Entry through a custom house is not the essence of the act."  *Cunard Steamship Cop

v. Mellon*, 262 U.S. 100, 122 (1923).  This definition has been used in determining whether one

has "imported" a patented invention in contravention of 35 U.S.C. § 271.  *Bristol-Myers Co. v.

Erbamont, Inc.*, 723 F.Supp. 1038, 1044 (D. Del. 1989) (stating "it is not necessary that the

goods in issue have passed through U.S. Customs to be imported").

Focus Products asserts it is merely a holding company.  Focus Products general counsel

David Beine declares that on January 17, 2007, Focus Products acquired certain assets of Back

to Basics Products, Inc.  As part of the acquisition, Focus Products created Back to Basics

Products LLC, which received the assets purchased from Back to Basics Products, Inc.  Back to

Basics Products LLC and defendant West Bend are subsidiaries of defendant Focus Electrics. Focus Electrics is, in turn, a subsidiary of Focus Products.

Focus Products has never made, marketed, used or sold any of the Accused Blenders. Thus, it argues it cannot be held directly liable for any of the claims asserted against it. Plaintiff's patent claims relate to the method of use claimed in Claim 1 of the '021 Patent. Plaintiff's other claims relate to the use of the unregistered number "5000" in connection with Back to Basics' "Blender Solution™ 5000."

Plaintiff responds that Focus Products can be held liable, because (1) it imports the Accused Products and (2) it reviewed all instructions and packaging before the Accused Products were placed on the market.  Plaintiff supports its arguments with the deposition testimony of Jeffrey Wellek, executive vice-president of Focus Products.  Mr. Wellek testified that Focus Products holds the customs bond under which all of its subsidiaries' products are imported into the United States, including Back to Basics' Accused Blenders.  Further, it is corporate policy that Focus Products' general counsel review all proposed packaging and instruction manuals for all of the subsidiaries' products including the Accused Blenders. However, Mr. Wellek was unable to state whether the policy is actually carried out.  Focus Products has had a general counsel since January 2007.  Mr. Wellek added that Focus Products' general counsel, David Beine, effectively serves as general counsel to the subsidiary companies as well.

Finally, Mr. Wellek testified that Focus Products has no employees dedicated to sales or marketing.  All such functions are handled at the subsidiary level.  The head of Focus Electrics, Mike Carpenter, reports to Keith Jaffee, CEO of Focus Products, but Mr. Wellek does not know

if Mr. Carpenter has ever discussed marketing or sales strategies with Mr. Jaffee. Moreover, when asked "How is Focus Products involved in the marketing and sales strategies of Focus Electrics?", Mr. Wellek responded, "It's basically not involved." Nonetheless, plaintiff makes much of the fact that Mr. Wellek next testified that Mr. Jaffee, as a representative of Focus Products, generally attends the monthly sales meetings between the sales executives of each subsidiary. During these meetings, the sales executives share "information regarding successes and strategies with respect generally to specific customers."

Focus Products replies that the majority of plaintiff's arguments go to whether Focus Products might be held vicariously liable for the acts of its subsidiaries, a theory of liability disclaimed by plaintiff. Focus Products also maintains that any activities it does engage in are not sufficient to find it liable in this case. Importantly, Focus Products argues that importation of the Accused Blenders cannot constitute direct patent infringement because the asserted patent claim is a method claim.

In any event, Focus Products points to additional testimony by Mr. Wellek to establish that it is, in fact, merely a holding company and does not engage in any infringing activities. Mr. Wellek testified that its subsidiary, Focus Electrics, "makes its own decisions." Mr. Wellek also detailed Focus Products' limited operations: "It coordinates acquisition activities, it provides some general services to the subsidiaries, such as accounting, human resources, and other kind of -- IT, other kind of executive-level activities."

Focus Products also "provides financing with [its] bank relationships and kind of general oversight of the operations of Focus Electrics." This general oversight is accomplished in that "the president of Focus Electrics [Mike Carpenter] reports to the CEO of Focus Products Group

9

[Keith Jaffee]."  Focus Electrics provides financial reports and sales data to Focus Products. Focus Products also assists some subsidiaries with finding vendors to produce their products; however, to the best of Mr. Wellek's knowledge Focus Products has not offered this service to Focus Electrics.  Focus Electrics has its own purchasing staff.

Focus Products also submits a second declaration by Mr. Beine to support its argument that it does not "import" any patented or trademarked article into the United States.  Mr. Beine states that Focus Products does not import any products for or on behalf of Focus Electrics or any of its subsidiaries and has not imported any Accused Blenders.  He states that Focus Electrics or its subsidiaries "arranges for the shipping, the shipping supplies, the tracking of these products, and the delivery of these products into the United States of America."  All employees who undertake these activities "are employees of Focus Electrics, LLC or one of its subsidiaries and are not direct employees of Focus Products Group, LLC."  Further, "the purchase orders and/or invoices are originated, created, issued, and/or maintained by Focus Electrics, LLC, or one of its subsidiaries, and not by Focus Products Group, LLC" and the individuals who do so are not direct employees of Focus Products.

Mr. Beine's second declaration also clarifies his role as general counsel.  He declares he is not only the general counsel for Focus Products but also the general counsel for Focus Electrics and West Bend.  He states that he has reviewed the instruction manuals and packaging for the Accused Blenders but that he did so in his capacity as general counsel for Focus Electrics and its subsidiaries and not as general counsel for Focus Products.

The Court agrees with Focus Products that it has never sold or offered for sale plaintiff's patented invention or used plaintiff's alleged trademark in commerce.  The Accused Blenders are

10

sold by the subsidiary defendants.  Focus Products' mere attendance at sales meetings does not make it, as a separate corporate entity, the company that ultimately sold the blenders.  Similarly, Focus Products' review of its subsidiaries' product literature cannot make it liable for indirect infringement.[2]

The Court also agrees with Focus Products that it does not "import" the Accused Blenders into the United States as that term is used in the patent or trademark statutes.  Focus Products did not "bring in" any blenders from outside the country.  Its subsidiaries were the entities who accomplished the "bringing in."  The Court finds that merely holding the customs bond is insufficient.

Focus Products' motion for summary judgment on all claims is granted.

2.      *The Patent Infringement Motions*

In this section of the Opinion, the Court addresses defendants' motion for summary judgment of no patent infringement, plaintiff's cross-motion for summary judgment of infringement, defendants' motion to strike the expert report of Dr. Traylor, plaintiff's motion for leave to file a surreply and defendants' motion for leave to file a surreply.

Plaintiff alleges defendants infringe Claim 1 of the '021 Patent by using their blenders in accordance with the claimed method.  Plaintiff also alleges that defendants actively induce others to infringe and contribute to the infringement by others.  35 U.S.C. §§ 271(b), (c).  Claim 1 is as follows:

> A method of preventing the formation of an air pocket around
> rotating blades positioned in a pitcher of a blender,

---

[2]

> Plaintiff argues that defendants teach others to infringe through the
> instructions for use provided in the Accused Blender's user manuals.

11

the air pocket being created from an air channel of a cross-
sectional size defined by a member associated with the
blades,
comprising the steps of
supplying a fluid into the pitcher, and
positioning a plunger,
having a cross-sectional size approximating the
cross-sectional size of the member,
adjacent to and above the rotating blades
while maintaining the plunger free of contact
with the pitcher
thereby preventing the formation of an air pocket
in the fluid around the rotating blades.

The Court previously construed Claim 1 to mean:

A method of preventing the formation of an air pocket around
rotating blades positioned in a pitcher of a blender *but not including a
method of stirring to disperse, dislodge, or break-up an air pocket after
it has begun to form*,
the air pocket being created from an air channel of a cross-sectional
size defined by a member associated with the blades,
comprising the steps of
supplying a fluid into the pitcher, and
positioning a *device that can be inserted into a blender*,
having a cross-sectional size approximating the
cross-sectional size of the member,
adjacent to and above the rotating blades
while maintaining the *device* free of contact with
the pitcher
thereby preventing the formation of an air pocket in
the fluid around the rotating blades.

Each of defendants' Accused Blenders is sold with a Stir Stick. Defendants make and sell

"dozens" of models encompassed within the definition of the Accused Blenders. Defendants do

not dispute that their Stir Stick is a "device" as that term is used in Claim 1 as construed by the

Court.

In their motion for summary judgment of non-infringement, defendants argue they do not

infringe because: (1) they use the Stir Stick to stir the contents of the blender while the blades

12

are rotating; (2) they did not design or market their Stir Stick to be positioned "adjacent to and above the rotating blades"; (3) the Stir Stick is not maintained "free of contact with the pitcher" of the blender; and (4) the Stir Stick does not necessarily "prevent the formation of an air pocket."

In support of their cross-motion and in opposition to defendants' motion, plaintiff argues that:  (1) defendants use the Accused Blenders without stirring; (2) defendants position the Stir Stick "adjacent to and above the rotating blades" when they insert a Stir Stick and operate a blender without stirring; (3) defendants maintain the Stir Stick "free of contact with the pitcher" when they insert a Stir Stick and operate a blender without stirring; and (4) the Stir Stick "prevents the formation of an air pocket around the rotating blades."  Plaintiff also asserts that a stirring operation can infringe the claim if it meets all of the other claim limitations.

Because of the importance of plaintiff's final argument, the Court addresses it at the outset.  Plaintiff argues that only stirring which "disperses, dislodges, or breaks up an air pocket after it has begun to form" is outside the scope of the claim.  Plaintiff's position is untenable.  All stirring operations were disclaimed by plaintiff during prosecution of the parent application to the '021 Patent.  *See* Doc. 81 (claim construction order) at 8-9.  Plaintiff repeatedly stated during prosecution that there was a "fundamental distinction" between use of a device to prevent formation of an air pocket and a stirrer, "which at best, can only dislodge the air pocket once formed."  Plaintiff further stated that stirring devices "can only cure an existing problem and not automatically prevent it from occurring."  This disclaimer of *all* stirring operations is further evidenced by the examiner's statement that any action to "stir the contents of the pitcher" is "a materially different process" than that covered by Claim 1.  Plaintiff cannot now recapture what

13

it clearly disclaimed during prosecution - namely, that stirring can prevent the formation of an air pocket before it forms.[3]

Having resolved this preliminary question, the Court turns to the evidence before it and the parties' positions on the merits. In support of their motion, defendants rely upon the '021 Patent; plaintiff's first amended complaint; the parties' responses to certain written discovery requests; this Court's claim construction order; defendants' U.S. Patent No. 6,527,433; the packaging and users' manuals for defendants' Accused Blenders; and the deposition testimony of Thomas Daniels. Defendants also submit several video clips showing the use of defendants' blenders on the QVC home shopping channel as well as what appears to be a television commercial.

Plaintiff's cross-motion relies upon the following additional evidence: a video clip from QVC demonstrating Thomas Daniels' use of one of defendants' Accused Blenders; the deposition testimony of Back to Basics' witnesses Thomas Daniels, William Beesley III, Dale Oldroyd, Claude Brandt and Brian Beesley; the deposition testimony of plaintiff's witness John Barnard; the deposition testimony of defendants' technical expert Dr. Majid Rashidi; plaintiff's website; a chart comparing various blenders compiled by Mr. Oldroyd; and an email authored by Brian Beesley. Plaintiff also relies upon the report of its infringement expert, Dr. Lee Swanger,

---

[3]     Moreover, as will be discussed below, plaintiff's only argument regarding the "adjacent to and above" and "free of contact" limitations relates to operations where the Stir Stick is held stationary. Plaintiff cannot cobble together what defendants refer to as a "Frankenstein's monster" of an infringement case with practice of one element of the claim during a stirring operation and practice of another element while holding the Stir Stick stationary.

14

and the consumer survey of its marketing expert, Dr. Mark Traylor.[4]

Before addressing the merits of the motions, the Court must first decide whether or not all of plaintiff's evidence is properly before the Court.  Defendants spend a great deal of time in their opening brief arguing that plaintiff should be limited in the evidence it can rely on because of its purported failure to sufficiently disclose its infringement contentions during discovery. During discovery, defendants asked plaintiff to disclose the factual, evidentiary support for its contention that defendants directly or indirectly infringe Claim 1 of the '021 Patent.  Plaintiff responded:  "Back to Basics makes, uses, offers for sale, sells, or imports ... blenders that, in use, infringe claim 1 of the '021 Patent.  ...  Furthermore, Back to Basics' own promotional materials teach customers that use of the stir stick prevents the formation of air pockets by breaking air pockets up before they can form."

Defendants asked plaintiff to supplement its response by identifying "the conditions

---

[4]

> Plaintiff moves for leave to file a surreply on the ground that defendants improperly submitted new evidence with their reply in support of their motion for summary judgment.  The Court agrees that defendants' new evidentiary submissions were improper and does not rely upon them in rendering this Opinion.  Plaintiff also seeks leave to introduce excerpts from the second deposition of Mr. Daniels, which took place after defendants submitted their reply. Plaintiff's motion for leave is granted.  To the extent plaintiff's surreply presents Mr. Daniels' new testimony to the Court, plaintiff's surreply has been considered.  However, to the extent the surreply reiterates arguments made previously and attempts to introduce new legal arguments and evidence other than Mr. Daniels' new testimony, the Court has not considered it.

> Defendants also move for leave to file a surreply, complaining that plaintiff itself raised new arguments in its reply in support of its own cross-motion for summary judgment of patent infringement. Defendants' motion for leave is denied for the reasons set forth in plaintiff's opposition thereto.

under which infringement is alleged to occur" and "the specifics of each allegedly infringing use."  Defendants also propounded a new interrogatory aimed at soliciting this information. Plaintiff responded by stating that any use of an Accused Blender in accordance with defendants' instructions or advertising was an infringing use.  Plaintiff identified only one specific instance of alleged direct infringement by defendants:  the "demonstrations of the Accused Blenders as shown in the QVC videos produced by Back to Basics."  Defendants sought supplementation of this response but never received one.  Defendants also asked plaintiff to identify those promotional materials that plaintiff contends teach breaking up air pockets before they can form. Plaintiff apparently responded by identifying certain promotional material.[5]  It is not clear which promotional material was identified by plaintiff.  Plaintiff responds that much of the evidence it relies on in support of its cross-motion for summary judgment was produced by defendants just before defendants filed their motion for summary judgment.  Further, the deposition testimony relied upon by plaintiff was not obtained until after defendants filed their motion.

Plaintiff's position is well-taken.  The Court finds plaintiff should not be limited in the evidence upon which it may rely in support of its cross-motion for summary judgment.  Having addressed the question of what evidence is before the Court, the Court now turns to the merits of the parties' motions for summary judgment.

It is an act of direct infringement to make, use, offer to sell or sell any patented invention without authority in the United States.  35 U.S.C. § 271(a).  To infringe a method claim, each step of the claimed method must be performed.  *NTP, Inc. v. Research in Motion, Ltd.*, 418 F.3d

---

[5]
  As will be discussed below, whether defendants' promotional materials teach users to infringe goes to whether defendants' possessed the specific intent required to induce infringement.

1282, 1318 (Fed. Cir. 2005) ("it is well established that a patent for a method or process is not infringed unless all steps or stages of the claimed process are utilized").  A device need not be used in an infringing manner in every instance of use to form the basis for a finding of infringement of a method claim.  *Bell Commc'ns Research v. Vitalink Commc'ns Corp.*, 55 F.3d 615, 622-23 (Fed. Cir. 1995).  However, to prove direct infringement where a device can be used in an infringing or non-infringing manner, the plaintiff must point to specific instances of direct infringement.  *ACCO Brands, Inc. v. ABA Locks Mfr. Co., Ltd.*, 501 F.3d 1307, 1313 (Fed. Cir. 2007) (plaintiff produced no evidence of infringement in the form of, for example, testimony of actual users or surveys of actual customers).[6]

To prove inducement of infringement or contributory infringement, there must first be direct infringement.  *Aro Mfg. Co. v. Convertible Top Replacement Co.*, 365 U.S. 336, 341 (1961) (defendant can be held liable for contributory infringement if its customers directly infringe); *C.R. Bard, Inc. v. Advanced Cardiovascular Sys., Inc.*, 911 F.2d 670, 673 (Fed. Cir. 1990) (defendant can be held liable for inducement of infringement if its customers directly infringe).  "A defendant's liability for indirect infringement must relate to the identified instances of direct infringement.  Plaintiffs who identify *individual* acts of direct infringement must restrict their theories of vicarious liability -- and tie their claims for damages or injunctive relief -- to *the identified act*."  *Dynacore Holdings Corp. v. U.S. Philips Corp.*, 363 F.3d 1263, 1274 (Fed. Cir. 2004) (emphases in original).[7]

---

[6]  Plaintiff's own president and CEO, John Barnard, admitted that the Accused Blenders can be used in a non-infringing manner.

[7]  Plaintiff directs the Court to a different statement in *Dynacore*:

17

A.     Direct Infringement by Defendants - Mr. Oldroyd's Testing of Blenders

There is no dispute that the Accused Blenders can be used in an infringing or a non-infringing manner.  What this Court must decide, rather, is whether there is any genuine issue of material fact that any infringing use has actually occurred.

Plaintiff points to the deposition testimony of Dale Oldroyd, an employee of Back to Basics, to establish direct infringement by defendants.  Mr. Oldroyd testified to several things.  He stated that the "normal" testing of defendants' blenders that evaluated the ability of the blenders to crush ice cubes did not involve the use of a Stir Stick.  In those instances, he did see air pockets form (what defendants call "bridging" of the material above the mixing blades).  Mr. Oldroyd further testified that when an air pocket would form during testing, "the stir stick was used to, you know, spin it around and, you know, break that material up to allow it to fall back into the blades."

When asked to clarify whether an air pocket ever formed while using the Stir Stick, he stated that the Stir Stick is inserted after the air pocket has formed:  "the stir stick was used to

---

"Plaintiffs who identify an entire category of infringers (e.g., the defendant's customers) may cast their theories of vicarious liability more broadly, and may consequently seek damages or injunctions across the entire category."  (citing *Anton/Bauer, Inc. v. PAG, Ltd.*, 329 F.3d 1343 (Fed. Cir. 2003) and *Alloc, Inc. v. ITC*, 342 F.3d 1361 (Fed. Cir. 2003)).  In the case cited for this proposition, *Anton/Bauer*, it was undisputed that the accused product could only be used in an infringing manner and that all of defendant's customers infringed every time they used the product. The instant case is distinguishable. As stated above, if a product can be used in a non-infringing manner, plaintiff must rely upon proof of specific instances of infringement. *See ACCO Brands*, 501 F.3d at 1313.  The Court believes the broad statement by the *Dynacore* court is best read as limited to fact situations such as those in *Anton/Bauer*.

18

break up the air pocket.  If you're using the stir stick, you're moving the material in the container around.  It's being moved around, interrupted so that it can fall back into the blades to be blended."  Mr. Oldroyd was then asked whether he had ever witnessed the operation of a Back to Basics' blender with a Stir Stick where the user did not touch or move the Stir Stick.  Mr. Oldroyd testified that this situation occurs when he tests multiple blenders at one time and cannot stir all of the Stir Sticks at once.  When asked whether an air pocket occurred during those instances where the Stir Stick was not being moved, he stated "I don't recall specifically."  The excerpts of the testimony provided do not indicate which of the Accused Blenders Mr. Oldroyd used during his testing.

To prevail, plaintiff must establish that Mr. Oldroyd practiced every step of the claimed method and otherwise met all of the limitations of the claim.[8]  However, plaintiff's cross-motion addresses only several of the claim elements, namely "adjacent to and above the rotating blades", "free of contact with the pitcher" and "preventing formation of an air pocket."  These limitations are the same as those addressed by defendants in their motion for summary judgment of non-

---

[8]

> Plaintiff half-heartedly argues it must only prove defendants practiced the two operative steps of the claimed method: supplying a fluid and positioning the Stir Stick.  Plaintiff is incorrect.  Each and every limitation or element of the claimed method must be met.  *E.g., Dynacore*, 363 F.3d at 1273.  Plaintiff itself tacitly acknowledges this fact by addressing some of the structural limitations of the claim in its cross-motion.  Plaintiff's infringement expert Dr. Swanger also acknowledges that "even though claim 1 of the '021 patent is a method claim, it does disclose certain structure that is used to implement the method."  Dr. Swanger goes on to opine that the Accused Blenders possess the requisite structure.

19

infringement.[9]  The Court must therefore first determine whether or not plaintiff's failure to address the remaining claim elements is fatal to its cause.

Plaintiff argues that it is only required to address those claim elements that defendants addressed in their motion for summary judgment.  Plaintiff asserts that defendants conceded the other elements by failing to address them.  Plaintiff points to the deposition testimony of defendants' Rule 30(b)(6) witness, Mr. Daniels, in support of its position.[10]  Mr. Daniels testified as follows:

> Q.      Would you agree that there are factual bases for defendants' noninfringement position set forth in [defendants' motion for summary judgment of no patent infringement]?
> A.      Yes, I would.
> Q.      Are you aware of any bases for defendants' noninfringement position that are not articulated in the motion?
> ...
> A.      No.
> Q.      And just to be clear, I'm not asking you for attorney-client privilege.  I'm merely asking you for -- you know, to define the universe of factual bases for the assertions in defendants' affirmative defense that has not infringed, contributed to the infringement of or induced others to infringe, either directly or indirectly, any valid claim of the '021 patent.  ...  Are you aware of any reason why defendants believe that they have not infringed the '021 patent that are not articulated in defendants' motion for summary judgment of noninfringement.
> A.      I thought I just answered that.  I am not aware of any factual bases that aren't listed here as to why we don't infringe.

Defendants now attempt to qualify Mr. Daniels' testimony.  They argue he simply admitted that

---

[9]      The terms "claim element" and "claim limitation" are used interchangeably throughout this Opinion.

[10]      While neither party states this explicitly, it is the Court's understanding that Mr. Daniels testified on behalf of *all* defendants.

20

defendants chose to limit their motion for summary judgment to their strongest arguments, not that they conceded infringement of the other elements. After all, for defendants to prevail, they need only show that plaintiff's evidence fails on at least one element. Plaintiff, on the other hand, must put forward affirmative evidence on each and every element to be entitled to judgment as a matter of law.

The Court finds that defendants did in fact concede the other elements of the claim. Mr. Daniels' testimony is not ambiguous. Plaintiff asked for the "universe of factual bases for the assertions in defendants' affirmative defense." The question was not limited to the factual bases for those arguments advanced in defendants' motion for summary judgment of no patent infringement. Mr. Daniels answered there were no factual bases that were not articulated in defendants' motion. This party-admission cannot now be rescinded.

The Court now turns to whether plaintiff has established that Mr. Oldroyd infringed Claim 1 of the '021 Patent by practicing the *disputed* claim elements. Plaintiff asserts Mr. Oldroyd necessarily used an Accused Blender with a Stir Stick (1) adjacent to and above the blades and (2) free of contact with the pitcher when he inserted a Stir Stick but did not stir. Plaintiff has no direct evidence as to these two elements. Instead, plaintiff relies on the report of its infringement expert Dr. Lee Swanger to establish that use of the Stir Stick without stirring will *necessarily* result in the Stir Stick being positioned adjacent to and above the rotating blades and maintained free of contact with the pitcher (what Dr. Swanger terms the "default" position or operation). Dr. Swanger examined three of the "dozens" of defendants' Accused Blenders: the Smoothie Elite, the Smoothie Plus and the Blender Solution 5000. Dr. Swanger opines as follows:

21

It is my understanding that the Back to Basics blenders have the same general functional parts and features and that they only differ aesthetically from one another.  The stir stick of the Smoothie Elite is representative of the other Back to Basics blenders I have examined and tested, in geometry and configuration with respect to the other components of the blenders, in particularly with respect to the blades and bearing housing beneath the blades.

***

Through my testing, I have found that, during normal operation, the Back to Basics blenders will practice the claimed method of the '021 patent.  ...  In operation, when the stir stick is inserted into the container but not held by a user, the natural, default position for the stir stick is at or near the center of the container without touching the sides.  This is because the flow of materials and pressure differential in the container due to the momentum imparted by the rotation of the blades will draw the displaced stir stick into this centered position.  I have operated the Back to Basics blender with the stir stick inserted into the container but without holding it and have found that the stir stick will maintain itself adjacent to and above the blades at or near the center of the container without touching the sides.

Defendants counter Dr. Swanger's opinion on several grounds.  They argue there is at least a question of fact as to whether use of the Stir Stick in the so-called "default" manner will necessarily render the Stir Stick "adjacent to and above the rotating blades" and "free of contact with the pitcher."  Defendants' expert Dr. Rashidi opines that "the ball and socket design of the stir stick makes it very difficult and unlikely that the stir stick will be maintained [adjacent to and above the rotating blades] while the blender is in use."  Moreover, the evidence shows that use of the Stir Stick without holding it occasionally results in the Stir Stick spinning in the pitcher rather than remaining stationary.  A video clip submitted by defendants demonstrating use of one of the Accused Blenders shows a Stir Stick spinning freely in a blender when it is not being held by the blender operator.  Further, plaintiff's marketing expert, Dr. Traylor, observed

22

that when some end users place the Stir Stick in the blender, they "let the stir stick spin."[11] Defendants argue there is at least a question of fact as to whether a Stir Stick spinning in this manner is "adjacent to and above the rotating blades."

Defendants also argue that, in any event, Dr. Swanger's evidence is insufficient because it is merely hypothetical in nature. Where an accused product can be used in a non-infringing manner, plaintiff must point to specific instances of infringement. Plaintiff cannot rely on hypothetical infringement such as an infringing use by an expert witness. *See ACCO Brands*, 501 F.3d at 1313 (plaintiff's sole evidence was opinion of expert who used product in an infringing manner; court held this hypothetical evidence of what might occur when a customer uses the product insufficient).

The Court finds that *ACCO Brands* dictates that Dr. Swanger's opinion cannot be relied upon in support of plaintiff's claim. Because the Stir Stick may be used in a non-infringing manner, plaintiff must point to specific instances of infringement. Plaintiff cannot rely on the hypothetical infringement by Dr. Swanger to show that Mr. Oldroyd practiced these elements of the claim.[12]

---

[11]

        Dr. Traylor's expert report, which purports to characterize the behavior of approximately 100 survey participants as they used an Accused Blender, will be discussed more fully below. For the present purposes, it is sufficient to note that he observed the Stir Stick spinning on several occasions when the participant inserted the Stir Stick but did not hold on to it while operating the blender.

[12]

        Plaintiff also argues that defendants' Accused Blenders were *designed* to have the Stir Stick positioned adjacent to and above the blades. Plaintiff points to defendants' blender packaging , which states the Stir Stick "stirs within a quarter inch of the blade." Plaintiff also points out that defendants' instruction manual does not

Because Dr. Swanger's opinion is plaintiff's only evidence on whether Mr. Oldroyd operated the Accused Blender with a Stir Stick "adjacent to and above the rotating blades" and "free of contact with the pitcher", plaintiff cannot establish Mr. Oldroyd infringed Claim 1 of the '021 Patent.[13]

B.    Direct Infringement by Defendants - Mr. Daniels' QVC Demonstration

Plaintiff also attempts to establish defendants directly infringed Claim 1 by relying on the demonstration of several Accused Blenders by Back to Basics' Thomas Daniels.  Plaintiff submits a ten-minute video of a demonstration on QVC in which Mr. Daniels demonstrates the use of one of defendants' Accused Blenders - the Smoothie Elite 500 model.  Mr. Daniels has several blenders set up on a table.  He is shown adding fresh fruit and ice cubes to a blender, inserting the Stir Stick, turning the blender on and stirring the liquid until the resulting

---

*require* users to touch the sides of the pitcher with the Stir Stick. Defendants dispute this position with evidence that the Stir Stick and pitcher of the Accused Blenders were actually designed to facilitate movement of the Stir Stick and contact of the Stir Stick with the pitcher.  While this evidence might be relevant to inducement of infringement and whether defendants intended their users to infringe, it is not evidence of a specific instance of direct infringement as required under *ACCO Brands*, 501 F.3d at 1313.

Defendants' expert Dr. Rashidi also testified it is *possible* for the Stir Stick to remain adjacent to and above the rotating blades when it is not held by the end user, depending on what ingredients are supplied to the pitcher.  However, this is not evidence of whether Mr. Oldroyd ever practiced the claimed method.

[13]

Because plaintiff has no evidence as to whether Mr. Oldroyd used the Stir Stick adjacent to and above the rotating blades and free of contact with the pitcher, the Court declines to address whether he operated an Accused Blender so as to prevent the formation of an air pocket.

"smoothie" is ready.  He then dispenses the smoothie from a tap-like pour spout located at the bottom of the pitcher while still stirring the mixture.  He then lets go of the Stir Stick and allows the remaining smoothie to continue mixing while he prepares a second smoothie in a second blender.  Mr. Daniels then returns to the first blender and dispenses an additional smoothie without moving the Stir Stick.

When Mr. Daniels operates the second blender, he stirs the mixture during the mixing process and while dispensing the resulting drink.  He does also bring the Stir Stick to rest at times during mixing; when he does so, it appears to be angled toward the side of the pitcher rather than straight down toward the blade assembly.  While Mr. Daniels dispenses the drink from the second blender, the Stir Stick is occasionally stationary in the center of the pitcher.  Mr. Daniels subsequently turns the second blender off.  When he dispenses a second drink from the second blender, he turns the blender back on but does not operate the Stir Stick.

During the demonstration, Mr. Daniels explains that the pitcher is shaped like a vortex to create a "tornado-type action" during mixing which, together with the Stir Stick, enhances the mixing process by forcing the ingredients toward the blades.  The Stir Stick is also described by the QVC host as being used to "stir things up" and "move everything around."  Mr. Daniels then demonstrates the Stir Stick to a caller.  He demonstrates by moving the Stir Stick in a circular motion in an empty blender to show that the Stir Stick does not touch the blades of the pitcher. The Stir Stick does not appear to touch the sides of the pitcher during this portion of the demonstration.

Defendants' video submissions include five short video clips from QVC as well as what appears to be a television commercial.  Near the end of some of the clips submitted by

25

defendants, only the dispensing mechanism on the blender is shown; therefore, it is difficult to know whether the user is still stirring the mixture at that point during the demonstration.  Where the Stir Stick is visible, it is generally being used to stir.  In clip #3 submitted by defendants, the Stir Stick appears to touch the sides of the pitcher during mixing.  In clip #4, it appears that an air bubble rises to the top of the mixture after Mr. Daniels dispenses the smoothie.  In clip #5, the user lets go of the Stir Stick after dispensing a smoothie and while the blender is still on.  The Stir Stick continues to rotate in the blender until the blender is shut off.

The Court is also presented with evidence in the form of Mr. Daniels' deposition testimony.  In his most recent deposition, he was asked to characterize portions of the QVC video submitted by plaintiff.  Mr. Daniels was questioned regarding a 26-second portion of the ten-minute video (from 1 minute 38 seconds to 2 minutes 4 seconds).  Mr. Daniels testified that during this time, he did not touch the Stir Stick and the Stir Stick did not touch the side of the pitcher.  He also testified that he was unable to determine from a viewing of the video whether or not an air pocket formed.

Plaintiff argues the evidence establishes that Mr. Daniels practices each of the disputed claim limitations:  maintaining the Stir Stick adjacent to and above the rotating blades and free of contact with the pitcher thereby preventing the formation of an air pocket.  Defendants point out that in one of the short video clips they submitted, an air bubble is actually seen rising to the top of the fluid in the blender; therefore, it was not prevented from forming as required by the claim.  Defendants also argue that plaintiff must prove an air pocket would have formed but for the use of the Stir Stick to establish that the Stir Stick actually prevented the formation of the air

pocket.[14]

Plaintiff does not address whether or not it must prove an air pocket would have formed but for the use of the Stir Stick.  Instead, plaintiff merely counters that Mr. Daniels infringes the claim even though he engages in a stirring operation.  Plaintiff maintains that Mr. Daniels practices each claim limitation in dispute and that an infringing act cannot be translated into a non-infringing one simply by employing the additional step of stirring.  *Moleculon*, 793 F.2d at 1271 ("an accused method does not avoid literally infringing a method claim having the transitional phrase 'which comprises' (or 'comprising') simply because it employs additional steps").[15]

---

[14]

Defendants also rely upon the testimony of their expert Dr. Rashidi. Dr. Rashidi opines that whether or not an air pocket will form is dependent upon a large number of variables.  The mere presence of a Stir Stick or Plunger is insufficient to guarantee an air pocket will not form.  In fact, Dr. Rashidi tested the Accused Blenders and found that in some instances, an air pocket formed even when he used the Stir Stick.  The Court finds this opinion is related to whether or not Claim 1 is valid.  Moreover, Dr. Rashidi's experience using the Accused Blenders is not evidence of whether or not Mr. Daniels infringed Claim 1 when he demonstrated the blenders on QVC.

[15]

Plaintiff's reliance on *Bio-Tech. Gen. Corp. v. Duramed Pharms.*, 325 F.3d 1356, 1361-62 (Fed. Cir. 2003), is misplaced.  *Duramed* involved a patent claim to a method of contraception involving ingestion of an oral contraceptive pill.  The claim required taking a pill containing only estrogen at the outset of the menstrual cycle. Defendants' patients were instructed to take the estrogen-only pill at the end of the menstrual cycle.   However, the timing of administration of the placebo pill affected the patients' cycles such that, after taking defendants' pills for more than one month, the estrogen-only pill was then being taken at the outset of the cycle. This, the court found, was sufficient for plaintiff to avoid a grant of summary judgment of no infringement to defendant.  The case does not support plaintiff's proposition that Mr. Daniels infringed so long

While the parties may differ in their interpretations of what exactly is shown in the QVC video, such differences do not create a genuine issue of material fact. They merely represent attorney argument and characterization of the evidence. The evidence itself has been viewed by the Court and the Court finds no genuine issue as to whether Mr. Daniels is shown infringing the claim. The Court finds that the QVC video does not show Mr. Daniels practicing the claimed method because he engages in a stirring operation that was disclaimed by plaintiff during prosecution before the United States Patent and Trademark Office ("PTO").[16, 17]

The Court finds that plaintiff has failed to show it is entitled to judgment as a matter of law that defendants directly infringed Claim 1 of the '021 Patent. On the other hand, defendants have shown that plaintiff, "who bears the burden of proof at trial [has failed] to make a showing

---

as he ceased stirring at some point during operation of the blender.

[16]

Plaintiff's reliance on an email by Back to Basics employee Brian Beesley is misplaced. Plaintiff contends that Mr. Beesley "knew that air pockets formed during blending operations and that those air pockets were problematic because they disrupted blending." This may be true. Mr. Beesley's email contains a list of selling advantages of defendants' blenders over a competitor's blender. The competitor's advertising material stated no stir stick was necessary. Mr. Beesley points out that an air pocket will form in the competitor's blender if the mixture is thick enough and that use of the Stir Stick allows making a thicker smoothie. Even so, this does not establish that Mr. Daniels infringed the claim.

[17]

Plaintiff also attempts to make much of the fact that in approximately 2005 or 2006, Mr. William Beesley III, one of the owners of Back to Basics, brought to Mr. Daniels' attention that Vita-Mix's prior art blender, the 3600 model, also possessed a Stir Stick, or what Vita-Mix called a "Tamper." However, the Court does not make a determination of infringement by comparing the accused product to plaintiff's commercial product. The accused product must be compared to the claim itself, with all its elements and limitations.

28

sufficient to establish" direct infringement.  *Tolton*, 48 F.3d at 941.  Accordingly, the Court

grants defendants' motion for summary judgment of no direct infringement and denies plaintiff's

cross-motion for summary judgment of direct infringement.

C.      <u>Direct Infringement by Defendants' Customers as basis for finding Indirect Infringement</u>

As discussed above, plaintiff asserts that defendants directly infringed Claim 1 of the

'021 Patent.  Plaintiff also asserts that defendants have actively induced others to infringe or

have contributed to infringement by others.  Each of these acts are considered acts of "indirect"

infringement."  A prerequisite to finding indirect infringement is a finding of direct infringement

by another.  Plaintiff attempts to show direct infringement by another in two ways:  (1) by

inferring that defendants' customers infringe, and (2) by conducting a survey of consumers who

use kitchen blenders.  The Court addresses each position in turn.

Plaintiff has no direct evidence that any of defendants' customers have ever practiced the

disputed claim limitations.  Plaintiff instead argues that direct infringement can be inferred

where a defendant's instruction manual teaches customers to infringe.  *Golden Blount, Inc. v.*

*Robert H. Peterson Co.*, 438 F.3d 1354, 1362 (Fed. Cir. 2006); *Moleculon Research Corp. v.*

*CBS, Inc.*, 793 F.2d 1261, 1272 (Fed. Cir. 1986).  In each of the cited cases, there was no dispute

that the instructions taught users to infringe the patent at issue.  The present case is

distinguishable.  Here, defendants' instruction manuals do not instruct users to infringe.  The

manuals instruct the user to "turn", "rotate" or "move" the Stir Stick "counter-clockwise" to

"increase blending efficiency."  At most, the manuals fail to tell users not to infringe.  While the

instructions certainly need not recite the claim steps and limitations verbatim to teach

infringement, the Court finds that no reasonable factfinder could conclude that defendants'

instructions teach users to infringe.  These manuals cannot support an inference that defendants' customers have infringed Claim 1.

D.        Direct Infringement by Survey Subjects as basis for finding Indirect Infringement

In the absence of evidence of direct infringement by actual customers, plaintiff also conducted a survey to determine whether end users are likely to infringe Claim 1.  The survey was conducted by Dr. Mark Traylor to establish that certain end users operated defendants' blenders in an infringing manner.  Dr. Traylor's expert report (the "Traylor Report") sets forth his observations as to how the survey participants used the Accused Blenders.  Plaintiff's goal is to provide evidence that will form the basis for a finding of inducement of infringement or contributory infringement.[18]

The Traylor Report purports to summarize the behaviors of 103 survey participants who were asked to use one of defendants' Accused Blenders to make a drink.  Participants were given a new blender in a box and asked to use the blender as if they had just purchased it for use in their home.  Each user was given one of four of defendants' Accused Blenders:  the Smoothie Elite, the Blender Solution 5000, the Smoothie Plus (white), or the Smoothie Plus (brushed chrome).[19]  The participants were videotaped.  Dr. Traylor then watched the videotape and classified each subject's behavior into one or more categories.  The behavior could be classified as "held stir stick stationary", "used stir stick to mix a little", "used stir stick to mix a lot",

---

[18]
    As stated above, a finding of direct infringement by another is a prerequisite to finding a defendant induced infringement or contributed to it.

[19]
    These appear to be the same blenders examined by plaintiff's infringement expert Dr. Swanger.

"didn't hold stir stick" or "did not use the stir stick."  The behavior was further classified

depending on whether the blender was on or off and whether the lid was on or off.  If a

participant engaged in more than one of these behaviors, then each behavior was counted for that

participant.  Dr. Traylor's assistant also classified each participant's behavior.  Dr. Traylor and

his assistant then compared classifications and made changes as they deemed fit.  A chart of the

results is reproduced below:

| **Main Classification** | **Sub-Classification** | **Frequency** |
| --- | --- | --- |
| Did Not Use Stir Stick | | 40 |
| With Blender On | held stir stick stationary | 44 |
| | used stir stick to mix a little | 34 |
| | used stir stick to mix a lot | 26 |
| | didn't hold stir stick | 16 |
| With Blender Off and Lid On | used stir stick to mix a little | 21 |
| | used stir stick to mix a lot | 11 |
| With Blender Off and Lid Off | used stir stick to mix a little | 8 |
| | used stir stick to mix a lot | 4 |

The categories were created by plaintiff's counsel.  Dr. Traylor was not told what

behaviors mattered or what the parties' positions were in this litigation.  He was asked only to

identify whether and how the subjects used the Stir Stick.  He did not determine whether any

user touched the side of the pitcher with the Stir Stick or whether an air pocket formed during

use.  Thus, Dr. Traylor offers no opinion on whether any of the participants infringe the claim at

issue.[20]  However, plaintiff's attorneys have designated some of the behaviors as "infringing."

---

[20]

Plaintiff's technical expert Dr. Swanger also does not appear to have

31

Specifically, it seems that "held stir stick stationary", "didn't hold stir stick" and "used stir stick to stir a little" with the blender on are considered by plaintiff to be infringing acts.  Dr. Traylor also offers no opinion on whether any of the participants read the user manuals supplied with the Accused Blenders.  Thus, he does not offer an opinion on whether defendants induced infringement by teaching users to infringe through the instructions provided in their user manuals.

Defendants move to strike the Traylor Report pursuant to Federal Rules of Evidence 402 and 702.  Rule 702 provides:

> If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise, if (1) the testimony is based upon sufficient facts or data, (2) the testimony is the product of reliable principles and methods, and (3) the witness has applied the principles and methods reliably to the facts of the case.

Fed. R. Evid. 702.  Rule 402 provides in pertinent part:  "Evidence which is not relevant is not admissible."  Evidence is relevant if it has "any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence."  Fed. R. Evid. 401.

Survey evidence is admissible and is a proper subject of expert opinion testimony.  *See, e.g., Applera Corp. v. MJ Research, Inc.*, 389 F.Supp.2d 344 (D. Conn. 2005).  In determining whether the proffered expert opinion is relevant, the Court should consider the "fit" of the opinion, that is whether the opinion "is sufficiently tied to the facts of the case that it will aid the

---

offered any opinion on whether any of the survey participants infringed.

32

jury in resolving a factual dispute." *Daubert v. Merrell Dow Pharms.*, 509 U.S. 579, 591 (1993). The Court may also determine there is "too great an analytical gap between the data and the opinion proffered." *Gen. Elec. Co. v. Joiner*, 522 U.S. 136, 146 (1997). The Court is not required to admit an expert opinion that is connected to the data by only the expert's word. *Id.*

Defendants have several complaints regarding Dr. Traylor's opinion and the methodology underlying it. Defendants assert (1) the Traylor Report will not assist the trier of fact because classification of the behaviors does not require any specialized knowledge, training or education; (2) it will not assist the trier of fact because it does not assess whether the participants read or relied upon defendants' instructions in deciding how to use the Accused Blenders; (3) it will not assist the trier of fact because Dr. Traylor did not assess whether an air pocket formed or was prevented from forming during operation by the participants; (4) the results are irrelevant or the methods unreliable because plaintiff's attorneys changed one of Dr. Traylor's classifications from "let the stir stick spin" to "did not hold the stir stick"; (5) the results are irrelevant or the methods unreliable because the classification "held the stir stick stationary" included instances where users held the Stir Stick to the side and touched the side of the pitcher; (6) the results are irrelevant or the methods unreliable because Dr. Traylor failed to assess whether an air pocket would have formed had the "infringing" users not used the Stir Stick; (7) the results are irrelevant or the methods unreliable because at least some of the behaviors were incorrectly classified; (8) the results are based on insufficient facts or data or the methods are unreliable because the participants do not represent defendants' actual customers; and (9) the methods are unreliable because Dr. Traylor has no understanding of the matters at issue in this case though the study was designed by plaintiff's attorneys specifically for use in

33

this litigation.

Many of defendants' arguments are supported simply by the text of Rules 402 and 702 and the general principles applied to expert testimony, detailed above.  However, in support of their final argument, defendants rely on *Mike's Train House, Inc. v. Lionel, LLC*, 472 F.3d 398 (6th Circ. 2007).  In *Lionel*, defendant was accused of copying plaintiff's copyrighted model train designs.  Plaintiff's expert compared various design drawings by the parties and concluded that certain features of defendant's drawings were indicative of copying.  For example, both plaintiff's and defendant's drawings used the number "2600" to refer to the train's boiler.  Plaintiff's expert opined this was evidence of copying.  However, the record made clear that all model train manufacturers use the number "2600 " to refer to the boiler as a matter of industry custom.  Thus, the appeals court found plaintiff's expert's methodology unreliable and remanded the case for a new trial.  The Sixth Circuit also noted it is "suspicious of methodologies created for the purpose of litigation, because 'expert witnesses are not necessarily always unbiased scientists.'"  Thus, the court should consider "whether an expert's testimony relates to matters growing naturally and directly out of their own research, or whether the expert's testimony has been developed for the purposes of litigation."

Back to Basics asserts that Dr. Traylor's report should be stricken pursuant to *Lionel* because he had an inadequate understanding of the issues involved in this lawsuit leading to an opinion with no nexus to the issues before the Court.  Defendants also complain that Dr. Traylor's methodology was unduly manipulated by plaintiff's attorneys and was purely litigation-driven, a factor considered by the *Lionel* court.  Plaintiff responds that the *Lionel* case is inapplicable because the expert opinion at issue was directed to copyright infringement and

34

not a consumer survey.

Plaintiff further responds, more generally, that all of defendants' complaints go to the weight not the admissibility of the evidence.[21]  *E.g., Scott Fetzer Co. v. House of Vacuums, Inc.*, 381 F.3d 477 (5th Cir. 2004) (usually, methodological flaws go to weight of evidence; but some surveys are so flawed as to render any reliance on them unreasonable; plaintiff's survey was inadmissible in trademark case because questions were leading and universe of participants was too narrow).  Plaintiff's primary thrust is that surveys are generally admissible.  *Applera*, 389 F.Supp.2d 344 (survey of actual customers used to establish direct infringement as basis for finding inducement of infringement); *see also Winner Intern. Royalty Corp. v. Wang*, 202 F.3d 1340, 1350 (Fed. Cir. 2000) (survey established nexus between commercial success and patented feature, went to rebutting a *prima facie* case of patent invalidity for obviousness).

More specifically, plaintiff argues that Dr. Traylor's "double-blind" survey, in which neither he nor the subjects knew which behaviors were favorable to which party, was objective and accurate in its reporting and, thus, reliable.  He was tasked with determining "how consumers use a Back to Basics blender and 'stir stick' to prepare a drink."  His methodology is purportedly more objective than a question-and-answer survey would have been because it avoids the potential for leading the participants or guiding their responses in any way.

---

[21]

> Plaintiff also argues, albeit halfheartedly, that the motion to strike is untimely because it was not filed with defendants' motion for summary judgment of non-infringement.  Plaintiff offers no legal authority to support its position.  The Traylor Report was first relied upon by plaintiff in support of its cross-motion for summary judgment of infringement.  The motion to strike was filed contemporaneously with defendants' opposition to that cross-motion. The motion to strike is not untimely.

35

As to the instances in which defendants argue Dr. Traylor mis-coded the participants' behaviors, plaintiff points out that defendants' expert Dr. Joseph only identified one such mis-coding.  The other instances were discovered by defendants' attorneys and, thus, are not supported by admissible evidence.

As to whether the Traylor Report is relevant, plaintiff relies on *Applera Corp. v. MJ Research, Inc.*, 389 F.Supp.2d 344 (D. Conn. 2005).  In *Applera*, plaintiff introduced the results of a customer survey through an expert witness.  The survey participants were actual customers of defendant.  They were asked questions about how they used defendant's product in order to determine whether any of them had directly infringed a complex biotechnology method claim in plaintiff's patent.  This evidence was apparently used to establish defendant had induced these customers to infringe.  The court declined to preclude the expert's testimony at trial, stating the double-blind study was conducted with "rigorous methodological standards."  The court also found the survey relevant:  "the questions pertained in part to experiences learned by direct perception and to events that are unlikely to be forgotten, namely the usage of [defendant's products] during a period not exceeding six years, and were posed to individuals who by self-report were the most knowledgeable in the lab about such usage."

Plaintiff also relies on deposition testimony by defendants' own experts.  Dr. Rashidi, defendants' technical expert on infringement, and Dr. Joseph, defendants' rebuttal survey expert, both testified that, during use by certain survey participants who otherwise appear to practice the claimed method, they saw no air pocket form.  This, plaintiff says, establishes that the survey is relevant to infringement.

Finally, plaintiff argues that the "universe" of survey participants is not over-inclusive

36

and, if it is, this goes to the weight of the evidence not its admissibility. Plaintiff cites to several trademark cases in support of its position. In these trademark cases, plaintiffs relied on surveys of actual or potential customers to establish the "likelihood of confusion" element necessary to a finding of trademark infringement.

The Court agrees with plaintiff that survey evidence generally is admissible. The Court finds that Dr. Traylor's survey was conducted in a reliable manner. Defendants' dissatisfaction with Dr. Traylor's conclusions are grounds for vigorous cross-examination, not exclusion.

The more difficult question is whether the Traylor Report is relevant to the issues in this litigation - namely whether defendants actively induced infringement. First, the Court must decide whether the behaviors of these survey participants is relevant to whether actual users of the Accused Blenders (that is, defendants' actual customers) have infringed Claim 1. The participants in Dr. Traylor's survey were selected if they decided or helped to decide what new kitchen appliances to buy for the household, owned at least one blender and used it at least once per month. Potential participants were disqualified if they or anyone in their family worked for a kitchen appliance manufacturer, distributor or retailer, a marketing research company, an advertising agency, a law firm or a public relations firm.

In the many trademark cases relied upon by the parties, courts hold that the "universe" of survey participants must be adequately defined so as to represent actual or potential customers. *E.g., Leelanau Wine Cellars, Ltd. v. Black & Red, Inc.*, 452 F.Supp.2d 772 (W.D. Mich. 2006). The parties also point to two patent cases in which surveys are discussed in the context of demonstrating direct infringement as the foundation for a finding of indirect infringement. In *ACCO Brands*, the court merely noted that plaintiff failed to provide any evidence of direct

infringement in the form of, for example, testimony of actual users or surveys of actual

customers.  The court did not say such evidence was required.  In *Applera*, plaintiff did produce

a survey of actual customers and such evidence was deemed admissible.  Again, the court did not

say such evidence was required.[22]

The Court finds the Traylor Report be stricken on relevancy grounds.  However, the

Court does not do so simply because the participants were not actual or potential customers of

defendants.  There is no clear pronouncement on the subject from the Federal Circuit and, so,

this Court will not require such precision in the selection of survey participants.  The Traylor

Report is irrelevant because Dr. Traylor cannot testify whether an air pocket formed during use

by any of the survey participants, whether any participant touched the side of the pitcher with the

Stir Stick or whether any participant actually read the instruction manuals.[23]  Dr. Traylor

---

[22]

       Plaintiff also argues that there need not be "correspondence between units sold and directly infringing customers" to establish inducement; that is, plaintiff need not put forward evidence of infringement by actual or potential customers.  *Hilgraeve, Inc. v. Symantec Corp.*, 272 F.Supp.2d 613 (E.D. Mich. 2003).  In *Hilgraeve*, the district court was asked to rule on a motion for partial summary judgment to limit damages for inducement of infringement.  Defendant asked the court to assume its own customers infringed and that it induced them to do so.  Even so, defendant argued, any damages should be limited to the number of sales plaintiff could prove led to infringing uses.  The court rejected this argument reasoning that the Federal Circuit permits circumstantial evidence of intent to induce infringement.  The statements in *Hilgraeve* are inapposite to plaintiff's position.

[23]

       Plaintiff argues that many of the participants did read the instruction manuals.  However, plaintiff has no admissible evidence to back up this statement.  While the videotape does show some participants looking at the manual and turning its pages, Dr. Traylor testified that he does not know whether any of those participants actually read the contents of the manual and he made no attempt to ascertain this point.

observed only that several of the participants held the Stir Stick still or not at all while operating the Accused Blenders.  This is insufficient to permit any finder of fact to conclude that any survey participant practiced every one of the claimed limitations.[24]

E.     Inducement of Infringement

The Patent Act provides:  "Whoever actively induces infringement of a patent shall be liable as an infringer."  35 U.S.C. § 271(b).  "In order to prevail on an inducement claim, the patentee must establish first that there has been direct infringement, and second that the alleged infringer knowingly induced infringement and possessed specific intent to encourage another's infringement.  Specific intent requires a showing that the alleged infringer's actions induced infringing acts and that he knew or should have known his actions would induce actual infringements."  *ACCO Brands*, 501 F.3d at 1312 (internal quotations and citations omitted).  Plaintiff must also show that defendants knew of the patent.  *DSU Med. Corp. v. JMS Co.*, 471 F.3d 1293, 1304 (Fed. Cir. 2006) (clarifying law of inducement *en banc*).

In other words, "a patent holder must prove that once the defendants knew of the patent, they actively and knowingly aided and abetted another's direct infringement."  *Id.* at 1305 (internal quotations omitted).  "The mere knowledge of possible infringement by others does not amount to inducement."  *Id.* at 1305.  However, direct evidence of intent is not required;

---

[24]     After all, he was told only to determine how the Stir Stick was used.

Dr. Traylor also has no opinion on whether the Stir Sticks were maintained adjacent to and above the rotating blades.  For this piece of the puzzle, plaintiff relies on the hypothetical evidence from Dr. Swanger that operation of the blender in the "default" position will necessarily meet this and other claim limitations.  As this Court has already noted, Dr. Swanger's opinion on this point is inadmissible.

circumstantial evidence will suffice.  *Id.* at 1306.  But, "where a product has substantial noninfringing uses, intent to induce infringement cannot be inferred even when the defendant has actual knowledge that some users of its product may be infringing the patent."  *Warner-Lambert Co. v. Apotex Corp.*, 316 F.3d 1348, 1365 (Fed. Cir. 2003) (finding there was no evidence of intent to infringe).

Plaintiff has failed to prove direct infringement by any end user, as explained above. Plaintiff's proof of intent also fails.  Plaintiff relies on defendants' instruction manuals and packaging.  The Court has reviewed the instruction manuals and packaging.  The manuals instruct the user to "turn", "rotate" or "move" the Stir Stick "counter-clockwise" to "increase blending efficiency."  Some of the Accused Blenders' packaging actually shows the Stir Stick touching the side of the pitcher.  Plaintiff also relies on the now-stricken Traylor Report. However, as mentioned above, Dr. Traylor never ascertained whether any of the survey participants actually read the instructions or relied upon them in deciding how to use the Stir Stick.  Plaintiff also complains that the instruction manuals do not *mandate* that users touch the side of the pitcher with the Stir Stick.  However, defendants need not teach their customers to *not* infringe in order to avoid a finding of intent to induce infringement.

Defendants rely in part on the expert opinion of Dr. Edward Finegan.  Dr. Finegan holds a Ph.D. and works in the area of linguistics.  He opines that "Smoothie Maker customers would understand the manuals to suggest that the "stir stick" should be used to "stir" ingredients while the Smoothie Maker is operating and by turning the "stir stick" counter-clockwise through the mixture while the Smoothie Maker is running."  He further opines that "the manuals do not suggest that customers should not allow the "stir stick" to touch the sides of the pitcher.  On the

contrary, the "stir stick" and the directions for its use invite touching the pitcher sides with the "stir stick."

Defendants also point out their Stir Sticks and pitchers were actually designed to facilitate and encourage stirring and contact with the pitcher.  The Stir Sticks each have a ball and socket configuration at the point at which they rest upon the lid of the pitcher.  The ball and socket permit the Stir Stick to be more easily stirred.  The spacing of the "ribs" on the inner surface of the pitcher also facilitates stirring while the Stir Stick is in contact with the pitcher.  Finally, each Stir Stick has an "o-ring" around the bottom of the Stir Stick that keeps the device from scratching the inner surface of the pitcher.  Several of plaintiff's own witnesses - CEO John Barnard and named inventor on the '021 Patent Richard Boozer - testified that the o-ring was likely intended to protect the inside of the pitcher from being scratched or marred when the Stir Stick came into contact with the pitcher during use.

As stated above, to prove specific intent requires a showing that the alleged infringer's actions induced infringing acts and that he knew or should have known his actions would induce actual infringements.  This requires plaintiff to prove that once the defendants knew of the patent, they actively and knowingly aided and abetted another's direct infringement.  The Court finds that no jury could find defendants possessed the necessary intent.  As the Court has stated above, no reasonable jury could find that the instruction manuals and packaging teach users to infringe.  Moreover, there is no evidence that any user has ever relied on the instructions to do so.  Defendants' motion for summary judgment of no inducement is granted and plaintiff's cross-motion for summary judgment of inducement of infringement is denied.

F.      Contributory Infringement

41

The Patent Act provides:

> Whoever offers to sell or sells within the United States or imports into the United States a component of a patented machine, manufacture, combination or composition, or a material or apparatus for use in practicing a patented process, constituting a material part of the invention, knowing the same to be especially made or especially adapted for use in an infringement of such patent, and not a staple article or commodity of commerce suitable for substantial noninfringing use, shall be liable as a contributory infringer.

35 U.S.C. 271(c).

To establish contributory infringement, plaintiff must first establish direct infringement. *Aro Mfg.*, 365 U.S. at 341.  Plaintiff has failed to produce evidence that would permit a factfinder to conclude any end user directly infringed Claim 1.  This alone defeats plaintiff's claim of contributory infringement.

Moreover, plaintiff cannot prove the Stir Sticks are not "suitable for substantial noninfringing use."  In fact, the evidence demonstrates the Stir Sticks and Accused Blenders are suitable to perform a non-infringing stirring operation.  Many of the participants in Dr. Traylor's survey used the Stir Sticks to stir.  Mr. Daniels used the Stir Stick to stir on QVC.  And, plaintiff's own CEO John Barnard admitted at deposition that the Accused Blenders could be used in a non-infringing manner.  Defendants' motion for summary judgment of no contributory infringement is granted.  Plaintiff's cross-motion for summary judgment of contributory infringement is denied.

*3.*      *Defendants' Motion to Limit Patent Infringement Damages*

Defendants move for partial summary judgment to limit any patent infringement damages to the amount defendants would have spent to implement a non-infringing alternative.  *See Grain Processing Corp. v. American Maize-Products Co.*, 185 F.3d 1341 (Fed. Cir. 1999).  Because the

42

Court finds that defendants do not infringe Claim 1 of the '021 Patent, defendants' motion is moot.

4.      *The Patent Invalidity Motions*

In this section of the Opinion, the Court addresses defendants' motion for summary judgment that Claim 1 is invalid, plaintiff's motion for summary judgment that Claim 1 is not invalid, plaintiff's motion to strike defendants' infringement arguments contained in their invalidity motion and defendants' motion for leave to file a surreply.[25]

A patent claim must meet the requirements of 35 U.S.C. §§ 102, 103 and 112 to be valid. While defendants' counterclaim asserts all three sections of the Patent Act as grounds for finding Claim 1 invalid, defendants' motion challenges the validity of Claim 1 under Sections 102 and 103 only.[26]  Section 102 provides that no one shall be entitled to a patent if the purported invention is not novel - that is if another has invented the same thing before.  If a single prior art reference discloses all the elements of the claimed invention, that reference is deemed to "anticipate" the claimed invention and render it unpatentable under Section 102.  "There must be no difference between the claimed invention and the reference disclosure, as viewed by a person

---

[25]

Because the Court has determined there is no patent infringement, it has the discretion to refuse to consider the parties' validity contentions. *Phonometrics, Inc. v. Northern Telecom*, 133 F.3d 1459 (Fed. Cir. 1998).  However, the better practice seems to be that courts consider all issues presented given the public importance of determining whether a patent is invalid.  *Sinclair & Carroll Co., Inc. v. Interchemical Corp.*, 325 U.S. 327 (1945).

[26]

Plaintiff's motion that Claim 1 is not invalid, on the other hand, addresses all three grounds.  Plaintiff's motion is discussed more fully below.

of ordinary skill in the field of the invention." *Scripps Clinic and Res. Found. v. Genentech, Inc.*, 927 F.2d 1565, 1576 (Fed. Cir. 1991).  An anticipating prior art reference must also be "enabled"; that is, it must enable one of skill in the art to make and use the invention.  *Elan Pharms., Inc. v. Mayo Found.*, 346 F.3d 1051, 1054 (Fed. Cir. 2003).

Section 103 provides that one may not obtain a patent if "the differences between the subject matter sought to be patented and the prior art are such that the subject matter as a whole would have been obvious at the time the invention was made to a person having ordinary skill in the art."  Thus, even if one prior art reference does not teach each and every limitation of the claimed invention, the claim may still be invalid for obviousness.  To determine if a claim is obvious, the Court must consider the scope and content of the prior art, the level of one of ordinary skill in the art, the differences between the claimed invention and the prior art and any objective indicia of nonobviousness.  *Graham v. John Deere Co.*, 383 U.S. 1 (1966).  As with anticipation, to render a claim obvious, the prior art must enable one of skill in the art to make and use the claimed invention.  *Beckman Instruments, Inc. v. LKB Produkter AB*, 892 F.2d 1547 (Fed. Cir. 1989).

Defendants first argue that if Claim 1 is interpreted as broadly as plaintiff desires - that is to include stirring operations and operation where the Stir Stick incidentally touches the side of the pitcher - then Claim 1 must be invalid because plaintiff admitted the prior art taught such stirring operations and because Claim 1 explicitly disclaims any operation in which the Stir Stick touches the side of the pitcher.  However, the validity of Claim 1 is not judged against plaintiff's infringement contentions.  This Court's construction of the claim controls, not plaintiff's proffered construction.  The claim, as construed by the Court, is then compared to the prior art.

44

*E.g., Helifix Ltd. v. Blok-Lok, Ltd.*, 208 F.3d 1339, 1346 (Fed. Cir. 2000).  Plaintiff moves to strike defendants' infringement arguments made in their motion for summary judgment of patent invalidity.  The motion to strike is well taken and is granted for the reasons stated therein.[27] Defendants' motion for leave to file a surreply is denied.

As to defendants' contention that Claim 1 is invalid, defendants make several arguments: (1) Claim 1 is anticipated by U.S. Patent No. 4,561,782 to Jacobsen ("Jacobsen"); (2) Claim 1 is anticipated by U.S. Patent No. 2,757,909 to Wayne ("Wayne"); and (3) Claim 1 is obvious in light of Jacobsen, Wayne, U.S. Patent No. 2,785,547 to Barros ("Barros") and a 1982 Vita-Mix instruction manual.[28]  Plaintiff counters each of defendants arguments on the merits.

Plaintiff also asserts that defendants' motion for summary judgment of patent invalidity should be denied simply because defendants fail to cite to their expert's report or deposition testimony to support their arguments.  During discovery, defendants produced only the opinion of Dr. Rashidi in support of their invalidity contentions; no fact witnesses testified on the subject.[29]  However, in support of their motion for summary judgment that Claim 1 is invalid,

---

[27]

> Defendants' professed concern that this Court will be "duped" by plaintiff's attempts to recapture stirring operations to ensure a finding of patent infringement is not well-founded.  Defendants can rest assured that this Court relies on its own claim construction in ruling on both the infringement and invalidity motions.

[28]

> Plaintiff does not dispute that each of these references is prior art as defined by 35 U.S.C. § 102(b).

[29]

> Plaintiff moved to preclude defendants from introducing any evidence on the subject of patent invalidity.  Defendants had failed to designate any fact witness to testify on behalf of the corporations on this topic.  The Court denied plaintiff's motion stating patent invalidity is typically the realm of experts.  *See* Doc. 115.

defendants do not invoke Dr. Rashidi's opinion at all.  Thus, the only basis for finding that the

prior art anticipates Claim 1 or renders it obvious comes in the form of attorney argument.

Defendants also fail to invoke their technical expert's opinion in opposition to plaintiff's motion

for summary judgment that Claim 1 of the '021 Patent is not invalid.  Plaintiff argues that this

alone is enough to warrant a grant of summary judgment in its favor.  The Court agrees.

In ruling on a motion for summary judgment and in determining whether there is a

genuine issue of material fact, "[a] district court is not obligated to wade through and search the

entire record for some specific facts that might support the nonmoving party's claim."  *Interroyal*

*Corp. v. Sponseller*, 889 F.2d 108, 111 (6th Cir. 1989), cert. denied, 494 U.S. 1091 (1990); *see*

*also L.S. Heath & Son, Inc. v. AT&T Information Systems, Inc.*, 9 F.3d 561 (7th Cir. 1993);

*Skotak v. Tenneco Resins, Inc.*, 953 F.2d 909, 915 n. 7 (5th Cir.) ("Rule 56 does not impose upon

the district court a duty to sift through the record in search of evidence to support a party's

opposition to summary judgment …."), *cert. denied*, 506 U.S. 832 (1992).  Thus, a court is

entitled to rely, in determining whether a genuine issue of material fact exists on a particular

issue, upon only those portions of the verified pleadings, depositions, answers to interrogatories

and admissions on file, together with any affidavits submitted, specifically called to its attention

by the parties.

The Court agrees with plaintiff that defendants' motion for summary judgment that Claim

1 is invalid should be denied because defendants provide only attorney argument in support of

their invalidity contentions.  Likewise, defendants cannot defeat plaintiff's motion for summary

judgment that Claim 1 of the '021 Patent is not invalid; defendants failed to point to any

*evidence* to rebut plaintiff's position that defendants cannot prove Claim 1 is invalid.  The

attorneys employed in this matter are from very large, sophisticated firms that handle complex matters of this sort on a daily basis.  Their failure to invoke the sole evidence they have in support of their invalidity contentions cannot be ignored.

For these reasons, defendants' motion for summary judgment that Claim 1 of the '021 Patent is invalid is denied.  Plaintiff's motion for summary judgment that Claim 1 of the '021 Patent is not invalid is granted.[30]

### 5. *Plaintiff's Motion for Summary Judgment of No Inequitable Conduct*

Plaintiff moves for summary judgment on defendants' counterclaim and affirmative defense of inequitable conduct.  To prevail on their claim, defendants must present "evidence of affirmative misrepresentations of a material fact, failure to disclose material information, or submission of false material information, coupled with an intent to deceive."  *Dayco Prods., Inc. v. Total Containment, Inc.*, 329 F.3d 1358, 1362 (Fed. Cir. 2003).  Both intent and materiality are questions of fact that must be proven by clear and convincing evidence.  *Id.*  A reference "is material to patentability when it is not cumulative to information already of record or being made of record in the application, and (1) it establishes, by itself or in combination with other information, a *prima facie* case of unpatentability of a claim; or (2) it refutes, or is inconsistent with, a position the applicant takes in:  (i) opposing an argument of unpatentability relied on by the [Patent and Trademark] Office, or (ii) asserting an argument of patentability."  37 C.F.R. § 1.56(b).  "Intent to deceive cannot be inferred solely from the fact that information was not

---

[30]
As mentioned above, defendants' motion does not argue Claim 1 is invalid for failure to comply with 35 U.S.C. § 112; however, plaintiff's motion does.  Defendants' failure to rebut plaintiff's showing with any evidence makes it appropriate for the Court to grant plaintiff's motion in its entirety.

disclosed; there must be a factual basis for a finding of deceptive intent." *M. Eagles Tool Warehouse, Inc. v. Fisher Tooling Co.*, 439 F.3d 1335, 1340 (Fed. Cir. 2006).

Defendants assert that plaintiff and or its attorney engaged in several instances of inequitable conduct during prosecution of the '021 Patent.  Defendants first rely on an allegedly false statement by inventor John Barnard in a declaration submitted to the PTO.  Mr. Barnard declared that a prior art reference was irrelevant because it was directed to low-powered blenders that do not form air pockets around the blades.  Mr. Barnard later testified at deposition that he believed this statement to be true at the time he made it.  Defendants' patent law expert, attorney Thomas Smegal, counters that the statement itself is false; therefore, it is irrelevant whether Mr. Barnard *believed* it was true.  Defendants offer the Wayne patent, mentioned above in connection with patent validity, to demonstrate the falsity of the declaration.  Wayne is directed to an "agitator device for a mixer."  Wayne discloses that when mixing "liquids of relatively high viscosity" an "air bubble or pocket tends to form directly above the blades of the mixer in these circumstances and prevents much of the liquid in the container from circulating downwardly through the mixing blades in an efficient manner."  The agitator "prevents the formation of any sizeable air bubbles in the liquid."  The agitator is affixed to the blade assembly such that the agitator extends upwards from and perpendicular to the blade assembly.  The agitator is driven by a motor shaft that imparts a rotary motion to the agitator.

Defendants also assert that plaintiff committed inequitable conduct by its failure to disclose Wayne to the patent office during prosecution.  Defendants argue that plaintiff's patent attorney Edward Grieve knew of the Wayne patent during prosecution of the '021 Patent and failed to disclose it to the examiner.  During prosecution of the '021 Patent, the examiner

48

provided Attorney Grieve with a copy of the Jacobsen reference, U.S. Patent No. 4,561,782 ("Jacobsen") and relied on Jacobsen in rejecting several of the apparatus claims.  Jacobsen refers to Wayne by name and patent number and states that the Wayne patent is "entitled Agitator Device for a Mixer."  Jacobsen goes on to state that Wayne "teaches an agitator device for use in conjunction with a food mixer so that the food mixer can disintegrate relatively hard materials such as ice cubes in the absence of appreciable amounts of liquid."  Attorney Grieve testified at deposition that he could not "recall" whether or not he had seen the Wayne reference before.

Finally, defendants complain that five patents, which were disclosed to plaintiff during prosecution of two unrelated patent applications, should have been disclosed during prosecution of the '021 Patent.

To prove inequitable conduct, defendants must establish that plaintiff or its attorney acted with the intent to deceive the patent office.  Such intent cannot be inferred merely from a failure to disclose.  *M. Eagles*, 439 F.3d at 1340.  Thus, as to Wayne and the other five patents that were not disclosed, defendants cannot simply rely on attorney argument to make their case. Moreover, it was the examiner himself who made Attorney Grieve aware of the Wayne reference - albeit indirectly by citing Jacobsen as prior art.  Thus, while a reasonable factfinder could conclude that Attorney Grieve knew of Wayne, no reasonable factfinder could conclude that he acted with an intent to keep the Wayne patent and its teachings hidden from the examiner.

As to Mr. Barnard's declaration, it may be true that false statements in a declaration are presumed to be made with an intent to deceive the examiner.  The parties cite conflicting law on this point.  However, the only credible evidence as to intent rebuts this presumption - Mr. Barnard testified he did not knowingly make a false statement.  Therefore, no finder of fact could

49

reasonably conclude that he acted with an intent to deceive.  *See Hebert v. Lisle Corp.*, 99 F.3d 1109, 1116 (Fed. Cir. 1996) (knowledge of falsity is a predicate to intent to deceive).  Mr. Smegal's opinion that the declaration was in fact false does not create a genuine issue of material fact on this point.  Mr. Smegal is a patent attorney, not a technical expert.  Therefore, he is unqualified to opine whether Mr. Barnard's declaration as to the state of the art at the time was or was not true.[31]

Plaintiff's motion for summary judgment of no inequitable conduct is granted.

6.      *Plaintiff's Motion for Summary Judgment on Certain Affirmative Defenses*

Plaintiff moves for summary judgment on the following of defendants' affirmative defenses:  patent misuse, unclean hands, waiver, laches, estoppel and failure to mitigate.  The motion is granted as to patent misuse, waiver, laches, estoppel and failure to mitigate for the reasons stated in plaintiff's memorandum in support of its motion.  As to the unclean hands defense, the Court grants plaintiff's motion albeit for the reasons discussed above in connection with plaintiff's motion for summary judgment of no inequitable conduct.  Plaintiff argues that the patent statute bars an unclean hands defense where plaintiff has done no more than assert its patent against another, *see* 35 U.S.C. § 271(d).  However, defendants here assert that plaintiff has done more than that by intentionally failing to disclose material prior art references to the PTO during prosecution of the '021 Patent.  Therefore, the Court relies on its reasoning in connection with the inequitable conduct motion rather than on plaintiff's Section 271(d)

---

[31]
        The Court also questions whether Mr. Smegal would be qualified to offer an opinion on the materiality of the prior art references.  He is a patent attorney, not a technical expert or one of ordinary skill in the art.

50

argument.

7.     _Plaintiff's Motion for Summary Judgment of No Deceptive Trade Practices_

Plaintiff moves for summary judgment on defendants' third and fourth counterclaims.

(Doc. 121)  Defendants' allege plaintiff made false or misleading statements in violation of

Section 43(a) of the Lanham Act and the Ohio Deceptive Trade Practices Act.

To prevail on their counterclaims defendants must prove:

> (1) [plaintiff] has made false or misleading statements of fact
> concerning his own product or another's; (2) the statement actually or
> tends to deceive a substantial portion of the intended audience; (3)
> the statement is material in that it will likely influence the deceived
> consumer's purchasing decisions; (4) the advertisements were
> introduced into interstate commerce; and (5) there is some causal link
> between the challenged statements and harm to the [defendants].

_American Council of Certified Podiatric Physicians & Surgeons v. American Board of Podiatric_

_Surgery, Inc._, 185 F.3d 606, 613 (6th Cir. 1999) (stating elements for Lanham Act claim).[32]

Statements that are literally false are presumed to be deceptive.  _Id._ at 614.  The Court must also

recognize "the importance of clearly distinguishing the elements necessary to prove a breach of

the Lanham Act from the elements necessary to justify a certain remedy for that breach:  'the

inquiries should be kept separate because a violation of the Lanham Act can be remedied in more

ways than one.'"  _Balance Dynamics Corp. v. Schmitt Indus._, 204 F.3d 683, 689 (6th Cir. 2000).

"A plaintiff seeking injunctive relief for false advertising faces a lower standard of 'showing

only that the defendant's representations about its product have a tendency to deceive

consumers."  _Herman Miller, Inc. v. Palazzetti Imps. & Exps., Inc._, 270 F.3d 298, 323 (6th Cir.

---

[32] The elements of a claim under the Ohio Deceptive Trade Practices
Act are the same.  _Spafford v. Cuyahoga Community College_, 2005
WL 797936 at ¶ 29, n.3 (Ohio App. 2005).

51

2001) (quoting *Podiatric Physicians*); *see also Balance Dynamics*, 204 F.3d at 689 (the court

should not "read out of the Lanham Act the remedies that do not rely on proof of injury caused

by actual confusion").  However, a party seeking relief must show that "he is injured or likely to

be damaged [] before he will be entitled even to injunctive relief" though he "need not quantify

the losses actually borne."  *Frisch's Restaurants v. Elby's Big Boy*, 670 F.2d 642, 649 (6th Cir.

1982).

   In March of 1994, plaintiff advertised its Vita-Pro product as having a "patented tamper."

In December 1998, plaintiff advertised another of its products as having a "patented tamper

design."  And, in September 2002, plaintiff advertised its Vita-Prep product as having a

"patented accelerator tool."  Plaintiff also now "marks" the tamper with the '021 Patent and

Canadian Patent No. 2,091,425 (the "Canadian Patent").[33]  The claims of the Canadian Patent are

directed to plaintiff's tamper.  The Canadian Patent claims priority to U.S. Patent Application

No. 860,892 ("the '892 application").  The '892 application is the parent of the application that

led to the '021 Patent.  The '892 application, which contained claims directed to the tamper, was

rejected by the PTO and was abandoned by plaintiff.  The '021 Patent contains only one claim.

That claim is directed to a method, not an apparatus.  Specifically, it is directed to a method of

preventing the formation of an air pocket around the rotating blades of a blender.  The '021

Patent issued on April 12, 1994.  The Canadian Patent issued February 17, 2004.

   Plaintiff contends the "tamper is covered by [its] '021 patent and its Canadian Patent."

Plaintiff argues there is no evidence that its advertising statements are false or misleading, that

_____

[33]

   The Patent Act limits the damages available to patent owners who do
   not mark their patented products by affixing the patent number to the
   patented article.  35 U.S.C. § 287(a).

52

any statement deceived any customer, that any statement materially affected any customer's purchasing decision or that any statement caused injury to defendants.  Plaintiff relies heavily on the specification of the '021 Patent.  The specification refers to the tamper as the invention. Plaintiff also argues that defendants have no evidence of actual or likely deception of Vita-Mix's "consumer population."  Defendants argue that if the post-1994 advertising statements are found to be literally false, deception is presumed.

Defendants point out that plaintiff conveniently ignores that the specification of the '021 Patent was originally drafted to support the apparatus claims of the '892 application and that all apparatus claims were rejected by the PTO.[34]  Defendants also state that the '021 Patent did not issue until April 1994.  Accordingly, defendants assert that, at a minimum, the March 1994 statement is literally false and, thus, presumed to be deceptive because plaintiff had *no* patent at that time.  Defendants also argue that because the claim in the '021 Patent is directed only to a method, not the tamper *apparatus*, plaintiff's advertising between April 1994 and February 2004 was false because plaintiff did not have a patent to the tamper until February 17, 2004. Defendants further argue that any advertising of the tamper as "patented" after February 17, 2004 is misleading because the tamper is not actually patented in the United States - the '021 Patent contains no claims to the tamper apparatus.  Defendants argue such advertising is likely to deceive consumers into believing that the tamper has patent protection in the United States. Defendants also contend that marking the tampers with the '021 Patent is misleading.

---

[34]  In fact, the specification makes no mention of the now-claimed method of preventing the formation of the air pocket.  After allowance, the title and abstract were modified to indicate a method was being claimed.  *See* Doc. 81 at 7.

As to whether the advertising statements were material to consumers' purchasing decisions, defendants offer plaintiff's Rule 30(b)(6) witness Jeffrey Wellek.  Mr. Wellek testified that one purpose of marking a product with a patent number is that "a consumer would feel they're getting something unique or special, that there's something different about this product, the product that's patented, versus a similar type of product that's not patented, even though the consumer may or may not know what the patent - probably doesn't know what the patent covers."  Defendants' witness Tom Daniels testified similarly:  "any time the purchasing public sees that a patent is applied to a product, they connotate a higher value with the associated patent with that product.  ...  It adds credibility to the product and enhances the salability of the product."

Finally, defendants argue that they need not prove direct injury to themselves to prevail.  They assert that injunctive relief can be awarded when the injury consists of deceit to the consuming public.  Defendants also argue, without pointing to any legal support or evidence, that false advertising hurts all competitors in the marketplace including themselves by devaluing true statements regarding patent protection.  Plaintiff responds that the Court should, at a minimum, grant summary judgment on defendants' claim for monetary damages because defendants have no evidence to support they have actually been injured.

In reply, plaintiff also argues that defendants claims are barred by laches because the allegedly false statements were made more than two years before defendants asserted their counterclaims.

The Court agrees with plaintiff that defendants have failed to present more than a "mere scintilla of evidence" in support of their counterclaims.  *Copeland v. Machulis*, 57 F.3d 476, 479

54

(6th Cir. 1995).  Fatal to defendants' claim is their failure to present any evidence that they were likely to be or were harmed by plaintiff's advertising.  Plaintiff's motion for summary judgment on defendants' third and fourth counterclaims is granted.

8.    _Defendants' Motion for Summary Judgment of No Trademark Infringement_

Defendants move for summary judgment on plaintiff's false designation of origin claim under 15 U.S.C. § 1125(a), deceptive trade practices claim under Ohio Rev. Code §§ 4165.01 and 4165.02 and common law trademark and unfair competition claims.  Plaintiff states it has rights in the number "5000" and that defendants infringe those rights by using the number "5000" in connection with the "Blender Solution™ 5000" product.

"The Lanham Act was intended to make actionable the deceptive and misleading use of marks, and to protect persons engaged in commerce against unfair competition."  *Dastar Corp. v. Twentieth Century Fox Film Corp.*, 539 U.S. 23, 28 (2003) (internal quotations omitted). "[T]here is no such thing as property in a trademark except as a right appurtenant to an established business or trade in connection with which the mark is employed."  *Rock & Roll Hall of Fame*, 134 F.3d at 753.  "A trademark is a designation, 'any word, name, symbol, or device, or any combination thereof,' which serves 'to identify and distinguish [the] goods [of the mark's owner] ... from those manufactured or sold by others and to indicate the source of the goods, even if that source is unknown.'"  *Rock & Roll Hall of Fame & Museum v. Gentile Prods.*, 134 F.3d 749, 753 (6th Cir. 1998) (quoting 15 U.S.C. § 1127).  "[I]n order to be protected as a valid trademark, a designation must create a separate and distinct commercial impression, which ... performs the trademark function of identifying the source of the merchandise to the customers." *Id.* (internal quotations omitted).  The Lanham Act imposes liability on "any person who, on or

55

in connection with any goods or services . . . uses in commerce . . . any false designation of

origin [which] is likely to cause confusion, or to cause mistake, or to deceive . . . as to the origin

. . . of his or her goods, services, or commercial activities."  15 U.S.C. § 1125(a)(1)(A).

To prove false designation of origin, plaintiff must establish:

> (1) ownership of a specific mark in connection with specific goods or
> services; (2) continuous use of the mark; (3) establishment of
> secondary meaning if the mark is descriptive; and (4) a likelihood of
> confusion amongst consumers due to the contemporaneous use of the
> parties' marks in connection with the parties' respective goods.

See Homeowners Group, Inc. v. Home Marketing Specialists, Inc., 931 F.2d 1100, 1105 (6th Cir.

1991) (discussing service marks).  Because plaintiff's mark is unregistered, plaintiff "must show

that it has actually used the designation at issue *as a trademark*, and that the defendant has also

used the same or a similar designation *as a trademark*."  *Rock & Roll Hall of Fame*, 134 F.3d at

753 (emphases in original).  Plaintiff must also prove "the false designation [had] a substantial

economic effect on interstate commerce" for its federal Lanham Act claim to survive.  *Johnson*

*v. Jones*, 149 F.3d 494, 502 (6th Cir. 1998); *see also Future Lawn, Inc. v. Maumee Bay*

*Landscape Contractors, LLC*, 2008 U.S. Dist. LEXIS 26000 (N.D. Ohio April 1, 2008) (Carr,

C.J.).

A trademark can be suggestive, arbitrary, fanciful or descriptive.  *See, e.g., Tumblebus,*

*Inc. v. Cranmer*, 399 F.3d 754, 761 (6th Cir. 2005).  A descriptive mark is not "inherently

distinctive."  *Id.*  "[I]t does not bring to mind any one product when scrutinized in the abstract."

*Degidio v. West Group Corp.*, 191 F.Supp.2d 904, 911 (N.D. Ohio 2002).  This is why a

descriptive mark will only be protectable if it has acquired secondary meaning - that is "it has

come to distinctively identify the *source* of a particular good or service, as opposed to merely

56

identifying the product or service itself." *Id.* (emphasis added).  Whether a mark is merely

descriptive is a question of fact.  *Towers v. Advent Software, Inc.*, 913 F.2d 942, 944 (Fed. Cir.

1990).

When determining whether a particular mark or trade dress has acquired a secondary

meaning, the Sixth Circuit applies a seven-factor test which considers: (a) direct consumer

testimony; (b) consumer surveys; (c) exclusivity, length, and manner of use; (d) amount and

manner of advertising; (e) amount of sales and number of customers; (f) established place in the

market; and (g) proof of intentional copying.  *Tumblebus*, 399 F.3d at n.9 (citations omitted).

"No single factor is determinative and every one need not be proven."  *Herman Miller*, 270 F.3d

at 312.  However, the "evidentiary burden necessary to establish secondary meaning is

substantial."  *Burke-Parsons-Bowlby Corp. v. Appalachian Log Homes, Inc.*, 871 F.2d 590, 596

(6th Cir. 1989).  "Because the determination of whether a mark has acquired secondary meaning

is primarily an empirical inquiry, survey evidence is the most direct and persuasive evidence.

Survey evidence is not the only relevant evidence, however."  *Id.*

> Direct proof of secondary meaning is difficult to obtain.  Absent
> direct proof, the Court must draw reasonable inferences from
> evidence of long-term usage, from considerable effort and
> expenditure of money toward developing a reputation and good will
> for the trademark.  Sales volume, though relevant, is not necessarily
> sufficient to indicate recognition of the mark by purchasers as an
> indication of the source.  Advertising expense also is relevant but will
> not, standing alone, establish secondary meaning.  Where advertising
> expenditures are required to 'merely survive' in the competitive
> market, advertising expenditures cannot be used to prove secondary
> meaning.  However, extensive advertising which results in consumer
> association with a single source can establish secondary meaning.
> The duration of use of the mark can establish secondary meaning
> where the duration is more than a relatively short period.  In *WLWC
> Centers*, the Court determined that three years was insufficient to
> prove that the mark had acquired secondary meaning.

*Burke-Parsons*, 871 F.2d 590 (internal citations omitted).  Whether secondary meaning exists is a question of fact.  *Bristol-Myers Squibb Co. v. McNeil-P.P.C., Inc.*, 973 F.2d 1033, 1041 (2nd Cir. 1992).

To determine likelihood of confusion, the Court should consider:  (1) strength of the plaintiff's mark; (2) relatedness of the goods; (3) similarity of the marks; (4) evidence of actual confusion; (5) marketing channels used; (6) likely degree of purchaser care; (7) defendant's intent in selecting its mark; and (8) likelihood of expansion of the product lines.  *Tumblebus*, 399 F.3d 754.  "These factors imply no mathematical precision, but are simply a guide to help determine whether confusion is likely.  They are also interrelated in effect.  Each case presents its own complex set of circumstances and not all of these factors may be particularly helpful in any given case.  But a thorough and analytical treatment must nevertheless be attempted."  *Homeowners*, 931 F.2d at 1107.  Plaintiff need not show all or even most of the factors to be successful.  *Wynn Oil Co. v. Thomas*, 839 F.2d 1183, 1186 (6th Cir. 1988).  "[T]he general concept underlying likelihood of confusion is that the public believe that 'the mark's owner sponsored or otherwise approved of the use of the trademark.'"  *Id.*

The evidence establishes that plaintiff has never registered the number "5000" as a federal trademark or in any state.  Neither does plaintiff advertise the 5000 series of blenders with a trademark designation - *i.e.*, a "TM" symbol.  The number 5000 is never used alone but always in connection with the name "Vita-Mix."  Plaintiff uses the number in connection with its "Vita-Mix® 5000" product.  Plaintiff chose to use the number 5000 "with its new line of blenders ... to allow customers to recognize that it was a replacement and upgrade to the previous Vita-Mix 4500 blenders."  Plaintiff uses the number 5000 in connection with four of its blenders:  the

58

Vita-Mix 5000, Vita-Mix Super 5000, Vita-Mix Deluxe 5000 and Vita-Mix Ultimate 5000. Plaintiff has been using the number 5000 in commerce since 2001.  Recently, plaintiff has introduced a Vita-Mix 5200 blender.  The Vita-Mix 5000 blender has one of at least three different "model" or "item numbers" depending on the color of the base.  There is also a different item number for "reconditioned" Vita-Mix 5000 blenders.  Plaintiff's website refers to the products as the "5000 series."

The Vita-Mix 5000 blenders sell for $369 to $574 on plaintiff's website.  The average selling price of a Vita-Mix blender is currently $449 or $498 (plaintiff's expert provides the lower figure by taking sales that date back to 1993; defendants' expert relies only on more recent sales, resulting in a higher figure).  Sales of the Vita-Mix 5000 blender totaled approximately $346 million through June 2007.  Sales from April 2001 through December 2003 totaled approximately $80 million.  Plaintiff also sells its blenders via direct mail advertising, direct demonstrations and home shows.  Plaintiff also performs demonstrations at Costco and Sam's, but it does not place  its blenders on the retailers' shelves; all sales at such demonstrations are made directly to the consumer.  Plaintiff advertises its blender as performing "35 food tasks ... that no other machine can do."

Plaintiff's president and CEO declares that "Vita-Mix has long used four-digit numbers as trademarks to identify and distinguish its blender products."  He also declares without any support that "the 5000™ mark has become well-known nationwide and around the world, and the 5000™ mark is associated in the minds of consumers with blenders and related accessories manufactured or sold by or on behalf of Vita-Mix."  Finally, he states in conclusory fashion "Vita-Mix has been, and continues to be, harmed by the confusingly similar use of the 5000™

59

mark in connection with [defendants'] Blender Solutions 5000 product."

Defendants use the number 5000 to distinguish their Blender Solution 5000 from the Blender Solution 4000 and Blender Solution 5500.[35]  The only place the number 5000 appears on defendants' packaging is in small font on the bottom of the box next to the product's UPC bar code.  The number also appears on the owner's manual in the title "Blender Solution™ 5000" and to identify the blender on defendants' website.  Defendants' former vice president of product development Brian Beesley declares that defendants chose the designation "5000" because it was designed to have a suggested retail price ("MSRP") of $49.99 for this particular blender. Similarly, defendants' Blender Solution 4000 has an MSRP of $39.99 and the 5500 model has an MSRP of $54.99.  One of defendants' witnesses, Jeffrey Meek, considers the number 5000 "more as a part number than name."  He testified that the full name of defendants' product is the "Blender Solution 5000" and that the number 5000 serves to indicate to customers the difference between the 5000 model and other models such as the 4000 or the 5500.  Defendants sell through national retailers, department stores and some "mom and pop" hardware and houseware shops. Defendants also sell through the Internet and their own retail store; such direct sales account for less than 1% of all sales.  Defendants' advertise the blender as "Model # 5000 - Blender Solution 5000."  Amazon.com retails the blender for $62.99.  Defendants' average wholesale price on all blenders with a Stir Stick is $24.  Defendants' sales of the Blender Solution 5000 total

---

[35]

        Defendant Focus Products states it "has never made, used or sold the products accused of infringement."  Defendant West Bend states it "has never imported or sold a product bearing the number "5000." Nonetheless, both of these defendants join the motion for summary judgment of no trademark infringement.  Accordingly, all defendants will be treated collectively for purposes of deciding this motion.

approximately $2 million.  Profits on these sales were $646,856.

Thomas Daniels, one of defendants' witnesses, testified that he learned of plaintiff's Vita-Mix 5000 blender "after [he] was made aware of the one that had the wooden or the plastic, whatever it was, dowel and then dispenser valve."[36]  Other evidence, submitted in connection with the motions for summary judgment concerning patent infringement, establish that William Beesley III informed Mr. Daniels of plaintiff's blender with the "tamper" in 2005 or 2006.

In 2005, one of defendants' employees suggested a "head-to-head" comparison between the Vita-Mix Super 5000 and the Blender Solution 5000.  According to Jeffrey Meek, one of defendants' witnesses, the comparison was considered because "Vita-Mix, being very high end, if we compared to them, it would be a good marketing story that we could tell, because they were so high end and we were more entry.  ...  As we did with all of our competitors, we did a product comparison to educate our team.  And since there was such a discrepancy in price, point out if the results were comparable."  Defendants investigated and decided against such a comparison because plaintiff's blender was too expensive to purchase for such testing.[37]  Mr. Meek later clarified that he does not consider Vita-Mix a competitor "because of the price point

---

[36]
　　　　Mr. Daniels was also asked whether he first learned of the Vita-Mix 5000 before he filed his own patent application on the blender he invented while working for Back to Basics.  Mr. Daniels responded, "I don't recall.  ...  Possibly."  Mr. Daniels' patent application was filed in November 2001.  Defendants do admit they became aware of the '021 Patent in 2001.

[37]
　　　　In December 2005, defendants' Jeffrey Meek's in-laws purchased a Vita-Mix, told him they liked it and suggested that defendants "do something similar" to which he responded "we're not at the same price point.  We go after a different portion of the market."  He does not know which Vita-Mix blender his in-laws own.

61

variance."  None of defendants' customers has ever lodged a complaint indicating they purchased a Back to Basics blender when they thought they were purchasing a Vita-Mix instead.

The Court must first decide whether plaintiff *and* defendants use the number 5000 as a trademark.  *Rock & Roll Hall of Fame*, 134 F.3d at 753.  There is no evidence that defendants use the number 5000 as a trademark to indicate the origin of their Blender Solution.  In fact, the only evidence on this point is that defendants use the number as a model number or to indicate the suggested retail price for the Blender Solution.  Plaintiff does not even address this point in its opposition to defendants' motion.  Instead, plaintiff skips ahead to the next step in the analysis - whether the alleged mark is merely descriptive or not.  But, if the number 5000 is not used as a trademark by defendants, that is to identify their goods and indicate the source of those goods, then the Court need go no further.  *See Rock & Roll Hall of Fame*, 134 F.3d at 753.  The Court also notes that plaintiff's only evidence that Vita-Mix itself uses the number 5000 as a trademark is the self-serving testimony of its president and CEO.  All other evidence indicates that the number is used by plaintiff to designate between its own models of blenders and not to indicate that Vita-Mix is the source of the 5000 blender.[38]

For the same reason, plaintiff's remaining claims of deceptive trade practices under Ohio Rev. Code § 4165.02 and common law trademark and unfair competition claims must also fail. Each cause of action requires first that there be a trademark to infringe.  *See, e.g.*, Ohio Rev. Code § 4165.02 (violations all require some showing regarding the source of the goods - defendant must pass his goods off as those of another, create likelihood of confusion as to the

---

[38]  Plaintiff also fails to introduce any evidence that defendants' alleged "false designation [had] a substantial economic effect on interstate commerce."  *Johnson*, 149 F.3d at 502.

source of his goods or make a deceptive representation as to the source of his goods).  A

trademark is defined under Ohio law to be "a mark used by a person to identify goods and to

distinguish them from the goods of others."  Ohio Rev. Code § 4165.01.  Like the federal

definition relied upon above, Ohio's definition requires a trademark to identify the source of the

goods.  Neither plaintiff's nor defendants use the number 5000 as such.  Without a trademark,

plaintiff cannot prove trademark infringement.

Accordingly, defendants' motion for summary judgment of no trademark infringement is

granted.

**CONCLUSION**

For the foregoing reasons, defendant Focus Products' motion for summary judgment on

all claims is GRANTED.  Defendants' motion for summary judgment of no patent infringement

is GRANTED.  Plaintiff's cross-motion for summary judgment of patent infringement is

DENIED.  Defendants' motion to strike the expert report of Dr. Traylor is GRANTED.

Plaintiff's motion for leave to file a surreply is GRANTED.  Defendants' motion for leave to file

a surreply is DENIED.  Defendants' motion to limit patent infringement damages is MOOT.

Defendants' motion for summary judgment of patent invalidity is DENIED.  Plaintiff's motion

for summary judgment of no patent invalidity is GRANTED.  Plaintiff's motion to strike

defendants' infringement arguments made in connection with patent invalidity is GRANTED.

Defendants' motion for leave to file a surreply to plaintiff's motion to strike is DENIED.

Plaintiff's motion for summary judgment of no inequitable conduct is GRANTED.  Plaintiff's

motion for summary judgment on certain of defendants' affirmative defenses is GRANTED.

Plaintiff's motion for summary judgment of no unfair trade practices is GRANTED.

Defendants' motion for summary judgment of no trademark infringement is GRANTED.

IT IS SO ORDERED.

/s/ Patricia A. Gaughan
PATRICIA A. GAUGHAN
United States District Judge

Dated:  7/1/08